**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 25-5402**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

NATIONAL ASSOCIATION OF THE DEAF and DERRICK FORD,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**BRIEF FOR APPELLANTS**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

CHARLES W. SCARBOROUGH
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.    Parties and Amici

Plaintiffs are the National Association of the Deaf and Derrick Ford. Matthew Bonn was previously a plaintiff. Defendants are Donald J. Trump, in his official capacity as President of the United States; the Executive Office of the President; the White House Office; the Office of the Vice President; Susan Wiles, in her official capacity as White House Chief of Staff; and Karoline Leavitt, in her official capacity as Press Secretary to the President of the United States. No amici or intervenors participated in the district court.

## B.    Ruling Under Review

The ruling under review is a memorandum opinion and order (JA153-178) issued by the district court on November 4, 2025, granting a preliminary injunction.

## C.    Related Cases

This case has not previously been before this Court or any other court other than the district court. We are not aware of any pending related cases within the meaning of the Court's Rule 28(a)(1)(C).

/s/ Daniel Winik
Daniel Winik

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.................................................................................iv

GLOSSARY ............................................................................................ x

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION ................................................... 6

STATEMENT OF ISSUES ................................................................ 6

PERTINENT STATUTES AND REGULATIONS............................ 6

STATEMENT OF THE CASE........................................................... 6

    A.    Statutory And Regulatory Background ..........................................6

    B.    The Prior *NAD* Action .................................................................10

    C.    This Action.....................................................................................12

SUMMARY OF ARGUMENT ......................................................... 15

STANDARD OF REVIEW ............................................................... 17

ARGUMENT...................................................................................... 18

I.    Plaintiffs Lack A Cause Of Action To Enforce Section 504
Against The White House ........................................................... 18

    A.    Section 504 Does Not Imply A Private Right Of Action
Against Federal Programs..............................................................18

    B.    There Is No Implied Equitable Cause Of Action To
Enforce Section 504.......................................................................38

- ii -

II.    Plaintiffs Are Unlikely To Succeed On The Merits Of Their Section 504 Claim ........................................................................ 47

CONCLUSION ................................................................................ 57

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                  **Page(s)**

*Alexander v. Choate,*
469 U.S. 287 (1985) ......................................................................... 5, 48, 49, 55

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ............................................ 18, 20, 22, 28, 29, 33, 34

*American Council of the Blind v. Paulson,*
525 F.3d 1256 (D.C. Cir. 2008) ............................... 9, 34, 35, 49, 50, 51, 54, 56

*Armstrong v. Exceptional Child Center, Inc.,*
575 U.S. 320 (2015) ................................................... 38, 42, 42-43, 43

*Badgerow v. Walters,*
596 U.S. 1 (2022) ........................................................................... 21

*Bostock v. Clayton County,*
590 U.S. 644 (2020) ....................................................................... 52

*Cannon v. University of Chicago,*
441 U.S. 677 (1979) ....................................................................... 29

*Changji Esquel Textile Co. v. Raimondo,*
40 F.4th 716 (D.C. Cir. 2022) ......................................................... 40

*Clark v. Skinner,*
937 F.2d 123 (4th Cir. 1991) ..................................................... 23, 24

*Clevinger v. Advocacy Holdings, Inc.,*
134 F.4th 1230 (D.C. Cir. 2025) ..................................................... 17

*Cooper Industries, Inc. v. Aviall Services, Inc.,*
543 U.S. 157 (2004) ....................................................................... 34

*Correctional Services Corp. v. Malesko,*
534 U.S. 61 (2001) ......................................................................... 38

*Cousins v. Secretary of the U.S. Department of Transportation,*
880 F.2d 603 (1st Cir. 1989) ................................................................. 23, 24

*DCH Regional Medical Center v. Azar,*
925 F.3d 503 (D.C. Cir. 2019) ...............................................................41

*Doe v. Attorney Gen.,*
941 F.2d 780 (9th Cir. 1991) ............................................................ 24-25

*Doe A v. Spahn,*
2025 WL 1305360 (D.D.C. May 6, 2025)................................... 23, 24, 28, 36

*Federal Express Corp. v. U.S. Department of Commerce,*
39 F.4th 756 (D.C. Cir. 2022) ...............................................................40

*Filebark v. U.S. Department of Transportation,*
555 F.3d 1009 (D.C. Cir. 2009) .............................................................27

*Florida Health Sciences Center, Inc. v. Secretary of Health & Human Services,*
830 F.3d 515 (D.C. Cir. 2016) ...............................................................40

*Fornaro v. James,*
416 F.3d 63 (D.C. Cir. 2005) ................................................................27

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ...........................................................................26

*Global Health Council v. Trump,*
153 F.4th 1 (D.C. Cir. 2025) .................................................................41

*Gonzaga University v. Doe,*
536 U.S. 273 (2002) ...........................................................................28

*Grosdidier v. Chairman, Broadcasting Board of Governors,*
560 F.3d 495 (D.C. Cir. 2009) ...............................................................27

*Gross v. FBL Financial Services, Inc.,*
557 U.S. 167 (2009) ...........................................................................21

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
527 U.S. 308 (1999) ..................................................................39

*Harrison v. Rubin,*
174 F.3d 249 (D.C. Cir. 1999) ...............................................50

*J.L. v. Social Security Administration,*
971 F.2d 260 (9th Cir. 1992) ...................................... 25, 37

*Lane v. Peña,*
518 U.S. 187 (1996) ................................................................35

*Leedom v. Kyne,*
358 U.S. 184 (1958) ................................................................39

*Mathis v. U.S. Parole Commission,*
749 F. Supp. 3d 8 (D.D.C. 2024) ...................... 23, 24, 28, 29, 45, 46

*Mayfield v. City of Mesa,*
131 F.4th 1100 (9th Cir. 2025) .................................... 49, 54

*McQuiggin v. Perkins,*
569 U.S. 383 (2013) ...................................................... 43, 44

*Medina v. Planned Parenthood South Atlantic,*
606 U.S. 357 (2025) ...................................................... 18, 26

*Moya v. DHS,*
975 F.3d 120 (2d Cir. 2020)............................................ 23, 24

*National Association of the Deaf v. Harvard University,*
377 F. Supp. 3d 49 (D. Mass. 2019) ....................................50

*National Association of the Deaf v. Netflix, Inc.,*
869 F. Supp. 2d 196 (D. Mass. 2012) ...................................50

*National Association of the Deaf v. Trump,*
486 F. Supp. 3d 45 (D.D.C. 2020) ............................ 11, 27, 28, 53

*National Association of the Deaf v. Trump*,
2020 WL 5757463 (D.D.C. Sept. 23, 2020) ......................................................11

*Nuclear Regulatory Commission v. Texas*,
605 U.S. 665 (2025) ........................................................... 3, 39

*Nyunt v. Chairman, Broadcasting Board of Governors*,
589 F.3d 445 (D.C. Cir. 2009) ..................................... 27, 40, 41

*Ryan v. Federal Deposit Insurance Corp.*,
565 F.2d 762 (D.C. Cir. 1977) ..................................................31

*Sai v. DHS*,
149 F. Supp. 3d 99 (D.D.C. 2015) .......................... 23, 24, 29

*Seminole Tribe of Florida v. Florida*,
517 U.S. 44 (1996) ...................................................... 44, 45

*Soucie v. David*,
448 F.2d 1067 (D.C. Cir. 1971) ...............................................26

*Southeastern Community College v. Davis*,
442 U.S. 397 (1979) ................................................................48

*Steel Co. v. Citizens for a Better Environment*,
523 U.S. 83 (1998) ...................................................................34

*Universities Research Association v. Coutu*,
450 U.S. 754 (1981) ................................................................22

*Verizon Maryland, Inc. v. Public Service Commission of Maryland*,
535 U.S. 635 (2002) ................................................................44

*Winter v. NRDC*,
555 U.S. 7 (2008) ............................................................. 15-16

*Wright v. New York State Department of Corrections*,
831 F.3d 64 (2d Cir. 2016)......................................................49

*Yelapi v. DeSantis*,
  487 F. Supp. 3d 1278 (N.D. Fla. 2020) ...........................................................50

*Young, Ex parte*,
  209 U.S. 123 (1908) .........................................................................................44

**Statutes:**

Rehabilitation Act of 1973,
  Pub. L. No. 93-112, 87 Stat. 355 ......................................................................6
    § 504, 87 Stat. at 394....................................................................... 7, 19

Rehabilitation, Comprehensive Services, and Developmental Disabilities
  Amendments of 1978, Pub. L. No. 95-602, 92 Stat. 2955 ...............................6
    tit. I, § 119(2), 92 Stat. at 2982 (codified at 29 U.S.C. § 794(a)) ..................7
    tit. I, § 120(a), 92 Stat. at 2982-2983 (codified at 29 U.S.C. § 794a)............8

5 U.S.C. § 702.................................................................................................22

28 U.S.C. § 1292(a)(1) ......................................................................................6

29 U.S.C. § 791.......................................................................................... 8, 20

29 U.S.C. § 794(a) .....................2, 4, 7, 16, 21, 22, 29, 33, 42, 46, 47, 48, 51, 52, 54

29 U.S.C. § 794a.......................................................................................... 8, 20

29 U.S.C. § 794a(a) .........................................................................................42

29 U.S.C. § 794a(a)(2) .................................................................................. 8, 31

29 U.S.C. § 794a(b)...................................................................................... 8, 33

42 U.S.C. § 2000e-5(f) .....................................................................................20

42 U.S.C. § 2000e-16(c).....................................................................................20

**Regulations:**

3 C.F.R. pt. 102 ...................................................................................9

3 C.F.R. § 102.103 ...............................................................................9

3 C.F.R. § 102.149 ...............................................................................9

3 C.F.R. § 102.150(a) ..........................................................................9

3 C.F.R. § 102.150(a)(3) ......................................................................9

3 C.F.R. § 102.160(a) ........................................................................10

3 C.F.R. § 102.160(d) ........................................................................10

3 C.F.R. § 120.170 .............................................................................10

3 C.F.R. § 120.170(g)-(h) ..................................................................10

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ..................................................................6

**Other Authorities:**

*Carry*, Oxford English Dictionary (online ed. rev. 2025),
   https://doi.org/10.1093/OED/1003574638 ........................................ 21-22

Order, *National Association of the Deaf v. Biden*,
   No. 20-5349 (D.C. Cir. Mar. 22, 2021)..............................................12

Order, *Powers v. Collins*,
   No. 24-6576 (9th Cir. Mar. 3, 2026) .................................................25

## GLOSSARY

ADA                     Americans with Disabilities Act

APA                     Administrative Procedure Act

ASL                     American Sign Language

EOP                     Executive Office of the President

NAD                     National Association of the Deaf

## INTRODUCTION

Since the advent of television, communications by the President, members of his Administration, and his Press Secretary have been widely disseminated through that medium. Until 2021, those communications were never routinely accompanied by American Sign Language (ASL) interpretation. In this case, however, the district court held that Section 504 of the Rehabilitation Act—which has been applicable to the White House and federal agencies since 1978—compels the White House to provide ASL interpretation in a video feed for "all publicly announced White House press briefings conducted by the President or White House Press Secretary that are captured by White House communication channels." JA185.

This Court should reverse for two reasons. *First*, there is no private right of action to enforce Section 504 against federal programs. That is clear from the text, structure, and history of the Rehabilitation Act. When Congress expanded the scope of Section 504 to include federal programs, it simultaneously enacted a remedial provision that provided express rights of action for *other* Rehabilitation Act violations, but not for a Section 504 claim against federal programs. That would alone suffice to show that Congress did not mean to create a right of action in this circumstance. But there is

more: Congress specified the extension of Section 504 to federal programs was to be "carr[ied] out" through regulations promulgated by agencies. 29 U.S.C. § 794(a). Agencies regularly entertain Section 504 complaints under those regulations, and for agencies that are covered by the Administrative Procedure Act (APA), the APA supplies a means for judicial review of the adjudication of such complaints.

For that reason, nearly every court of appeals to have addressed the issue has held that Section 504 can be enforced against federal programs only through administrative proceedings, with judicial review available under the APA, and not through an implied right of action in federal court. And even the one outlier, the Ninth Circuit, has recognized that Congress meant for agencies to take the primary role in ensuring their compliance with Section 504. Most of the district judges to have addressed the issue in this Circuit have likewise agreed with the near-consensus among the courts of appeals. Tellingly, the district court here did not cite—much less address—*any* of the decisions rejecting its view of the law.

The district court may have been motivated to recognize an implied right of action because the defendants here—White House officials and entities—are not covered by the APA. But the unavailability of the APA

pathway to enforce Section 504 against the White House is no basis to conclude that Section 504 affords a private right of action to do so. Congress chose to provide some pathways, and not others, for judicial enforcement of Section 504 against federal programs. It is not the courts' role to provide a remedy that Congress omitted.

Nor can plaintiffs circumvent the absence of an express or implied cause of action under Section 504 by invoking an implied equitable cause of action. When such claims assert statutory as opposed to constitutional violations, they are subject to a stringent standard, requiring a showing that the defendant "agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (emphasis omitted). Regardless of whether Section 504 can reasonably be understood to require what the district court ordered here, it certainly does not contain any "'specific'" mandate to that effect, *id.* The White House's continuation of a practice pursued by Presidents of both parties—during the entire 47-year period since Congress subjected federal programs to Section 504, except for the four-year duration of the last Administration—is not remotely the sort of flagrant illegality that can, in rare circumstances, justify extrastatutory relief.

*Second*, even if plaintiffs have a cause of action, they failed to establish a likelihood of success on the merits of their Section 504 claim. Section 504 does not require the White House to provide ASL interpretation when real-time closed captioning and after-the-fact transcripts are available.

The district court based its contrary conclusion on a sweeping rationale: that written communications of any sort are insufficient to provide access to the "many deaf" Americans who "use ASL to communicate and have limited to no proficiency in English." JA170-171. But even if that rationale were supported as a factual matter, it was faulty as a legal matter because Section 504 applies only where a person with a disability faces exclusion or discrimination "solely by reason of" that disability. 29 U.S.C. § 794(a). The district court did not purport to find that deaf Americans who find it difficult to read written English face that difficulty "solely by reason of" their hearing disability. The record would not support such a finding. And that is unsurprising, because many deaf Americans do comprehend written English—as evidenced by the fact that closed captioning is the most routine form of accommodation for video communications. Indeed, plaintiff National Association of the Deaf has itself filed multiple lawsuits requesting closed captioning (rather than ASL interpretation) as an accommodation.

The district court's reasoning was also unsupported as a factual matter. The district court determined that closed captioning and transcripts are insufficient to provide the "meaningful access" that Section 504 requires, but the record evidence on that point relates largely to the efficacy of closed captioning for real-time comprehension—not to the efficacy of transcripts for slightly delayed comprehension. The district court did not grapple with that distinction or attempt to explain why real-time comprehension is essential to provide "meaningful access" to routine White House press briefings.

The district court's sweeping rationale would have extraordinary ramifications. The vast majority of governmental communications take place in writing. The district court's logic would seem to suggest that agencies are compelled to record video ASL translations of all of them. That would defy the Supreme Court's admonition that courts construing the Rehabilitation Act must bear in mind not just "the need to give effect to the statutory objectives" but the "countervailing" imperative of "keep[ing Section] 504 within manageable bounds." *Alexander v. Choate*, 469 U.S. 287, 299 (1985).

We therefore respectfully request that this Court reverse the district court's order.

## STATEMENT OF JURISDICTION

The district court issued a preliminary injunction on November 4, 2025. JA153-178. The government filed a timely notice of appeal on November 7. JA179-180; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

1. Whether plaintiffs have an implied cause of action to enforce Section 504 of the Rehabilitation Act against defendants.

2. Whether plaintiffs demonstrated a likelihood of success on their claim that the Rehabilitation Act requires the White House to provide ASL interpretation for all press briefings.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Statutory And Regulatory Background

1. This case turns on the construction of the Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 355, as amended by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. No. 95-602, 92 Stat. 2955 (1978 Act).

As originally enacted in 1973, Section 504 of the Rehabilitation Act provided that "[n]o otherwise qualified handicapped individual in the United States … shall, solely by reason of his handicap, be excluded from … participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  Pub. L. No. 93-112, § 504, 87 Stat. at 394.  That prohibition did not apply to the federal government itself—only to federally funded private entities.

In the 1978 amendments, Congress revised the Act in three significant ways.  *First*, Congress expanded the substantive protections of Section 504 to reach "any program or activity conducted by any Executive agency," as opposed to only those receiving federal financial assistance.  1978 Act, tit. I, § 119(2), 92 Stat. at 2982 (codified at 29 U.S.C. § 794(a)).

*Second*, Congress directed "[t]he head of each such agency" to "promulgate such regulations as may be necessary to carry out" that amendment. 1978 Act, tit. I, § 119(2), 92 Stat. at 2982 (codified at 29 U.S.C. § 794(a)).  Congress directed that the "proposed regulation[s]" be submitted to the relevant congressional committees and that they "take effect no earlier than the thirtieth day" after those submissions.  *Id.*

*Third*, Congress added a new "Remedies and Attorneys' Fees" provision as Section 505 of the Rehabilitation Act. *Id.* § 120(a), 92 Stat. at 2982-2983 (codified at 29 U.S.C. § 794a). Section 505 provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964" are "available to any person aggrieved by any" Section 504 violation by a "recipient of Federal assistance or Federal provider of such assistance." 29 U.S.C. § 794a(a)(2). It says nothing about what rights, procedures, or remedies are available to persons aggrieved by Section 504 violations by a federal agency in its programmatic capacity (as opposed to its funding capacity). By contrast, Section 505 *does* address suits against federal agencies under a different provision of the Rehabilitation Act: Section 501 (codified at 29 U.S.C. § 791), which forbids employment discrimination by federal agencies. Section 505 further provides that attorney's fees are available "[i]n any action or proceeding to enforce or charge a violation of a provision of this subchapter." *Id.* § 794a(b).

2. Following the enactment of the 1978 Act, agencies of the Executive Branch issued the prescribed regulations to implement Section 504 as to their particular programs and activities.

Relevant here are regulations issued by the Office of Administration within the Executive Office of the President (EOP). 3 C.F.R. pt. 102. Those regulations encompass the activities of various EOP entities, which they define for this purpose (and only this purpose) as "[a]genc[ies]." *Id.* § 102.103.

Consistent with Section 504, the regulations generally provide that EOP "shall operate each" of its "program[s] or activit[ies] so that the program or activity, when viewed in its entirety, is readily accessible to and usable by individuals with handicaps." *Id.* § 102.150(a). That requirement is subject to the exception that EOP need not "take any action that it can demonstrate would result in a fundamental alteration in the nature of a program or activity or in undue financial and administrative burdens." *Id.* § 102.150(a)(3); *see id.* § 102.149 (general accessibility requirement is subject to the exceptions "provided in § 102.150"). That exception, like the basic mandate for accessibility, is consistent with judicial interpretations of Section 504. *See, e.g., American Council of the Blind v. Paulson*, 525 F.3d 1256, 1267-1268 (D.C. Cir. 2008) (Section 504 does not require "a fundamental alteration to [an] existing program" as opposed to "meaningful access" to that program as it exists).

The regulations further specify that EOP "shall take appropriate steps to ensure effective communication with … members of the public." 3 C.F.R. § 102.160(a). Like the general accessibility requirement, however, that requirement "does not require [EOP] to take any action that it can demonstrate would result in a fundamental alteration in the nature of a program or activity or in undue financial and administrative burdens." *Id.* § 102.160(d). If an otherwise required action "would result in such an alteration or such burdens," the regulations provide that EOP "shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with handicaps receive the benefits and services of the program or activity." *Id.*

Finally, the regulations set forth a process for the filing and adjudication of administrative complaints. *Id.* § 120.170. As a general matter, complaints must be adjudicated in writing within 180 days, and unsuccessful complainants may file an administrative appeal. *Id.* § 120.170(g)-(h).

### B. The Prior *NAD* Action

In 2020, during the emergency phase of the global COVID-19 pandemic, the National Association of the Deaf (NAD) and five deaf individuals brought a narrow suit alleging that the White House was violating Section

504 by not providing "in-frame ASL interpretation" for COVID-related briefings. *National Ass'n of the Deaf v. Trump* (*NAD I*), 486 F. Supp. 3d 45, 48 (D.D.C. 2020) (Boasberg, J.). The district court concluded that the plaintiffs were entitled to preliminary relief, *id.*, and entered a preliminary injunction requiring that an ASL interpreter be "include[d] … in the" White House video "feed for all White House coronavirus briefings," *National Ass'n of the Deaf v. Trump*, 2020 WL 5757463, at *1 (D.D.C. Sept. 23, 2020). In doing so, the court commented that "[c]losed captioning and transcripts may constitute a reasonable accommodation" for deaf people "under some circumstances," but it did not find those accommodations sufficient for the COVID-related information at issue, in light of the rapidly evolving circumstances in which that information was urgently relevant to health and safety. *NAD I*, 486 F. Supp. 3d at 58. The White House complied with that injunction while filing an appeal before this Court (No. 20-5349).

In April 2021, after President Biden took office, his Administration issued a memorandum specifying that EOP would provide ASL interpretation for certain White House briefings. JA65-66. On the basis of that policy change, the plaintiffs in the prior litigation entered into a settlement agreement with the government (JA62), and the government dismissed its appeal

to this Court.  Order, *National Ass'n of the Deaf v. Biden*, No. 20-5349 (D.C. Cir. Mar. 22, 2021) (granting dismissal).

### C. This Action

1. After President Trump began his second term, EOP returned to the pre-2021 policy of not generally providing ASL interpretation for press briefings.  Instead, closed captioning is available for such briefings, both through television networks that carry them and through online video platforms that stream them live or allow them to be viewed after the fact.  After-the-fact transcripts of briefings are also commonly publicly available.

In late May 2025, NAD and two individuals—Derrick Ford and Matthew Bonn—brought this action alleging, among other things, that Section 504 requires EOP to provide ASL interpretation for public briefings.  Plaintiffs moved for a preliminary injunction.  The government opposed a preliminary injunction on several grounds, including that Section 504 does not afford a right of action against federal programs and that closed captioning and transcripts provide the meaningful access that Section 504 requires. While the preliminary-injunction motion was pending, Mr. Bonn dismissed his claim, leaving NAD and Mr. Ford as the only two plaintiffs.  JA151-152.

2. The district court entered a preliminary injunction.  JA153-178.

As an initial matter, the district court concluded that Section 504 implies a private cause of action to enforce its terms against federal programs. The court based that conclusion on the fact that Section 504 uses phrasing—"'no person … shall be subjected to discrimination'"—that the Supreme Court has construed, in decades-old cases involving other statutes, to imply a private right of action. JA162-163. The court was unmoved by the fact that Section 505, which expressly prescribes the means by which plaintiffs can assert *other* types of Rehabilitation Act violations in suits in federal court, is silent about Section 504 claims against federal programs, even though Section 505 was enacted at the same time as Section 504 was extended to cover federal programs. *See* JA165-167.

The district court further concluded that, even if Section 504 does not imply a private right of action against federal programs, plaintiffs can still invoke "a court's 'inherent equitable power to enjoin the Government from violating the Rehabilitation Act.'" JA168. The court rejected the idea that the Rehabilitation Act's existing framework for judicial review of certain claims, through certain pathways, constitutes a "'detailed and exclusive remedial scheme'" of the sort that forecloses an implied equitable cause of action. JA168-169.

The district court next determined that plaintiffs are likely to succeed on the merits of their claim that the White House violates Section 504 by not providing ASL interpretation for press briefings. The court reasoned that plaintiff "Ford and many deaf NAD members use ASL to communicate and have limited to no proficiency in English," and that it cannot be a reasonable accommodation "to transcribe press briefings into a language that Ford and many NAD members do not know." JA170-171. And the court concluded that the provision of ASL interpretation for press briefings would not constitute a "'fundamental alteration'" of briefings, of the sort that the Rehabilitation Act does not require. JA171-172.

Finally, the district court concluded that plaintiffs would be irreparably harmed by the denial of a preliminary injunction, on the view that they "are not able to receive information conveyed at White House press briefings" absent ASL interpretation. JA173-174. And the court found no countervailing harm to the government in the balance of equities.

The district court ordered that "[t]he [EOP], White House Office, White House Chief of Staff, and White House Press Secretary shall immediately begin providing a simultaneous and publicly accessible feed with visible [ASL] interpretation by a qualified interpreter for all publicly announced

- 14 -

White House press briefings conducted by the President or White House Press Secretary that are captured by White House communication channels." JA177.

The government then filed a notice of compliance explaining how it interpreted the injunction. The district court construed that notice as a motion to clarify and entered an order granting the motion. JA181-185. As clarified, the injunction requires the White House to "take all reasonable steps to provide a simultaneous and publicly accessible" ASL feed, as opposed to flatly ordering that it provide the feed. JA185 (emphasis omitted). And the district court explained that the phrase "'press briefings' includes (1) events that the White House publicly announces as press briefings or press conferences; and (2) events for which the enjoined defendants have knowledge that the President or Press Secretary plans to provide information to the press or take questions from the press." *Id.* (emphasis omitted).

## SUMMARY OF ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7,

20 (2008). This Court should reverse because plaintiffs failed to establish a likelihood of success on the merits for two reasons.

*First*, plaintiffs lack a cause of action. As nearly every court of appeals to address the issue has held, the Rehabilitation Act's text, structure, and history make clear that it does not afford a private right of action to enforce Section 504 against federal programs. Rather, Section 504 complaints against federal programs can be pursued through the administrative process, with subsequent judicial review, to the extent available, under the APA.

Plaintiffs cannot circumvent the absence of a private right of action under Section 504 by invoking an implied equitable cause of action. The Supreme Court has stringently limited the availability of extrastatutory equitable review, and this case falls well outside the doctrine's limited scope.

*Second*, plaintiffs have failed to establish a likelihood of success on their claim that Section 504 requires the provision of real-time ASL interpretation even where closed captioning and transcripts are available. Plaintiffs failed to establish that any difficulty they might face in reading written English is "solely by reason of" their hearing disability, 29 U.S.C. § 794(a). And even assuming plaintiffs satisfied that requirement, and showed that closed captioning is imperfect for real-time comprehension, the district court failed to

explain why real-time comprehension—rather than slightly delayed comprehension through closed captioning or transcripts—is necessary for access to White House press briefings to be "meaningful" in this context. Instead, the court made a broad pronouncement that written communications of any sort are insufficient to provide access to the "many deaf" Americans who "use ASL to communicate and have limited to no proficiency in English." JA170-171. If that reasoning were sound, then governments at every level would have to translate not just all oral communications but also written communications into ASL. The Supreme Court has cautioned against reading Section 504 to require just that sort of wholesale transformation of how the government functions.

## STANDARD OF REVIEW

This Court reviews de novo "a district court's legal conclusions" in a preliminary-injunction ruling. *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1233 (D.C. Cir. 2025). It "review[s] any weighing of the preliminary injunction factors for abuse of discretion." *Id.* It "accept[s] a district court's factual findings unless they are clearly erroneous." *Id.* at 1234.

ARGUMENT

**I.     Plaintiffs Lack A Cause Of Action To Enforce Section 504 Against The White House**

      **A.     Section 504 Does Not Imply A Private Right Of Action Against Federal Programs**

      1.     As the Supreme Court explained in *Alexander v. Sandoval*, 532 U.S. 275 (2001), on which the district court relied heavily, "private rights of action to enforce federal law"—just "[l]ike substantive federal law itself"— "must be created by Congress." *Id.* at 286.  Not all statutes "create individual rights," as opposed to regulatory prohibitions to be enforced by the government. *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 367-368 (2025).  And even where statutes create individual rights, "[t]he judicial task" when a private litigant asserts those rights "is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy"—a right of action allowing the litigant to enforce her right in federal court. *Sandoval*, 532 U.S. at 286.

      For some statutes, the question whether they imply a private right of action may be close.  For Section 504, it is not.  The Rehabilitation Act's text, structure, and history make clear that Section 504—even assuming it

- 18 -

provides for an individual right—does not provide a private right of action against federal agencies in their programmatic capacities.

As originally enacted, Section 504 did not apply to programs or activities conducted by federal agencies—only to those "receiving Federal financial assistance." Pub. L. No. 93-112, § 504, 87 Stat. at 394. The operative language of that original statute—providing that "[n]o otherwise qualified handicapped individual in the United States … shall, solely by reason of his handicap, be … subjected to discrimination" by covered programs or activities, *id.*—may have created an individual right to be free from discrimination in the covered programs and activities. But that language could not imply an individual right to be free from discrimination in federal programs, much less a private remedy against federal programs, because the statute did not yet cover federal programs.

When Congress amended the Rehabilitation Act in 1978 to extend coverage to federal programs, it simultaneously did two things that make clear it was not creating a private right of action against federal programs, even if it was creating an individual right to be free from discrimination in federal programs.

*First*, it enacted a remedial provision as Section 505, 29 U.S.C. § 794a. That provision expressly allows persons aggrieved by two types of Rehabilitation Act violations to sue in federal court. Under § 794a(a)(2), persons aggrieved by a Section 504 violation committed "by any recipient of Federal assistance or Federal provider of such assistance" can invoke "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964," which the Supreme Court had previously held provides a private right of action, *see Sandoval*, 532 U.S. at 288. And under § 794(a)(1), persons aggrieved by a violation of Section 501 of the Act, 29 U.S.C. § 791—which forbids federal agencies from engaging in employment discrimination on the basis of disability—can invoke "[t]he remedies, procedures, and rights set forth in" Title VII of the Civil Rights Act. That framework likewise provides a pathway to federal court for plaintiffs who have first exhausted the Equal Employment Opportunity Commission's administrative complaint process. *See* 42 U.S.C. § 2000e-5(f); *id.* § 2000e-16(c).

For present purposes, however, Section 505 is most notable for what it does *not* provide: any express right of action for a violation of Section 504 by a federal agency in its programmatic capacity. And Congress's decision to provide a right of action for Section 501 violations by federal agencies, and

Section 504 violations by federal funding recipients, is most naturally read to exclude a right of action for Section 504 violations by federal programs. That is doubly true because Congress was adding federal programs to the scope of Section 504 at the very same time it was omitting Section 504 violations by federal programs from the scope of Section 505. "'[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act,' [courts] generally take the choice to be deliberate." *Badgerow v. Walters*, 596 U.S. 1, 11 (2022). And "'negative implications raised by disparate provisions are strongest'" where, as here, "the provisions were 'considered simultaneously when the language raising the implication was inserted.'" *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009).

*Second*, Congress was not merely silent on the question of how it expected Section 504 to be enforced against federal programs. Rather, in amending Section 504 to apply to federal programs, Congress instructed agency heads to "promulgate such regulations as may be necessary to carry out" that and other "amendments" to Section 504 made by the 1978 Act. 29 U.S.C. § 794(a). The phrase "to carry out," as relevant here, means "to put … into action or practice," "to cause … to be implemented," or "to undertake." *Carry*, Oxford English Dictionary (online ed. rev. 2025), https://doi.

org/10.1093/OED/1003574638.  Congress's direction for agencies to issue regulations to "carry out" the 1978 amendments thus makes clear that it meant for Section 504 to be "implemented" and "put … into action" against agencies through an administrative process in the first instance.  That confirms what Congress already made clear by omitting federal programs' Section 504 violations from the scope of the express rights of action otherwise provided by Section 505—namely, that Congress did not envision a private right of action as the means of enforcing Section 504.  *See Universities Rsch. Ass'n v. Coutu*, 450 U.S. 754, 772–773 (1981) (language of statute "'phrased as a directive to federal agencies' … provide[d] no support for the implication of a private remedy"); *Sandoval*, 532 U.S. at 289 (similar).

Importantly, in providing for agencies to "carry out" the enforcement of Section 504 against their programs, 29 U.S.C. § 794(a), Congress did not foreclose judicial enforcement.  Rather, Congress was legislating against the backdrop of the APA, which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  Congress thus envisioned that if a person complained to an agency that it was violating Section 504, and the agency

rejected the person's complaint, the person could then sue the agency in federal court under the APA to the same extent as with any other action by that agency. But the cause of action in federal court would be under the APA, not Section 504 itself.

2. Given these features of the 1978 Act, it is unsurprising that all but one of the four courts of appeals to have considered the question, and three of the five district judges to have considered it within this Circuit, have concluded that Section 504 does not afford a private right of action against federal programs. *See Moya v. DHS*, 975 F.3d 120, 127-128 (2d Cir. 2020); *Clark v. Skinner*, 937 F.2d 123, 125 (4th Cir. 1991); *Cousins v. Secretary of the U.S. Dep't of Transp.*, 880 F.2d 603, 605-611 (1st Cir. 1989) (en banc) (Breyer, J.); *Doe A v. Spahn*, 2025 WL 1305360, at *4 (D.D.C. May 6, 2025) (Nichols, J.); *Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8, 17-22 (D.D.C. 2024) (McFadden, J.); *Sai v. DHS*, 149 F. Supp. 3d 99, 111-115 (D.D.C. 2015) (Moss, J.).

These six decisions, written and joined (in relevant part) by a total of 14 federal judges with a wide range of interpretive philosophies, are compelling in their logic. They recognize that "'[i]mplied rights of action are disfavored, and will not be found in the absence of clear evidence of legislative intent.'" *Moya*, 975 F.3d at 128; *see Sai*, 149 F. Supp. 3d at 113. They note

that Congress's choice to provide express rights of action for certain types of Rehabilitation Act violations—while specifying regulations as the means of carrying out the extension of Section 504 to cover federal programs—fore-closes any inference that Congress impliedly meant to allow direct judicial enforcement of Section 504 against federal programs. *See Moya*, 975 F.3d at 128; *Mathis*, 749 F. Supp. 3d at 19; *Doe A*, 2025 WL 1305360, at \*4; *Sai*, 149 F. Supp. 3d at 113. And they uniformly observe that the APA affords a path-way for enforcing Section 504, through judicial review of agency actions on administrative complaints, against agencies that are covered by the APA. *See Moya*, 975 F.3d at 128; *Cousins*, 880 F.2d at 605-606; *Clark*, 937 F.2d at 125-126; *Doe A*, 2025 WL 1305360, at \*5; *Mathis*, 749 F. Supp. 3d at 22; *Sai*, 149 F. Supp. 3d at 113-114. As Judge Moss explained in *Sai*, "Congress unambigu-ously intended to create a right to be free from disability discrimination in federal programs and activities," but "it is easy to imagine why Congress would not have created a private cause of action to enforce Section 504 against federal agencies: it knew that review would be available under the APA." 149 F. Supp. 3d at 113.

The only appellate court to have reached a different conclusion is the Ninth Circuit, in a decision a decade before *Sandoval*. *See Doe v. Attorney*

- 24 -

*General*, 941 F.2d 780, 794 (9th Cir. 1991), *abrogated on other grounds by Lane v. Peña*, 518 U.S. 187 (1996). But even the Ninth Circuit has expressly recognized that, by directing agencies to promulgate regulations implementing the expansion of Section 504 to federal programs, Congress made clear that "agencies themselves should take primary responsibility for compliance" with Section 504. *J.L. v. Social Sec. Admin.*, 971 F.2d 260, 265 (9th Cir. 1992), *abrogated on other grounds by Lane*, 518 U.S. 187. And the Ninth Circuit has accordingly required that certain Section 504 claims be administratively exhausted before being brought in federal court. *See id.* at 265-272. We note that the government has recently filed a petition for rehearing en banc asking the Ninth Circuit to overrule its aberrational recognition of a private right of action, Petition for Rehearing En Banc, *Powers v. Collins*, No. 24-6576 (9th Cir. Feb. 6, 2026), and the Ninth Circuit has ordered a response to that petition, Order, *Powers* (9th Cir. Mar. 3, 2026).

3. The only contrary decisions by district judges in this Circuit have come in this case and in its prior iteration. These outlier rulings may have been influenced by a consideration unique to the White House: that the ordinary APA pathway for enforcing Section 504 is unavailable because the White House and its associated offices—at least those lacking "substantial

independent authority," *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971)—are not "agencies" within the meaning of the APA, *see Franklin v. Massachusetts*, 505 U.S. 788, 800-801 (1992).

But the unavailability of the APA pathway for enforcing Section 504 against the White House is no basis to conclude that Section 504 affords a private right of action to do so. Although "there was a time in the mid-20th century when" federal courts "'assumed it to be a proper judicial function to provide' whatever 'remedies' [they] deemed 'necessary to make effective a statute's purpose,'" the Supreme Court has long since disavowed that approach, in favor of the understanding that "no statute pursues any single 'purpos[e] at all costs'" and that, "often enough, Congress may 'not wish to pursue [a] provision's purpose to the extent of authorizing private suits'" to enforce it. *Medina*, 606 U.S. at 368-369. Here, Congress deliberately chose to allow private suits enforcing Section 504 against some entities, but not against federal agencies in their programmatic capacities. And although Congress allowed for judicial review of agencies' resolution of administrative complaints, that pathway to enforce Section 504 is available only against agencies covered by the APA. It is not the courts' role to provide a remedy that Congress omitted.

This Court's Civil Service Reform Act (CSRA) cases are instructive in this regard.   As this Court has recognized, the CSRA framework—governing the "review and resolution of federal employment disputes"—reflects congressional choices both to "provid[e]" and to "not provid[e]" "particular forums and procedures for particular kinds of claims." *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009).  Time and again, the Court has recognized that the CSRA framework is comprehensive and exclusive even where it "provides no judicial relief" to a particular class of litigants. *Id.*; *see, e.g.*, *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009); *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009).  As then-Judge Roberts wrote for the Court in one such case, "what you get under the CSRA is what you get." *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005).  These cases reflect the error of the district court's approach here and in *NAD I*, 486 F. Supp. 3d 45 (D.D.C. 2020)—an approach that strains statutory text and structure past the breaking point to avoid enforcing the limits of the remedy that Congress created.

Neither the district court here nor the district court in *NAD I* gave any compelling reason to depart from how most courts have understood the text, history, and structure of the Rehabilitation Act.  Start with *NAD I*.  There,

Judge Boasberg analyzed Section 504 essentially in isolation from Section 505, concluding that its "rights-creating language" implied a private right of action. *Id.* at 53-54. But as discussed above, "even where a statute is phrased in such explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private *right* but also a private *remedy*.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (quoting *Sandoval*, 532 U.S. at 286). And as Judges McFadden and Nichols explained in their subsequent opinions, Judge Boasberg's opinion improperly "looks past" the "right-remedy disparity in Sections 504 and 505," on which Judge Moss's opinion in *Sai* had correctly focused. *Mathis*, 749 F. Supp. 3d at 22; *see Doe A*, 2025 WL 1305360, at *4 (explaining that while Section 504 "read in a vacuum" could "well create a presumption of a private right of action," "the rest of the statute is inconsistent with that position").

Judge Boasberg's opinion also distinguished certain of the contrary decisions, like *Cousins* and *Clark*, on the theory that they "dealt with Executive agencies' acting as a regulator, as opposed to in a substantive capacity." *NAD I*, 486 F. Supp. 3d at 56 (emphasis omitted). But both Judge Moss and Judge McFadden have explained why that is a distinction without a difference. "[I]t lacks any footing in the statutory text" and "is also highly

malleable: Any 'regulatory' violation could be reframed as a 'substantive' violation, and vice versa." *Mathis*, 749 F. Supp. 3d at 21; *see Sai*, 149 F. Supp. 3d at 115.

Unlike Judge Boasberg's opinion in the prior case, Judge Ali's opinion in this case did not even acknowledge, much less attempt to distinguish, the significant body of case law reaching a contrary conclusion. The opinion never once cites *Moya*, *Cousins*, *Clark*, *Doe A*, or *Sai*, and it cites *Mathis* only as to the availability of an implied equitable cause of action (discussed below). The district court's failure to engage with *any* of the contrary authorities — all of which the government had cited in opposing a preliminary injunction — speaks volumes about the lack of rigor of its analysis.

The district court's first-principles analysis reflects the same lack of rigor. The court placed heavy emphasis on the fact that Section 504 uses language — "[n]o otherwise qualified individual … shall … be subjected to discrimination," 29 U.S.C. § 794(a) — that had previously been construed, in decades-old cases addressing other statutes, as implying a private right of action, *see Sandoval*, 532 U.S. at 288; *Cannon v. University of Chicago*, 441 U.S. 677, 689-690 (1979). But even if that language creates an individual right to be free from discrimination, any analysis of whether it creates a private

remedy against federal programs is incomplete, in the context of this statute, without accounting for the text and structure of Section 505—the remedial provision Congress added to the statute when it expanded Section 504's scope to include federal programs. As discussed above, Congress's choice to provide *other* private rights of action in Section 505, but not a private right of action to sue federal programs for Section 504 violations—even as it was simultaneously expanding Section 504 to cover federal programs—fore-closes the inference that Section 504 itself implies a private right of action against federal programs.

The district court's response to this obvious problem was to suggest that Congress enacted the express-right-of-action provisions in Section 505, for other types of Rehabilitation Act claims, simply to "*expand*[] the remedies available for discrimination claims against the federal government as an em-ployer and against federal funding recipients." JA166. But even assuming the original version of Section 504 implied a private right of action against the entities then covered by Section 504—which did not include federal pro-grams—Section 505 did not just expand the *remedies* that would previously have been available under that implied right of action. Rather, it created an express right of action to enforce Section 504 against federal funding

recipients through the "procedures … set forth in title VI." 29 U.S.C. § 794a(a)(2). The district court's theory fails to explain why, if Congress were interested only in expanding remedies for Section 504 violations by federal funding recipients, it would have created an express cause of action rather than simply prescribing available remedies under the implied cause of action that (in the district court's view) already existed. Congress's choice to create an express cause of action for some violations of Section 504, but not violations by federal programs, thus creates a strong negative inference that the district court simply ignored.

The district court's theory also fails to account for Congress's creation, in Section 505, of an express cause of action for violations of Section 501 by federal agencies in their capacities as employers. Section 501 does not (and did not in 1978) contain the sort of language that *Cannon* held to imply a right of action, so in enacting Section 505, Congress was choosing to create a right of action in federal court where none had existed before. *See Ryan v. Federal Deposit Ins. Corp.*, 565 F.2d 762, 763 (D.C. Cir. 1977) (reviewing compliance with the initial version of Section 501 under the APA, rather than inferring a private right of action). Again, it would be very strange for Congress to have done that—while omitting an express cause of action for

Section 504 violations by federal programs — if Congress had actually meant to allow a right of action for Section 504 violations by federal programs.

The district court offered one additional rationalization for Congress's choice to omit Section 504 claims against federal programs from the scope of Section 505: The court suggested that it would not have made sense for Congress to allow plaintiffs aggrieved by Section 504 violations in federal programs to bring such claims under the Title VI or Title VII frameworks, neither of which applies to federal programs. JA166. But although some facets of the Title VI framework (like administrative procedures for terminating funding) are inapposite to federal programs, the private right of action that Congress allowed plaintiffs to invoke against funding recipients could sensibly be invoked — as a basis for equitable relief, though not damages — against the federal government. And even if not, that does not explain why Congress did not specify *some other* express right of action against federal programs, if it actually meant for Section 504 claims against federal programs to proceed directly in federal court.

The district court also placed repeated emphasis (JA164, 166-167) on Section 505's fee provision, which states that "[i]n any action or proceeding to enforce or charge a violation of a provision of this subchapter, the court,

in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 29 U.S.C. § 794a(b). But that provision says nothing at all about *what* "action[s] or proceeding[s]" may be brought "to enforce or charge a violation of a provision of" the Rehabilitation Act. It simply speaks to how fees may be allocated in such actions or proceedings, whatever they may be. In short, the fee provision provides no genuine support for the district court's reading of the statute, and the extent of the weight the district court placed on this thinnest of reeds is telling.

Finally, the district court offered no answer at all to the second of the two key indicators that, when Congress expanded Section 504 to apply to federal programs, it did not mean for the expansion to be effectuated through a private right of action against federal programs. As discussed above, Congress's specification of agency regulations as the means of "carry[ing] out" the expansion, 29 U.S.C. § 794(a), eliminates any remaining ambiguity on the right-of-action issue. The Supreme Court concluded as much in *Sandoval*, explaining that Congress's provision for agency enforcement of Title VI regulations refuted any inference of "a congressional intent to create privately enforceable rights" under the regulations. 532 U.S. at 290.

"The express provision of one method of enforcing a substantive rule," the Court noted, "suggests that Congress intended to preclude others." *Id.*

4. Of course, this Court and other courts have sometimes entertained Section 504 claims brought directly in federal court against federal programs. But those decisions cannot be read as resolving the private-right-of-action issue when it was not raised. *See, e.g.*, *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) ("'Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.'"). And there is good reason for the government's choice not to have raised the private-right-of-action issue in those cases: The existence of a cause of action bears on the merits rather than on subject-matter jurisdiction, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998), and the government has often chosen not to dispute the existence of a cause of action in cases where it may not make a significant difference whether a plaintiff proceeds directly in federal court or seeks APA review of action on an administrative complaint.

For example, in *American Council of the Blind v. Paulson*, 525 F.3d 1256 (D.C. Cir. 2008), this Court affirmed a ruling that Section 504 requires the Treasury Department "to design and issue paper currency that is readily

distinguishable to the visually impaired." *Id.* at 1259. That claim—brought in district court in the first instance—would more properly have been brought in an administrative complaint, with subsequent APA review of the agency's action on the complaint. But that procedural distinction would not have made a significant difference in the bottom line. Had review proceeded under the APA, the district court and this Court would have needed to decide the same legal question: whether Section 504 requires that the currency be modified so distinctions among denominations are discernible by visually impaired people. As the district court here noted, the government likewise chose not to "dispute the propriety of" the injunctive relief, as opposed to the damages, granted to the Section 504 plaintiff in *Lane*, 518 U.S. at 190.[1]

---

[1] To the extent the district court suggested (JA166) that a footnote in the government's brief in *Lane* was inconsistent with the government's position here, that is incorrect. The footnote observed that, as noted above, "[i]t would have been odd for Congress to have provided that" the rights, procedures, and remedies set forth in Title VI, as opposed to some other set of rights, procedures, and remedies, applied to Section 504 claims against federal programs, because "Title VI does not prohibit discrimination" by federal programs. Brief for the Respondents at 16 n.8, *Lane*, 518 U.S. 187 (No. 95-365), 1996 WL 115795. But as discussed above, that does not mean Congress's choice to provide *any* express right of action against Section 504 violations by federal programs should be taken to also allow an implied right of action. Indeed, the government's brief in *Lane* also specified—immediately before the footnote the district court quoted—that "[b]y extending the

*Continued on next page.*

In other cases, by contrast, the procedural distinction may matter much more. Consider *Doe A*, a pending case brought by "eight individuals whose applications for overseas volunteer positions with the United States Peace Corps were rejected on the grounds that each of them suffers from a mental disability." 2025 WL 1305360, at *1. The question whether the agency discriminated against those applicants in violation of Section 504 requires a highly individualized analysis of each applicant's condition, what accommodations would be necessary to allow the applicant to serve overseas, whether they would be practicable for the agency, and so on. That is exactly the sort of complaint that is most sensibly addressed by the agency in the first instance, because in the course of addressing the complaint the agency can consider the individualized facts brought to its attention and determine whether its treatment of a given applicant comports with Section 504. If the agency answers that question in the affirmative, it can memorialize its

---

remedial provision of Section 505(a)(2) only to the funding activities of federal agencies, while extending the nondiscrimination obligation of Section 504 to programs and activities conducted by such agencies, Congress explicitly treated federal executive agencies differently from federal fund recipients for remedial purposes." *Id.* at 15-16.

reasoning for subsequent judicial review, and if it answers in the negative, it can alter its conduct and thus obviate the need for judicial review.

All that has two important implications for this case. First, the Court should not assume from the fact that it has sometimes adjudicated Section 504 claims that the cause-of-action argument the government now raises is novel or ill-founded. There are sound reasons why the government sometimes does not press the argument. And second, the Court should resist what might be an understandable temptation in this case—where defendants are not part of an agency within the meaning of the APA, and the ordinary pathway for judicial review of Section 504 claims is thus unavailable—to hold that the plaintiffs can therefore proceed with a private cause of action under Section 504. Many other cases, such as *Doe A*, exemplify why Congress chose to charge "agencies themselves" with "primary responsibility for compliance" with Section 504, *J.L.*, 971 F.2d at 265. Affirming the district court's cause-of-action ruling would make law not just in this anomalous case but in many mine-run cases in this Circuit, where the disadvantages of recognizing a cause of action are much clearer. And it would cement a circuit split that the Ninth Circuit otherwise could resolve with en banc review of its outlier precedent.

**B.** **There Is No Implied Equitable Cause Of Action To Enforce Section 504**

The district court here further erred—as did the district court in *Mathis*—by concluding that Section 504 can be enforced against federal agencies through an implied equitable cause of action. The point that both this district court and the *Mathis* court missed is that there is a significant difference between implied claims seeking equitable relief based on constitutional violations and implied claims seeking equitable relief based on statutory violations. The latter are subject to well-established, stringent constraints that are not satisfied here.

1. Courts routinely entertain claims seeking equitable relief against constitutional violations. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."); *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (equitable relief "has long been recognized as the proper means for preventing entities from acting unconstitutionally"). In adjudicating such claims, courts can and do enjoin constitutional violations by the government as long as the

injunction—in favor of the party requesting it—is of the sort that "was traditionally accorded by courts of equity."  *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-319 (1999).

But claims asserting a statutory violation, known as *ultra vires* claims, are fundamentally different.  Before the "enactment of the APA," when "those challenging agency action often lacked a statutory cause of action" to do so, "courts sometimes entertained 'a bill in equity'" for that purpose.  *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 680 (2025).  "In particular, courts recognized a right to equitable relief where an agency's action was ultra vires—that is, 'unauthorized by any law and … in violation of the rights of the individual.'"  *Id.*  But since the enactment of the APA, the Supreme Court has "strictly limited nonstatutory ultra vires review to the 'painstakingly delineated procedural boundaries'" set forth in *Leedom v. Kyne*, 358 U.S. 184 (1958).  *Nuclear Regul. Comm'n*, 605 U.S. at 681.

The *Leedom v. Kyne* doctrine permits "judicial review of agency action for alleged statutory violations even when a statute precludes review"—but "only where (i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts 'in excess of its delegated powers and

- 39 -

contrary to a specific prohibition in the' statute that is 'clear and mandatory.'" *Nyunt*, 589 F.3d at 449 (citations omitted). This Court has particularly emphasized the stringency of the third requirement, explaining that "[a]n agency violates a 'clear and mandatory' statutory command only when the error is 'so extreme that one may view it as jurisdictional or nearly so.'" *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022); *see also, e.g.*, *Federal Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) ("[U]*ltra vires* claims are confined to 'extreme' agency error[.]"); *Florida Health Scis. Ctr., Inc. v. Secretary of Health & Hum. Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016) (*ultra vires* claim requires "a 'patent violation of agency authority'"). Given the rigor of that standard, "a *Leedom v. Kyne* claim is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt*, 589 F.3d at 449.

This Court has carefully policed the distinction between implied equitable claims of constitutional violations and *ultra vires* claims asserting statutory violations. Recently, for example—in vacating an injunction entered by the same district judge as in this case—the Court explained that plaintiffs cannot "recast statutory claims as constitutional ones" by arguing "that 'whenever the President acts in excess of his statutory authority, he also

- 40 -

violates the constitutional separation-of-powers doctrine.'" *Global Health Council v. Trump*, 153 F.4th 1, 14 (D.C. Cir. 2025).

2.      Because the claim here plainly fails to satisfy the stringent *ultra vires* standard, the district court erred in believing that it could grant equitable relief regardless of whether Section 504 actually confers a right of action.

Even if the first two predicates for *ultra vires* review are satisfied, the third requirement—that the government must "plainly" have "act[ed] 'in excess of its delegated powers and contrary to a specific prohibition in the' statute that is 'clear and mandatory,'" *Nyunt*, 589 F.3d at 449—is not. Regardless of whether one might reasonably conclude that Section 504 of the Rehabilitation Act requires the White House to provide ASL interpretation for press briefings, the White House's choice not to do so—consistent with the choices made by every other Administration, save for the most recent prior one—does not violate "'a specific prohibition in'" Section 504 or any other statute, *id.* The *ultra vires* doctrine is available only to correct "'extreme' agency error, not merely '[g]arden-variety errors of law or fact.'" *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019). There is accordingly no basis for nonstatutory equitable relief against the White House's choice not to provide ASL interpretation for press briefings.

3. Even if the *ultra vires* standard did not apply, moreover, there would be an additional reason equitable relief is unavailable here: As *Armstrong* explains, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." 575 U.S. at 327. And here, for the reasons discussed above, the statutory scheme impliedly precludes a cause of action in equity to enforce Section 504 against federal programs, in the same way that it precludes reading a cause of action directly into Section 504. By providing for direct judicial enforcement of Section 504 against funding recipients (but not federal programs), 29 U.S.C. § 794a(a) — and by providing for Section 504's expansion to federal programs to be "carr[ied] out" through agency action, *id.* § 794(a) — Congress impliedly foreclosed judicial enforcement of Section 504 against federal programs, other than through review of agency actions where available under the APA.

4. Neither the district court here nor the *Mathis* court addressed the problems discussed above.

Here, the district court based its analysis on *Armstrong*, where the Supreme Court reiterated the longstanding principle "that federal courts may in some circumstances grant injunctive relief against state" and federal "officers who are violating, or planning to violate, federal law," 575 U.S. at 326-

327. The plaintiffs in *Armstrong*—who sought "to enforce" a provision of the federal Medicaid Act, *id.* at 322, a provision they regarded as preempting a provision of state law—recognized the importance of recharacterizing their statutory claims as constitutional ones in order to invoke an equitable cause of action. That is why they framed their claims as asserting a violation of the Supremacy Clause. But the Supreme Court rejected that invitation, declining to infer a right of action under the Supremacy Clause. *Id.* at 324-327. And the Court held that the Medicaid Act did not imply a "private right of action," *id.* at 331, and for essentially the same reason concluded that the Act "implicitly preclude[d] private enforcement" through an equitable cause of action, *id.* at 328. That analysis hardly supports the district court's view in this case that courts have expansive authority to enjoin statutory violations. To the contrary, it makes clear why Sections 504 and 505 of the Rehabilitation Act should be read as impliedly precluding any equitable enforcement of Section 504 against federal programs, just as they preclude reading a private right of action into Section 504 itself.

The district court's misunderstanding of implied equitable causes of action draws little support from the other cases it cited. The Supreme Court's decision in *McQuiggin v. Perkins*, 569 U.S. 383 (2013), had nothing to

do with any effort to enjoin an asserted statutory violation. The question in the cited portion of that opinion was whether a statute displaced "the courts' equitable authority to invoke the miscarriage of justice exception to overcome expiration of the statute of limitations governing a first federal habeas petition." *Id.* at 397. And the cited portions of *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002), and *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), addressed a wholly different question: whether the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), applied to allow a suit against state officers notwithstanding the Eleventh Amendment's jurisdictional bar, or whether the *Ex parte Young* exception had been displaced by the remedies specified in federal law. *See Verizon*, 535 U.S. at 645-648; *Seminole Tribe*, 517 U.S. at 73-76. The default rule on that question (the *Ex parte Young* exception to sovereign immunity applies except if it has been displaced) is completely different from the default rule on the cause-of-action issue in this case (there is no equitable cause of action unless stringent requirements are satisfied).

Moreover, the Supreme Court's holding in *Seminole Tribe* was that the statute in question (the Indian Gaming Regulatory Act) *did* displace the *Ex parte Young* cause of action, even though the Court had held that the

statutory remedy was itself unenforceable because of the Eleventh Amendment. 517 U.S. at 73-76. That holding weighs strongly in favor of our position here: that Congress's provision for Section 504 to be enforced through agency regulations and APA review displaces any equitable cause of action to enforce Section 504 directly in federal court, even in a case (like this one) where the APA pathway for judicial enforcement is unavailable.

The analysis in *Mathis* suffers from the same flaws. Like the district court here, the *Mathis* court relied heavily on *Armstrong* and on the wholly inapposite discussion of equitable authority in *McQuiggin*. *See Mathis*, 749 F. Supp. 3d at 22-23. And like the district court here, the *Mathis* court determined—contrary to this Court's long line of cases applying narrow constraints on the *Leedom v. Kyne* doctrine—that courts have equitable authority to enjoin statutory violations except where that authority has been displaced by statute. *See id.* at 23-24. The district court in *Mathis* did attempt to differentiate Section 504 from the remedial scheme that the Supreme Court held to preclude an implied equitable claim (under *Ex parte Young*) in *Seminole Tribe*. *See Mathis*, 749 F. Supp. 3d at 23. But the court's reasoning—that Section 504 does not "set[] out a 'detailed and exclusive remedial scheme'" because "it prescribes no remedy" "[b]eyond in-house rulemaking"—is

unpersuasive. As discussed above, Congress enacted the directive for agencies to "carry out" the expansion of Section 504 to their programs, 29 U.S.C. § 794(a), against the backdrop of the APA, well understanding that—for covered agencies—the APA would allow judicial review of any agency decision rejecting a Section 504 complaint. That is exactly the sort of "'detailed and exclusive remedial scheme'" that forecloses an implied equitable cause of action, *Mathis*, 749 F. Supp. 3d at 23.

Finally, the district court here asserted that its inherent power to enjoin the White House was "reinforced by Congress's decision to define 'Executive agency' more broadly in the Rehabilitation Act than in the APA." JA169 n.2. "It would not 'make sense,'" the court suggested, for Congress to have limited Section 504 plaintiffs "'to the APA's remedial scheme'" when (as this case shows) not all entities covered by Section 504 can be sued under the APA. *Id.* But that analysis rests on the faulty assumption that Congress must have intended for the requirements of Section 504 to be judicially enforceable in all circumstances. As discussed above, the entire point of the doctrine constraining *ultra vires* claims is that not all statutory constraints on the government are judicially enforceable, and courts are not free to invent causes of action to make them enforceable where Congress has not done so.

At bottom, the equitable-power analysis here and in *Mathis* cannot be squared with the stringent limits that this Court and the Supreme Court have placed on *ultra vires* claims. There is no implied equitable cause of action for private parties to enjoin Section 504 violations by the government. Any cause of action here must come from the Rehabilitation Act itself. And for the reasons discussed above, no such cause of action exists.

## II. Plaintiffs Are Unlikely To Succeed On The Merits Of Their Section 504 Claim

Even assuming plaintiffs have a cause of action, moreover, they failed to show a likelihood of success on the merits of their Section 504 claim. There is no dispute that plaintiffs generally have access to simultaneous closed captioning and after-the-fact transcripts of White House press briefings. The district court failed to justify its conclusion that plaintiffs lack meaningful access to press briefings, "solely by reason of" their hearing disability, 29 U.S.C. § 794(a), because they have difficulty understanding written English in captions or transcripts.

1. As relevant, Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the

benefits of, or be subjected to discrimination … under any program or activity conducted by any Executive agency."  29 U.S.C. § 794(a).

The seminal decision articulating the bounds of this provision is *Alexander v. Choate*, 469 U.S. 287 (1985).  There, the Supreme Court declined to accept the argument that Section 504 "reaches only purposeful discrimination against" people with disabilities, *id.* at 292, but also declined to accept the argument that Section 504 "reach[es] all action disparately affecting" people with disabilities, *id.* at 298.  The latter position, the Court explained, would impose "a wholly unwieldy administrative and adjudicative burden," requiring covered entities "first to evaluate the effect on [people with disabilities] of every proposed action that might touch the interests of [that population], and then to consider alternatives for achieving the same objectives with less severe disadvantage."  *Id.*

"Any interpretation of" Section 504, the Court explained, "must therefore be responsive to two powerful but countervailing considerations — the need to give effect to the statutory objectives and the desire to keep [Section] 504 within manageable bounds."  469 U.S. at 299.  Addressing its prior decision in *Southeastern Community College v. Davis*, 442 U.S. 397 (1979), the Court explained that what Section 504 requires is the provision of "*meaningful*

access." *Choate*, 469 U.S. at 301 (emphasis added). That may require covered entities to make "reasonable accommodations," stopping short of "'fundamental alteration[s],'" to their existing practices. *Id.* at 300-301. But it does not require "perfect" access. *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (quotation marks omitted). If it did, then it would amount to the sort of strict disparate-impact standard that the Supreme Court rejected. Rather, "'[t]he hallmark of a reasonable accommodation is *effectiveness*.'" *Id.* (emphasis added); *see American Council of the Blind*, 525 F.3d at 1259, 1265, 1273 (repeatedly invoking the effectiveness standard).

Courts have not applied a one-size-fits-all approach to the question of what accommodations are necessary to ensure that deaf people, or others with disabilities that create communication barriers, can participate in communication "effectively." Rather, they have explained that determining whether a given accommodation allows "'effective communication is a fact-intensive exercise.'" *Mayfield v. City of Mesa*, 131 F.4th 1100, 1110 (9th Cir. 2025). It depends on such "'factors'" as "'the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place.'" *Id.* And this Court has recognized more generally that the analysis of

"meaningful access" is "necessarily fact-specific." *American Council of the Blind*, 525 F.3d at 1267.

For that reason, there is no general rule that ASL interpretation is a necessary accommodation for deaf people. *See, e.g., Yelapi v. DeSantis*, 487 F. Supp. 3d 1278, 1286 (N.D. Fla. 2020) (denying preliminary injunction that would have required ASL interpretation at all press briefings held by the Florida governor). Indeed, NAD itself has brought multiple lawsuits seeking closed captioning—*not* ASL interpretation—as a reasonable accommodation under the Rehabilitation Act or its analogue, the Americans with Disabilities Act (ADA).[2] *See National Ass'n of the Deaf v. Harvard Univ.*, 377 F. Supp. 3d 49, 53 (D. Mass. 2019) ("Plaintiffs seek declaratory and injunctive relief requiring Harvard to provide timely, accurate captioning of the audio and audiovisual content that Harvard makes available online to the general public for free."); *National Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196, 198 (D. Mass. 2012) ("Plaintiffs seek injunctive and declaratory relief requiring Defendant to provide closed captioning for all of its Watch Instantly content."). Determining whether ASL interpretation is a required

---

[2] "Claims and defenses under the two statutes are virtually identical." *Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999).

accommodation in a particular case requires a "necessarily fact-specific" analysis of the context, *American Council of the Blind*, 525 F.3d at 1267.

2.      Here, there was no basis in the record for the district court's conclusion that, "solely by reason of" their hearing disability, 29 U.S.C. § 794(a), plaintiffs lack meaningful access to White House press briefings without simultaneous ASL translation of those briefings.

The district court's analysis rested on the premise that, because "ASL and English are distinct languages with distinct vocabularies, grammars, and syntaxes," "providing written English" transcriptions of press briefings, rather than ASL translations, "does not enable" plaintiffs "to receive the information conveyed during a press briefing." JA170-171. But that analysis was flawed in multiple ways.

*First*, even if many deaf Americans face difficulties in comprehending written English, there is no basis to conclude that those difficulties are "solely by reason of" their deafness, 29 U.S.C. § 794(a). The record certainly shows that reading difficulties are widespread among deaf Americans, because "[r]eading requires Deaf people to learn written English without the benefit of having heard it all their lives." JA53. But it is equally obvious that many deaf Americans can read English well; they have graduated from top

universities and thrived in reading-intensive fields.  There is no basis in the record to conclude that deafness is the "sole[]" cause of reading difficulties, 29 U.S.C. § 794(a) — as opposed to a contributing cause, when combined with (for example) pedagogical shortfalls — in the way that, say, paraplegia is the sole cause of a person's inability to walk.  *See, e.g.*, *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020) (the word "'solely'" in antidiscrimination statutes "indicate[s] that actions taken 'because of' the confluence of multiple factors do not violate the law").

*Second*, even if plaintiffs' reading difficulties were "solely by reason of" their hearing disability, 29 U.S.C. § 794(a), the record does not support the district court's sweeping conclusion that transcripts and closed captioning are inadequate to provide plaintiffs with meaningful access to press briefings.

The record evidence on this point relates largely to the efficacy of closed-captioning for real-time comprehension — not to the efficacy of transcripts for slightly delayed comprehension.  Plaintiff Ford's declaration, for example, says that he "stopped watching" press briefings because he "could not understand much of what was being said, even with closed captioning." JA36.   It says nothing about the efficacy of his reading after-the-fact

transcripts.  JA36-37.  The same is true of former plaintiff Bonn's declaration, which likewise focuses on the difficulty of following real-time closed captioning.  JA38-39.  The same is true of the declaration from NAD official Kelby Brick.  JA57-60.  And while plaintiffs' expert declaration more generally discusses the difficulties that many deaf Americans face in learning to read, it likewise focuses on how those difficulties can limit their ability to "fully access the captioning of a press conference."  JA54; *see* JA40-56.

The district court did not grapple with, or even acknowledge, the distinction between real-time closed captioning and after-the-fact transcripts.  In the prior iteration of this case, Judge Boasberg recognized that "[c]losed captioning and transcripts may constitute a reasonable accommodation under some circumstances," but he concluded that they did not "provide meaningful access" in the unusual "circumstances" of the emergent phase of a pandemic—circumstances in which the plaintiffs' interest in up-to-the-minute comprehension of information provided by the government was obviously at or near its peak.  486 F. Supp. 3d at 58 (quotation marks omitted).  Here, there is no similarly obvious reason why after-the-fact transcripts would be insufficient to provide meaningful access to press briefings even if real-time closed captioning is too difficult for some people to follow.

Plaintiffs' expert declaration claims that deaf Americans may take longer to read and understand written transcripts than those who were able to learn to read without a hearing disability, and that their comprehension may not be as good. But none of that answers the question whether the transcripts would supply *effective* access, because as discussed above, effective access need not be perfect access. Answering whether a given accommodation allows "'effective communication is a fact-intensive exercise,'" *Mayfield*, 131 F.4th at 1110; *see American Council of the Blind*, 525 F.3d at 1267. The record fails to address that question, and the district court failed to recognize the need to answer it.

3.      The enormous implications of the district court's reasoning underscore these errors in the court's logic. If the Rehabilitation Act requires the White House to provide ASL interpretation for press briefings, on the theory that reading difficulties are "solely by reason of" deafness, 29 U.S.C. § 794(a), and that written materials are categorically insufficient accommodations for deafness, then the same reasoning would require ASL interpretation of *every* oral communication by *every* governmental entity subject to the Rehabilitation Act or the ADA. Every speech by every Cabinet secretary, every governor, every mayor—every official of every federal agency and

every entity that receives federal financial assistance—would need to be translated into ASL in real time.

Moreover, nothing about the district court's logic is specific to *oral* communications; it would also mean that ASL translation is required for *written* communications. If deaf Americans do not have meaningful access to press briefings by reading transcripts, then presumably they also do not have meaningful access to the information on the websites of the Internal Revenue Service or the Centers for Disease Control. On the district court's logic, those agencies would be required to record and post ASL translations of all the content on their websites, because information about tax filing and public health is of undoubted importance to deaf Americans. So would the Office of the Federal Register, for the tens of thousands of pages that it publishes annually for countless agency actions. So would every state and local government, for the important written information that they provide. These astonishing and unprecedented results would fundamentally alter operations at every level of government and contravene the Supreme Court's admonition that obligations imposed under Section 504 must be kept "within manageable bounds," *Choate*, 469 U.S. at 299.

The district court does not appear to have considered the far-reaching and unworkable implications of its ruling. But had the court recognized the need to differentiate among contexts, in the "fact-specific" way that precedent requires, *American Council of the Blind*, 525 F.3d at 1267, it would have recognized the deficiency of plaintiffs' limited evidentiary record in this case. Even if plaintiffs had established that closed captioning alone would not afford them meaningful access to White House briefings, they did not establish that after-the-fact transcripts are insufficient to provide effective, even if imperfect, access. For that reason, if this Court does not reverse the preliminary injunction on the ground that plaintiffs lack a cause of action, it should at a minimum vacate the injunction and instruct the district court as to the legal standard that it must apply in further proceedings.

## CONCLUSION

The district court's preliminary injunction should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

CHARLES W. SCARBOROUGH

 */s/ Daniel Winik*
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*
  *Daniel.L.Winik@usdoj.gov*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,891 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik

**ADDENDUM**

# TABLE OF CONTENTS

29 U.S.C. § 794.................................................................................. A1

29 U.S.C. § 794a............................................................................... A1

**29 U.S.C. § 794**

## § 794. Nondiscrimination under Federal grants and programs

(a) Promulgation of rules and regulations

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

…

**29 U.S.C. § 794a**

## § 794a. Remedies and attorney fees

(a)(1) The remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-16), including the application of sections 706(f) through 706(k) (42 U.S.C. 2000e-5(f) through (k)) (and the application of section 706(e)(3) (42 U.S.C. 2000e-5(e)(3)) to claims of discrimination in compensation), shall be available, with respect to any complaint under section 791 of this title, to any employee or applicant for employment aggrieved by the final disposition of such complaint, or by the failure to take final action on such complaint. In fashioning an equitable or affirmative action remedy under such section, a court may take into account the reasonableness of the cost of any necessary work place accommodation, and the availability of alternatives therefor or other appropriate relief in order to achieve an equitable and appropriate remedy.

(2) The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

(b) In any action or proceeding to enforce or charge a violation of a provision of this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.