**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 25-5402**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

NATIONAL ASSOCIATION OF THE DEAF and DERRICK FORD,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of Columbia

---

**JOINT APPENDIX**

---

BRETT A. SHUMATE
  *Assistant Attorney General*

CHARLES W. SCARBOROUGH
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*

# TABLE OF CONTENTS

**Page**

District Court Docket Sheet ....................................................................................JA1

Complaint (Dkt. 1) .............................................................................................JA11

Attachments to Motion for Preliminary Injunction:

    Declaration of Derrick Ford (Dkt. 2-2)...............................................JA36

    Declaration of Matthew Bonn (Dkt. 2-3) ...........................................JA38

    Declaration of Dr. Judy Shepard-Kegl and Dr. Amy June
        Rowley (Dkt. 2-4) .......................................................................JA40

    Declaration of Kelby N. Brick (Dkt. 2-5)............................................JA57

    Letter from NAD to White House Chief of Staff
        (Jan. 31, 2025) (Dkt. 2-6) .............................................................JA61

    Memorandum from Assistant to the President and
        Director of White House Management and
        Administration (Apr. 26, 2021) (Dkt. 2-7) ...............................JA64

    Letter from NAD to White House Associate Director of
        Finance (Jan. 31, 2025) (Dkt. 2-8) ...............................................JA67

Transcript of Hearing on Motion for Preliminary
    Injunction (Dkt. 25).......................................................................JA72

Plaintiff Matthew Bonn's Notice of
    Voluntary Dismissal (Dkt. 28).........................................................JA151

Memorandum Opinion and Order Granting
    Preliminary Injunction (Dkt. 29).....................................................JA153

Notice of Appeal (Dkt. 31) ...............................................................................JA179

Order Clarifying Preliminary Injunction (Dkt. 35) ....................................JA181

Transcripts of Hearing on Motion to Clarify (Dkts. 36, 37) .....................JA186

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25−cv−01683−AHA

NATIONAL ASSOCIATION OF THE DEAF et al v. TRUMP et al

Assigned to: Judge Amir H. Ali

Case in other court: USCA, 25−05402

Cause: 29:0794 Job Discrimination (Handicap)

Date Filed: 05/28/2025
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

| | | |
|---|---|---|
| **NATIONAL ASSOCIATION OF THE DEAF** | represented by | **Caitlyn R. Lewis**<br>ARNOLD & PORTER KAYE SCHOLER LLP<br>250 West 55th Street<br>New York, NY 10019<br>212−836−7751<br>Email: Caitlyn.Kellerman@arnoldporter.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Alexander E. Sirio**<br>ARNOLD & PORTER KAYE SCHOLER LLP<br>601 Massachusetts Ave, NW<br>Washington, DC 20001<br>202−942−6087<br>Email: Alex.Sirio@arnoldporter.com<br>*ATTORNEY TO BE NOTICED* |
| | | **Alexander Sklaroff Van Hook**<br>NATIONAL ASSOCIATION OF THE DEAF<br>Law and Advocacy Center<br>8630 Fenton Street<br>Suite 202<br>Silver Spring, MD 20910<br>484−312−2001<br>Email: alexander.vanhook@nad.org<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Brittany Shrader**<br>NATIONAL ASSOCIATION OF THE DEAF<br>Law and Advocacy Center<br>8630 Fenton Street<br>Suite 202<br>Silver Spring, MD 20910<br>301−639−1970<br>Email: brittany.shrader@nad.org<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Drake Darrah**<br>8630 Fenton Street<br>Ste 202<br>Silver Spring, MD 20910<br>240−748−1711<br>Email: drake.darrah@nad.org<br>*PRO HAC VICE* |

*ATTORNEY TO BE NOTICED*

**Robert J. Katerberg**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave, NW
Washington, DC 20001
(202) 942−5000
Fax: (202) 942−5999
Email: robert.katerberg@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Samuel Kleinman**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave, NW
Washington, DC 20001
202−942−5821
Email: Sam.Kleinman@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Ian S. Hoffman**
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Ave, NW
Washington, DC 20001
202−942−6406
Fax: 202−942−5999
Email: ian.hoffman@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DERRICK FORD**                          represented by

**Alexander E. Sirio**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Alexander Sklaroff Van Hook**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brittany Shrader**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Drake Darrah**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert J. Katerberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Kleinman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ian S. Hoffman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **MATTHEW BONN** <br> *TERMINATED: 07/28/2025* | represented by | **Caitlyn R. Lewis** <br> (See above for address) <br> *LEAD ATTORNEY* <br> *PRO HAC VICE* <br> *ATTORNEY TO BE NOTICED* |
| | | **Alexander E. Sirio** <br> (See above for address) <br> *ATTORNEY TO BE NOTICED* |
| | | **Alexander Sklaroff Van Hook** <br> (See above for address) <br> *PRO HAC VICE* <br> *ATTORNEY TO BE NOTICED* |
| | | **Brittany Shrader** <br> (See above for address) <br> *PRO HAC VICE* <br> *ATTORNEY TO BE NOTICED* |
| | | **Drake Darrah** <br> (See above for address) <br> *PRO HAC VICE* <br> *ATTORNEY TO BE NOTICED* |
| | | **Robert J. Katerberg** <br> (See above for address) <br> *ATTORNEY TO BE NOTICED* |
| | | **Samuel Kleinman** <br> (See above for address) <br> *ATTORNEY TO BE NOTICED* |
| | | **Ian S. Hoffman** <br> (See above for address) <br> *ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **DONALD J. TRUMP** <br> *in his official capacity as President of the* <br> *United States* | represented by | **Elizabeth Themins Hedges** <br> DOJ−Civ <br> 950 Pennsylvania Ave NW <br> Washington, DC 20530 <br> 771−209−1978 <br> Email: elizabeth.t.hedges@usdoj.gov <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |
| | | **Christian Dibblee** <br> DOJ <br> FEDERAL PROGRAMS BRANCH − <br> Civil Division <br> 1100 L Street, N.W. <br> Washington, DC 20005 <br> 202−353−5980 <br> Email: christian.r.dibblee@usdoj.gov <br> *ATTORNEY TO BE NOTICED* |
| | | **Tyler J. Becker** <br> U.S. DEPARTMENT OF JUSTICE <br> Office of the Assistant Attorney General, <br> Civil Division <br> 950 Pennsylvania Ave NW |

Rm. 3632
Washington, DC 20530
202−514−4052
Email: tyler.becker@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**EXECUTIVE OFFICE OF THE PRESIDENT**

represented by **Elizabeth Themins Hedges**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christian Dibblee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**WHITE HOUSE OFFICE**

represented by **Elizabeth Themins Hedges**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christian Dibblee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF THE VICE PRESIDENT**

represented by **Elizabeth Themins Hedges**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christian Dibblee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SUSAN WILES**
*in her official capacity as White House Chief of Staff*

represented by **Elizabeth Themins Hedges**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christian Dibblee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**KAROLINE LEAVITT**
*in her official capacity as Press Secretary*
*to the President of the United States*

represented by **Elizabeth Themins Hedges**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christian Dibblee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tyler J. Becker**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/28/2025 | 1 | COMPLAINT against EXECUTIVE OFFICE OF THE PRESIDENT, KAROLINE LEAVITT, OFFICE OF THE VICE PRESIDENT, THE WHITE HOUSE OFFICE, DONALD J. TRUMP, SUSAN WILES ( Filing fee $ 405 receipt number ADCDC−11719783) filed by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Attachments: # 1 Exhibit − A ASL Policy, # 2 Exhibit − B January 31, 2025 Letter, # 3 Exhibit − C April 12, 2025 Letter, # 4 Civil Cover Sheet, # 5 Summons − Pam Bondi, # 6 Summons − Civil Process Clerk, # 7 Summons − Executive Office of the President, # 8 Summons − Karoline Leavitt, # 9 Summons − Office of the Vice President, # 10 Summons − President Donald J. Trump, # 11 Summons − Susan Wiles, # 12 Summons − The White House Office)(Hoffman, Ian) (Entered: 05/28/2025) |
| 05/28/2025 | 2 | MOTION for Preliminary Injunction *and Request for an Expedited Hearing* by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Attachments: # 1 Text of Proposed Order, # 2 Declaration of Derrick Ford, # 3 Declaration of Matthew Bonn, # 4 Declaration of Dr. Judy Shepard−Kegl and Dr. Amy June Rowley, # 5 Declaration of Kelby N. Brick, # 6 Exhibit − A − January 31, 2025 Letter, # 7 Exhibit − B − ASL Policy, # 8 Exhibit − C − April 12, 2025 Letter)(Hoffman, Ian). Added MOTION to Expedite on 5/29/2025 (znmw). (Entered: 05/28/2025) |
| 05/28/2025 | 3 | NOTICE OF RELATED CASE by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. Case related to Case No. 20−cv−2107. (Hoffman, Ian) (Entered: 05/28/2025) |
| 05/29/2025 | 4 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by NATIONAL ASSOCIATION OF THE DEAF (Hoffman, Ian) (Entered: 05/29/2025) |
| 05/29/2025 | | Case Assigned to Chief Judge James E. Boasberg. (znmw) (Entered: 05/29/2025) |
| 05/29/2025 | 5 | SUMMONS (8) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 05/29/2025) |
| 06/02/2025 | 6 | NOTICE of Appearance by Elizabeth Themins Hedges on behalf of All Defendants (Hedges, Elizabeth) (Entered: 06/02/2025) |
| 06/02/2025 | 7 | RESPONSE re 3 Notice of Related Case *Objection to Designation as Related Case* filed by EXECUTIVE OFFICE OF THE PRESIDENT, KAROLINE LEAVITT, OFFICE OF THE VICE PRESIDENT, DONALD J. TRUMP, WHITE HOUSE OFFICE, SUSAN WILES. (Hedges, Elizabeth) (Entered: 06/02/2025) |
| 06/02/2025 | | MINUTE ORDER: The Court ORDERS that: 1) Defendants shall file their Opposition to Plaintiffs' 2 Motion for a Preliminary Injunction by June 11, 2025; 2) Plaintiffs shall file their Reply by June 18, 2025; and 3) The parties shall appear for a hearing on the Motion via Zoom on June 26, 2025, at 2:00 p.m. So ORDERED by Chief Judge James E. Boasberg on June 2, 2025. (lcjeb3) (Entered: 06/02/2025) |

| 06/02/2025 | | MINUTE ORDER: The Court ORDERS that Plaintiffs shall file any response to Defendants' 7 Response by June 5, 2025. So ORDERED by Chief Judge Boasberg on June 2, 2025. (lcjeb3) (Entered: 06/02/2025) |
|---|---|---|
| 06/03/2025 | 8 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Brittany Shrader, Filing fee $ 100, receipt number ADCDC−11732900. Fee Status: Fee Paid. by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Hoffman, Ian) (Attachment 1 replaced on 6/4/2025) (znmw). (Entered: 06/03/2025) |
| 06/04/2025 | | NOTICE OF ERROR regarding 8 MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Brittany Shrader, Filing fee $ 100, receipt number ADCDC−11732900. Fee Status: Fee Paid.. The following error(s) need correction: Declaration must have an original, ink signature. Please refile using the event Declaration. (znmw) (Entered: 06/04/2025) |
| 06/04/2025 | 9 | DECLARATION *(CORRECTED ATTACHMENT 1)* by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF re 8 MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Brittany Shrader, Filing fee $ 100, receipt number ADCDC−11732900. Fee Status: Fee Paid.. (Hoffman, Ian) (Entered: 06/04/2025) |
| 06/04/2025 | 10 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Drake W. Darrah, Filing fee $ 100, receipt number ADCDC−11735675. Fee Status: Fee Paid. by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Hoffman, Ian) (Entered: 06/04/2025) |
| 06/04/2025 | 11 | Amended MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Drake W. Darrah, *Filing fee $ 100, receipt number ADCDC−11735675. Fee Status: Fee Paid.* Fee Status: No Fee Paid. by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Hoffman, Ian) (Entered: 06/04/2025) |
| 06/04/2025 | 12 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Alexander S. Van Hook, Fee Status: No Fee Paid. by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Hoffman, Ian) (Entered: 06/04/2025) |
| 06/04/2025 | | MINUTE ORDER: The Court ORDERS that the 8 Motion for Leave to Appear Pro Hac Vice of Brittany Shrader is GRANTED. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. So ORDERED by Chief Judge James E. Boasberg on June 4, 2025. (lcjeb3) (Entered: 06/04/2025) |
| 06/04/2025 | | MINUTE ORDER: The Court ORDERS that the 11 Motion for Leave to Appear Pro Hac Vice of Drake W. Darrah is GRANTED. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. So ORDERED by Chief Judge James E. Boasberg on June 4, 2025. (lcjeb3) (Entered: 06/04/2025) |
| 06/04/2025 | | MINUTE ORDER: The Court ORDERS that the 12 Motion for Leave to Appear Pro Hac Vice of Alexander S. Van Hook is GRANTED. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a).** Click for instructions. So ORDERED by Chief Judge James E. Boasberg on June 4, 2025. (lcjeb3) (Entered: 06/04/2025) |
| 06/04/2025 | 13 | NOTICE of Appearance by Alexander E. Sirio on behalf of MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF (Sirio, Alexander) (Entered: 06/04/2025) |
| 06/05/2025 | 14 | REPLY re 3 Notice of Related Case *Plaintiffs' Response to Defendants' Objection to Notice of Relatedness under LCvR 40.5* filed by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Attachments: # 1 Exhibit A)(Hoffman, Ian) Modified event title on 6/6/2025 (znmw). (Entered: 06/05/2025) |

| | | |
|---|---|---|
| 06/06/2025 | | MINUTE ORDER: Although it is quite a close question, the Court ultimately believes that this case does not fall within our related–case rule. The relief sought is considerably broader here; there has been a break in administrations; and, given the Court's limited involvement in the prior case, the judicial economy to be gained is slight. The Court, accordingly, ORDERS that the Calendar Committee shall randomly reassign this matter. So ORDERED by Chief Judge James E. Boasberg on June 6, 2025. (lcjeb3) (Entered: 06/06/2025) |
| 06/06/2025 | | Case randomly reassigned to Judge Amir H. Ali pursuant to the Minute Order dated 6/6/2025. Chief Judge James E. Boasberg is no longer assigned to the case. (ztnr) (Entered: 06/06/2025) |
| 06/06/2025 | 15 | NOTICE of Appearance by Alexander Sklaroff Van Hook on behalf of All Plaintiffs (Van Hook, Alexander) (Entered: 06/06/2025) |
| 06/09/2025 | 16 | NOTICE of Appearance by Tyler J. Becker on behalf of All Defendants (Becker, Tyler) (Entered: 06/09/2025) |
| 06/09/2025 | 17 | NOTICE of Appearance by Drake Darrah on behalf of All Plaintiffs (Darrah, Drake) (Entered: 06/09/2025) |
| 06/11/2025 | 18 | Memorandum in opposition to re 2 MOTION for Preliminary Injunction *and Request for an Expedited Hearing* MOTION to Expedite *Memorandum in Opposition* filed by EXECUTIVE OFFICE OF THE PRESIDENT, KAROLINE LEAVITT, OFFICE OF THE VICE PRESIDENT, DONALD J. TRUMP, WHITE HOUSE OFFICE, SUSAN WILES. (Attachments: # 1 Exhibit Proposed Order)(Hedges, Elizabeth) (Entered: 06/11/2025) |
| 06/17/2025 | | MINUTE ORDER. The Court will hold a motion hearing on Plaintiffs' 2 motion for preliminary injunction on June 25, 2025, at 10:00 am in Courtroom 19. The motion hearing scheduled for June 26, 2025, is vacated. Signed by Judge Amir H. Ali on 6/17/2025. (lcaha1) (Entered: 06/17/2025) |
| 06/17/2025 | 19 | NOTICE of Appearance by Brittany Shrader on behalf of All Plaintiffs (Shrader, Brittany) (Entered: 06/17/2025) |
| 06/18/2025 | 20 | REPLY to opposition to motion re 2 Motion for Preliminary Injunction,,, Motion to Expedite,, filed by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Hoffman, Ian) (Entered: 06/18/2025) |
| 06/20/2025 | | MINUTE ORDER. The Court will hold a motion hearing on Plaintiffs' 2 motion for preliminary injunction on July 2, 2025, at 10:30 am in Courtroom 19. The motion hearing scheduled for June 25, 2025, is vacated. Signed by Judge Amir H. Ali on 6/20/2025. (lcaha1) (Entered: 06/20/2025) |
| 06/23/2025 | 21 | NOTICE of Appearance by Samuel Kleinman on behalf of MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF (Kleinman, Samuel) (Entered: 06/23/2025) |
| 07/01/2025 | 22 | NOTICE of Appearance by Robert J. Katerberg on behalf of MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF (Katerberg, Robert) (Entered: 07/01/2025) |
| 07/01/2025 | 23 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Caitlyn Lewis Kellerman, Filing fee $ 100, receipt number ADCDC–11790649. Fee Status: Fee Paid. by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing, # 3 Text of Proposed Order)(Sirio, Alexander) (Entered: 07/01/2025) |
| 07/02/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 22 NOTICE of Appearance by Robert J. Katerberg on behalf of MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF (Katerberg, Robert).<br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: |

| | | |
|---|---|---|
| | | https://www.dcd.uscourts.gov/attorney−renewal.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 7/9/2025. (zapb) Modified on 7/3/2025 (zhcn). (Entered: 07/02/2025) |
| 07/02/2025 | | MINUTE ORDER granting 23 motion for leave to appear pro hac vice. Attorney Caitlyn Lewis Kellerman is hereby admitted pro hac vice to appear in this matter. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)**. Click for instructions. Signed by Judge Amir H. Ali on 7/2/2025. (lcaha1) (Entered: 07/02/2025) |
| 07/02/2025 | 24 | NOTICE of Appearance by Caitlyn R. Lewis on behalf of MATTHEW BONN, NATIONAL ASSOCIATION OF THE DEAF (Lewis, Caitlyn) (Entered: 07/02/2025) |
| 07/02/2025 | | Minute Entry for proceedings held before Judge Amir H. Ali: Motion Hearing held on 7/2/2025 re 2 Motion for Preliminary Injunction. Oral arguments heard. The Court takes the motion under advisement. Written ruling forthcoming via Chambers. (Court Reporter: Sonja Reeves) (ASL Interpreters: Joseph Lucas and Sarah Blattbert) (Certified Deaf Interpreters: Nancylynn Ward, and Neisha Washington−Shepherd) (zalh) (Entered: 07/02/2025) |
| 07/06/2025 | 25 | TRANSCRIPT OF MOTION HEARING before Judge Amir H. Ali held on July 2, 2025; Page Numbers: 1−79. Date of Issuance: July 6, 2025. Court Reporter/Transcriber Sonja L. Reeves, RDR, CRR, Telephone number (202) 354−3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 7/27/2025. Redacted Transcript Deadline set for 8/6/2025. Release of Transcript Restriction set for 10/4/2025.(Reeves, Sonja) (Entered: 07/06/2025) |
| 07/15/2025 | 26 | STANDING ORDER. The parties are ordered to comply with the directives set forth in the attached standing order. See document for details. Signed by Judge Amir H. Ali on 7/15/2025. (lcaha1) (Entered: 07/15/2025) |
| 07/22/2025 | 27 | Joint MOTION to Vacate *Answer Deadline and Set JSR Deadline* by EXECUTIVE OFFICE OF THE PRESIDENT, KAROLINE LEAVITT, OFFICE OF THE VICE PRESIDENT, DONALD J. TRUMP, WHITE HOUSE OFFICE, SUSAN WILES. (Attachments: # 1 Text of Proposed Order)(Becker, Tyler) (Entered: 07/22/2025) |
| 07/22/2025 | | MINUTE ORDER. The parties' 27 joint motion to vacate answer deadline and set deadline for joint status report is granted. The July 28, 2025, deadline to file an answer is vacated. The parties shall file a joint status report within ten days of the Court's ruling on Plaintiffs' 2 motion for a preliminary injunction. Signed by Judge Amir H. Ali on 7/22/2025. (lcaha1) Modified on 7/28/2025. (zalh) (Entered: 07/22/2025) |
| 07/25/2025 | 28 | NOTICE *[PLAINTIFF MATTTHEW BONN'S NOTICE OF VOLUNTARY DISMISSAL OF HIS CLAIMS AGAINST DEFENDANTS]* by MATTHEW BONN, DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF (Hoffman, Ian) (Entered: 07/25/2025) |
| 11/04/2025 | 29 | MEMORANDUM OPINION AND ORDER. Plaintiffs' 2 motion for a preliminary injunction is granted in part and denied in part. See document for details. The Executive Office of the President, White House Office, White House Chief of Staff, and White House Press Secretary shall file a status report by November 7, 2025, that |

| | | |
|---|---|---|
| | | apprises the court of their compliance with this order. Signed by Judge Amir H. Ali on 11/4/2025. (lcaha1) (Entered: 11/04/2025) |
| 11/05/2025 | 30 | NOTICE of Appearance by Christian Dibblee on behalf of All Defendants (Dibblee, Christian) (Entered: 11/05/2025) |
| 11/07/2025 | 31 | NOTICE OF INTERLOCUTORY APPEAL TO DC CIRCUIT COURT re 29 Memorandum Opinion by WHITE HOUSE OFFICE, KAROLINE LEAVITT, SUSAN WILES, EXECUTIVE OFFICE OF THE PRESIDENT. Fee Status: No Fee Paid. Parties have been notified. (Dibblee, Christian) Modified event title and link on 11/10/2025 (znmw). (Entered: 11/07/2025) |
| 11/07/2025 | 32 | NOTICE *of Efforts To Comply With Preliminary Injunction* by EXECUTIVE OFFICE OF THE PRESIDENT, KAROLINE LEAVITT, WHITE HOUSE OFFICE, SUSAN WILES (Dibblee, Christian) (Entered: 11/07/2025) |
| 11/07/2025 | | MINUTE ORDER. The court is in receipt of Defendants' 32 notice. Plaintiffs shall file a response by November 10, 2025. Signed by Judge Amir H. Ali on 11/7/2025. (lcaha1) (Entered: 11/07/2025) |
| 11/10/2025 | 33 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 31 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 11/10/2025) |
| 11/10/2025 | 34 | RESPONSE re 32 Notice (Other) filed by DERRICK FORD, NATIONAL ASSOCIATION OF THE DEAF. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Hoffman, Ian) (Entered: 11/10/2025) |
| 11/11/2025 | | MINUTE ORDER. The parties shall appear for a status conference on November 13, 2025, at 9:30am in Courtroom 19. The parties shall be prepared to discuss the positions in their 32 notice and 34 response. Signed by Judge Amir H. Ali on 11/11/2025. (lcaha1) (Entered: 11/11/2025) |
| 11/13/2025 | | USCA Case Number 25−5402 for 31 Notice of Appeal to DC Circuit Court, filed by SUSAN WILES, KAROLINE LEAVITT, WHITE HOUSE OFFICE, EXECUTIVE OFFICE OF THE PRESIDENT. (zjm) (Entered: 11/13/2025) |
| 11/13/2025 | | Minute Entry for proceedings held before Judge Amir H. Ali: Status Conference held on 11/13/2025. The Court takes matter under advisement. Joint oral motion for an extension of time to file a joint status report is heard and granted. Joint Status Report is due by 11/21/2025. (Court Reporters: Lisa Edwards and William Zaremba) (zalh) (Entered: 11/13/2025) |
| 11/17/2025 | 35 | ORDER. The court construes Defendants' 32 notice as a motion for clarification. The motion is granted as set forth herein. See document for details. Signed by Judge Amir H. Ali on 11/17/2025. (lcaha1) (Entered: 11/17/2025) |
| 11/17/2025 | 36 | TRANSCRIPT OF STATUS CONFERENCE before Judge Amir H. Ali held on November 13, 2025; Page Numbers: 1−40. Date of Issuance: November 17, 2025. Court Reporter/Transcriber Lisa Edwards, Telephone number (202) 354−3269, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 12/8/2025. Redacted Transcript Deadline set for 12/18/2025. Release of Transcript Restriction set for 2/15/2026.(Edwards, Lisa) (Entered: |

| | | 11/17/2025) |
|---|---|---|
| 11/20/2025 | 37 | TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS before Judge Amir H. Ali held on November 13, 2025; Page Numbers: 1−34. Court Reporter/Transcriber: William Zaremba; Email: William_Zaremba@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, PDF or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 12/11/2025. Redacted Transcript Deadline set for 12/21/2025. Release of Transcript Restriction set for 2/18/2026.(Zaremba, William) (Entered: 11/20/2025) |
| 11/21/2025 | 38 | Joint STATUS REPORT by EXECUTIVE OFFICE OF THE PRESIDENT, KAROLINE LEAVITT, OFFICE OF THE VICE PRESIDENT, DONALD J. TRUMP, WHITE HOUSE OFFICE, SUSAN WILES. (Hedges, Elizabeth) (Entered: 11/21/2025) |
| 11/24/2025 | | MINUTE ORDER. The court is in receipt of the parties' 38 joint status report. Within five days of the D.C. Circuit's decision in the pending appeal, the parties shall file a joint status report proposing next steps, including a proposed deadline for Defendants' responsive pleading. Signed by Judge Amir H. Ali on 11/24/2025. (lcaha1) (Entered: 11/24/2025) |
| 11/24/2025 | | DEPOSIT of Funds for Bond in the amount of $ 1.00, Receipt Number 210832; pursuant to 11/4/2025 MEMORANDUM OPINION AND ORDER (mg) (Entered: 11/25/2025) |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION OF THE DEAF<br>8630 Fenton Street, Suite 202<br>Silver Spring, MD 20910,<br><br>DERRICK FORD<br>c/o National Association of the Deaf<br>8630 Fenton Street, Suite 202<br>Silver Spring, MD 20910,<br><br>MATTHEW BONN<br>c/o National Association of the Deaf<br>8630 Fenton Street, Suite 202<br>Silver Spring, MD 20910,<br><br>   *Plaintiffs*,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as<br>President of the United States,<br>1600 Pennsylvania Avenue NW<br>Washington, DC 20500,<br><br>EXECUTIVE OFFICE OF THE PRESIDENT<br>1600 Pennsylvania Avenue NW<br>Washington, DC 20500,<br><br>THE WHITE HOUSE OFFICE<br>1600 Pennsylvania Avenue NW<br>Washington, DC 20500,<br><br>OFFICE OF THE VICE PRESIDENT<br>1600 Pennsylvania Avenue NW<br>Washington, DC 20500,<br><br>SUSAN WILES<br>in her official capacity as White House<br>Chief of Staff,<br>1600 Pennsylvania Avenue NW<br>Washington, DC 20500, | Civil Action No. 25-cv-1683 |

- JA11 -

KAROLINE LEAVITT,
in her official capacity as Press Secretary
to the President of the United States,
1600 Pennsylvania Avenue NW
Washington, DC 20500;

        *Defendants*.

## COMPLAINT

1.      For four years, beginning in January 2021, the White House provided American Sign Language ("ASL") interpreters for all public briefings, press conferences, and related events by the President, the Vice President, and the White House Press Secretary. The ASL interpreters appeared on all of the White House's official communication channels, including the White House website, YouTube, Facebook, and Twitter/X. For the hundreds of thousands of deaf and hard of hearing ("deaf") Americans who rely on ASL to communicate, the presence of ASL interpreters gave them access to all White House briefings in real time.[1]

2.      For many deaf Americans, ASL is their primary and preferred language. ASL is a complete and complex language distinct from English. It has its own vocabulary and rules for grammar and syntax. It is not simply English in hand signals. Many deaf individuals cannot read or understand written English. Consequently, English closed captions are not an adequate substitute for ASL interpretation.

3.      For these reasons, the only way many deaf individuals can meaningfully access the White House's press briefings is through qualified ASL interpreters who appear on the screen beside the speaker.

---

[1] Plaintiffs use the term "deaf" to refer to individuals with hearing levels or hearing loss that qualify as disabilities under the Rehabilitation Act. The phrase "deaf" includes Deaf, DeafBlind, DeafDisabled, Hard of Hearing, and Late Deafened individuals.

4.      However, in January 2025, the White House inexplicably stopped using ASL interpreters for any of its public press briefings or similar events.  Consequently, Defendants are now denying hundreds of thousands of deaf Americans meaningful access to the White House's real-time communications on various issues of national and international import.

5.      The White House's failure to provide qualified ASL interpreters during public briefings, press conferences, and related events is against the law.  Federal law unequivocally prohibits discrimination against individuals with disabilities and requires them to have meaningful access to the federal government's programs and services.  Failing to provide ASL interpreters deprives deaf people of meaningful access to the White House's press briefings.

6.      In 2020, this Court agreed and entered a preliminary injunction requiring the White House to provide ASL interpretation for all of its press briefings related to COVID-19.  *See Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45, 57-61 (D.D.C. 2020); Order, *Nat'l Ass'n of the Deaf v. Trump*, No. 20-cv-2107-JEB (D.D.C. Sept. 23, 2020), ECF No. 22.  The Court found that closed captions did not provide meaningful access to White House press briefings for deaf persons who rely on ASL to communicate, and thus the National Association of the Deaf and several deaf persons had established a likelihood of success on the merits of their claim under federal law.  The Court's reasoning applies equally here, where Plaintiffs are being actively denied access to all of the White House's press briefings.

7.      Plaintiffs thus bring this action to vindicate their right to meaningful access to White House briefings and to compel Defendants to resume providing qualified ASL interpreters at all White House press briefings and related events.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law.

9.      Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201, 2202.

10.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) and (e).  Defendants reside in the District of Columbia.  Further, a substantial part of Defendants' unlawful acts giving rise to Plaintiffs' claims occurred in this district.

## PARTIES

11.     Plaintiff the National Association of the Deaf ("NAD") is the nation's premier civil rights organization of, by, and for deaf and hard of hearing individuals in the United States. Established in 1880 by deaf and hard of hearing leaders, the NAD is dedicated to preserving, protecting, and promoting the civil, human, and linguistic rights of the approximately 48 million deaf and hard of hearing people in the United States.  The NAD has associational standing to sue on behalf of its deaf and hard of hearing members because (i) the NAD's members have standing to sue in their own right, (ii) advocating on behalf of its members on this issue is germane to the NAD's mission of advocating for its members' civil, human, and linguistic rights, and (iii) none of the NAD's members is required to participate in this action because the NAD is seeking declaratory and injunctive relief and not an individualized remedy for its members.

12.     Plaintiff Derrick Ford is a 36-year-old deaf resident of Anderson, Indiana and a member of NAD.  He is a graduate of the Indiana Institute of the Deaf.  ASL is Mr. Ford's preferred and primary language.  He has significant difficulty reading and understanding English.  When he watches television, Mr. Ford has trouble understanding the closed captioning, especially when the content is complex.  Mr. Ford watched many White House press briefings from 2021 to 2024 on the White House's YouTube channel because an ASL interpreter was broadcast with the briefings. After the change in administration in January 2025, Mr. Ford tried to watch the White House's press briefings but the lack of ASL interpreters rendered him unable to understand much of what was being said, even with closed captioning.  Mr. Ford stopped watching in February 2025.  Mr.

4

Ford wants to resume watching the White House press briefings because he is concerned about missing information about executive orders; diversity, equity, and inclusion ("DEI"); Social Security; Medicare; the economy; and issues impacting Americans in general.  Mr. Ford would resume watching White House press briefings if ASL interpreters were provided.

13.     Plaintiff Matthew Bonn (also known as Treean River) is a 48-year-old deaf resident of Germantown, Maryland and a member of NAD.  Mr. Bonn has a certificate in Deaf Support Specialist from Southwest College for the Deaf and is currently attending Gallaudet University.  ASL is Mr. Bonn's preferred and primary language.  Mr. Bonn has significant difficulty reading and understanding English.  He also has trouble understanding closed captioning on television, especially when the subject matter is complex.  Mr. Bonn regularly watched White House press briefings from 2021 to 2024 on the White House's YouTube channel because there was an ASL interpreter broadcast with the briefings.  After the change in administration in January 2025, Mr. Bonn tried to watch the White House's press briefings but because there were no ASL interpreters, he could not understand much of what was being discussed despite the closed captioning.  He stopped trying to watch in February 2025.  Mr. Bonn wants access to the White House press briefings restored because he wants information about the economy, Medicare and Medicaid changes, and executive orders on gender issues.  Mr. Bonn would resume watching the White House press briefings if ASL interpreters were provided.

14.     Defendant Donald J. Trump is the President of the United States.  He is sued in his official capacity.

15.     Defendant the Executive Office of the President ("EOP") "provide[s] the President with the support that he or she needs to govern effectively" and has responsibility for, among other things, "communicating the President's message to the American people."  The Executive Branch,

5

https://trumpwhitehouse.archives.gov/about-the-white-house/the-executive-branch/  (last visited May 27, 2025).

16. Defendant the White House Office is an agency within the EOP and has responsibility for, among other things, the White House's press briefings.

17. Defendant Office of the Vice President is an agency within the EOP that supports Vice President J.D. Vance in his executive and legislative duties.

18. Defendant Susan Wiles is the White House Chief of Staff and is responsible for, among other things, overseeing the EOP.  She is sued in her official capacity.

19. Defendant Karoline Leavitt is Press Secretary to the President of the United States.  She is sued in her official capacity.  As Press Secretary, Ms. Leavitt holds regular press briefings.

<strong>FACTUAL ALLEGATIONS</strong>

**<u>Deafness and American Sign Language</u>**

20. More than 48 million deaf persons live in the United States.  For many of these individuals—at least several hundred thousand—ASL is their primary language, and English is, at best, a second language.  Many deaf persons know virtually no English.

21. ASL is a complete and complex language distinct from English, with its own vocabulary and rules for grammar and syntax—it is not simply English on the hands.  These languages differ not only in the modalities in which they are expressed (auditory versus visual) but also in how words are formed, sentences are arranged, and questions are signaled.  Additionally, facial expressions play a significant grammatical role in ASL while in English facial expressions have only an affective role in communication.

22. ASL has no widely used or standardized written component.  For several reasons, including early language deprivation, many deaf people have a very limited ability to read and

6
- JA16 -

write in English.  Indeed, studies have shown that the median reading level for deaf adults is around grade four.  Many deaf Americans, therefore, cannot communicate via written English.

23.     Written English is not an effective means of communication for the many thousands of deaf individuals who have limited English capabilities, particularly for complex and important topics.

24.     Many deaf Americans who use ASL require qualified ASL interpreters to communicate with persons who can only communicate in a spoken language such as English.  The most effective interpretations are those provided by native ASL signers—that is, Certified Deaf Interpreters ("CDIs") (discussed below).  Such fluent and accurate interpretations are critical for deaf Americans, especially in times of great and frequent change.

**White House Press Briefings and Related Events**

25.     The White House Office, and in particular the White House Press Office and Press Secretary, are responsible for the public communications of the Administration.

26.     The President and the White House communicate with the public in various formats.  Press briefings conducted at the White House are one of the most common formats.  The Press Office generally convenes press briefings by notifying the reporters and networks covering the White House that a press briefing will occur.  During such briefings, the President, Vice President, Press Secretary, and other officials typically deliver remarks to members of the White House Press Corps.  Following those remarks, members of the Press Corps are often given an opportunity to ask questions about virtually any topic of interest.

27.     The frequency at which such briefings occur varies across presidential administrations.  Some administrations, however, deliver public briefings on an almost-daily basis.

28.    The Press Office permits members of the media and media outlets to attend and film the press briefings using television network video cameras.  The footage is pooled and shared among various networks.  Many of the nation's major news networks broadcast the White House briefings to a live national audience.

29.    Additionally, the White House Communications Agency films and broadcasts White House press briefings using its own video cameras and delivery apparatus.  The White House's broadcasts regularly appear on the White House's official communication channels, including YouTube, Facebook, and Twitter/X.

30.    In addition to press briefings conducted by the Press Secretary, President Trump has frequently delivered live remarks directly to Americans.  On February 11, 2025, for example, he spoke from the Oval Office to announce an executive order "aimed at cutting the size of the federal government."  *See* The White House, *President Trump Signs Executive Orders in the Oval Office, Feb. 11, 2025*, https://www.youtube.com/watch?v=L0f-ZAVOoPk (last visited May 27, 2025).  And on April 2, 2025, he delivered a speech from the White House Rose Garden to announce tariffs on most other countries.  *See* The White House, *President Trump Participates in the Make America Wealthy Again Event*, https://www.youtube.com/watch?v=yiTFPN6SZsU (last visited May 27, 2025).  These types of public briefings and remarks are also posted on the White House's official communication channels, including YouTube, Facebook, and Twitter/X.

**NAD's Past Efforts to Ensure the Provision of ASL Interpreters for White House Briefings**

31.    This is not the first time NAD has been forced to file suit to ensure deaf persons receive legally required access to White House press briefings.

32.    In March 2020, the White House began holding regular, televised briefings regarding the COVID-19 outbreak.  Even though governors, mayors, and other elected officials

across the country were providing ASL interpreters for their COVID-19 briefings, the White House refused to do so. Consequently, hundreds of thousands of deaf Americans were unable to receive this important information on health safety due to the lack of ASL interpreters.

33.    On August 3, 2020, NAD and five individual plaintiffs filed suit in this Court challenging the White House's failure to provide ASL interpretation of COVID-19 press briefings. *See* Compl., *Nat'l Ass'n of the Deaf v. Trump*, No. 20-cv-2107-JEB (D.D.C. Aug. 3, 2020), ECF No. 1. The plaintiffs alleged that the White House's failure to provide ASL interpretation violated Section 504 of the Rehabilitation Act of 1973 and the First Amendment of the United States Constitution. The plaintiffs also sought a preliminary injunction to compel the White House to provide live ASL interpretation of all public briefings concerning the COVID-19 pandemic. *See* Pls.' Mot. for Prelim. Inj., *Nat'l Ass'n of the Deaf v. Trump*, No. 20-cv-2107-JEB (D.D.C. Aug. 3, 2020), ECF No. 2.

34.    On September 9, 2020, this Court (Judge Boasberg) granted NAD's motion for a preliminary injunction. *Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45, 61 (D.D.C. 2020). The Court found that the plaintiffs were likely to succeed on the merits of their Rehabilitation Act claim, explaining that the White House's failure to provide ASL interpreters likely denied plaintiffs "meaningful access" to the administration's briefings and that "[c]losed captioning and transcripts" were not adequate or reasonable alternative accommodations. *Id.* at 57–58 (citation omitted). The Court further found that denying "timely access" to "critical information" was likely to cause plaintiffs to suffer irreparable harm. *Id.* at 58–59.

35.    The Court thus concluded that the plaintiffs were entitled to preliminary injunctive relief that would provide them with meaningful access to the White House's COVID-19 press briefings. *Id.* The Court ordered the White House to provide "a qualified ASL interpreter . . . for

9

all White House coronavirus briefings." Order, *Nat'l Ass'n of the Deaf v. Trump*, No. 20-cv-2107-JEB (D.D.C. Sept. 23, 2020), ECF No. 22. The order required that the interpreter appear in the live video feed. *Id.* The White House could accomplish that by locating the interpreter "physically near the speaker" or displaying the interpreter in a picture-in-picture video feed. *Id.*

36. The Court's order went into effect on October 1, 2020. *Id.* Thereafter, the White House began providing an ASL interpreter, in-frame, for all its COVID-19-related briefings.[2]

**The Biden Administration's Provision of ASL Interpreters**

37. In early 2021, after the change in administration, the White House began providing in-frame, qualified ASL interpreters for *all* press briefings—not limited to just those addressing COVID-19—conducted by President Joseph Biden, Vice President Kamala Harris, the White House Press Secretary, and other key members of the administration. The ASL interpreters were visible on the White House's official communication channels, including WH.gov/live, Facebook, Twitter/X, and YouTube. The White House also used a team of hearing interpreters and Certified Deaf Interpreters ("CDIs") to interpret the briefings.

38. CDIs are a type of qualified ASL interpreter. They are individuals who are deaf or hard of hearing and who have demonstrated knowledge and understanding of interpretation, deafness, the Deaf community, and Deaf culture. They have native or near-native fluency in ASL, and they undergo countless hours of specialized training. Registry of Interpreters

---

[2] "In-frame" ASL interpretation refers to simultaneous sign language interpreting where the sign language interpreter is visible on screen beside the speaker. This may be accomplished by placing the interpreter physically near the speaker, or by superimposing a live video feed of the interpreter into a frame that appears alongside the speaker, with the frame sized appropriately to allow deaf viewers to see and understand the interpretation. Under either approach, the in-frame interpreter would be visible on televised broadcast and on streamed mobile devices.

for    the    Deaf,    Inc.,    *Certified    Deaf    Interpreter    Certification    (CDI)*, https://rid.org/certification/available-certifications/ (last visited May 27, 2025).

39.    The White House provided the ASL interpreters via picture-in-picture technology, meaning the video feed of the interpreter was superimposed next to the video of the speaker.  This allowed the ASL interpreters to be physically located in a different location from the speaker at the press briefing.  Upon information and belief, the White House typically filmed the ASL interpreters (who was typically a CDI) while located in the White House or Eisenhower Executive Office Building and provided the interpreters with a live video and/or audio feed of the person speaking at the press briefing.  At other times, the ASL interpreters interpreted via Zoom.  The White House would then combine the video feed of the ASL interpreter with the video feed of the speaker at the press briefing via picture-in-picture technology, as follows:



40.    The White House's efforts were groundbreaking.  For the first time in history, deaf Americans who communicate via ASL had meaningful access to all White House briefings in real time.

41.    On April 26, 2021, the White House memorialized these efforts in an official policy memorandum entitled "Communication Services for People Who Are Deaf or Hard of Hearing at

11

- JA21 -

Presidential Briefings" (the "Policy") (attached hereto as Exhibit A).  The Policy reiterated the Biden administration's commitment to ensuring "accessibility for all Americans, including by ensuring effective communication at Presidential briefings with people who are Deaf or Hard of Hearing."  Ex. A at 1.

42.      To achieve this, the Policy provided that "a qualified [ASL] interpreter" would be included at all "[b]riefings conducted by the President, Vice President, First Lady, Second Gentleman, or White House Press Secretary" as broadcast by the White House Communications Agency.  *Id.*  The Policy dictated that when the White House used picture-in-picture technology, it would "[i]nclude the video feed of the qualified ASL interpreter in the White House feed that is aired or uploaded on WH.gov; and [e]nsure that the video feed of the qualified ASL interpreter is also included in the video uploaded to the White House's social media pages." *Id*. at 2.  The Policy also stated that the White House would "[p]rovide the video feed of the qualified ASL interpreter to television networks or the networks' pool feed for use in their live broadcasts." *Id*.

43.      In light of the White House's adoption of the Policy, NAD agreed to voluntarily dismiss its lawsuit.  *See* Joint Stipulation of Dismissal with Prejudice, *Nat'l Ass'n of the Deaf v. Trump*, No. 20-cv-2107-JEB (D.D.C. Dec. 16, 2021), ECF No. 38.

44.      The White House successfully implemented this Policy for the remainder of President Biden's four-year term.  An ASL interpreter thus appeared in hundreds (if not thousands) of hours of footage of White House press briefings, providing the deaf community with unprecedented and sustained meaningful access to the White House's public communications.

**The Trump Administration's Failure to Provide ASL Interpreters**

45. Before President Biden's term ended, White House officials developed guidelines and best practices for providing ASL interpretation going forward. As explained by Elsie Stecker, a CDI who served as an interpreter in the White House:

> [W]e've already developed guidelines and an internal structure for interpreting services, including how to make a request from vendors, along with specifications from them. We also developed an internal policy for ASL interpreting, along with best practices for large events where a CDI should be provided. We also developed best practices for press briefings and what we should expect from contractors and how we can support them. The guidelines are complete and it's "gold." The packet of information has been available since August and it includes everything needed to make [the White House's] events accessible for everyone.

The Daily Moth, Interview with Former White House CDI Elie Stecker, https://www.dailymoth.com/blog/interview-with-former-white-house-cdi-elsie-stecker (last visited May 27, 2025).

46. The guidelines and best practices were consistent with positions articulated by other leading organizations. The Registry of Interpreters for the Deaf, for example, emphasizes the importance of providing CDIs for press conferences. Because CDIs are specialists who are able meet the diverse linguistic needs of a broader array of the Deaf community, they are the ones who are best able to convey critical information efficiently to deaf individuals. *See* Registry of Interpreters for the Deaf, Inc., *RID Position Statement: CDIs at Press Conferences*, https://rid.org/rid-position-statement-cdis-at-press-conferences/ (last visited May 27, 2025).

47. President Trump was sworn in for a second term on January 20, 2025. Since that time, the White House has completely stopped providing ASL interpreters for White House press briefings.

13

48.    Press Secretary Leavitt has delivered at least twenty-six press conferences to members of the media.  President Trump has held numerous live events—with press in attendance—to announce new executive orders, address the American public alongside foreign heads of state, and reveal major shifts in domestic and international policy.

49.    On March 4, 2025, President Trump delivered a nationally televised address before a joint session of Congress.  This event was broadcast on major television networks and streamed on the White House YouTube channel.  No ASL interpreters were provided for this high-profile event.

50.    The White House has not provided an ASL interpreter for any of the aforementioned public briefings or events like them.  It is apparent that the White House is not complying with the Policy announced and followed by the prior administration.  It is also apparent that the White House does not follow any of the guidelines or best practices developed by knowledgeable White House officials.

51.    Following many of the White House's press briefings and related events, the White House has posted footage of those briefings to its official communications channels, such as its official channel on YouTube.  The posted videos do not contain any ASL interpreters.

52.    To be sure, some of the posted videos do contain English closed captions (though it appears that the closed captions are auto generated by YouTube without human editing or clean up).  Nevertheless, English closed captioning is not accessible to many deaf individuals, including those with even some knowledge of English.

53.    Tone is also often lost in written captions.  By contrast, an interpreter can convey the tone and context of a message through facial expressions, sign choice, and demeanor.

54.    Moreover, those deaf individuals with limited knowledge of English may misunderstand captions because they are relying on their knowledge of ASL—a wholly different language—to make sense of the English captions.

55.    Further, the provision of closed captioning frequently contains errors and omissions that make it difficult or impossible for deaf individuals to understand the information being conveyed, particularly if they are not fluent in English.

56.    Given all this, on January 31, 2025, NAD sent a letter (attached hereto as Exhibit B) to Defendant Susan Wiles "urg[ing] the White House to reinstate ASL interpretation services." Ex. B at 2.  NAD explained that "[a]ccess to White House press briefings is critical for all deaf and hard of hearing Americans, since it is the primary means by which the administration communicates important information to the public."  *Id.*  Moreover, NAD explained that— consistent with Judge Boasberg's 2020 opinion—providing ASL interpreters for White House press briefings was both "ethically imperative" and "legally mandated."  *Id.*  NAD requested that "the White House honor its commitment to accessibility by reinstating ASL interpreters for all relevant events."  *Id.*

57.    The White House has not responded to NAD's January 31, 2025 letter.

58.    Having received no response to its initial letter, on April 12, 2025, NAD sent a follow-up letter (attached hereto as Exhibit C) reiterating its request that the White House honor its initial commitment to accessibility and resume providing qualified ASL interpreters for all press briefings, press conferences, and related events.  Despite NAD's efforts, as of the date of this filing, the White House has not provided any substantive response to these requests, nor has the White House resumed providing ASL interpreters for its press briefings, press conferences, or related events.

59.     NAD has also received numerous complaints from deaf citizens who are unable to understand the Trump administration's briefings due to the lack of in-frame televised ASL interpretation.

60.     It remains as important as ever that all Americans have meaningful access to and are able to enjoy the benefits of timely information from the White House.  Such access allows Americans—both deaf and hearing—the equal opportunity to participate in American society.

61.     The White House's failure to provide qualified ASL interpreters (including CDIs) for its press briefings, press conferences, and related events broadcast by the White House to the public prevents Plaintiffs from accessing critical information in real time.  Without ASL interpreters, Plaintiffs must wait for secondary sources to interpret and relay this information, often with less accuracy and detail than through direct access to White House communications.

**COUNT ONE**
**Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**
**(Declaratory and Injunctive Relief against Defendants EOP, the White House Office, and the Office of the Vice President)**

62.     Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

63.     Section 504 of the Rehabilitation Act provides in pertinent part that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any . . . program or activity conducted by any Executive agency."  29 U.S.C. § 794(a).

64.     Defendants EOP, the White House Office, and Office of the Vice President are "Executive agencies" within the meaning of 29 U.S.C. § 794(a).  *See* 29 U.S.C. § 794(a) (directing heads of agencies to promulgate regulations necessary to carry out the Rehabilitation Act);

Enforcement of Nondiscrimination on the Basis of Handicap in Federally Conducted Programs, 53 Fed. Reg. 25,872, 25,872 (July 8, 1988) (final rule requiring Federal Executive Agencies, including EOP, to operate all programs and services to ensure nondiscrimination against qualified individuals with disabilities); 3 C.F.R. Part 102 (codifying regulations); 7 Op. O.L.C. 110, 110, 114 (1983) ("The term 'Executive agency' as used in [Section] 504 must be construed broadly to include all government entities which are not within either the legislative or judicial branches."); *see also* 29 U.S.C. § 794(a); 3 C.F.R. § 102.103 (defining White House Office and Office of the Vice President as "agenc[ies]" for purposes of EOP regulations implementing Rehabilitation Act).

65.    Public briefings conducted by EOP, the White House Office, and the Office of the Vice President are all federally conducted programs or activities subject to Section 504 of the Rehabilitation Act.

66.    A disability is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual."  29 U.S.C. § 705(9)(B) (citing 42 U.S.C. § 12102(1)(A)).

67.    Deafness is a disability pursuant to 29 U.S.C. § 705(21)(A)(iii) and is a physical impairment that substantially limits the major life activities of hearing.

68.    Plaintiffs, who are deaf, are qualified individuals with a disability within the meaning of Section 504.

69.    Defendants' practice of refusing to provide ASL interpretation violates Section 504 by authorizing, or failing to forbid, actions that:

    a.  Exclude from participation in, deny the benefits of, or otherwise subject individuals to discrimination under a program or activity conducted by an Executive Agency

17

- JA27 -

on the basis of disability (or "handicap").   29 U.S.C. § 794(a); 3 C.F.R. § 102.130(a); *id.* § 102.149.

b.  Deny qualified individuals with disabilities (or "handicaps") the opportunity to participate in or benefit from the aid, benefit, or service.   3 C.F.R. § 102.130(b)(1)(i); *id.* § 102.149.

c.  Afford qualified individuals with disabilities (or "handicaps") an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded to others.  *Id.* § 102.130(b)(1)(ii).

d.  Provide a qualified individual with disabilities (or "handicaps") with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level achievement as that provided to others.  *Id.* § 102.130(b)(1)(iii).

e.  Provide different or separate aid, benefits, or services to individuals with handicaps or to any class of individuals with disabilities (or "handicaps") than is provided to others, where such action is not necessary to provide qualified individuals with disabilities (or "handicaps") with aid, benefits, or services that are as effective as those provide to others.  *Id.* § 102.130(b)(1)(iv).

f.  Otherwise limit a qualified individual with disabilities (or "handicaps") in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.  *Id.* § 102.130(b)(1)(vi); *id.* § 102.149.

70.     Defendants' practice of refusing to provide ASL interpretation further violates Section 504 by failing to comport with its own Communications requirements pursuant to 3 C.F.R. § 102.160 to:

18

a. Take appropriate steps to ensure effective communication with applicants, participants, personnel of other Federal entities, and members of the public. 3 C.F.R. § 102.160(a).

b. Furnish appropriate auxiliary aids where necessary to afford an individual with disabilities (or "handicaps") an equal opportunity to participate in, and enjoy the benefits of, a program or activity conducted by the agency. 3 C.F.R. § 102.160(a)(1).

c. In determining what type of auxiliary aid is necessary, give primary consideration to the requests of the individual with disabilities (or "handicaps"). 3 C.F.R. § 102.160(a)(1)(i).

71. As a result of Defendants' acts and omissions, NAD's members, Mr. Ford, and Mr. Bonn are excluded from participation in, denied the opportunity to participate in or benefit from, and denied the full benefits of the White House's briefings.

72. Providing ASL interpretation would not impose an undue financial or administrative burden on Defendants. Indeed, the White House successfully provided ASL interpretation for four years.

**COUNT TWO**
**Violation of the First Amendment of the U.S. Constitution**
**(Declaratory and Injunctive Relief against all Defendants)**

73. Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

74. The First Amendment to the U.S. Constitution guarantees, among other things, "the freedom of speech."

75. The Supreme Court has held that the protection afforded by the First Amendment "is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v.*

*Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976).  Thus, where one enjoys a right to speak, others hold a "reciprocal right to receive" that speech, which "may be asserted" in court. *Id.* at 757.

76.     This right to receive speech includes speech originating from Defendants, particularly where the speech is made available to the public but not to Plaintiffs and other deaf persons who rely on ASL to communicate.

77.     Defendants' refusal to provide in-frame, qualified ASL interpretation prevents Plaintiffs from accessing and receiving the communications provided by their elected representatives.

78.     Denying this access serves no legitimate or compelling need and is not rationally related or narrowly tailored to serve any government interest.

79.     Providing such access would not impose an undue financial or administrative burden on Defendants.  Again, the White House successfully provided ASL interpretation for four years.

80.     Further, depriving Plaintiffs of their right to receive speech from the Defendants also impinges on Plaintiffs' First Amendment right to "petition the Government for a redress of grievances."  Because Defendants are depriving Plaintiffs of speech from the President and other White House officials, Plaintiffs cannot fully know what to petition the government for.

81.     Accordingly, Defendants' refusal to provide in-frame, qualified ASL interpretation violates the First Amendment.

## COUNT THREE
### Violation of the Fifth Amendment of the U.S. Constitution
### (Declaratory and Injunctive Relief against all Defendants)

82.     Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

20
- JA30 -

83.     The Fifth Amendment to the U.S. Constitution guarantees, among other things, that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  This clause prohibits denial of equal protection of the laws when the violation is committed by federal government actors, including Defendants.

84.     The Constitution's guarantee of equal protection under the law protects against discrimination.  This guarantee is violated when government action treats a person or persons differently from others similarly situated and there is no rational basis for the difference in treatment.

85.     Further, when the government's disparate treatment of a person or persons impinges on a fundamental right, that government action is subject to strict scrutiny.

86.     Here, Defendants denied Plaintiffs equal protection under the law by treating them differently from others who were similarly situated (namely, hearing persons) and, on information and belief, Defendants did so intentionally.  Defendants carried out this discriminatory treatment by refusing to provide in-frame, qualified ASL interpretation at White House press briefings and similar events.

87.     Further, Defendants' actions impinge on Plaintiffs' fundamental rights under the First Amendment, including the right to receive speech and to petition the government for redress of grievances.

88.     Defendants' actions serve no legitimate or compelling need and are not rationally related or narrowly tailored to serve any government interest.  Nor do Defendants' actions survive strict scrutiny.

89.     Providing ASL interpretation at White House press briefings would not impose an undue financial or administrative burden on Defendants.  Again, the White House successfully provided ASL interpretation for four years.

90.     Accordingly, Defendants' refusal to provide in-frame, qualified ASL interpretation violates the Fifth Amendment.

**COUNT FOUR**
**Mandamus Relief**
**(Declaratory and Injunctive Relief against all Defendants)**

91.     Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

92.     The Rehabilitation Act provides Plaintiffs with a clear right to relief—namely, to not be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity conducted by any Executive agency solely by reason of disability.

93.     Defendants have a clear duty to act—namely, to provide Plaintiffs with meaningful access to the public benefits, programs, and services that they administer.  As it relates to White House's press briefings, this duty entails an obligation to provide live televised, in-frame, qualified ASL interpretation.  This duty is ministerial in nature.

94.     By failing to provide in-frame, qualified ASL interpretation, Defendants have violated their duties to Plaintiffs under the Rehabilitation Act.

95.     Thus, if the Court concludes that the Rehabilitation Act, First Amendment, and Fifth Amendment do not provide an adequate remedy to Plaintiffs, then there would be no other adequate remedy available to Plaintiffs, and Plaintiffs would be entitled to relief in the form of a writ of mandamus ordering Defendants to comply with the statutory duties imposed by the Rehabilitation Act.

## COUNT FIVE
### Non-statutory Review
**(Declaratory and Injunctive Relief against All Defendants)**

96.     Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

97.     By failing to provide in-frame, qualified ASL interpretation, Defendants have violated their duties to Plaintiffs under the Rehabilitation Act and acted *ultra vires*.

98.     Thus, if the Court concludes that the Rehabilitation Act, First Amendment, and Fifth Amendment do not provide an adequate remedy to Plaintiffs, the Court should award relief under the doctrine of non-statutory review.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that judgment be entered against Defendants and that the Court grant the following:

a.   Preliminary and thereafter permanent injunctive relief requiring Defendants to:

    i.   Provide qualified ASL interpreters, including CDIs, at all White House press briefings, press conferences, and related events conducted by the President, Vice President, First Lady, Second Lady, or White House Press Secretary, for which the White House Press Office or the White House Office of the Press Secretary provide public notice of their occurrence before the event commences and that are captured by the White House Communications Agency ("WHCA") or other White House communication channels;

    ii.   Make the qualified ASL interpreter visible in the frame of all broadcasts by the WHCA or other White House communication channels, either by placing the interpreter physically near the speaker and including the interpreter in the footage shot, or by including a separate video feed of the interpreter using

picture-in-picture format, with the width of the interpreter feed constituting at least 33% of the full width of the screen;

   iii.    Provide the video feed of the qualified ASL interpreter to television networks or the networks' pool feed to enable use in their live broadcasts when using picture-in-picture format;

   iv.    Ensure that the qualified ASL interpreter is visible in all videos streamed on or uploaded to the White House's website and social media pages, including but not limited to, YouTube, Facebook, and Twitter/X.

b. Declaratory relief that Defendants have violated the Rehabilitation Act by failing to provide qualified ASL interpretation for all public briefings conducted by Defendants;

c. Declaratory relief that Defendants have violated the First and Fifth Amendments by failing to provide qualified ASL interpretation for all public briefings conducted by Defendants;

d. Order all Defendants, in the form of mandamus relief and/or under the doctrine of non-statutory review, to provide the injunctive relief described above;

e. Retain jurisdiction over this action to ensure Defendants' compliance with the mandates of Section 504 of the Rehabilitation Act, the First Amendment, and the Fifth Amendment;

f. Award Plaintiffs reasonable attorneys' fees and costs; and

g. Award such other relief as this Court deems just.

Dated: May 28, 2025

/s/ *Ian S. Hoffman*

Ian S. Hoffman (D.C. Bar No. 983419)
Alex E. Sirio (D.C. Bar No. 1724703)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001-3743
Telephone: (202) 942-5000
Fax: (202) 942-5999
ian.hoffman@arnoldporter.com
alex.sirio@arnoldporter.com

Caitlyn Lewis Kellerman**
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 W 55th Street
New York, NY 10019
Telephone: (212) 836-7751
caitlyn.kellerman@arnoldporter.com


/s/ *Brittany Shrader*

Brittany Shrader**
Drake W. Darrah**
NAD Law and Advocacy Center
8630 Fenton Street, Suite 202
Silver Spring, MD 20910
Telephone: (301) 587-1788
Fax: (301) 587-1791
brittany.shrader@nad.org

**pro hac vice motion forthcoming*

*Counsel for Plaintiffs*

25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL ASSOCIATION OF THE DEAF, *et al.*,

        *Plaintiffs*,

    v.

DONALD J. TRUMP, *et al.*,

        *Defendants*.

Civil Action No.  25-cv-1683

**DECLARATION OF DERRICK FORD IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

I, Derrick Ford, hereby state under penalty of perjury that the following statements are true and accurate to the best of my knowledge, information, and belief:

1.      I am a 36-year-old deaf resident of Anderson, Indiana. Growing up, I attended and graduated from the Indiana Institute for the Deaf.  I did not attend college.  I am currently employed.

2.      I am fluent in American Sign Language ("ASL"), which is my preferred and primary language.

3.      I have great difficulty reading and understanding English.  When I watch television, I have trouble understanding the closed captioning, especially when the content is complex.

4.      I watched many White House press briefings from 2021 to 2024 on the White House's YouTube channel because there was an ASL interpreter broadcast with the briefings.

5.      After President Trump took office in January 2025, I tried to watch the White House press briefings. But I stopped watching in February 2025 because no ASL interpreters were provided and I could not understand much of what was being said, even with closed captioning.

1

- JA37 -

6.　　I want to watch the White House press briefings because I am concerned about missing information about executive orders; diversity, equity, and inclusion ("DEI"); Social Security; Medicare; the economy; and issues impacting Americans in general.

7.　　I would resume regularly watching White House press briefings if ASL interpreters were provided.

8.　　My lawyers drafted this declaration for me after they met with me several times. Certified Deaf Interpreters interpreted this document for me and helped me discuss it with my lawyers before signing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: May 19, 2025

_____
　　　　　　　　Derrick Ford

2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION OF THE DEAF, *et al.*,

    *Plaintiffs*,

    v.

DONALD J. TRUMP, *et al.*,

    *Defendants*.

Civil Action No.  25-cv-1683

**DECLARATION OF MATTHEW BONN IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

I, Matthew Bonn, hereby state under penalty of perjury that the following statements are true and accurate to the best of my knowledge, information, and belief:

1.    I am a 48-year-old deaf resident of Germantown, Maryland.  I have a certificate in Deaf Support Specialist from Southwest College for the Deaf.  I am currently attending Gallaudet University.

2.    American Sign Language ("ASL") is my preferred and primary language.

3.    I have great difficulty reading and understanding English.  When I watch television I have trouble understanding the closed captioning, especially when the content is complex.

4.    I regularly watched White House press briefings from 2021 to 2024 on the White House's YouTube channel because there was an ASL interpreter broadcast with the briefings.

5.    After the change in administration in January 2025, I tried to watch the White House's press briefings, but I stopped trying to watch in February 2025.  Because there were no ASL interpreters, I could not understand much of what was discussed, even with closed captioning.

- JA39 -

6.      I want to watch and understand the White House press briefings because I want to hear what the President and other senior officials have to say about issues like the economy, changes in Medicare and Medicaid, and executive orders on gender issues.

7.      I would resume watching the White House press briefings if ASL interpreters were provided.

8.      My lawyers drafted this declaration for me after they met with me several times.  A Certified Deaf Interpreter interpreted this document for me and helped me discuss it with my lawyers before signing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: May 19, 2025

_____

Matthew Bonn

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION OF THE DEAF
8630 Fenton Street, Suite 202
Silver Spring, MD 20910,

DERRICK FORD
c/o National Association of the Deaf
8630 Fenton Street, Suite 202
Silver Spring, MD 20910,

MATTHEW BONN
c/o National Association of the Deaf
8630 Fenton Street, Suite 202
Silver Spring, MD 20910,

        *Plaintiffs*,

        v.

DONALD J. TRUMP, in his official capacity as
President of the United States,
1600 Pennsylvania Avenue NW
Washington, DC 20500,

EXECUTIVE OFFICE OF THE PRESIDENT
1600 Pennsylvania Avenue NW
Washington, DC 20500,

THE WHITE HOUSE OFFICE
1600 Pennsylvania Avenue NW
Washington, DC 20500,

OFFICE OF THE VICE PRESIDENT
1600 Pennsylvania Avenue NW
Washington, DC 20500,

SUSAN WILES
in her official capacity as White House
Chief of Staff,
1600 Pennsylvania Avenue NW
Washington, DC 20500,

Civil Action No. 25-cv-1683

- JA40 -

KAROLINE LEAVITT,
in her official capacity as Press Secretary
to the President of the United States,
1600 Pennsylvania Avenue NW
Washington, DC 20500;

      *Defendants*.

# EXPERT DECLARATION OF DR. JUDY SHEPARD-KEGL AND

# DR. AMY JUNE ROWLEY

May 28, 2025

## I.     Introduction

### A.     Qualifications

1.  Dr. Judy Shepard-Kegl offers her opinion as a linguist, a nationally certified interpreter with over 40 years of experience, and an interpreter trainer. Dr. Amy June Rowley offers her opinion as a native signer of American Sign Language (ASL) with life-long experience in the Deaf community, an individual trained in Deaf education, a nationally certified teacher of ASL, an assessor of ASL language proficiency, and a researcher on second language learners of ASL.

2.  Drs. Rowley and Shepard-Kegl have significant prior experience as experts and have both produced reports and testified at trial. Courts in Maine, Minnesota, Oregon, Missouri, Louisiana, New Jersey, New York, Pennsylvania, Rhode Island, and Georgia have qualified Dr. Shepard-Kegl as an expert while courts in Wisconsin have qualified Dr. Rowley as an expert.

3.  **Dr. Judy Shepard-Kegl.** Dr. Shepard-Kegl is hearing and has native language competency in English and fluency in ASL. She was raised in a bilingual and bicultural Slovene and English home, where English was the dominant language. She is a member of a trilingual English-ASL-Nicaraguan Sign Language family, which includes her late hearing spouse, Deaf daughter, and two hearing children. Dr. Shepard-Kegl has navigated parenting a Deaf child in Deaf and mainstream settings. Her research and teaching experience include theoretical linguistics, bilingualism, neurolinguistics, and cultural research in spoken and signed languages, emergent languages, and language deprivation.

4.  Dr. Shepard-Kegl completed her bachelor's degree in linguistic anthropology and her master's degree in bilingualism at Brown University. Dr. Shepard-Kegl completed her Ph.D. in theoretical linguistics at the Massachusetts Institute of Technology with a dissertation on word

formation, syntax, and discourse in ASL. She completed her senior postdoctoral work in cognitive neuroscience at the Center for Molecular and Behavioral Neuroscience at Rutgers, the State University of New Jersey.

5. Dr. Shepard-Kegl has taught and worked in linguistics, cognitive science, and psychology research laboratories at Northeastern University and Princeton University. She was formerly a Research Assistant Professor of Neuroscience at Rutgers before moving to a position in linguistics at the University of Southern Maine, where she taught linguistics and interpreting, directed the Signed Language Research Laboratory, and developed and coordinated the ASL/English Interpreting Concentration of the Linguistics major. She has also served as a Principal Investigator on grants from both the National Science Foundation and the National Institutes of Health. She engages in linguistic, neurolinguistic, and cultural research in spoken and signed languages. Dr. Shepard-Kegl retired in 2023 but continues to conduct research at the University of Southern Maine as an Emeritus Professor. She also teaches part-time and supervises a Fulbright Scholar from Pakistan who is focusing on introducing Pakistani Sign Language as an academic subject at the university level.

6. Dr. Shepard-Kegl is nationally credentialed and works as an ASL/English interpreter with specializations in legal interpreting, educational interpreting, and mental health and medical interpreting. She is also nationally certified in oral transliteration. She has consulted extensively on the assessment of interpreting, ASL language development, and language breakdown (e.g., aphasia and Parkinson's disease). She has served as a consultant on the development of the national assessments for the Cued Speech version of the Educational Interpreter Performance Assessment (EIPA-CS), the Core Certified Healthcare Interpreter Assessment, and the Registry of Interpreters for the Deaf Task Force on assessment of future

Legal Interpreters. She is currently serving on a statewide committee for the Transforming Interpreting Maine Project (TIME), which seeks to improve Maine's interpreting services.

7. **Dr. Amy June Rowley.** Dr. Rowley, who is Deaf, has a lifetime of experience navigating a hearing world visually without sound. She has native competency in ASL and is fluent in English. She was raised in a bilingual (English and ASL) and bicultural Deaf home, where ASL was the dominant language. She was educated in mainstream schools during the infancy of the Individuals with Disabilities Education Act and attempted to access some of her education without interpreters. She currently lives in a bilingual (English and ASL) household with her Deaf spouse, her two Deaf children, and a hearing child, where the dominant language is ASL. She has also navigated parenting Deaf children in Deaf and mainstream settings.

8. Dr. Rowley completed her bachelor's degree in biology at Gallaudet University and her master's degree in Deaf Education at Western Maryland College. She completed her Ph.D. in Urban Education, Curriculum, and Instruction, with a focus on Second Language Acquisition at the University of Wisconsin, Milwaukee. Dr. Rowley also holds an ASL Specialist Certification from Western Maryland College.

9. Dr. Rowley has extensive experience teaching ASL and Deaf Studies. As an Associate Clinical Professor and Coordinator of ASL Programs in the Department of Exceptional Education at The University of Wisconsin, Milwaukee, she was responsible for overseeing five ASL-related programs at both the undergraduate and post-baccalaureate levels.

10. Dr. Rowley now serves as a Professor in the Department of Writing, Languages, and Literatures at California State University East Bay. She also teaches interpreting classes at Ohlone College that focus on language variation and educational interpreting.

11. Dr. Rowley is a nationally recognized authority in assessment of ASL proficiency and pedagogy. She has been involved with portfolio development and assessment for ASL Teacher Training Programs. She served on the ASL Teachers Association Revision Task Force to redesign their Teacher Evaluation and Certification Program. She was also the Chair of the Evaluations and Certifications Program under the ASL Teachers Association, which is the governing body for certifying teachers of ASL in the United States and beyond, for 10 years.

12. Dr. Rowley has published on educational interpreting, the role of ASL in interpreter education, ASL and interpreter education programs, power and privilege, accessibility, and Deaf-related communication access legal cases.

### B. Objectives

13. Drs. Shepard-Kegl and Rowley have been retained in this case to offer their expert opinion on the accommodations needed for a heterogeneous population of Deaf Americans to access the public press briefings offered by the White House on a regular basis and intended to inform the American public of timely information regarding national issues.

## II. Summary of Opinions

14. In Deaf culture, it is customary to start with the main point of the discussion and follow with evidence substantiating that point. We follow that tradition here.

15. **American Sign Language is Not English.** ASL and English are two completely distinct languages. English captioning and other written texts are therefore insufficient to provide meaningful access for individuals who are Deaf. For many Deaf Americans, access to public press briefings via written English captions would be the same as if those captions and texts were provided in Spanish, Russian, or Chinese. Thus, meaningful access requires ASL/English

6

- JA45 -

interpretation by trained and qualified interpreters able to understand English at a native level and to sign ASL at a native level.

16. **Many Deaf Individuals Struggle to Read Due to Limited Proficiency in English.** Deaf Americans learning to read English often start with only limited proficiency in English or no proficiency at all. An overwhelming majority of Deaf children in America have no exposure to ASL in their home environment because they are born into hearing homes. English is not accessible to these children because they cannot hear the language spoken around them. When learning to read, Deaf children are thus at a significant disadvantage as compared to their hearing peers because they have little or no language foundation. For them reading is not simply cracking a code that ties writing to sound. What they "sound out" does not match a language they already have in place. White House press briefings involve dense language and complex concepts that—when expressed in English text—exceed many Deaf individuals' reading ability. Captions are thus inaccessible to a significant portion of the Deaf population.

17. **Remote ASL/English Interpretation Makes Access for the Deaf and Hard of Hearing Community Effortless.** Technological advances allow for interpreters or teams of interpreters to provide remote interpretation without difficulty or significant logistical or financial burden. These advances have increased communication access exponentially and the White House can easily deploy this technology to provide critical information to Deaf constituents.

18. **Deaf Interpreters Should Serve as the Primary Interface with the Deaf Public.** The more carefully processed and natively fluent the interpretation, the more the receiver can digest the message. Native-level interpretations prevent receivers from the distraction caused by trying to correct errors or fill in gaps that inherently occur with interpretation from a fluent but non-native signer. The most effective native-level interpretations for Deaf receivers typically

require a team of hearing interpreters whose native language is English and Deaf interpreters whose native language is ASL. The hearing interpreter interprets to the Deaf interpreter who in turn interprets for the Deaf receiver and vice versa. Such teams provide access to a fluent, accurate, and culturally matched interpretation, which is critical to a Deaf person's understanding, especially when the government makes complex and high-impact announcements.

### III.    Background – Nomenclature

19. The terms defined below help address several misconceptions people may have about deaf people, their language(s), their culture, and their community.

20. **American Sign Language.** A language completely distinct from English in modality (visual and gestural as opposed to auditory) and grammar (polysynthetic as opposed to isolating).

21. **Culturally Deaf**. A culturally Deaf person is most comfortable in the company of other Deaf people and signs ASL. They view themselves as a member of a cultural minority rather than as a member of the dominant hearing culture with a pathological deficit. Attitudinal indicators of Deaf identity and cultural affiliation include being a part of culturally Deaf social groups, membership in Deaf organizations, and marriage to or significant relationships with a Deaf partner. Culturally Deaf people also typically choose an occupation that requires little use of English daily and attracts other Deaf people.

22. **The Difference Between "Deaf" and "deaf."** Deaf, with a capital D, refers to a person who has hearing loss and also identifies with Deaf people and Deaf culture. This person is likely to sign ASL, seek out other Deaf people, attend Deaf events, and have a cultural perspective on deafness. When the word *deaf* is in lowercase, it refers specifically to a person's medical condition of hearing loss, which is the medical or pathological perspective on deafness. A

person who is hard of hearing may sometimes identify as *culturally Deaf* and, conversely, a profoundly deaf person may not identify with Deaf culture but still be profoundly deaf.

23. **The Difference Between "Hard of Hearing" and "deaf."** A person who is "hard of hearing" has a mild to moderate hearing loss and can with some difficulty, or when using a hearing aid, hear sounds within the speech range. A hearing aid can help a person with mild to moderate hearing loss by amplifying sound. A hearing aid may help a person with a severe hearing loss to hear speech better, but it will not completely correct such a loss. A person with profound hearing loss, by contrast, cannot hear sounds within the speech range even when aided.

24. **Hearing.** The use of "hearing person" is uncommon except when distinctions between hearing and Deaf people are at issue. We will use hearing both for cases in which a person physically can hear and for people who have a mainstream hearing cultural perspective.

25. **Linguistic Conventions.** When a word or phrase is italicized it represents the actual word or sentence. When a word or phrase is in quotes it represents the meaning of the text. For example, *he fell for it hook, line, and sinker* means "he is gullible." Additionally, when a word or phrase is capitalized it represents an ASL sign for the word. For example, the sign for the English word *already* is FINISH.

**IV.    American Sign Language Is Not English**

26. There are many misconceptions about signed languages: that these languages are universal, that they are not languages but mere systems for gesturing, and that that they are just manual versions of a dominant spoken language. This last misconception underpins the false idea that providing captioning or a written English text to Deaf individuals is a reasonable accommodation that provides meaningful communication access. It is not.

27. American Sign Language and English are two completely distinct languages. They do not even fall into the same typological categories. Romance languages (French, Italian, and Spanish) or Germanic languages (English, German, and Dutch) fall into the class of isolating languages. In isolating languages words are comprised of very few morphemes, which are units that when added to words change their meaning or part of speech (e.g., adding *-ed* to *bake* and getting the past tense or adding *-er* to *bake* and making a noun from a verb). Signed languages fall into the class of polysynthetic languages and share more in common with Yupik, Nahuatl, and the Algonquian languages. J.L. Singleton & E.L. Newport, *When learners surpass their models: The acquisition of American Sign Language from inconsistent input*, 49 Cognitive Psych. 370, 337 (2004). These languages are made up of many morphemes. *Id*. English and ASL also differ not only in the modalities in which they are expressed (auditory versus visual) but in how words are formed, sentences are arranged, and questions, conditionals, relative clauses, topics, and other constructions are signaled. *Id*. For example, ASL and English speakers ask questions differently. In English, the question word is at the beginning ("Who likes John?") while in ASL the question word is at the end ("LIKE j-o-h-n WHO?").

28. English and ASL also differ in their placement of words describing the relative positions of two items. For example, an ASL signer trying to convey the concept that *the ball is under the chair* might sign, "The chair is under the ball." Another example involves passive voice. In Standard English, a passive sentence like *John was hit by Mary* is taken to mean "John hit Mary" in Deaf English, where "was hit" is taken to mark the past tense, not the passive.

29. Simply, ASL is ***not*** English on the hands—far from it. An ASL/English interpreter must, therefore, take the input from one language, understand it, and concept for concept, convey that information in the grammatical forms of another language. Consider again the construction

of questions in ASL. Grammatical facial expressions play a significant role in marking wh-question sentences (those involving *who, what, why, when, how,* etc.) and questions requiring a "yes" or "no" answer. In spoken languages like English facial expressions, by contrast, play a minor role. For native English speakers, for example, facial expressions serve as a caricature (i.e., making faces) or help to show affect or emotion. Although ASL signers also use facial expressions this way, grammatical facial expressions are distinct from affective facial expressions in ASL. For example, wh-questions involve furrowed brows—a facial expression that in English is often also associated with anger—and "yes" and "no" questions involve raised eyebrows and a forward projection of the head—a facial expression that in English may be associated with confusion or annoyance. These expressions convey essential grammatical information to ASL signers and often convey different information to English speakers.

30. ASL and signed languages have all the structure and complexity of any other human language. ASL is a distinct language that is altogether different from English. To assume otherwise, as many individuals unfamiliar with signed language may do, risks serious communication breakdowns that can impact the health and safety of Deaf individuals.

**V.      Many Deaf Individuals Struggle to Read Due to Limited Proficiency in English**

31. Because ASL and English are different languages, providing ASL signers with written English does not make information accessible. A Deaf person who has little to no mastery of English can neither reliably understand the intended meaning in written English nor reliably determine when they must seek clarification of a misunderstanding.

32. ASL does not have a widely used or standardized written language. Although some Deaf individuals are bilingual and use ASL for face-to-face communication and English for written communication, fluency in English is not widespread among the Deaf community. A majority

of Deaf children in America are born into hearing homes where ASL is not used, and English is not accessible (because they cannot hear the language spoken in their environment). *See* Ross E. Mitchell & Michael A. Karchmer, *Chasing the mythical ten percent: Parental hearing status of deaf and hard of hearing students in the United States*, 4 Sign Language Studies 138–163 (2004) (finding that "less than five percent of deaf and hard of hearing students receiving special education are known to have at least one deaf parent."). This environment puts Deaf children at a disadvantage when learning to read because they do not typically have a strong language foundation.

33. A seminal study by the Office of Demographic Studies at Gallaudet University found that the median reading level of a Deaf individual at age 20 was the grade equivalent of 4.5 and that only 10% of 20-year-old Deaf individuals read at or above the eighth-grade level. R.J. Trybus & M.A. Karchmer, *School achievement scores of hearing impaired children: national data on achievement status and growth patterns*. 122:2 Am. Ann. Deaf 62-69 (1977). Since then, studies and analyses alike have observed little to no change in the median reading level among Deaf students. *See, e.g.,* Peter V. Paul, *Literacy and deafness: The development of reading, writing, and literate thought*, 23-24 (1998) ("[T]he results show an annual growth rate of only 0.3 reading grade level per year with a leveling off or plateau occurring at the third- or fourth-grade reading level."); Marc Marschark, Patricia Sapere, Carol M. Convertino, Connie Mayer, Loes Wauters & Thomastine Sarche, *Are Deaf Students' Reading Challenges Really About Reading?*, 154:4 Am. Ann. Deaf 357, 357 (2009) ("Reading achievement among deaf students typically lags significantly behind hearing peers, a situation that has changed little despite decades of research"); S. Qi & R.E. Mitchell, *Large scale academic achievement testing of deaf and hard-of-hearing students: Past, present, and future*, 17:1 J. Deaf Stud. Deaf Educ., 1,

17 (2012) ("[M]edian performance never exceeds the fourth-grade equivalent for any cohort"); Beverly Trezek & Connie Mayer, *Reading and deafness: State of the evidence and implications for research and Practice*, 9 Educ. Sci. 216, 216 (2019) ("[O]utcome data have consistently indicated significant delays in achievement among [Deaf] students, with a reported median fourth-grade reading level for high school graduates").

34. Fourth grade is when most students transition from "learning to read" to "reading to learn." J.S. Chall & V.A. Jacobs, *Poor Children's Fourth-Grade Slump*, Am. Educ. (Spring 2023), https://www.aft.org/ae/spring2003/chall_jacobs. This transition signals a shift from decoding text and acquiring basic fluency ("learning to read") to understanding more complex vocabulary that requires greater comprehension skill ("reading to learn"). *Id*. The cited studies highlight that a significant portion of the Deaf population never makes the transition from "learning to read" to "reading to learn" because they lack the fluency in English necessary to master complex comprehension and vocabulary.

35. Learning to read as a hearing person who already knows English is different than learning to read as a Deaf person who uses a signed language or has no prior first language. When a hearing student learns to read, they are learning to decode a written orthography (the spelling system of a language) and to "read aloud" words and sentences that are already in their language repertoire. This approach to reading is called phonics. The learner can sound out the words on the page and associate them with words and grammar they already know. Consider an example of a first grader learning to read and sounding out the following: *The cat is under the table*. They already understand and can speak the spoken version of this sentence in their everyday life well before they can read it.

36. Learning to read is not the same for a Deaf student. Reading requires Deaf people to learn written English without the benefit of having heard it all their lives. Deaf people may come with prior fluency in a signed language (which, as discussed above, is vastly different from a spoken language), or they may come with no language foundation at all. Consider an English speaker attempting to read Russian. They would not be able to decode a sentence, even if they could learn to sound it out, because they lack exposure to Russian. Just like the English speaker who lacks the preexisting foundation of competency in spoken Russian, a pre-lingually Deaf person lacks the prior foundation of competency in English.

37. To compensate, when Deaf people with little or no mastery of English read aloud, they often produce a sign for a word they know and fingerspell the ones they do not. The sign is not always conceptually accurate but is one with a similar spelling (e.g., board (of wood) for board (of directors)). Their ability to fingerspell a word is the ability to transpose (or code) written letters into fingerspelled letters of the English alphabet. But signing a word they know and fingerspelling do not indicate that they understand text—it merely means that they can convert one meaningless symbol to another.

38. Even when Deaf individuals partially master English syntax, they must still rely on their knowledge of ASL to understand the English sentences they read. This reliance creates misunderstandings that are often the opposite of the intended meaning. Deaf readers with limited English proficiency compensate for their lack of syntactic mastery of English by relying upon what they know and expect to be happening in the world. For example, a Deaf reader may understand the sentence "The dog bit the mail carrier" simply based on recognizing the words *dog*, *bit*, and *mail carrier* and then applying their knowledge of the world to guess that a dog bit a mail carrier. They may do the same to understand the sentence "The mail carrier

14

was bitten by the dog." However, the true test of their reading abilities occurs when presented with the counterintuitive sentence "The dog was bitten by the mail carrier." Using vocabulary and guesses based on real-world experience, they will again arrive at the inference that "a dog bit a mail carrier," which is incorrect. The only way to understand the counterintuitive sentence is to rely on knowledge of English syntax.

39. Many Deaf people who have little to no mastery of English have full mastery of ASL. White House press briefings, by their very nature, involve dense language and complex concepts that, when expressed in English text, exceed many Deaf individuals reading ability. Thus, while many Deaf individuals cannot fully access the captioning of a press conference produced in English, they can access an interpretation of that same press conference to ASL—their primary language.

## VI.     Remote ASL/English Interpretation Makes Access for the Deaf Community Effortless

40. There is no longer a need for an interpreter or interpreting team to be present in the same room as a speaker. Using remote interpretation methods, interpreters need only a video feed of a press conference to provide accurate interpretation. The interpreter can then be fed into the video of the event via the insertion of a video insert (i.e., picture-in-picture technology).

41. Using remote interpretation removes the logistical and spatial barriers that once frustrated ASL/English interpretation. Indeed, in public broadcasts, a video feed of interpreters is often available by logging on to a website. Technology already in wide use can thus be deployed to make White House press conferences more accessible without substantial burden.

## VII.    Deaf Interpreters Should Serve as the Primary Interface with the Deaf Public

42. Access to a fluent, accurate, and culturally matched interpretation is critical especially when the government makes consequential and potentially life-altering announcements.

43. When providing information to a diverse Deaf audience, Deaf interpreters are best equipped to access the broadest range of Deaf receivers.

44. Mistakes made during past national emergencies show why Deaf interpreters are needed. During Hurricane Katrina, for example, Deaf Americans were poorly informed of the nature of the emergency and what actions to take because no or poor interpretation was provided.

45. For Deaf Americans to understand critical emergency information, it is necessary to put into place clear emergency response plans. A key component of these plans is that interpreters directly interfacing with the Deaf population be natively fluent interpreters who are also culturally Deaf. During such critical periods, clear ASL grammar on the hands, body, and face transmitted efficiently and clearly in a culturally responsive manner by someone the Deaf community immediately understands and trusts is necessary. A Deaf interpreter can make the difference between a calm and well-informed public and a panicked and traumatized group with no information.

46. Importantly, teams of hearing and natively English-speaking ASL/English interpreters and Deaf and natively signing ASL/English interpreters provide the most effective interpretation and thus the broadest access.

## VIII.  Conclusion

47. Since January 2025, the White House has and continues to take swift action that signals profound and far-reaching changes to the economy, healthcare, employment, access to government services, and fundamental civil rights. The Deaf community requires ASL interpretation—a standard accommodation—to access this potentially life-altering information.  English closed captions are insufficient to provide access to the White House's press briefings to many Deaf Americans. Denying this access limits Deaf Americans' ability to

16

participate in and contribute to society, which is critical to the functioning of any country, most especially the United States.

_(signature)_

Dr. Judy Shepard-Kegl
May 28, 2025

_(signature)_

Dr. Amy June Rowley
May 28, 2025

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION OF THE DEAF, *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, *et al.*,

*Defendants*.

Civil Action No.  25-cv-1683

**DECLARATION OF KELBY N. BRICK IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

I, Kelby N. Brick, hereby state under penalty of perjury that the following statements are true and accurate to the best of my knowledge, information, and belief:

1.      I am an attorney, Certified Deaf Interpreter, and the Chief Operating Officer of the National Association of the Deaf ("NAD").  I previously served as the Director of the Maryland Governor's Office of the Deaf and Hard of Hearing, a position I held from July 2015 through March 2023.  I hold a Bachelor of Arts degree in government from Gallaudet University and a Juris Doctor degree from the Temple University James E. Beasley School of Law.

2.      Since President Trump was sworn into office for a second term and his Administration began holding televised press briefings, NAD has received numerous complaints from deaf and hard of hearing ("deaf") Americans who are unable to understand the briefings due to lack of in-frame televised American Sign Language ("ASL") interpreters.

3.      For many deaf individuals, English is, at best, a second language.  Indeed, many deaf persons know virtually no English.

4.      ASL is the primary language of many of the NAD's members and the Individual Plaintiffs.  Many deaf people rely on ASL as their primary language to understand fast-paced information that is complex and critical for civic participation and accessing government services as opposed to error-prone captioning in English.

5.      Written English is not an effective means of communication for many deaf individuals who have limited English capabilities.  Therefore, even when closed captioning is provided, those deaf individuals cannot effectively receive the messages conveyed at the White House press briefings.

6.      Furthermore, closed captioning for live television broadcasts frequently contains errors, delays and omissions that make it difficult or impossible for deaf individuals to understand the information being provided in the briefings, particularly if they are not fluent in English.  Tone is also frequently lost in written captions.  By contrast, an interpreter can convey the tone and context of a message through facial expressions, sign choice, and demeanor.

7.      On January 31, 2025, NAD wrote to White House Chief of Staff Susie Wiles to request that President Trump and the White House resume providing in-frame ASL interpreters for all televised press briefings and related events.  A true and correct copy of the letter is attached hereto as Exhibit A.

8.      The January 31 letter explained that from early 2021 to January 2025, the White House consistently provided ASL interpreters for all White House press briefings, including them in all its broadcasts and on all its social media channels.  It further explained that this practice followed a White House written policy dated April 26, 2021 (the "ASL Policy"), adopted after NAD and several deaf individuals sued the White House for failing to provide ASL

interpreters during the COVID-19 pandemic.  A true and correct copy of the ASL Policy is attached hereto as Exhibit B.

9.    The January 31 letter noted that "the White House appears to have ceased compliance with the ASL Policy…and is no longer providing ASL interpreters for press briefings and related events."  NAD "urge[d] the White House to reinstate ASL interpretation services," emphasizing that "[p]roviding ASL interpreters is [both] ethically imperative [and] legally mandated."

10.    As of May 9, 2025, NAD has not received a response from White House Chief of Staff Susan Wiles.

11.    On April 12, 2025, NAD forwarded the January 31 letter to Moses Ayala, Associate Director of Finance at the White House.  A true and correct copy of the letter is attached hereto as Exhibit C.

12.    The April 12 letter reiterated NAD's request "that the White House resume providing [ASL] interpreters for all White House press briefings and related events."  NAD also offered to assist the White House "in securing appropriately qualified and certified deaf interpreting teams."

13.    As of May 9, 2025, NAD has not received a response from White House Associate Director of Finance Moses Ayala.

14.    Retaining qualified sign language interpreters for press briefings is relatively inexpensive. Furthermore, the provision of sign language interpreters is straightforward, as demonstrated by the Biden administration's consistent implementation of this practice for four years.

- JA60 -

15.    As a result of the White House's refusal to provide in frame televised ASL interpreters, deaf people who rely on ASL and live in the United States remain unable to access the White House's briefings and any essential information they provide.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: May 9, 2025

_____

Kelby N. Brick

# Exhibit A

**National Association of the Deaf**
www.nad.org

January 31, 2025

Susie Wiles
Chief of Staff
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

Dear Ms. Wiles:

Founded in 1880 by deaf and hard of hearing leaders, the National Association of the Deaf (NAD) is the nation's premier civil rights organization dedicated to advocating for deaf and hard of hearing individuals in the United States.  On behalf of NAD, I write to urgently request that the White House resume providing American Sign Language (ASL) interpreters for all press briefings and related events. As the oldest national civil rights organization, the NAD's mission is to preserve, protect, and promote the civil, human, and linguistic rights of more than 48 million deaf and hard of hearing people in this country.

The NAD and several deaf individuals previously reached a settlement with the President of the United States and other White House officials, regarding the White House's failure to provide American Sign Language (ASL) interpreters during press briefings related to the COVID-19 pandemic. The settlement followed a landmark court ruling in September 2020 that ordered the White House to provide interpreters for all such briefings.

In early 2021, the White House implemented comprehensive ASL interpretation services for all briefings conducted by the President, Vice President, First Lady, Second Gentleman, and/or White House Press Secretary, as broadcast by the White House Communications Agency.  These interpreters were visible on the White House's official communication channels, including WH.gov/live, Facebook, Twitter/X, and YouTube.  The White House demonstrated its commitment by employing a team of both hearing and Certified Deaf Interpreters.

**National Association of the Deaf**
www.nad.org

The White House's efforts were historic: for the first time in history, deaf and hard of hearing Americans had equal access to all White House briefings in real time. The White House's policy for ensuring equal access was stated in a memorandum dated April 26, 2021 (the "ASL Policy"), which is attached. The White House successfully implemented this policy for the last four years.

However, the White House appears to have ceased compliance with the ASL Policy referenced in the settlement and is no longer providing ASL interpreters for press briefings and related events. For example, the White House did not provide an ASL interpreter for Press Secretary Leavitt's remarks on January 28, 2025, or President Trump's January 30, 2025 press conference. Additionally, ASL interpretation is notably absent from recent videos on the White House's YouTube channel.

NAD strongly urges the White House to reinstate ASL interpretation services. Access to White House press briefings is critical for all deaf and hard of hearing Americans, since it is the primary means by which the administration communicates important information to the public. People of all political affiliations have a right and desire to stay informed of what the President and his office are telling the American people in real time. Captioning does not serve the needs of the large population of Deaf individuals whose first and dominant language is ASL and who cannot access information from the White House without ASL access.

Providing ASL interpreters is ethically imperative but legally mandated. The ASL Policy was implemented after a federal court ordered the White House to provide ASL interpreters for all press briefings related to COVID-19, which began in October 2020. Through the ASL Policy, the White House expanded the use of ASL interpreters to *all* press briefings, not just those related to COVID-19. We ask that the White House honor its commitment to accessibility by reinstating ASL interpreters for all relevant events.

Should you require any assistance in this process, including in securing appropriately qualified and certified deaf interpreting teams, please do not hesitate to contact our Chief Operating Officer, Kelby Brick, at kelby.brick@nad.org.

Sincerely,

Bobbie Beth Scoggins, Ed.D.
Interim Chief Executive Officer
bobbiebeth.scoggins@nad.org

- JA63 -

# Exhibit B

THE WHITE HOUSE
Washington

April 26, 2021

MEMORANDUM

FROM:     ANNE FILPIC, ASSISTANT TO THE PRESIDENT AND DIRECTOR OF
WHITE HOUSE MANAGEMENT AND ADMINISTRATION

SUBJECT:  COMMUNICATION SERVICES FOR PEOPLE WHO ARE DEAF OR HARD
OF HEARING AT PRESIDENTIAL BRIEFINGS

The Biden-Harris Administration is committed to accessibility for all Americans, including by ensuring effective communication at Presidential briefings with people who are Deaf or Hard of Hearing. The purpose of this memorandum is to clarify the policy of the Executive Office of the President (EOP) regarding the provision of American Sign Language interpreting and closed captioning services at White House briefings.

This policy goes into effect today, April 26, 2021, and applies to all covered White House briefings, as defined and directed below. This policy does not govern or limit the provisions of services for other briefings involving EOP employees, internal meetings among EOP staff, or any other type of event not covered by the categories below. Moreover, this policy is not intended to govern or limit the provision of accessibility services other than American Sign Language interpreting and closed captioning services. This policy will be reviewed on an ongoing basis and may be updated to address significant changes in technology or best industry practices.

Covered White House Briefings:

The Executive Office of the President shall provide a qualified American Sign Language ("ASL") interpreter[1] at the following types of White House briefings:[2]

- Briefings conducted by the President, Vice President, First Lady, Second Gentleman, or White House Press Secretary, for which the White House Press Office or the White House Office of the Press Secretary provide public notice of their occurrence before the event commences and that are captured by the White House Communications Agency (WHCA);

---

[1] The term "qualified ASL interpreter" has the same meaning as a "qualified interpreter" under 28 C.F.R. § 35.104, which is an interpreter who "is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary."

[2] For purposes of this policy, "briefing" is considered an event open to the press.

Revised: April 26, 2021

- Briefings held to address the coronavirus pandemic, including updates regarding the spread of COVID-19, the federal government's response to the pandemic, and vaccinations or treatments; and
- Any other briefings as approved by the White House Press Secretary or designee, Director of the Office of Administration (OA) and Director of the Office of Management and Administration, or designee(s).

Location & Display of ASL Interpreter in WHCA Feed

When feasible, the qualified ASL interpreter should be located physically near the speaker at covered White House briefings, to be captured in WHCA's feed alongside the speaker. If the qualified ASL interpreter is being filmed in a remote location, WHCA shall include in the frame a separate video feed of the interpreter using a picture-in picture (PIP) format, with the width of the interpreter feed constituting at least 33% of the full width of the screen.

Publication of the Event Video Feed in PIP Format

When WHCA uses the PIP format described above, the White House will:

- Provide the video feed of the qualified ASL interpreter to television networks or the networks' pool feed for use in their live broadcasts;
- Include the video feed of the qualified ASL interpreter in the White House feed that is aired or uploaded on WH.gov; and
- Ensure that the video feed of the qualified ASL interpreter is included in the video uploaded to the White House's social media pages, where made possible by the social media platform.

Provision of Closed Captioning Services

Within approximately 24 hours of a covered White House briefing or other briefing captured by WHCA, the Office of Digital Strategy will, in coordination with WHCA and OA, upload a video feed of the briefing that includes closed captioning of the event to:

- WH.gov
- The White House's pages on Facebook and YouTube.

If you need to request interpreter services for a briefing, please contact ███████, Chief of Staff for the White House Press Office, ██████.

If you have any questions about this policy, please contact the Office of General Counsel of the Office of Administration at ████████.

Revised: April 26, 2021

# Exhibit C

**National Association of the Deaf**
www.nad.org

**VIA E-MAIL MOSES.K.AYALA@WHO.EOP.GOV AND U.S. MAIL**

April 12, 2025

Moses Ayala
Associate Director of Finance
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

Dear Mr. Ayala:

I write on behalf of the National Association of the Deaf (NAD).  Founded in 1880 by deaf[1] leaders, NAD is the nation's premier civil rights organization dedicated to advocating for deaf and hard of hearing individuals in the United States.  On January 31, 2025, NAD sent a letter, attached hereto, to the White House Chief of Staff Susie Wiles to request that the White House resume providing American Sign Language (ASL) interpreters for all White House press briefings and related events.

As the letter explained, from early 2021 to January 2025, the White House consistently provided ASL interpreters for *all* White House press briefings, including them in all of its broadcasts and on all of its social media channels.  This practice followed a White House written policy dated April 26, 2021, adopted after NAD and several deaf individuals sued the White House for failing to provide ASL interpreters during the COVID-19 pandemic.  It now appears the White House has abandoned this policy and is no longer providing ASL interpreters for any press briefings or other related events, leaving the important information provided by the current administration during these briefings inaccessible to a large portion of the deaf community.  As NAD's letter explains, federal law requires the White House to provide ASL interpreters at all press briefings conducted by President Trump, Press Secretary Leavitt, or other senior White House administration officials.

To date, there have been at least one dozen press briefings this year, and many more related events with press, for which the White House has not provided ASL interpreters.  Further, the White House has not responded to NAD's January 31 letter.  NAD thus reiterates its request that the White House honor its past commitment to accessibility and resume providing ASL interpreters for all press briefings and related events.

---

[1] The phrase "deaf" includes Deaf, DeafBlind, DeafDisabled, Hard of Hearing, and Late Deafened individuals.

**National Association of the Deaf**
www.nad.org

NAD respectfully requests your assistance in bringing this important matter to the attention of any other persons responsible for deciding whether to resume the practice of providing ASL interpreters for White House press briefings and other related events.  Should you require any assistance, including in securing appropriately qualified and certified deaf interpreting teams, you may contact our Chief Operating Officer, Kelby Brick, at kelby.brick@nad.org.


Sincerely,


Bobbie Beth Scoggins, Ed.D.
Interim Chief Executive Officer


Enclosure: NAD's January 31, 2025, Letter

**National Association of the Deaf**
www.nad.org

January 31, 2025

Susie Wiles
Chief of Staff
The White House
1600 Pennsylvania Avenue, NW
Washington, D.C. 20500

Dear Ms. Wiles:

Founded in 1880 by deaf and hard of hearing leaders, the National Association of the Deaf (NAD) is the nation's premier civil rights organization dedicated to advocating for deaf and hard of hearing individuals in the United States.  On behalf of NAD, I write to urgently request that the White House resume providing American Sign Language (ASL) interpreters for all press briefings and related events. As the oldest national civil rights organization, the NAD's mission is to preserve, protect, and promote the civil, human, and linguistic rights of more than 48 million deaf and hard of hearing people in this country.

The NAD and several deaf individuals previously reached a settlement with the President of the United States and other White House officials, regarding the White House's failure to provide American Sign Language (ASL) interpreters during press briefings related to the COVID-19 pandemic. The settlement followed a landmark court ruling in September 2020 that ordered the White House to provide interpreters for all such briefings.

In early 2021, the White House implemented comprehensive ASL interpretation services for all briefings conducted by the President, Vice President, First Lady, Second Gentleman, and/or White House Press Secretary, as broadcast by the White House Communications Agency.  These interpreters were visible on the White House's official communication channels, including WH.gov/live, Facebook, Twitter/X, and YouTube.  The White House demonstrated its commitment by employing a team of both hearing and Certified Deaf Interpreters.

**National Association of the Deaf**
www.nad.org

The White House's efforts were historic: for the first time in history, deaf and hard of hearing Americans had equal access to all White House briefings in real time.  The White House's policy for ensuring equal access was stated in a memorandum dated April 26, 2021 (the "ASL Policy"), which is attached.  The White House successfully implemented this policy for the last four years.

However, the White House appears to have ceased compliance with the ASL Policy referenced in the settlement and is no longer providing ASL interpreters for press briefings and related events.  For example, the White House did not provide an ASL interpreter for Press Secretary Leavitt's remarks on January 28, 2025, or President Trump's January 30, 2025 press conference.  Additionally, ASL interpretation is notably absent from recent videos on the White House's YouTube channel.

NAD strongly urges the White House to reinstate ASL interpretation services.  Access to White House press briefings is critical for all deaf and hard of hearing Americans, since it is the primary means by which the administration communicates important information to the public. People of all political affiliations have a right and desire to stay informed of what the President and his office are telling the American people in real time.  Captioning does not serve the needs of the large population of Deaf individuals whose first and dominant language is ASL and who cannot access information from the White House without ASL access.

Providing ASL interpreters is ethically imperative but legally mandated.  The  ASL Policy was implemented after a federal court ordered the White House to provide ASL interpreters for all press briefings related to COVID-19, which began in October 2020.  Through the ASL Policy, the White House expanded the use of ASL interpreters to *all* press briefings, not just those related to COVID-19.   We ask that the White House honor its commitment to accessibility by reinstating ASL interpreters for all relevant events.

Should you require any assistance in this process, including in securing appropriately qualified and certified deaf interpreting teams, please do not hesitate to contact our Chief Operating Officer, Kelby Brick, at kelby.brick@nad.org.

Sincerely,

Bobbie Beth Scoggins, Ed.D.
Interim Chief Executive Officer
bobbiebeth.scoggins@nad.org

- JA71 -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


NATIONAL ASSOCIATION OF THE   )
DEAF, et al.,                 )
                             )
        Plaintiffs,           )
                             )
     vs.                      ) CASE NO. 1:25-cv-01683-AHA
                             )
DONALD J. TRUMP, et al.,      )
                             )
        Defendants.           )
_____ )


TRANSCRIPT OF MOTION HEARING
**BEFORE THE HONORABLE AMIR H. ALI, DISTRICT JUDGE**
Wednesday - July 2, 2025
10:44 a.m. - 12:12 p.m.
Washington, DC


**FOR THE PLAINTIFFS:**
Arnold & Porter Kaye Scholer LLP
BY:  IAN S. HOFFMAN, SAMUEL KLEINMAN, ROBERT J.
     KATERBERG, ALEX SIRIO and CAITLYN KELLERMAN
601 Massachusetts Avenue, NW
Washington, DC 20001

National Association of the Deaf
BY:  BRITTANY SHRADER, DRAKE DARRAH and
     ALEXANDER VAN HOOK
8630 Fenton Street, Suite 202
Silver Spring, Maryland 20910


**FOR THE DEFENDANTS:**
United States Department of Justice
BY:  ELIZABETH THEMINS HEDGES and TYLER J. BECKER
950 Pennsylvania Avenue, NW
Washington, DC 20530
_____
**SONJA L. REEVES**
**Registered Diplomate Reporter**
**Certified Realtime Reporter**
**Federal Official Court Reporter**
Transcript Produced from the Stenographic Record


- JA72 -

(Call to Order of the Court at 10:44 a.m.)

DEPUTY CLERK:  Calling Civil Action 25-1683, *National Association of the Deaf, et al., versus Donald J. Trump, et al.*

May I have counsel identify yourselves for the record, beginning with plaintiffs' counsel.

But before you start, I would just like to put on the record that we have ASL interpreters, as well as certified deaf interpreters providing interpretation, and they have been previously sworn.  You can proceed.  Thank you.

MR. HOFFMAN:  Good morning, Your Honor.  Ian Hoffman with the law firm of Arnold & Porter on behalf of the plaintiffs.  I will introduce my colleagues who are also here to make things a little bit easier, if that's okay with the Court.

From the Arnold & Porter team, I have Mr. Rob Katerberg, Mr. Alex Sirio, Mr. Sam Kleinman, and Ms. Caitlyn Lewis.  From the NAD team, National Association of the Deaf, I have Ms. Brittany Shrader, Mr. Alex Van Hook, and also Mr. Drake Darrah, who is here as well.  All have noted their appearances on the record.

THE COURT:  Okay.  Good afternoon to you all. Welcome.

MS. HEDGES:  Yes, Your Honor.  I'm Elizabeth Hedges from the Department of Justice on behalf of the defendants. And with me at counsel table, also from DOJ, is Tyler Becker.

THE COURT: Good morning, Ms. Hedges. We're here, obviously, on plaintiffs' motion for preliminary injunction, and I'll hear argument from both sides.

You should each plan on 20 to 25 minutes each.

It's plaintiffs' motion, so I will let you go first. I'll have questions for you, but I will give you each a couple of minutes, at least, to kind of frame your arguments and orient me. I have read the briefing. I've read the relevant case law. This is an instance in which I'll just kind of front that we have some of my colleagues writing opinions that are pretty on point, including, you know, the chief judge's opinion. We have Judge Moss's opinion, Judge McFadden's opinions. So while they're not binding on me, they're thoughtful opinions and it may be a helpful tool to you in your argument to talk about, you know, which parts of those you think they got right and which parts you think they got wrong.

I'll just reiterate, there are a couple of reasons to pace yourself. We've got, you know, the best of the best in terms of court reporters here, but we do have to get everything on the record. We have ASL translation. And then, frankly, it's helpful for me if I can process everything you're saying, too. My court reporter knows she has license to interrupt you and let you know if you're going too fast, and don't worry if that happens, but it is helpful for you to slow down.

So with that, go ahead.

MR. HOFFMAN:  Thank you very much, Your Honor.  And we appreciate the accommodation with the interpreters today and the patience of the Court this morning.  My prime objective today, Judge, is to help assist the Court in reaching its ruling and writing an opinion here, and so I appreciate the Court's guidance.  Of course, feel free to direct me wherever you wish so I can be most helpful.

Your Honor, this is a case about ensuring that deaf Americans have the same access to White House press briefings as all other Americans.  Without that access, deaf Americans are being deprived of their fundamental right to participate in a democratic process and are being excluded from ongoing nationally important conversations.  The denial of ASL interpreters here is discriminatory, it's harmful, and it's ongoing.

The Rehabilitation Act, which indisputably applies to the defendants here, plainly requires that the White House provide appropriate accommodations to ensure meaningful access to the White House press briefings.  There is no dispute that providing ASL interpreters here is feasible and manageable.  The defendants did so for four years successfully and without issue.

This court, Judge Boasberg, remedied, similarly, discriminatory conduct in 2020 in NAD I case, and this Court should follow the same path here and order the defendants to

provide ASL interpreters for the White House press briefings.

THE COURT:  Can you address kind of the obvious distinction in that case taking place during the pandemic? Obviously, the government points that out, and you address it somewhat in the brief.  But, you know, that was dealing with press briefings on an ongoing spread of a virus, trying to avoid the spread, all of, you know, what goes along with the pandemic.  So can you just speak to that in terms of how that relates both to the Rehabilitation Act?  And then we can get to, also, irreparable harm.

MR. HOFFMAN:  Yes, Your Honor.  On the Rehabilitation Act, the analysis is the same.  The question is just whether the White House press briefings are themselves programs or services and whether the denial of interpreters for those press briefings is discriminatory and whether there's -- you know, whether providing the requested interpreters would be unduly burdensome or a fundamental alteration.

There is no legal doctrinal distinction between ASL interpreters for emergency or really important press briefings versus sort of, quote, "everyday press briefings," as I believe defendants' papers put it.  There isn't a distinction in the Rehabilitation Act for that, between those types of programs and services.  Section 504 applies to any programs or services carried out by the executive.

THE COURT:  Couldn't it be relevant -- I guess in

two -- two ways come to mind.  I mean, one could be in terms of what actually has to be provided, right?  If there's an urgency if you're dealing with a pandemic, maybe live translation is required.  But, you know, the government points to written transcripts, for example, if there is not a timeliness to it.  Couldn't that be relevant?

And then I guess the second piece, which I want to ask you about a little bit as well, is kind of -- you know, the language of the statute is "program" or "activity," and that's defined quite broadly.  And I know in your relief, you kind of cabin it in various ways as to which proposed relief, which types of activities, which types of briefings, for example, would be covered or not, but I'm not sure exactly how you get to that line through the statute.

So just start with the high level.  Couldn't it be relevant to those two parts, what needs to be provided and in which activities?  And then help me sort through exactly how you get to where you are.

MR. HOFFMAN:  Absolutely, Your Honor.  So the sort of urgency or imminent need kind of factor, Your Honor, I think is most relevant here for the irreparable harm piece of the analysis.  I think it's less relevant for sort of the merits of the underlying Rehabilitation Act claim because, as Your Honor notes, the definition of any programs or services is quite broad, and the case law backs that up.  It's essentially

anything that the executive does.

Where this case may differ in terms of the factors to consider from the NAD I case in 2020 is the irreparable harm. Obviously, irreparable harm there, I don't even think the defendants really disputed irreparable harm in 2020 because of the national health emergency that was going on.

Here is a different type of irreparable harm that is going on, and it's more of the ability to engage with the nation's leadership and to understand from the source what the nation's leader and his designees are saying to the American people. And the harm that comes from that is -- depending on the press briefing, of course, is more the nature of depriving deaf Americans of the ability to participate in their democracy going forward.

We cite the cases the *NAD versus State of Florida* case, I believe we cite in our reply brief, which was about the Florida legislature's failure for a time to provide closed captioning for certain televised legislative proceedings. And the court there very clearly held and explained, citing a district court case in Oklahoma also on point, that there's a fundamental right for deaf Americans to participate in the democratic process that was implicated by that failure. That ongoing deprivation is what's happening here. So the nature of the irreparable harm is different in that case and this case.

THE COURT: To the extent you have specific things in

mind -- I realize -- you know, I'm not going to ask you to make you an exhaustive list. But, you know, with the pandemic, you could point to the pandemic and something very specific. When you say "loss of participation," are there examples that come to mind, things where there would be irreparable harm, things that are discussed in press briefings in particular that stick out to you, that if you weren't able to participate in a live fashion, you would be missing out on what you're discussing?

MR. HOFFMAN: Again, I mean, I'll start with the broadest generality, Your Honor. And the same cases I talked about out of Florida and out of Oklahoma talk about the First Amendment right to petition the government for grievances. If the citizens don't know what the government is saying, it impinges on their ability to petition for grievances. It could come up in a variety of contexts, you know, cuts to Medicare and Medicaid, immigration issues, whether the nation is going to war, Your Honor.

It's difficult to draw distinctions here as to which kinds of -- whether depriving deaf persons of some of those press briefings is more harmful than others. I think that when the president or his designees decide to take the podium and address the American people or address the press, who will then, you know, distribute to the American people, those are matters of national significance and importance.

And so while we focused our relief sought in the first

case on the urgent and imminent health issues, these same underlying harms apply here. And, again, to be clear, Your Honor, you know, there could be, at any point, other sort of significant health issues that arise, God forbid another pandemic, but things that are national emergencies or natural disasters and things like that, that could arise. To be clear, we're not limiting our relief to that request. We're requesting it for all press briefings.

THE COURT: And then, can you address the government's argument that either written transcripts or closed captioning or the combination of the two would be sufficient?

MR. HOFFMAN: Absolutely, Your Honor.

THE COURT: I mean, sufficient with respect to kind of particularly the categories of things you just laid out, even if it weren't sufficient in the context of the pandemic?

MR. HOFFMAN: Absolutely, Your Honor. The record evidence in this case overwhelmingly shows that English closed captions and written transcripts are not adequate to provide meaningful access to the plaintiffs and many, many other deaf Americans. We submitted an expert affidavit from expert linguists and experts on American Sign Language and language acquisition that explain point by point, in detail, why American Sign Language is not English, turned into hand signs, and where because of the nature of deafness and the nature of language acquisition and the nature of when -- again, the

distinctions between a spoken and written language, like English and American Sign Language, for deaf persons to understand written English, especially at a complex level of the types of things being discussed at press briefings, it requires an extremely high level of competence in what is essentially a second language, a distant second language.

THE COURT:  So the idea is the response isn't -- you would say that it's kind of not an adequate response to say, well, this is less time sensitive, less urgent; and, therefore, we can use these other means, like closed captioning and written testimony, because it's not about just the live nature of the participation, it's about actually focusing on the type of translation that will be understood by the population?

MR. HOFFMAN:  That's right, Your Honor.  For my clients, for individual clients, and for many other deaf Americans, even a complete and accurate written transcript provided consistently and right after the fact, which, by the way, isn't happening now, to begin with, but even if it were, that would not provide meaningful access because it's not a matter of the closed caption -- it's not a matter of understanding and having access to word-for-word English.  It's a matter of having meaningful access to the message being conveyed in a way that deaf Americans who rely on American Sign Language can understand.

And it's a disability issue, Your Honor.  It's not --

there's a lot of references in defendants' papers to a second language and spinning out hypotheticals and what about all these other foreign languages. It's -- it's not just a language issue. It's an issue driven out of plaintiffs' disabilities and their deafness, and that's what distinguishes it from -- you know, there's no requirement in the Rehabilitation Act to provide, you know, all these other --

THE COURT: Right. There wouldn't be a disability in the first place, which I think is where you start?

MR. HOFFMAN: That's right.

THE COURT: Can you help me understand, what do I make of the fact that, and correct me if I'm wrong on this, but that ASL for press briefings just started relatively recently? And I know you describe it as -- as groundbreaking, and I understand that, but the law doesn't require every administration to continue something that was groundbreaking in a prior administration. So help me understand that.

And given how long the Rehabilitation Act has been a law, is the idea that, you know, all prior administrations were violating the law? Did it just not come up? Help me understand kind of how to situate the history and the significance, if at all, here.

MR. HOFFMAN: Understood, Your Honor. And so from the beginning, the law has required meaningful access, of course. And -- but, over time, the means by which, here the executive

agencies, can meet those obligations, it can change and evolve based on technology.

In 1978, closed captions weren't as prevalent. Wheelchair accessibility was not as prevalent. We just didn't have the technology that makes these types of accommodations as feasible and simple as they are now.

And merely because of that technological change and because something becomes feasible now, and because it wasn't provided before, doesn't mean the law doesn't require it today. I don't know if that answers the judge's question.

So one, I guess to boil it down, one would be pace of technological change makes accommodations that would provide meaningful access more feasible, and something that might not have been feasible in 1985 is feasible now, and the law might not have required it in 1985 in terms of that particular type of accommodation, but the law can and should look at each case in its present time and look at each case on the facts and circumstances before it.

Again, there are the ability to have video remote interpreting, for example, having an interpreter on an iPad at hospitals, and things like that. This is brand new.

THE COURT: Yeah. It's interesting. As you talk about it, I mean, I know the government makes an argument about the president's control of his image and right to control the image, and I'll ask the government about that. I want to

understand what they mean by that.

But in a way, the technology creates -- setting aside the kind of what the law requires, creates greater flexibility in terms of implementation, too.  I imagine there was a time in which you couldn't but have ASL without having someone directly next to the president.  But now there's a lot of other opportunities, including having different feeds, and I know you all proposed that it doesn't even have to be the main live feed, that there just needs to be a feed.

Do I understand the relief you proposed correctly?

MR. HOFFMAN:  We do request that it be a live feed, Your Honor.

THE COURT:  Live feed, but not that it has to be the only feed.  There could be one with ASL available and one without?  Maybe help me understand that piece.

MR. HOFFMAN:  So the relief we're seeking here would be that the ASL interpreter would appear on the screen at the same time as the speaker, so if it was President Trump or a press secretary, so we could -- on his YouTube page, for example, or the White House website, which is now carrying live press briefings and also all the archived press briefings, that when someone navigates to the White House website, they click on a video, they see the president, and also on the side of the screen they see the American Sign Language interpreter at the same time.

THE COURT:  So it wouldn't necessarily need to be -- you're not proposing that it's someone right next on the podium all the time --

MR. HOFFMAN:  Oh, yes.

THE COURT:  -- or right next to the person speaking in the press briefing.

And I guess part of my question is:  There could be a feed that includes the ASL live translation and a feed that doesn't, couldn't there, on the main website?

MR. HOFFMAN:  So two responses, Your Honor.  One, yes, the defendants could satisfy the injunction that we're requesting by physically placing an American Sign Language interpreter on the podium in close physical proximity to the speaker.  That would be one way.  And then so long as the White House cameras capture that person in the frame.

The alternative method, which is what the prior administration carried out, was the American Sign Language interpreter in a separate location with a separate video feed, but technologically, they can sort of fuse them together with relative ease and push them out in one feed together onto the White House website or the like.

The second issue you're raising, Your Honor, if I understand you correctly, is -- is whether we're requesting or whether it would be feasible to have essentially one web page, like one -- the official White House YouTube page, which pushes

out all their press briefings, that does not have an American Sign Language interpreter, and then have a separate official White House YouTube page that also includes the interpreter. And we're not requesting that, Your Honor.

I mean, that would certainly provide more access than now, but that feels very separate but equal, that it would be relegating deaf viewers to a different place, where the rest of the American people can go to watch these press briefings. And so we think it's most appropriate and most sensible to put them together.

Defendants obviously haven't proposed any of that kind of separate feed and haven't -- and there isn't any record evidence as to whether that's feasible or how that would actually work and whether it could be equal. But, you know, in the history of civil rights in this country, we usually have problems with separate accommodations for certain groups being equal when they should be provided together.

So that is -- but, again, certainly it would be more than what's being provided now, but the requested relief is that it be in the same place.

THE COURT: Can you help me -- we jumped to relief, and that was my fault. But can you help me, backing up a little bit to the statute, specifically on the Rehabilitation Act claim, can you walk me through this for a moment? Just at a high level, walk me through how you read the interactions

between -- and, really, I'm talking about 794 Subsection A and then 794a.  I don't know why Congress does this to us.  Good luck to my court reporter.  But, you know, those two side-by-side provisions and what they do.

MR. HOFFMAN:  Absolutely, Your Honor.  For my own ease of reference, I might refer to them as 504, which is 794 in the statute.  To be clear, for the record, 29 United States Code 794 is the same as Section 504 of the Rehabilitation Act.

THE COURT:  That's fine.

MR. HOFFMAN:  29 U.S. Code 794a is Section 505 of the Rehabilitation Act.  So I might refer to them as 504 and 505, which makes it slightly easier, in my mind as least.

Here's how they fit together, Judge, and some of the history is relevant and important here.  Section 504 was implemented in 1973.  There wasn't a Section 505 implemented in 1973.  The Section 505 is the remedies provision that talks about certain remedies under Title VI and Title IX being available for certain types of Rehabilitation Act violations.  That is for certain types of 504 violations.

But from 1973, the language added in 1973 was the same language that Congress had already passed in Title VI of the Civil Rights Act and Title IX of the educational amendments.  No otherwise qualified person shall be discriminated on -- I mean, I'm paraphrasing a little bit -- based on race or sex, the exact same language Congress used in passing the

Rehabilitation Act in 1973.

And jumping ahead, Your Honor, that is the rights-creating language that creates the private right of action.  It is not the separate remedies provision of 505 that was added in 1978.  It wasn't that remedies provision that creates the right of action.  The Supreme Court's *Cannon* decision makes this clear, the Supreme Court's *Alexander v. Sandoval* decision, Justice Scalia's opinion, makes that clear.

THE COURT:  We need to switch interpreters.  Just pause for a moment.

Go ahead.

(Pause.)

MR. HOFFMAN:  The *Cannon* case from the Supreme Court, the *Alexander v. Sandoval* decision from the Supreme Court, they all emphasize that the keys to finding implied rights of action under Title VI and Title IX was that language.  Where the *Mathis* opinion and the *Doe* opinion, the recent opinions that disagree with Judge Boasberg's opinion, where they go off track, Your Honor, respectfully, to the other judges of this court, but where they conflict with Judge Boasberg's decision and where we think they got it wrong is by focusing almost exclusively on the remedies provision of 505 and not recognizing the history and the Supreme Court's decisions that the language of 504 is what creates the right of action.

Your Honor, very strong evidence of this sort of

rights-creating intention and purpose of -- the intention of Congress in creating a private right of action comes in the legislative history for the 1978 amendments.  When Congress was discussing adding certain remedies to the Rehabilitation Act, it talks -- Congress specifically talked about the existence of private actions already being taken under 504 as it existed, and there is specific discussion in the record of a desire to bolster the ability of disabled persons and make their claims stronger by seeking things like legal fees.  And so when they --

THE COURT:  So what's your response to why didn't they -- I mean, look, they have the federal employment provisions, they have the financial assistance provisions, and then they've got the provision you're going under here, and there were remedial provisions as to the first two that were added in '78, and not the third one.

Why?  What's your response?

MR. HOFFMAN:  First of all, Your Honor, there was one remedial provision added in 1978 that would apply to the claims here, and it's the fee-shifting provision.  This is another place where the *Mathis* opinion gets it wrong, Your Honor, because there's a footnote that says, well, the fees provision only applies to the other types of Rehab Act violations.  But the plain language of that provision, it's separated and apart from 505(a)(1) and (2).  It's 505(b).  It says, any violation

under this subchapter, which includes 504.  So the attorney fee remedial --

THE COURT:  Does that beg the question, though, of whether you can bring a claim in the first place?

MR. HOFFMAN:  I don't think so, Your Honor, in light of this legislative history, because there is specific discussion about bolstering existing private rights of action.

THE COURT:  And I suppose any violation under this chapter would suggest that it applies to any violation of the preceding section.

MR. HOFFMAN:  That's right, including violations by executive agencies in carrying out programs and services.  So that addition, and the fact that by its language the attorney fees provision is broader --

THE COURT:  So which part -- you said it's in conflict with Chief Judge Boasberg's opinion, I believe.

MR. HOFFMAN:  So the *Mathis* --

THE COURT:  *Mathis*, I understand why it would be in conflict with *Mathis*.  Did you say there's also a conflict with --

MR. HOFFMAN:  No.  I might have, but I would have misspoke.

THE COURT:  Okay.  Maybe I misheard you.  Okay.

MR. HOFFMAN:  Yes, there's a piece -- so backing up, Judge Boasberg, in the 2020 opinion, talks about the

fee-shifting provision and how that is further evidence of an implied --

THE COURT:  What I had heard, and I might have misheard, was a few steps earlier when you were talking about focusing too much on the remedial provision.

MR. HOFFMAN:  Yes.

THE COURT:  That maybe all the earlier decisions focused on that too much.  Is there something you're disagreeing with in the chief judge's opinion or no?

MR. HOFFMAN:  There's nothing I'm disagreeing with in the chief judge's opinion.

THE COURT:  All right.  That answers my question.

MR. HOFFMAN:  What I pointed out about Judge Mathis' [sic] opinion, he has a footnote -- sorry, *Mathis* opinion, Judge McFadden's opinion there, he has a footnote --

THE COURT:  I understood your point on that.  Let me ask you this.  Judge Boasberg found a private right of action under the Rehabilitation Act, obviously.  Judge McFadden didn't, but found that the Rehabilitation Act still didn't displace equitable powers of the Court.

Is there -- is there a particular order you think the analysis has to happen?  In other words, let me ask you this way.  If the Court were to conclude that there is an equitable power that's left in place, does it have to address the statutory question?

MR. HOFFMAN:  I think likely not, because plaintiffs would get complete relief.  I mean, assuming plaintiffs would get complete relief under the Court's equitable power, plaintiffs would encourage the Court to rule in the first instance that there is an implied private right of action here and follow Judge Boasberg's decision on that, even if the Court, sort of in the alternative, holds that even if there weren't --

THE COURT:  Yeah, that's fine.  I'm just trying to understand the relationship between --

MR. HOFFMAN:  Yes.

THE COURT:  -- the arguments and whether one is necessary to go first or not, or just from a matter of logic.

MR. HOFFMAN:  I think, so long as plaintiffs get the relief they're seeking, plaintiffs would be satisfied.

THE COURT:  You just want to win.  I understand that point.

MR. HOFFMAN:  Your Honor, I think that, you know, it's important to recognize that defendants rely heavily on the *Mathis* decision and the *Doe* decision that follows on to that, and we obviously disagree with that.

There is one other point about this I just want to make sure that I can make.  But if the Court were inclined to accept the *Mathis* view of the Rehabilitation Act and not the NAD I view, then the Court should, of course, apply the rest of

*Mathis* as well, which is finding an inherent equitable authority to remedy the same violations.

THE COURT:  Turning to the merits, we talked briefly about program or activity, and it has a broad understanding. It seems to be defined as basically everything that the agency does.  Yet, your relief, as I understand, is tailored in some ways.  It's limited to press briefings.  I think there's limited to the ones for which there's notice that they're going to happen.  So where does that come in?  Is that from a practicality perspective in terms of fashioning relief for an injunction?  You know, to kind of put it in a blunt fashion, how do you respond to the argument that, okay, if it's true that that accommodation is required and that ASL is required, then there has got to be an ASL interpreter following, you know, every one at the agency anywhere they go, any time they're going to speak publicly?  And, obviously, that's not what you proposed in the injunction, so help me connect the dots.

MR. HOFFMAN:  Your Honor, I'm always struck by these types of arguments, and similar arguments came up from the defendants in the first case.  They are a form of slippery slope arguments, that the fear is that there will be slippery slope to more accessibility and slippery slope to more inclusion and access.

THE COURT:  I'm not worried about it from a slippery

slope perspective.  I'm asking about it from a legal and logical coherence.

MR. HOFFMAN:  I think that where defendants get it right is by citing cases that each case is fact dependent both in terms of the disabilities at issue, the types of accommodations that are being requested.  And it's a fact-dependent exercise, and it depends on the relief that's being sought.

Here, we are seeking particular types of relief that we know to be feasible and that we know will not cause undue burden and fundamental alteration.

Hypothetical questions about, well, are there other things that these agencies are doing that aren't providing meaningful access and how would you remedy those, I understand Your Honor is asking a hypothetical.  Those are cases for another day, though, and they would involve their own individualized analysis as to both the need and the feasibility of the type of accommodation being sought.

And in other cases, that the outcomes might vary because they're very fact dependent.  They're very technologically dependent at times nowadays, and whether adding accommodations would fundamentally alter a program or service is a particularized inquiry into that program or service, in combination with the requested relief.

So I understand the Court's questions and I understand

the hypotheticals of sort of, you know, what about the next case and sort of where does this end, and I think that it's just like many other developments in the case law and developments in civil rights case law, that the courts address each case as it comes.

THE COURT: Okay. The government's argument, and I think it was actually Judge Moss's conclusion in one of the cases, is that because there's no private right of action, that the APA is an available mechanism. Why didn't you bring an APA claim?

MR. HOFFMAN: Your Honor, to be clear, in this case defendants themselves have maintained that the APA does not apply here.

THE COURT: At a high level, the Rehabilitation Act argument is that the APA remains an available remedy.

MR. HOFFMAN: Yes, Judge. I think that that principle --

THE COURT: Can you answer my question? Why didn't you bring an APA claim?

MR. HOFFMAN: Because we don't believe that the APA applies to these defendants either.

THE COURT: So it's just because the particular defendant actors would be excepted from --

MR. HOFFMAN: That's right.

THE COURT: Okay.

MR. HOFFMAN:  There's a specific definition of agency.

THE COURT:  This is my last question, but I'll give you the chance to add anything that you think you need to.

Does the relief you're asking for differ in any way from what was provided by the last administration?

MR. HOFFMAN:  No, Your Honor, it does not.  And we tailored the relief to that because we know it works.  So I don't know if that answers the question.

THE COURT:  That does answer my question.  Let me ask you a slightly different question.

Is there any aspect -- I'll ask you two questions, and you can try to answer them both related.

MR. HOFFMAN:  Sure.

THE COURT:  Is there any aspect of what the administration provided -- the last administration provided that perhaps you liked, but you'd say wasn't required by law?

And then similarly, does the relief you propose offer greater flexibility than just what the last administration did, and, if so, in kind of what ways?

MR. HOFFMAN:  On the first question, Your Honor, I think one distinction I would make -- let me back up.

I would say that I think that the accommodations that were provided by the last administration, as reflected in the policy document on which we based our prayer for relief, I think that the Rehabilitation Act would require American Sign

Language interpreters for all of those types of briefings.

However, Your Honor, for purposes -- I can acknowledge that for purposes of a preliminary injunction, the analysis of whether, for example, the second lady is doing a press conference about, I don't know, a ribbon cutting or opening of a building or something like that, a charitable event, that doesn't prevent the same type of risk of irreparable harm from depriving plaintiffs of that kind of press briefing. It's not whether the nation is going to war. It's not whether there will be significant cuts to healthcare services for people across the country.

And so we are -- to be very clear, we are seeking and requesting an injunction for all of those types of briefings, but I can acknowledge that the irreparable harm inquiry for certain types of those briefings might be different. But even if the injunction were more narrowly tailored, we would obviously maintain those claims for the life of the case.

THE COURT: Understood. Got it. That makes sense.

All right. Any other submissions you want to make before you sit down? I'll give you the chance to have a brief rebuttal, too.

MR. HOFFMAN: Absolutely, Your Honor. Just two -- two that quickly come to mind, Your Honor, of points that I believe are responsive to your earlier questions.

So on the implied private right of action issue, I

emphasize the attorney's fees provision and why that was one sort of way to make sense of the logic of the remedies provision 505(a) only addressing certain types of violations, and why was that done.  And I point out the 505(b) emphasizes -- or applies to all types of violations under 504.

But another point I wanted to make in terms of why did Congress -- why could Congress have done this, I guess two points on that.

Number one, it would have been an additional waiver of sovereign immunity to add the remedies that are available in 505(a), which include money damages.  It would have been an additional waiver of sovereign immunity to apply those remedies to any --

THE COURT:  That's if they said money damages.  I guess the question was more, why didn't they include a 505(c) that just says you can get injunctive relief.

MR. HOFFMAN:  Oh, because -- I understand Your Honor's question.  I mean, that --

THE COURT:  The subject on its face, it's called remedies, right, remedies and fees.  Or I should say the section is called Remedies and Fees.  So why didn't -- if they were providing damages and all sorts of other remedies available under Title VII for the employment context, if they were providing, you know, damages and other remedies under Title VI for the financial assistance context, why didn't they

still say, you know, and, by the way, you can sue for injunctive relief?

MR. HOFFMAN:  Well, Your Honor, I think the legislative history, then, is relevant here, because, clearly, the authors of the bill, at least the Senate bill, emphasize that they were adding remedies to bolster existing private rights of action.

THE COURT:  To that point, can I just ask you, you mentioned damages for 505(a) and (b).  Are there other types of specialized remedies that were added in those sections, and what are the ones that are relevant to you?

MR. HOFFMAN:  Well, they're relevant as part of the analysis in that --

THE COURT:  That's what I mean, relevant to your analysis.

MR. HOFFMAN:  Many of them, Judge, apply to employment-related issues.  The Title VI and Title IX statutory provisions that are referenced in 505(a) are all about things like following EEOC procedures, the ability of courts to award backpay and reinstatements.  The overwhelming majority, I would submit, Your Honor, of the types of relief that were added in 505(a)(1) and (2), apply to employment claims.  505(a)(1) is, by its terms, adding remedies to claims against the federal government as employer, but 505(a)(2) would apply to employment disability, employment discrimination claims against federal --

recipients of federal financial assistance.

So another sort of logical inference that can be drawn here is that the intention of Congress was to beef up the employment-related remedies in 505(a)(1) and (2), which don't map cleanly on to the types of claims at issue here, where the government is providing claims for services.

THE COURT:  And was there a second point you wanted to make?

MR. HOFFMAN:  Yes.  It's back to the irreparable harm argument, Your Honor.  And I guess two points about irreparable harm.  Again, we lay most of this out in our papers, but I think it bears emphasis that Judge Mathis' opinion -- I keep calling Judge Mathis, I'm sorry -- *Mathis* opinion, Judge McFadden's opinion in the *Mathis* case, also dealing with a Rehabilitation Act claim for failure to provide programs or services on an equal manner, said that the denial of equal treatment itself constitutes an injury, even if the plaintiffs in that case ultimately share in the same degree of success as their nondisabled counterparts.

And so the Court goes on, "This kind of harm is irreparable.  The Court cannot undo the discrimination plaintiffs have faced in the administration of their supervision.  And the law doesn't provide for money damages, so all that's left is forward-looking equitable remedies."

So the Court doesn't go so far as saying there's, per

se, irreparable harm with discrimination and you don't have to look at it at all.  What the Court's saying is that where there is discriminatory conduct, that's a strong indication of irreparable harm, even if there aren't downstream consequences that someone can point to.

THE COURT:  Got it.

MR. HOFFMAN:  And the last point, Your Honor, is about the sort of, well, hasn't this been the sort of state of the world for the last 50 years, and now you're claiming that the law requires this.  Also in the *Mathis* opinion, Judge, the government in that case argued that the harm wasn't really irreparable because the allegedly problematic practices date back to 2000 and the case was brought in 2020.  And the Court says, "Time alone does not immunize unlawful practices."  And that rings especially true here because Congress designed the Rehab Act to target disability discrimination that was most often the product not of invidious animus, but rather a thoughtlessness and indifference of benign neglect.

So the same principles apply here, Your Honor, and just because it hadn't been done before doesn't mean it's not required now.  Happy to answer any other questions.

THE COURT:  I appreciate that.

I'll hear from the government now.

MR. HOFFMAN:  Of course reserve time for rebuttal, if the Court permits.

THE COURT:  You don't have any time to reserve.

MR. HOFFMAN:  The ability, Your Honor.  Thank you.

MS. HEDGES:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MS. HEDGES:  May it please the Court, Elizabeth Hedges on behalf of the defendants.

Plaintiffs' requested relief would require the president to include ASL interpretation at all press briefings, regardless of whether plaintiffs plan to watch any given briefing and regardless of what other aides and accommodations are provided.  The requested injunction would effectively recognize a right to make the current administration continue a policy of the prior administration, a policy that the plaintiffs have shown no legal entitlement to in any statute or controlling precedent.

Indeed, the relief the plaintiffs seek here goes far beyond what the organizational plaintiff NAD argued was necessary in 2020, and it seeks to legally enshrine a policy that the Rehabilitation Act has never been interpreted to require.

I want to start with irreparable harm, which is where the Court, I believe, started with opposing counsel.

THE COURT:  Sure.

MS. HEDGES:  And it's very key here that there's no irreparable harm, for several reasons.  The first thing I'll

note is that there is no dispute that the plaintiffs do have access to captioning, they have access to transcripts, and they have access to press coverage in the media.

Now, the dispute is over, of course, whether those other means of access are sufficient under the Rehab Act.  But the problem for irreparable harm is that, as this Court's colloquy with opposing counsel recognized, those other opinions that recognized a right to ASL interpretation were in the COVID context, and Judge Boasberg's opinion explicitly recognizes, in several places, that he's taking into account that context.

THE COURT:  Understood.  But, I mean, help me understand this, because you started off by saying they're trying to demand a particular rigid form of relief, and I wondered if what you were getting at was, you know, we've suggested closed captioning and transcriptions.

But, as you heard, the argument that's being made is not about time limits or urgency; it's about the type of accommodation and the type of translation that actually matters here for the deaf population.

So how does it help to point to things that might not be adequate, and where is the evidence in the record that supports your side that those would be adequate?

MS. HEDGES:  Your Honor, because the plaintiffs have the burden, they have to show that it's not adequate, and here's where the issue comes up in this posture.

So they haven't shown -- they haven't carried their burden to show that they're being caused irreparable harm by the lack of realtime access. And Your Honor asked me about, well, is it a timeliness question, and I read the plaintiffs' declarations and their briefing, and they do talk about this lack of alleged real-time access. So I did actually read that, until I got here this morning, to be part of their claim.

And the reason that that matters under the case law, for example, if this Court looks at the *Yelapi* decision from the Northern District of Florida, very similar claim there, and that was in the COVID context. But the Court said the plaintiffs haven't established that they're entitled to ASL interpretation at all press briefings even just on the subjects of COVID, natural disasters, things like that, because they haven't established that there's the same type of urgent need for information in any given press briefing.

So if you look at Judge Boasberg's opinion in 2020, you look at his irreparable harm analysis on page 58 of his opinion, he's talking about their --

THE COURT: No. I understand the context there and I understand that he pointed out and relied on the context there and it might have made the case easier. But I still don't think that quite responds to the evidence that plaintiffs are adducing is that ASL is the relevant way for people to understand. It's not just a timeliness thing, but it's the --

it is the accommodation.

And then the government is saying, well, we have closed captions and we have written transcripts, but there's no evidence rebutting what plaintiffs have introduced. And this is court and evidence matters, and I understand plaintiffs have a showing to make, but they've actually provided evidence to the Court. And what I have on the other side is argument from you saying, well, just be happy with closed captions and transcriptions.

Can you point me to any evidence you've given me?

MS. HEDGES: Right, Your Honor. So, again, the evidence that we have -- so there's a couple pieces to this. But I don't dispute that plaintiffs allege that ASL is their preferred language and their first language. I'm not disputing that. I'm not disputing that that's -- might be an easier way, according to what they're alleging, to access the information. That's not what I'm disputing.

What I'm disputing is, are they actually being deprived of access in a way that's meaningful under the statute, because you'll notice if you look at their declarations, there's a line in the declarations that says, when I watch television, I have trouble understanding closed captioning, especially if the content is complex. But, of course, the converse of that is, so it appears that they are watching television. So I think that there's -- what's left

unestablished by those sorts of allegations is, okay, you're accessing content that you're alleging in this context is not being sufficiently made available to you.  And so I don't think that they've established that that is insufficient, but even --

THE COURT:  I'm trying to understand, without evidence from the government, how I even figure out -- I'm not clear what the government's position is.  Could you get rid of the closed captioning and the written transcripts and say, well, there's no urgency here, so people could just go hire -- take the time and resources and go hire their own person to transcribe it and then have their own person translate it into ASL?

MS. HEDGES:  No, Your Honor.

THE COURT:  Why?  Tell me what distinguishes that from -- I just don't have evidence from you, so I don't know what the position is of the government of what is sufficient and what is not.

MS. HEDGES:  Right, Your Honor.  So if I'm understanding correctly, we don't have to provide evidence that something -- so, for example, we're not required to bring our own expert and say -- in this posture, and say, well, actually, they can read just fine.

THE COURT:  Well, you're not required to, but if you want to rebut evidence that's in the record -- like, plaintiffs have the burden here.  Everybody knows that.  And plaintiffs

have actually adduced evidence as to what would be meaningful to the actual disability that's at issue here. And for you to come back and say no, no, no, no, no, ignore that evidence, my question is, based on what?

MS. HEDGES: Right. So just to take a step back here, a couple of things. One is, so they don't allege they can't read English. And, again, I understand that there's a disagreement about what's sufficient under the law. But they don't allege that that's actually totally inaccessible to them. And we do need to look at --

THE COURT: So could the government get rid of the closed captioning and the written transcriptions?

MS. HEDGES: No, Your Honor. So the other thing I was going to say is, Your Honor raised this point of, like, should they go hire someone to make their own transcripts. There's no dispute that I've seen in any of the papers or heard today that those transcripts and captions are available for any given press briefing that the plaintiffs have tried to access. The dispute is only over whether that's sufficient.

And so the other thing I would say is, especially on irreparable harm, if it's really irreparably harming them to access real-time information in the way that they're describing, why didn't they make that same claim in 2020? In 2020, they were saying, we need COVID-related information in real-time.

THE COURT:  Wouldn't the answer to that be that there was a COVID pandemic going on and it wasn't a war going on and other things that you might want to know what happened?

MS. HEDGES:  Your Honor, I think my understanding of having looked at both cases in this case -- or, I'm sorry, looked at both cases and the briefing in both cases, is that they said in 2020, we have an irreparable harm from lack of access to COVID-related briefings.  I'm not sure -- there was plenty of other stuff going on in the world in 2020, as we all recall, that wasn't COVID.  But now plaintiffs are arguing, well, we have an irreparable harm because we are being allegedly denied access to all of these topics without centering on any particular one.

And I'm just highlighting the problem with that because they had an opportunity in 2020, if this was really irreparably harming, especially the organizational plaintiff which was present in both cases, they had the opportunity to say that the Rehabilitation Act requires this and it's irreparable harming us.

THE COURT:  The idea being -- so that case went to a PI decision.  The idea being, plaintiffs there, when there was a live pandemic, were focused on getting information only about the live pandemic and weren't mentioning everything else and, therefore -- finish the sentence for me.  And therefore, they shouldn't be able to ask for live briefings today?

I just don't know what that gets you.  I get it, they were focused on the live pandemic.  The opinion was about providing briefing on what they were focusing on.  But I don't understand the end part of your sentence.  They're precluded?  They're -- I just don't understand how you finish the sentence.

MS. HEDGES:  No, no.  Your Honor.  And this, of course, is not my entire argument on irreparable harm.  I just think -- I'm just saying it's telling, and it undercuts the credibility of their claim now that they're being irreparably harmed.

THE COURT:  Specific to harm?

MS. HEDGES:  That's right, Your Honor.  That's my only point on that.

THE COURT:  Got it.  Okay.  That's actually helpful.  I appreciate that.

Can you tell me on the legal arguments you have -- I know you've got claim preclusion, the settlement agreement, you've got the Rehabilitation Act responses, and equitable powers responses.  What do you think your strongest argument is?

MS. HEDGES:  Your Honor, so in this posture, again, we think we have a very strong argument on irreparable harm.  But on the merits -- so I would start with the cause of action.  So as Your Honor was pointing out with opposing counsel, there's a serious structural impediment in the text of the statute to

plaintiffs' interpretation.

And, as Your Honor recognized, the *Doe* case, the *Mathis* case, the *Sai* case, which predated Chief Judge Boasberg's opinion, all of those cases looked at the statute.

Here is the chronology, and my friend on the other side touched on this, but I just want to walk through what happened. So 1973, we have the act. It's got a substantive provision about recipients of federal financial assistance. 1978 comes along --

THE COURT: Can I pause you there? This is actually helpful. I want to have you finish through this.

If we were just -- if we were in 1974, right, 1975, you just have that original version of the act with the different language saying, you know, "No otherwise qualified individual who shall, solely on the basis of their disability, be excluded from participation in activities and in financial assistance," if we just had that language that's in Section 504, and we're in 1974, would you be here? Would you have an argument that there's no cause of action?

MS. HEDGES: I think so, Your Honor, because -- I mean, I would have to visualize what that entire statute would look like, but --

THE COURT: We were going to read the whole statue in context, and that's where you're about to take me, but it's kind of helpful to do it one step at a time.

MS. HEDGES:  Right.

THE COURT:  And so what I'm saying is, you've got what the plaintiffs are saying is the rights-creating language. Take *Sandoval*.  Take whatever case you want.  It seems pretty comparable to what the Supreme Court has said is rights-creating language, and that's all you have, because we're in 1974.  You don't have the Section 505 yet, is my understanding.

MS. HEDGES:  That's right, Your Honor.

THE COURT:  My question is, would you be here?  Would you have an argument that there's no injunctive relief?  And if so, why?

MS. HEDGES:  I think so, Your Honor.  Again, I didn't brief this, so I want to say I think so.  Section 505 is the language that points litigants to the Civil Rights Act of 1964 and says that the remedies procedure --

THE COURT:  But didn't that come later?

MS. HEDGES:  That's right.

THE COURT:  Right.  But work with me.  We're in 1974 and 1975.  It has not come yet.

MS. HEDGES:  That's my point, Your Honor.  If we don't have that language, I would probably argue that Congress needs to speak very clearly to provide a right of action, and that's what the *Sandoval* case says.

THE COURT:  But doesn't it say, this is what they need

to say, essentially?

MS. HEDGES:  It actually says more than that, Your Honor.  So *Sandoval*, page 290 of -- 532 U.S. 275 at page 290, the *Sandoval* opinion says -- and this is the part that would apply to your current question, Your Honor -- "Even if other aspects of the statute, such as language making the would-be plaintiff a member of the class for whose benefit the statute was enacted, suggests the contrary" -- so I mixed myself up.

So this would apply to the world today.  If there's an express remedy, then --

THE COURT:  Right, right.  But we're not there.  There's no express remedy.

MS. HEDGES:  But the Court has also said that even if you're creating a substantive private right, that doesn't get you all the way to a private remedy, and that's what the Court in *Mathis* said as well, and that's what the Court -- Supreme Court just reminded us last week in *Medina* which is, just because Congress created a benefit doesn't mean that it created a remedy and we have to --

THE COURT:  So if we're in 1975 and a Court is reading, you know, "No otherwise qualified individual with a disability in the United States shall solely by reason of their disability be excluded from participation in an executive agency's activities," you would say that does what?  Nothing?

MS. HEDGES:  No, I wouldn't say it does nothing, Your

Honor.  I guess what I'm laying out here -- and, again, I didn't brief the statute this way because --

THE COURT:  What does it do?  A court reading that language, what does it do?  It either does something or it does nothing, and it sounds like you're telling me it does nothing.

MS. HEDGES:  No, Your Honor.  I'm not saying it does nothing.  I think we would still have an argument that there is no private right of action.

THE COURT:  Based on what?  It's kind of an important question, right, because you were just walking me through the timeline, and that is what existed at a certain point in time, and that language, as I understand it, wasn't changed.

So what is the argument that that language wouldn't be rights-creating language just vis-a-vis an injunction?  I understand that it wouldn't provide a damages remedy.  But just vis-à-vis being able to go into court and say, look, this is language that say, "No otherwise qualified individual with a disability in the United States shall solely by reason of their disability be excluded from participation in an executive agency's programs or activities," and that's happening to me, and I can get an injunction under this language, your argument would be -- I know you say that you would have an argument, but using that text, what is missing?

MS. HEDGES:  So, Your Honor, I do need to respectfully push back a little bit, because I think it is so clear what

Congress did in 1978 that -- that -- it's -- it's like the chronology is so clear and what Congress did --

THE COURT:  That's fine.  If you want me to tell me, look, before 1978, I wouldn't have an argument, we can move on to 1978, you can tell me that it's so clear.

MS. HEDGES:  No, Your Honor.  To be clear, I don't think I can concede that, because if it were 1974, I would have done a deep dive on the world as it existed at the time, and that's -- so I don't want to make a concession that I --

THE COURT:  Fine.  Do you have a statutory argument for me now with the deep dive that you've done --

MS. HEDGES:  Right.  Yes.

THE COURT:  -- that the language alone in Section 794, Subsection (a), wouldn't have created a private right of action for injunctive relief?  Do you have an argument for me now?

You can, you know, not concede if you had done a deeper dive you might have found one, but that's the language and that existed for a while by itself.

MS. HEDGES:  Your Honor, beyond what I already said, which is that Congress needs to speak very clearly, like the Supreme Court has said again and again --

THE COURT:  But you can't point me to anything -- so what did it need to say?

MS. HEDGES:  What did it need to say?

THE COURT:  What did it need to say in 1973, when it

passed this, if it wanted there to be a claim for injunctive relief with the provision by itself? You keep telling me you need to speak clearly. This seems pretty clear to me, is what I'm saying. It seems to be the language the Court has pointed to, and I'm asking you for a statutory argument.

MS. HEDGES: Your Honor, so I just think, like, what Congress, in fact, did with respect to recipients of federal financial assistance in the amendments in 1978 is what --

THE COURT: Okay. So you don't have an argument in 1974. Let's go to 1978, and tell me why 1978 so clearly changed things.

MS. HEDGES: So a couple of things happened in 1978. One, Congress added executive agencies to Section 504. It wasn't there before. Simultaneous with that, it added language directing executive agencies to promulgate regulations to effectuate the statute.

Also simultaneous with that, it added Section 505 with respect to recipients of federal financial assistance. It did not, of course, do so with respect to executive agencies.

And what the Court has said in *Sai*, which is the -- I believe, 2015 decision from the District of Columbia, is that that language directing agencies to go promulgate regulations showed that the focus of Congress was not on the individuals protected, but on the federal agencies that it instructs to implement the substantive provisions of the act.

This is where the APA comes in, and Your Honor had the colloquy with opposing counsel about this. And so what Congress has done is it has said, EOP, go promulgate regulations. EOP has gone and promulgated regulations. And if you're an aggrieved plaintiff, you can go through that process. And so then if you still believe you're aggrieved after going through that process, we then have a divergence depending on what type of defendant you're suing.

And it's correct that the APA doesn't apply to these defendants in this context, but that also doesn't mean there's a problem with the right of action because, again, as the Supreme Court has recognized, Congress just sometimes doesn't provide a --

THE COURT: So walk me through exactly what it is -- I know Judge Moss found this persuasive -- what exactly it is from the government's perspective that in 1978 said, okay, even if you might have read this previously to be a private right of action, now it's so clear that this is supposed to go through the APA. Focus on just the APA component for me. What is it exactly? It's the adding of executive agencies?

MS. HEDGES: Right. So when Congress said -- added that language directing the agencies to promulgate regulations under the statute to effectuate its provisions, that means that your remedy then becomes administrative recourse. And then, of course, the APA is its whole own thing, but within the EOP

regs, there's a provision for administrative appeal, and then if you're -- I guess if you're still aggrieved and you have a defendant that could be sued under the APA, you can go through the APA.

But the important thing to note here is, just because there's not a private right of action doesn't mean that there's no recourse. And that's something that I need to pushc back on from plaintiffs' side, because plaintiffs didn't even purport to have exhausted the EOP regs in terms of the process they were supposed to go to. So how can we stand here and say that there's no remedy without a private right of action when plaintiffs didn't go that way?

THE COURT: What should they have done?

MS. HEDGES: There's a process in the regulations about -- it describes you have to basically send a complete complaint that describes how you were aggrieved, when you were aggrieved. I'm paraphrasing, but --

THE COURT: For this type of claim?

MS. HEDGES: For in general, Your Honor.

THE COURT: For this type of claim?

MS. HEDGES: Yes, Your Honor.

So you're supposed to send something like that to, I believe it's the Office of Administration. And there's an address, and you send it to that address, and you include the specific pieces of information, and then the regs walk through

what it is that the Office of Administration does with that. Plaintiffs didn't do that here.  And --

THE COURT:  Finish that through.  And that would help clarify things how?  How would that end, in the government's position?  Had the plaintiffs done that, what would it have achieved?

MS. HEDGES:  First of all, we would be in a different world because we don't know what would have happened.  If they had gone through that process, we don't know what would have happened, and so we might not be here at all.  Certainly, I think it would just show up that plaintiffs have a remedy. It's just not a private right of action under the statute in court.  So that's my point with that, Your Honor.

Again, I would just point this Court, I mean, *Mathis* says this, the Supreme Court has said this.  Congress just doesn't always provide a right of action.  There are many statutes --

THE COURT:  Can I ask one specific question?

What's the best case you can give me, a governing case, binding case, DC Circuit, Supreme Court, that supports the APA argument you made, which I understood to be, there was an amendment saying that the agency should promulgate regulations and that that should be construed -- I don't know if it's a canon or otherwise -- as saying this is an APA claim.

MS. HEDGES:  Your Honor, I think that *Alexander v.*

*Sandoval* is a really good case on this because it has several paragraphs where it walks through that if Congress provides a means of remediating an issue, then it suggests the exclusion of another way of remediating, even if there's other rights-creating language in the statute.  Again, that's what I was talking about before.

THE COURT:  It's a *Sandoval*-type argument just in terms of how to understand the rights-creating language?

MS. HEDGES:  I think so, Your Honor.

And then as far as a case on our exclusion of an implied inherent equitable authority, we've got cases like the *Verizon* case and the *Seminole* case that we cite in our brief where the Court has also said, and, by the way, if Congress is very clearly providing a remedy, it excludes an implied equitable authority.

THE COURT:  Tell me what's wrong with this response, which I took to be the way plaintiffs' counsel finished.  So I'm going to give you a reading of a statute, and tell me how you see it differently.

So one way of looking at this is you've got, in Section 504, rights-creating language as to this particular claim, and also the claims dealing with financial assistance. And then -- that's in 1973.  That's the original act.  And that, you know, if a court had considered it at the time, they would have said you can seek injunctive relief.  Maybe they

would say, and I assume they would say, you can't seek damages. That's a different story because you need a clear waiver of sovereign immunity, but that's not an issue with an injunction.

Okay.  And then in 1978, Congress came and said, okay, well, look, when it comes to cases involving federal employment, we want to make clear that you have access to and go through this statutory remedial regime of Title VII, and when you have cases that involve financial assistance -- this is kind of Subsection 2 -- you have access to the remedial regime in Title VI, and that adding those remedial regimes, which included things like damages and other remedies, you know, if someone were to come and say, I get that for claims of the type here involving executive agencies and activities, good luck, I mean, there's an express statutory requirement there that provides that availability, but that providing greater remedies there didn't undo -- impliedly undo the rights-creating language.

Where does that go wrong, that theory of statutory interpretation?

MS. HEDGES:  Well, again, Your Honor, so I think both myself and counsel on the other side think the chronology here is important, but it can't overcome the text of the statute. And the text of the statute that we're interpreting today is very express in its provision of a remedy for certain types of defendants, and very silent and notably silent in excluding

that remedy for the defendants that we have here today.

THE COURT:  I guess what I'm trying to ask you is, like, the word "remedy" is doing a lot of work there, right?  So if I had a statute that said, look, there are three types of claims here, 1, 2 and 3, and that's Section 504, and then in Section 505 the statute said you can get injunctive relief for types 1 and 2, then I think you would have a really strong argument that there's no injunctive relief for number 3, right, because you would say, look, the statute says specifically you get it for 1 and 2, how could you possibly say you got it for 3.

I think the version I just laid out for you is where Section 504 says there's claims 1, 2 and 3 and uses rights-creating language, and then says in the next section, you can get damages-plus for type 1, you can get damages-plus for type 2, and doesn't say anything as to type 3.  And the question is:  Why does adding additional types of remedies take away injunctive relief?

So I guess I want you to be more specific than using the word "remedies," because there are different kinds of remedies.

MS. HEDGES:  Your Honor, I don't think my argument is that -- I think my argument is that Congress never provided a statutory remedy --

THE COURT:  So then it comes back to the 1974 world we

were in, right?  That's why I focused there.  I think you're saying there never was rights-creating language, and it seems like you couldn't give me a statutory argument there.  But now you're telling me that's what's most important.

MS. HEDGES:  No, Your Honor.  To be clear, I'm still thinking about the statute as it stands today.  But I think my argument, based on the statute, is that it doesn't provide a right of action in Section 504 and it does in Section 505, but only for certain types of actions.  And so because that's the world we're living in under cases like *Sandoval*, where Congress has to speak clearly if it's providing a right of action, Congress hasn't done so here for claims against executive agencies.

Even if plaintiffs had a right of action, then we get into, have they established a claim.  And I would again point the Court to the case out of Northern District of Florida, *Yelapi,* where the Court said there are all these unanswered questions.

THE COURT:  I have your point on that.  You did point me to those cases, and I appreciate it.  You rely on Judge McFadden's decision in the *Mathis* case for the part you like, which is that there was no statutory private cause of action.  Judge McFadden does go on to say that even still, the Rehabilitation Act doesn't displace equitable power.  Can you address that part of the decision?

MS. HEDGES:  Your Honor, I just don't think that part of the decision properly engages with the cases that we cite, like *Verizon* and *Seminole*, which, from the Supreme Court, that say that the implied equitable authority of the Court is displaced if Congress has said, here's a clear detailed exclusive remedial scheme that's going to handle these types of cases, and that's what happened here.

THE COURT:  As to this kind of claim?

MS. HEDGES:  That's right, Your Honor.

THE COURT:  Okay.

MS. HEDGES:  I guess I want to make sure I understand your question.

THE COURT:  Well, it sounds like -- correct me if I'm wrong, but it sounds like what you're saying is, the statute is so clear that there's no statutory right to an injunctive claim from the statutory interpretation perspective, and even if you get to the, okay, is there any residual court equitable power, it's so clear that it even displaced that.  Is that --

MS. HEDGES:  Not only that, Your Honor, but the fact that Congress has also set up this regulatory pathway through the agency that's charged with effectuating the statute.  So it's not just the fact, because, of course, we've been talking about the private right of action and the lack of one here, but it's not just that.  It's also that Congress has said, go set up regulations to deal with these sorts of claims.  And so that

is also an exclusive detailed remedial scheme that would displace --

THE COURT:  That's part of the reason why the statute is so clear?

MS. HEDGES:  I mean, the statute says, if you're an executive agency, go promulgate regulations.

THE COURT:  Right.  I guess what you're adding is that the fact that they wanted regulations promulgated suggests that they didn't want equitable power to apply?

MS. HEDGES:  Right, Your Honor.

THE COURT:  Can I understand your understanding of why the provision of ASL translators was canceled in the first place?

MS. HEDGES:  Right, Your Honor.  So my understanding is it's a discretionary decision.  So the prior admin made a decision to provide that, and then this current admin made a decision not to provide that.  But it didn't make a decision to never provide ASL under any circumstances or to never provide any accommodations whatsoever.  It just made a decision not to provide the ASL interpretation at every single press briefing.  Something I do want to point out --

THE COURT:  Is the administration providing it in some contexts?

MS. HEDGES:  I'll give you an example.  My understanding, I wasn't personally there, but my understanding

is that it was known at the Easter Egg Roll earlier this spring that there were going to be some deaf people in attendance, and so they provided a live ASL interpreter there.  That's my understanding.  I wasn't there, but that's what I've been told. And so that's an example of, we know there will be some people here who will benefit from this accommodation, it's a live event, we're providing an interpreter.  So that would be an example.

But something I did want to go back to that I heard plaintiffs' counsel talking about, what's different here between now and what the prior admin did.  And there are actually a couple of differences.  If you look at the policy that the Biden admin had, it looks like they provide for ASL interpreters at press briefings, but there's a couple of things that plaintiffs seem to have added to their scope of relief here.  They're asking for including CDIs, but it's not clear to me from their scope of relief that they want whether a CDI is sometimes necessary, but not always.

It's also, they've added this phrase, "and related events."  And I think I heard counsel for the other side say, well, we're not as sure about irreparable harm as to some types of events that the second lady might speak at.  But their scope of relief that they're asking for extends to all that.

And, again, I think we need to look back at the plaintiffs' declaration.  They talk about press briefings and

they don't say, "We want to watch every single one."  They say -- I believe the word they use is "regularly."  They say, we used to watch them, we'd like to watch them.  I don't dispute any of that.

But then plaintiffs come in here and they say, we actually want ASL at every press briefing, press conference, or related event at which the president, the vice president, the second lady, the press secretary, the first lady speak, and it's just very broad and it does, to my knowledge, go beyond anything that's been done before.

So I do think we need to be grounded not only in the law, but also in what has been recognized before as creating an entitlement.  And even setting aside the fact that those other cases were in the COVID context, which was a very different context, this is just unprecedented.  And so they have not established that they need this relief, especially not in the context of a preliminary injunction where they have to show not just harm, but irreparable harm.

THE COURT:  Are there other ways -- this wasn't a focus of the briefing -- of your briefing, was to respond to the scope of relief, at least kind of independently in the brief.  Are there other aspects of the relief that you want to highlight that the government believes are too broad?

MS. HEDGES:  Your Honor, let me pull it up here.  I looked at it before, but I think the entire thing is too broad.

THE COURT:  I have your point on that, on the legal claim.

MS. HEDGES:  Right, Your Honor.  So, you know, I think we think that Chief Judge Boasberg's decision, with respect, we think that was also too broad.  So our position was and continues to be that that --

THE COURT:  Too broad in what way?  I guess too broad because you don't think there should have been relief at all?

MS. HEDGES:  That's right, Your Honor.

MR. HOFFMAN:  But, I mean, I guess what I'm -- I'm interested in, you know, was there an aspect of Chief Judge Boasberg's relief that was too broad if you accept that relief was warranted?

MS. HEDGES:  Well, Your Honor, I do think -- so without having Chief Judge Boasberg's -- I have it at counsel table.  But without having it in front of me, I believe he was requiring all press briefings related to the COVID-19 pandemic.  And so even there, I think what we need to tie relief to, in the event that there's any relief, is we need to tie it to what these plaintiffs have established they're wanting to see.  That's what the *Yelapi* case talked about too, some of these events might not be presenting --

THE COURT:  I guess that's kind of what I'm asking you to help me with.  I agree that relief needs to be tailored to

legal violations, and I think especially so at a preliminary context. And I think my question for you is: In what way was the relief -- you said you disagreed with Chief Judge Boasberg. In what way was the relief not tailored to the legal violation found there?

MS. HEDGES: I think my primary disagreement is just on the merits of the law.

THE COURT: That's fine. I obviously have your position on that.

MS. HEDGES: But, again, Your Honor, I don't want to concede that any part of that injunction was properly tailored because I think --

THE COURT: I'm not asking these questions so I can say the government conceded something. I'm asking the questions so I can give you the opportunity to answer them and tell me what wasn't tailored. This is not a gotcha, okay, there wasn't an answer, they conceded it. It's a you have an opportunity to respond to arguments that were made in this case, and that would be helpful to have your response on.

MS. HEDGES: Right.

THE COURT: And concede or not, I mean, you're missing an opportunity to answer.

MS. HEDGES: So let me say this, Your Honor. I think to the extent there's a -- there's a big delta between what plaintiffs are asking for here and what Judge -- Chief Judge

Boasberg did, and Chief Judge Boasberg got it much more right because he actually looked at a specific harm, which was an alleged lack of access to health and safety information, and a specific interest in specific types of briefings that were dealing with information that was coming in really fast and changing really fast and the medical experts didn't know what was going on and they were figuring it out.

So to that extent, Chief Judge Boasberg's order was certainly much more appropriate than what plaintiffs are asking for here.  And what I would as this Court is, if that if this Court were inclined to grant any sort of relief, that it be tailored to what these particular plaintiffs have expressed interest in and established a need for through their specific allegations.

THE COURT:  So better to have it be tailored to the specific topics that have urgency?

MS. HEDGES:  I just think from a standpoint of how equitable relief works, that would be more correct.  I certainly don't think it's correct in any respect.

THE COURT:  And then you started the answer -- the first question -- the question I asked you was why the provision of ASL translators was canceled, and I think you said it's discretionary.  I take that to mean -- and this is consistent with the argumentation that, you know, the point is that the government doesn't have to do things it's not legally

required to do, and where it's not legally required, there's discretion.

Is that the reason, it's just there's flexibility for the government here?  And let me -- I'm not trying to hide the ball here.  I didn't see any response that it was too overly burdensome or feasibility things or anything from the government about it being difficult, and I -- I actually saw that the plaintiffs made an argument in their brief that it was inexpensive and feasible, and I saw your response to take it back to the deference point, the point being, it may be inexpensive and feasible, but the president has this discretion to control his image.

MS. HEDGES:  Your Honor, inexpensive is not a word I would use.  I think that's in the eye of the beholder a little bit.  And I'm certainly not prepared to say we think it's inexpensive.  What I will say and what we said in our brief is that the Rehabilitation Act says that if an accommodation would work a fundamental alteration in the nature of a program, then it's not required to be presented, even if the rest of plaintiffs' claim is established.

So our point is, this works a fundamental alteration because it's requiring an administration to continue a policy that the prior administration had that was never a policy before, that I'm aware of.  And, I mean, I haven't seen anything by plaintiffs in the record that it was ever a thing

before either.  And so administration comes in, decides to do this, totally fine, totally within their prerogative.  Then this administration comes in, decides we have other accommodations and we are not going to provide this one right now, and --

THE COURT:  That's helpful.  That makes sense, and I understand, but it's kind of coming back to the legal argument of, you know, it's not a one-way ratchet, it's not required; and, therefore, can't be forced to do it.  It's not a, we have evidence of the burden-type argument.  That's all I'm trying to understand.

MS. HEDGES:  Right, Your Honor.  I would rest on my brief as to the fundamental alteration point because we put the law in there and that is our position.

THE COURT:  Any other submissions you would like to make before you sit down?

MS. HEDGES:  Just a couple things, Your Honor.

First of all, again, we believe that this injunction would be improper in any fashion.  But if the Court were to grant relief, I would reiterate my request in my brief that the Court set a bond.  And we would be happy to do expedited briefing on that in terms of the amount that would be appropriate, but there is a cost to us from complying with any such order.

And then the other piece that we have in our brief

that I would just reiterate is that we would ask that the Court's order to be stayed to allow a determination regarding appeal.

But if I could just leave the Court with this:  This is an unprecedented ask that the plaintiffs are making and it's not supported by Chief Judge Boasberg's opinion in 2020, which was limited to COVID, and it's not supported by the controlling precedent under the Rehab Act either.

And then I would just rest on my briefs as to the First Amendment claim and as to the mandamus claim.

THE COURT:  Understood.  Thank you.

MS. HEDGES:  Thank you, Your Honor.

THE COURT:  Give you a chance to respond briefly.

MR. HOFFMAN:  Thank you very much, Your Honor.  Yes, briefly.

So on the implied private right of action point, Your Honor is exactly right to focus on and ask questions about the statute as it existed in that window between 1973 and 1978.  We know that Congress thought that they had created a private right of action via the 1973 language, and we know that the addition of remedies was intended to bolster that.

And I'm happy to hand up to the Court, if the Court wouldn't mind, I have a printout of the relevant Senate report with highlights of the relevant portion.  I think it goes directly to your -- I have copies, of course, for the other

side.  It goes directly to the legislative history piece and answering the Court's question --

THE COURT:  You cite it in the briefing?

MR. HOFFMAN:  I believe it is, and this piece is cited in Judge Boasberg's opinion.

THE COURT:  If you want to just refer to the specific report rather than pass it up, just read it into the record.

MR. HOFFMAN:  Sure, sure.

THE COURT:  The date and citation, if you have it.

MR. HOFFMAN:  Yes.  Let me find the right citation.  I had trouble finding the citation on West Law.  That's why I printed it myself to hand it up.

I believe one version of it is 1978, the year.  And the citation is 124, congressional record 30275.  There are various other types of citations, but what I would point to, Your Honor, is Judge Boasberg cited one piece of this for this point that I'm making, and there's actually a lot of discussion in the same report that supports this principle.

"The addition of remedies for private rights of action does not negate the whole private right of action for any and all other remedies."

And that's the fundamental point where the *Mathis* decision and the *Doe* decision went wrong.  But I'm not going to belabor the point, Your Honor, because I think my prior presentation covered it.

One thing that my prior presentation did not cover, which defendants' counsel did cover that I want to touch on briefly is this idea of administrative exhaustion.  The addition in 1978 of a requirement that executive agencies that are covered here promulgate regulations to carry this out, by itself, there's no textual or other support that that intended to negate any ability to sue in court for injunctive relief, and certainly doesn't negate the overwhelming evidence that Congress believed at the time, consistent with the state of the law in regards to Title VI and Title IX, that adding a requirement to promulgate regulations somehow negated existing private rights of action.  That's number one.

Number two, this is relevant to the Court's inherent equitable authority.  In the *Mathis* opinion, Judge McFadden talked about this regulatory requirement and talked about whether the regulation sets up any sort of remedial scheme that would essentially preempt, for lack of a better word, the Court's inherent equitable authority.  And Judge McFadden rejected that definitively, and defendants don't even acknowledge this in their papers.

Defendants' counsel argued that Judge Mathis' [sic] opinion doesn't grapple with the Verizon case.  Judge Mathis' [sic] opinion on this point starts with the Verizon case, sets up the test, and explains why it does not negate the existence of an equitable remedy.  "Where Congress has provided a

detailed and exclusive remedial scheme, that may displace the Court's inherent equitable authority."

And the Court then goes on to hold, on this very type of claim, a programs or services claim, "The Rehabilitation Act boasts no detailed" and executive -- "and exclusive," that is, "remedial scheme."

The Court goes on to say, "Beyond in-house rulemaking, it," the Rehab Act, "prescribes no remedy at all for the plaintiffs or other individuals mounting a challenge under the program conductor provision."

And that answers the question as to whether the addition of some --

THE COURT:  Okay.  I think I have your point on that.  I understand.

MR. HOFFMAN:  Okay.  And just, there's lots of case law out there that administrative exhaustion and the Rehab Act is not mandatory for nonemployment claims.  And even if, as a judicial discretion matter, the Court would consider it, it would be entirely futile here.

And it bears emphasis what defendants are arguing. They're arguing that the plaintiffs in this case should have essentially written a letter to the defendants, which, by the way, defendants did, but should have filed an administrative complaint to the agency, let the agency consider it.  If the first level review rejects the request, it goes up to the head

of the agency.  The head of the agency is a defendant in this case, Your Honor, that is vehemently opposed to this requested relief.  And the same defendants are arguing that the APA doesn't apply, so there would be no judicial review of even that in-house administrative decision.

So for defendants to argue that, well --

THE COURT:  I got it.  You know, if there's an exhaustion -- a firm exhaustion requirement coming into court and saying, well, they would have rejected it anyways, look, they're here defending this claim on the merits doesn't usually work very well.

MR. HOFFMAN:  Yes, if there's a statutorily required exhaustion remedy.  But when it's discretionary, futility is relevant.

THE COURT:  Right.

MR. HOFFMAN:  I think the last point I'll make, Your Honor, is -- I guess two quick points briefly.

There was discussion about the scope and lots of emphasis that on these particular plaintiffs, and there isn't proof that these particular plaintiffs want to watch all press briefings and the like.  A couple of responses on that.

First of all, the two individual plaintiffs are not the only plaintiffs in this case.  Plaintiff NAD has associational standing and is asserting the interests of the broader deaf community who rely on ASL and can't access the

press briefings just by closed captioning and transcripts alone.

In all events, the declarations from the particular plaintiffs, they talk about specific subject areas that they are interested in watching, DEI issues, executive orders, Medicare and Medicaid.  We cite this in our briefs, and it's right there in the record.

The Court, obviously, shouldn't, in our view, shouldn't limit the scope of relief just to the specifically enumerated things they're talking about in light of NAD's associational standing and the broader harm here of depriving deaf Americans of access to these types of briefings.

You asked defendants as to why they stopped providing American Sign Language interpreters.  I didn't hear a clear answer on that, other than the defendants have the discretion to do so.  But defendants pointed out that for other instances, like the White House Easter Egg Roll, they provided an interpreter for that for deaf participants in that program or service, which is great, and it's heartening.

But, Your Honor, if defendants are willing to provide an ASL interpreter for the White House Easter Egg Roll, they should be willing to provide American Sign Language interpreters to understand when the president speaks to the American people as to whether we're going to war.

So it's a stark contrast here and underscores the

irreparable harm that is ongoing to date in light of this deprivation.

There's lots of discussion of other points that I think are adequately addressed in our briefs, and so we'll rest on our papers for the rest. Thank you, Your Honor.

THE COURT: All right. I will take all the arguments under advisement and issue a written ruling on the PI.

I do appreciate all counsels' submissions. They were helpful to me. And also appreciate the translator services today.

We can adjourn. Thanks.

(Proceedings concluded at 12:12 p.m.)

CERTIFICATE

I, Sonja L. Reeves, Federal Official Court Reporter in and for the United States District Court of the District of Columbia, do hereby certify that the foregoing transcript is a true and accurate transcript from the original stenographic record in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 3rd day of July, 2025.


/s/ Sonja L. Reeves
SONJA L. REEVES, RDR-CRR
FEDERAL OFFICIAL COURT REPORTER

**'**

**'78** [1] - 18:16

**/**

**/s** [1] - 67:21

**1**

**1** [5] - 50:5, 50:7, 50:10, 50:13, 50:15
**10:44** [2] - 1:11, 2:1
**124** [1] - 62:14
**12:12** [2] - 1:11, 67:12
**1964** [1] - 40:15
**1973** [10] - 16:15, 16:16, 16:20, 17:1, 39:7, 43:25, 48:23, 61:18, 61:20
**1974** [7] - 39:12, 39:18, 40:7, 40:19, 43:7, 44:10, 50:25
**1975** [3] - 39:12, 40:20, 41:20
**1978** [17] - 12:3, 17:5, 18:3, 18:19, 39:9, 43:1, 43:4, 43:5, 44:8, 44:10, 44:12, 45:16, 49:4, 61:18, 62:13, 63:4
**1985** [2] - 12:14, 12:15
**1:25-cv-01683-AHA** [1] - 1:5

**2**

**2** [9] - 1:10, 28:22, 29:4, 49:9, 50:5, 50:7, 50:10, 50:13, 50:16
**2)** [1] - 18:25
**20** [1] - 3:4
**2000** [1] - 30:13
**20001** [1] - 1:15
**2015** [1] - 44:21
**202** [1] - 1:18
**2020** [13] - 4:24, 7:3, 7:5, 19:25, 30:13, 31:18, 33:17, 36:23, 36:24, 37:7, 37:9, 37:15, 61:6
**2025** [2] - 1:10, 67:19
**20530** [1] - 1:22
**20910** [1] - 1:18
**25** [1] - 3:4
**25-1683** [1] - 2:2
**275** [1] - 41:3
**29** [2] - 16:7, 16:10

**290** [2] - 41:3

**3**

**3** [5] - 50:5, 50:8, 50:11, 50:13, 50:16
**30275** [1] - 62:14
**3rd** [1] - 67:19

**5**

**50** [1] - 30:9
**504** [16] - 5:23, 16:6, 16:8, 16:11, 16:14, 16:19, 17:24, 18:6, 19:1, 27:5, 39:18, 44:13, 48:21, 50:5, 50:13, 51:8
**505** [11] - 16:10, 16:11, 16:15, 16:16, 17:4, 17:22, 40:7, 40:14, 44:17, 50:6, 51:8
**505(a** [4] - 27:3, 27:11, 28:9, 28:18
**505(a)(1** [4] - 18:25, 28:22, 29:4
**505(a)(2** [1] - 28:24
**505(b** [1] - 27:4
**505(b)** [1] - 18:25
**505(c** [1] - 27:15
**532** [1] - 41:3
**58** [1] - 33:18

**6**

**601** [1] - 1:15

**7**

**794** [4] - 16:1, 16:6, 16:8, 43:13
**794a** [2] - 16:2, 16:10

**8**

**8630** [1] - 1:18

**9**

**950** [1] - 1:21

**A**

**a.m** [2] - 1:11, 2:1
**ability** [8] - 7:8, 7:13, 8:14, 12:19, 18:8, 28:19, 31:2, 63:7
**able** [3] - 8:7, 37:25, 42:16
**above-entitled** [1] -

67:17
**absolutely** [5] - 6:19, 9:12, 9:16, 16:5, 26:22
**accept** [2] - 21:24, 56:13
**access** [29] - 4:9, 4:10, 4:18, 9:19, 10:19, 10:21, 10:22, 11:24, 12:13, 15:5, 22:24, 23:14, 32:2, 32:3, 32:5, 33:3, 33:6, 34:16, 34:19, 36:18, 36:22, 37:8, 37:12, 49:6, 49:9, 58:3, 65:25, 66:12
**accessibility** [2] - 12:4, 22:23
**accessing** [1] - 35:2
**accommodation** [8] - 4:2, 12:16, 22:13, 23:18, 32:18, 34:1, 54:6, 59:17
**accommodations** [10] - 4:18, 12:5, 12:12, 15:16, 23:6, 23:22, 25:22, 31:10, 53:19, 60:4
**according** [1] - 34:16
**account** [1] - 32:10
**accurate** [2] - 10:16, 67:16
**achieved** [1] - 47:6
**acknowledge** [3] - 26:2, 26:14, 63:20
**acquisition** [2] - 9:22, 9:25
**Act** [33] - 4:16, 5:9, 5:12, 5:22, 6:23, 11:7, 11:18, 15:24, 16:8, 16:11, 16:18, 16:22, 17:1, 18:4, 18:23, 20:18, 20:19, 21:24, 24:14, 24:25, 29:15, 30:16, 31:19, 32:5, 37:18, 38:18, 40:15, 51:24, 59:17, 61:8, 64:4, 64:8, 64:16
**act** [4] - 39:7, 39:13, 44:25, 48:23
**action** [32] - 17:4, 17:6, 17:15, 17:24, 18:2, 19:7, 20:17, 21:5, 24:8, 26:25, 28:7, 38:23, 39:19, 40:23, 42:8, 43:14, 45:11, 45:18, 46:6, 46:11, 47:12, 47:16, 51:8, 51:11, 51:14, 51:23, 52:23, 61:16,

61:20, 62:19, 62:20, 63:12
**Action** [1] - 2:2
**actions** [2] - 18:6, 51:9
**activities** [6] - 6:12, 6:17, 39:16, 41:24, 42:20, 49:13
**activity** [2] - 6:9, 22:4
**actors** [1] - 24:23
**actual** [1] - 36:2
**add** [2] - 25:3, 27:10
**added** [12] - 16:20, 17:5, 18:16, 18:19, 28:10, 28:21, 44:13, 44:14, 44:17, 45:21, 54:15, 54:19
**adding** [9] - 18:4, 23:21, 28:6, 28:23, 45:20, 49:10, 50:17, 53:7, 63:10
**addition** [5] - 19:13, 61:21, 62:19, 63:4, 64:12
**additional** [3] - 27:9, 27:12, 50:17
**address** [10] - 5:2, 5:4, 8:22, 9:9, 20:24, 24:4, 46:24, 51:25
**addressed** [1] - 67:4
**addressing** [1] - 27:3
**adduced** [1] - 36:1
**adducing** [1] - 33:24
**adequate** [5] - 9:18, 10:8, 32:21, 32:22, 32:24
**adequately** [1] - 67:4
**adjourn** [1] - 67:11
**admin** [4] - 53:15, 53:16, 54:11, 54:13
**administration** [16] - 11:16, 11:17, 14:17, 25:5, 25:15, 25:18, 25:23, 29:22, 31:12, 31:13, 53:22, 59:22, 59:23, 60:1, 60:3
**Administration** [2] - 46:23, 47:1
**administrations** [1] - 11:19
**administrative** [6] - 45:24, 46:1, 63:3, 64:16, 64:23, 65:5
**advisement** [1] - 67:7
**affidavit** [1] - 9:20
**afternoon** [3] - 2:21, 31:3, 31:4
**agencies** [13] - 12:1, 19:12, 23:13, 44:13,

44:15, 44:19, 44:22, 44:24, 45:20, 45:22, 49:13, 51:13, 63:4
**agency** [10] - 22:5, 22:15, 25:1, 47:22, 52:21, 53:6, 64:24, 65:1
**agency's** [2] - 41:24, 42:20
**aggrieved** [5] - 45:5, 45:6, 46:2, 46:16, 46:17
**agree** [1] - 56:25
**agreement** [1] - 38:17
**ahead** [3] - 3:25, 17:2, 17:11
**aides** [1] - 31:10
**al** [4] - 1:3, 1:6, 2:3
**Alex** [2] - 2:16, 2:18
**ALEX** [1] - 1:14
**Alexander** [3] - 17:7, 17:14, 47:25
**ALEXANDER** [1] - 1:17
**ALI** [1] - 1:10
**allegations** [2] - 35:1, 58:14
**allege** [3] - 34:13, 36:6, 36:9
**alleged** [2] - 33:6, 58:3
**allegedly** [2] - 30:12, 37:12
**alleging** [2] - 34:16, 35:2
**allow** [1] - 61:2
**almost** [1] - 17:21
**alone** [3] - 30:14, 43:13, 66:2
**alter** [1] - 23:22
**alteration** [5] - 5:17, 23:11, 59:18, 59:21, 60:13
**alternative** [2] - 14:16, 21:7
**amendment** [1] - 47:22
**Amendment** [2] - 8:12, 61:10
**amendments** [3] - 16:22, 18:3, 44:8
**American** [16] - 7:10, 8:22, 8:23, 9:21, 9:23, 10:2, 10:23, 13:24, 14:12, 14:17, 15:1, 15:8, 25:25, 66:14, 66:22, 66:24
**Americans** [9] - 4:9, 4:10, 7:13, 7:21, 9:20,

10:16, 10:23, 66:12
**AMIR** [1] - 1:10
**amount** [1] - 60:22
**analysis** [8] - 5:12, 6:22, 20:22, 23:17, 26:3, 28:13, 28:15, 33:18
**animus** [1] - 30:17
**answer** [10] - 24:18, 25:9, 25:12, 30:21, 37:1, 57:15, 57:17, 57:22, 58:20, 66:15
**answering** [1] - 62:2
**answers** [4] - 12:10, 20:12, 25:8, 64:11
**anyways** [1] - 65:9
**APA** [16] - 24:9, 24:12, 24:15, 24:19, 24:20, 45:1, 45:9, 45:19, 45:25, 46:3, 46:4, 47:21, 47:24, 65:3
**apart** [1] - 18:24
**appeal** [2] - 46:1, 61:3
**appear** [1] - 13:17
**appearances** [1] - 2:20
**applies** [6] - 4:16, 5:23, 18:23, 19:9, 24:21, 27:5
**apply** [14] - 9:2, 18:19, 21:25, 24:13, 27:12, 28:16, 28:22, 28:24, 30:19, 41:5, 41:9, 45:9, 53:9, 65:4
**appreciate** [7] - 4:2, 4:5, 30:22, 38:15, 51:20, 67:8, 67:9
**appropriate** [4] - 4:18, 15:9, 58:9, 60:23
**archived** [1] - 13:21
**areas** [1] - 66:4
**argue** [2] - 40:22, 65:6
**argued** [3] - 30:11, 31:17, 63:21
**arguing** [4] - 37:10, 64:20, 64:21, 65:3
**argument** [34] - 3:3, 3:15, 9:10, 12:23, 22:12, 24:6, 24:15, 29:10, 32:16, 34:7, 38:7, 38:19, 38:22, 39:19, 40:11, 42:7, 42:13, 42:21, 42:22, 43:4, 43:10, 43:15, 44:5, 44:9, 47:21, 48:7, 50:8, 50:22,

50:23, 51:3, 51:7, 59:8, 60:7, 60:10
**argumentation** [1] - 58:24
**arguments** [8] - 3:7, 21:12, 22:20, 22:22, 38:16, 57:18, 67:6
**arise** [2] - 9:4, 9:6
**Arnold** [3] - 1:13, 2:11, 2:15
**aside** [2] - 13:2, 55:13
**ASL** [28] - 2:7, 3:20, 4:13, 4:20, 5:1, 5:18, 11:13, 13:5, 13:14, 13:17, 14:8, 22:13, 22:14, 31:8, 32:8, 33:12, 33:24, 34:13, 35:12, 53:12, 53:18, 53:20, 54:3, 54:13, 55:6, 58:22, 65:25, 66:21
**aspect** [3] - 25:11, 25:14, 56:12
**aspects** [2] - 41:6, 55:22
**asserting** [1] - 65:24
**assist** [1] - 4:4
**assistance** [9] - 18:13, 27:25, 29:1, 39:8, 39:17, 44:8, 44:18, 48:22, 49:8
**ASSOCIATION** [1] - 1:3
**Association** [3] - 1:16, 2:3, 2:17
**associational** [2] - 65:24, 66:11
**assume** [1] - 49:1
**assuming** [1] - 21:2
**attendance** [1] - 54:2
**attorney** [2] - 19:1, 19:13
**attorney's** [1] - 27:1
**authority** [7] - 22:2, 48:11, 48:15, 52:4, 63:14, 63:18, 64:2
**authors** [1] - 28:5
**availability** [1] - 49:15
**available** [8] - 13:14, 16:18, 24:9, 24:15, 27:10, 27:23, 35:3, 36:17
**Avenue** [2] - 1:15, 1:21
**avoid** [1] - 5:7
**award** [1] - 28:19
**aware** [1] - 59:24

**B**

**b)** [1] - 28:9
**backing** [2] - 15:22, 19:24
**backpay** [1] - 28:20
**backs** [1] - 6:25
**ball** [1] - 59:5
**based** [6] - 12:2, 16:24, 25:24, 36:4, 42:9, 51:7
**basis** [1] - 39:15
**bears** [2] - 29:12, 64:20
**BECKER** [1] - 1:21
**Becker** [1] - 2:25
**becomes** [2] - 12:8, 45:24
**beef** [1] - 29:3
**BEFORE** [1] - 1:10
**beg** [1] - 19:3
**begin** [1] - 10:18
**beginning** [2] - 2:5, 11:24
**behalf** [3] - 2:11, 2:24, 31:6
**beholder** [1] - 59:14
**belabor** [1] - 62:24
**believes** [1] - 55:23
**benefit** [3] - 41:7, 41:18, 54:6
**benign** [1] - 30:18
**best** [3] - 3:18, 47:19
**better** [2] - 58:15, 63:17
**between** [8] - 5:18, 5:22, 10:1, 16:1, 21:10, 54:11, 57:24, 61:18
**Beyond** [1] - 64:7
**beyond** [3] - 31:17, 43:19, 55:9
**Biden** [1] - 54:13
**big** [1] - 57:24
**bill** [2] - 28:5
**binding** [2] - 3:13, 47:20
**bit** [6] - 2:13, 6:8, 15:23, 16:24, 42:25, 59:15
**blunt** [1] - 22:11
**Boasberg** [7] - 4:23, 19:25, 20:17, 57:3, 58:1, 62:16
**Boasberg's** [13] - 17:18, 17:20, 19:16, 21:6, 32:9, 33:17, 39:4, 56:4, 56:13, 56:16, 58:8, 61:6, 62:5

**boasts** [1] - 64:5
**boil** [1] - 12:11
**bolster** [3] - 18:8, 28:6, 61:21
**bolstering** [1] - 19:7
**bond** [1] - 60:21
**brand** [1] - 12:21
**brief** [12] - 5:5, 7:16, 26:20, 40:14, 42:2, 48:12, 55:22, 59:8, 59:16, 60:13, 60:20, 60:25
**briefing** [16] - 3:8, 7:12, 14:6, 26:8, 31:10, 33:5, 33:16, 36:18, 37:6, 38:3, 53:20, 55:6, 55:20, 60:22, 62:3
**briefings** [33] - 4:9, 4:19, 5:1, 5:6, 5:13, 5:15, 5:19, 5:20, 6:12, 8:6, 8:20, 9:8, 10:4, 11:13, 13:21, 15:1, 15:8, 22:7, 26:1, 26:13, 26:15, 31:8, 33:13, 37:8, 37:25, 54:14, 54:25, 56:18, 58:4, 65:21, 66:1, 66:12
**briefly** [5] - 22:3, 61:13, 61:15, 63:3, 65:17
**briefs** [3] - 61:9, 66:6, 67:4
**bring** [4] - 19:4, 24:9, 24:19, 35:20
**BRITTANY** [1] - 1:17
**Brittany** [1] - 2:18
**broad** [9] - 6:25, 22:4, 55:9, 55:23, 55:25, 56:5, 56:7, 56:8, 56:13
**broader** [3] - 19:14, 65:25, 66:11
**broadest** [1] - 8:10
**broadly** [1] - 6:10
**brought** [1] - 30:13
**building** [1] - 26:6
**burden** [5] - 23:11, 32:24, 33:2, 35:25, 60:10
**burden-type** [1] - 60:10
**burdensome** [2] - 5:17, 59:6
**BY** [3] - 1:14, 1:17, 1:21

**C**

**cabin** [1] - 6:11
**Caitlyn** [1] - 2:16
**CAITLYN** [1] - 1:14
**cameras** [1] - 14:15
**canceled** [2] - 53:12, 58:22
**Cannon** [2] - 17:6, 17:13
**cannot** [1] - 29:21
**canon** [1] - 47:24
**caption** [1] - 10:20
**captioning** [9] - 7:18, 9:10, 10:10, 32:2, 32:15, 34:23, 35:8, 36:12, 66:1
**captions** [5] - 9:18, 12:3, 34:3, 34:8, 36:17
**capture** [1] - 14:15
**carried** [3] - 5:24, 14:17, 33:1
**carry** [1] - 63:5
**carrying** [2] - 13:20, 19:12
**CASE** [1] - 1:5
**case** [54] - 3:9, 4:8, 4:24, 5:3, 6:25, 7:2, 7:3, 7:16, 7:20, 7:24, 9:1, 9:17, 12:16, 12:17, 17:13, 22:21, 23:4, 24:2, 24:3, 24:4, 24:5, 24:11, 26:17, 29:14, 29:18, 30:11, 30:13, 33:8, 33:22, 37:5, 37:20, 39:2, 39:3, 40:4, 40:24, 47:19, 47:20, 48:1, 48:10, 48:12, 51:16, 51:21, 56:22, 57:19, 63:22, 63:23, 64:15, 64:21, 65:2, 65:23
**cases** [19] - 7:15, 8:10, 23:4, 23:15, 23:19, 24:8, 37:5, 37:6, 37:17, 39:4, 48:11, 49:5, 49:8, 51:10, 51:20, 52:2, 52:7, 55:14
**categories** [1] - 9:14
**caused** [1] - 33:2
**CDI** [1] - 54:17
**CDIs** [1] - 54:16
**centering** [1] - 37:13
**certain** [11] - 7:18, 15:16, 16:17, 16:18, 16:19, 18:4, 26:15, 27:3, 42:11, 49:24, 51:9

certainly [7] - 15:5, 15:18, 47:10, 58:9, 58:19, 59:15, 63:8
CERTIFICATE [1] - 67:14
Certified [1] - 1:24
certified [1] - 2:7
certify [1] - 67:16
challenge [1] - 64:9
chance [3] - 25:3, 26:20, 61:13
change [3] - 12:1, 12:7, 12:12
changed [2] - 42:12, 44:11
changing [1] - 58:6
chapter [1] - 19:9
charged [1] - 52:21
charitable [1] - 26:6
Chief [10] - 19:16, 39:3, 56:4, 56:12, 56:16, 57:3, 57:25, 58:1, 58:8, 61:6
chief [3] - 3:11, 20:9, 20:11
chronology [3] - 39:5, 43:2, 49:21
Circuit [1] - 47:20
circumstances [2] - 12:18, 53:18
citation [4] - 62:9, 62:10, 62:11, 62:14
citations [1] - 62:15
cite [6] - 7:15, 7:16, 48:12, 52:2, 62:3, 66:6
cited [2] - 62:4, 62:16
citing [2] - 7:19, 23:4
citizens [1] - 8:13
civil [2] - 15:15, 24:4
Civil [3] - 2:2, 16:22, 40:15
claim [26] - 6:23, 15:24, 19:4, 24:10, 24:19, 29:15, 33:7, 33:10, 36:23, 38:9, 38:17, 44:1, 46:18, 46:20, 47:24, 48:22, 51:15, 52:8, 52:15, 56:2, 59:20, 61:10, 64:4, 65:10
claiming [1] - 30:9
claims [15] - 18:8, 18:19, 26:17, 28:22, 28:23, 28:25, 29:5, 29:6, 48:22, 49:12, 50:5, 50:13, 51:12, 52:25, 64:17
clarify [1] - 47:4

class [1] - 41:7
cleanly [1] - 29:5
clear [23] - 9:2, 9:6, 16:7, 17:7, 17:8, 24:11, 26:12, 35:6, 42:25, 43:2, 43:5, 43:6, 44:3, 45:18, 49:2, 49:6, 51:5, 52:5, 52:15, 52:18, 53:4, 54:16, 66:14
clearly [8] - 7:19, 28:4, 40:23, 43:20, 44:3, 44:10, 48:14, 51:11
CLERK [1] - 2:2
click [1] - 13:22
clients [2] - 10:15
close [1] - 14:13
closed [13] - 7:17, 9:10, 9:17, 10:10, 10:20, 12:3, 32:15, 34:3, 34:8, 34:22, 35:8, 36:12, 66:1
Code [2] - 16:7, 16:10
coherence [1] - 23:2
colleagues [2] - 2:12, 3:10
colloquy [2] - 32:7, 45:2
COLUMBIA [1] - 1:1
Columbia [2] - 44:21, 67:16
combination [2] - 9:11, 23:24
coming [3] - 58:5, 60:7, 65:8
community [1] - 65:25
comparable [1] - 40:5
competence [1] - 10:5
complaint [2] - 46:16, 64:24
complete [4] - 10:16, 21:2, 21:3, 46:15
complex [2] - 10:3, 34:23
complying [1] - 60:23
component [1] - 45:19
concede [4] - 43:7, 43:16, 57:11, 57:21
conceded [2] - 57:14, 57:17
concession [1] - 43:9
conclude [1] - 20:23

concluded [1] - 67:12
conclusion [1] - 24:7
conduct [2] - 4:24, 30:3
conductor [1] - 64:10
conference [2] - 26:5, 55:6
Conference [1] - 67:18
conflict [4] - 17:20, 19:15, 19:19
conformance [1] - 67:17
Congress [34] - 16:2, 16:21, 16:25, 18:2, 18:3, 18:5, 27:7, 29:3, 30:15, 40:22, 41:18, 43:1, 43:2, 43:20, 44:7, 44:13, 44:23, 45:3, 45:12, 45:21, 47:15, 48:2, 48:13, 49:4, 50:23, 51:10, 51:12, 52:5, 52:20, 52:24, 61:19, 63:9, 63:25
congressional [1] - 62:14
connect [1] - 22:17
consequences [1] - 30:4
consider [3] - 7:3, 64:18, 64:24
considered [1] - 48:24
consistent [2] - 58:24, 63:9
consistently [1] - 10:17
constitutes [1] - 29:17
construed [1] - 47:23
content [2] - 34:23, 35:2
context [15] - 9:15, 27:23, 27:25, 32:9, 32:10, 33:11, 33:20, 33:21, 35:2, 39:24, 45:10, 55:14, 55:15, 55:17, 57:2
contexts [2] - 8:15, 53:23
continue [3] - 11:16, 31:12, 59:22
continues [1] - 56:6
contrary [1] - 41:8
contrast [1] - 66:25
control [3] - 12:24,

59:12
controlling [2] - 31:15, 61:7
conversations [1] - 4:13
converse [1] - 34:24
conveyed [1] - 10:23
copies [1] - 61:25
correct [5] - 11:12, 45:9, 52:13, 58:18, 58:19
correctly [3] - 13:10, 14:23, 35:19
cost [1] - 60:23
counsel [14] - 2:4, 2:5, 2:25, 31:22, 32:7, 38:24, 45:2, 48:17, 49:21, 54:10, 54:20, 56:16, 63:2, 63:21
counsels' [1] - 67:8
counterparts [1] - 29:19
country [2] - 15:15, 26:11
couple [9] - 3:6, 3:17, 34:12, 36:6, 44:12, 54:12, 54:14, 60:17, 65:21
course [12] - 4:6, 7:12, 11:24, 21:25, 30:24, 32:4, 34:24, 38:7, 44:19, 45:25, 52:22, 61:25
Court [55] - 1:24, 2:1, 2:14, 4:3, 4:4, 4:24, 17:13, 17:14, 20:20, 20:23, 21:4, 21:7, 21:23, 21:25, 29:20, 29:21, 29:25, 30:13, 30:25, 31:5, 31:22, 33:9, 33:11, 34:7, 40:5, 41:13, 41:15, 41:16, 41:17, 41:20, 43:21, 44:4, 44:20, 45:12, 47:14, 47:15, 47:20, 48:13, 51:16, 51:17, 52:3, 52:4, 58:10, 58:11, 60:19, 60:21, 61:4, 61:22, 64:3, 64:7, 64:18, 66:8, 67:15, 67:15
court [15] - 3:19, 3:22, 4:23, 7:19, 7:20, 16:3, 17:20, 34:5, 42:3, 42:16, 47:13, 48:24, 52:17, 63:7, 65:8
COURT [118] - 1:1, 2:21, 3:1, 5:2, 5:25, 7:25, 9:9, 9:13, 10:7,

11:8, 11:11, 12:22, 13:13, 14:1, 14:5, 15:21, 16:9, 17:9, 18:11, 19:3, 19:8, 19:15, 19:18, 19:23, 20:3, 20:7, 20:12, 20:16, 21:9, 21:12, 21:16, 22:3, 22:25, 24:6, 24:14, 24:18, 24:22, 24:25, 25:2, 25:9, 25:14, 26:18, 27:14, 27:19, 28:8, 28:14, 29:7, 30:6, 30:22, 31:1, 31:4, 31:23, 32:11, 33:20, 35:5, 35:14, 35:23, 36:11, 37:1, 37:20, 38:11, 38:14, 39:10, 39:23, 40:2, 40:10, 40:17, 40:19, 40:25, 41:11, 41:20, 42:3, 42:9, 43:3, 43:10, 43:13, 43:22, 43:25, 44:9, 45:14, 46:13, 46:18, 46:20, 47:3, 47:18, 48:7, 48:16, 50:2, 50:25, 51:19, 52:8, 52:10, 52:13, 53:3, 53:7, 53:11, 53:22, 55:19, 56:1, 56:7, 56:24, 57:8, 57:13, 57:21, 58:15, 58:20, 60:6, 60:15, 61:11, 61:13, 62:3, 62:6, 62:9, 64:13, 65:7, 65:15, 67:6, 67:22
Court's [13] - 4:6, 17:6, 17:7, 17:23, 21:3, 23:25, 30:2, 32:6, 61:2, 62:2, 63:13, 63:18, 64:2
courts [2] - 24:4, 28:19
cover [2] - 63:1, 63:2
coverage [1] - 32:3
covered [3] - 6:13, 62:25, 63:5
COVID [9] - 32:8, 33:11, 33:14, 36:24, 37:2, 37:8, 37:10, 55:14, 61:7
COVID-19 [1] - 56:18
COVID-related [2] - 36:24, 37:8
created [4] - 41:18, 43:14, 61:19
creates [5] - 13:2, 13:3, 17:3, 17:6, 17:24

**creating** [14] - 17:3, 18:1, 18:2, 40:3, 40:6, 41:14, 42:14, 48:5, 48:8, 48:21, 49:17, 50:14, 51:2, 55:12
**credibility** [1] - 38:9
**CRR** [1] - 67:21
**current** [3] - 31:12, 41:5, 53:16
**cuts** [2] - 8:15, 26:10
**cutting** [1] - 26:5

**D**

**damages** [11] - 27:11, 27:14, 27:22, 27:24, 28:9, 29:23, 42:15, 49:1, 49:11, 50:15
**damages-plus** [2] - 50:15
**Darrah** [1] - 2:19
**DARRAH** [1] - 1:17
**date** [3] - 30:12, 62:9, 67:1
**Dated** [1] - 67:19
**DC** [4] - 1:11, 1:15, 1:22, 47:20
**deaf** [16] - 2:7, 4:8, 4:10, 7:13, 7:21, 8:19, 9:19, 10:2, 10:15, 10:23, 15:7, 32:19, 54:2, 65:25, 66:12, 66:18
**DEAF** [1] - 1:3
**Deaf** [3] - 1:16, 2:3, 2:17
**deafness** [2] - 9:24, 11:5
**deal** [1] - 52:25
**dealing** [5] - 5:5, 6:3, 29:14, 48:22, 58:5
**decide** [1] - 8:21
**decides** [2] - 60:1, 60:3
**decision** [22] - 17:7, 17:8, 17:14, 17:20, 21:6, 21:20, 33:9, 37:21, 44:21, 51:21, 51:25, 52:2, 53:15, 53:16, 53:17, 53:19, 56:4, 62:23, 65:5
**decisions** [2] - 17:23, 20:7
**declaration** [1] - 54:25
**declarations** [4] - 33:5, 34:21, 66:3
**deep** [2] - 43:8, 43:11

**deeper** [1] - 43:17
**defendant** [4] - 24:23, 45:8, 46:3, 65:1
**Defendants** [1] - 1:7
**defendants** [26] - 2:24, 4:17, 4:21, 4:25, 7:5, 14:11, 15:11, 21:19, 22:21, 23:3, 24:12, 24:21, 31:6, 45:10, 49:25, 50:1, 63:19, 64:20, 64:22, 64:23, 65:3, 65:6, 66:13, 66:15, 66:16, 66:20
**DEFENDANTS** [1] - 1:20
**defendants'** [4] - 5:21, 11:1, 63:2, 63:21
**defending** [1] - 65:10
**deference** [1] - 59:10
**defined** [2] - 6:10, 22:5
**definition** [2] - 6:24, 25:1
**definitively** [1] - 63:19
**degree** [1] - 29:18
**DEI** [1] - 66:5
**delta** [1] - 57:24
**demand** [1] - 32:13
**democracy** [1] - 7:13
**democratic** [2] - 4:12, 7:22
**denial** [3] - 4:13, 5:14, 29:16
**denied** [1] - 37:12
**Department** [2] - 1:20, 2:24
**dependent** [4] - 23:4, 23:7, 23:20, 23:21
**deprivation** [2] - 7:23, 67:2
**deprived** [2] - 4:11, 34:19
**depriving** [4] - 7:12, 8:19, 26:8, 66:11
**DEPUTY** [1] - 2:2
**describe** [1] - 11:14
**describes** [2] - 46:15, 46:16
**describing** [1] - 36:23
**designed** [1] - 30:15
**designees** [2] - 7:10, 8:21
**desire** [1] - 18:7
**detail** [1] - 9:22
**detailed** [4] - 52:5,

53:1, 64:1, 64:5
**determination** [1] - 61:2
**developments** [2] - 24:3, 24:4
**differ** [2] - 7:2, 25:4
**differences** [1] - 54:12
**different** [12] - 7:7, 7:24, 13:7, 15:7, 25:10, 26:15, 39:14, 47:7, 49:2, 50:20, 54:10, 55:14
**differently** [1] - 48:19
**difficult** [2] - 8:18, 59:7
**Diplomate** [1] - 1:23
**direct** [1] - 4:6
**directing** [3] - 44:15, 44:22, 45:22
**directly** [3] - 13:5, 61:25, 62:1
**disabilities** [2] - 11:5, 23:5
**disability** [10] - 10:25, 11:8, 28:25, 30:16, 36:2, 39:15, 41:22, 41:23, 42:18, 42:19
**disabled** [1] - 18:8
**disagree** [2] - 17:18, 21:21
**disagreed** [1] - 57:3
**disagreeing** [2] - 20:9, 20:10
**disagreement** [2] - 36:8, 57:6
**disasters** [2] - 9:6, 33:14
**discretion** [4] - 59:2, 59:11, 64:18, 66:15
**discretionary** [3] - 53:15, 58:23, 65:13
**discriminated** [1] - 16:23
**discrimination** [4] - 28:25, 29:21, 30:1, 30:16
**discriminatory** [4] - 4:14, 4:24, 5:15, 30:3
**discussed** [2] - 8:6, 10:4
**discussing** [2] - 8:8, 18:4
**discussion** [5] - 18:7, 19:7, 62:17, 65:18, 67:3
**displace** [4] - 20:20, 51:24, 53:2, 64:1

**displaced** [2] - 52:5, 52:18
**dispute** [7] - 4:19, 32:1, 32:4, 34:13, 36:16, 36:19, 55:4
**disputed** [1] - 7:5
**disputing** [4] - 34:14, 34:15, 34:17, 34:18
**distant** [1] - 10:6
**distinction** [4] - 5:3, 5:18, 5:21, 25:21
**distinctions** [2] - 8:18, 10:1
**distinguishes** [2] - 11:5, 35:14
**distribute** [1] - 8:23
**DISTRICT** [3] - 1:1, 1:1, 1:10
**district** [1] - 7:20
**District** [5] - 33:10, 44:21, 51:16, 67:15
**dive** [3] - 43:8, 43:11, 43:17
**divergence** [1] - 45:7
**doctrinal** [1] - 5:18
**document** [1] - 25:24
**Doe** [4] - 17:17, 21:20, 39:2, 62:23
**DOJ** [1] - 2:25
**DONALD** [1] - 1:6
**Donald** [1] - 2:3
**done** [11] - 27:4, 27:7, 30:20, 43:8, 43:11, 43:16, 45:3, 46:13, 47:5, 51:12, 55:10
**dots** [1] - 22:18
**down** [4] - 3:24, 12:11, 26:20, 60:16
**downstream** [1] - 30:4
**DRAKE** [1] - 1:17
**Drake** [1] - 2:19
**draw** [1] - 8:18
**drawn** [1] - 29:2
**driven** [1] - 11:4
**during** [1] - 5:3

**E**

**ease** [2] - 14:20, 16:5
**easier** [4] - 2:13, 16:12, 33:22, 34:15
**Easter** [3] - 54:1, 66:17, 66:21
**educational** [1] - 16:22
**EEOC** [1] - 28:19
**effectively** [1] - 31:11

**effectuate** [2] - 44:16, 45:23
**effectuating** [1] - 52:21
**Egg** [3] - 54:1, 66:17, 66:21
**either** [5] - 9:10, 24:21, 42:4, 60:1, 61:8
**Elizabeth** [2] - 2:23, 31:5
**ELIZABETH** [1] - 1:21
**emergencies** [1] - 9:5
**emergency** [2] - 5:19, 7:6
**emphasis** [3] - 29:12, 64:20, 65:19
**emphasize** [3] - 17:15, 27:1, 28:5
**emphasizes** [1] - 27:5
**employer** [1] - 28:24
**employment** [8] - 18:12, 27:23, 28:17, 28:22, 28:24, 28:25, 29:4, 49:6
**employment-related** [2] - 28:17, 29:4
**enacted** [1] - 41:8
**encourage** [1] - 21:4
**end** [3] - 24:2, 38:4, 47:4
**engage** [1] - 7:8
**engages** [1] - 52:2
**English** [6] - 9:17, 9:23, 10:2, 10:3, 10:21, 36:7
**enshrine** [1] - 31:18
**ensure** [1] - 4:18
**ensuring** [1] - 4:8
**entire** [3] - 38:7, 39:21, 55:25
**entirely** [1] - 64:19
**entitled** [2] - 33:12, 67:17
**entitlement** [2] - 31:14, 55:13
**enumerated** [1] - 66:10
**EOP** [4] - 45:3, 45:4, 45:25, 46:9
**equal** [5] - 15:6, 15:14, 15:17, 29:16
**equitable** [17] - 20:20, 20:23, 21:3, 22:1, 29:24, 38:18, 48:11, 48:15, 51:24,

52:4, 52:17, 53:9, 58:18, 63:14, 63:18, 63:25, 64:2

**especially** [7] - 10:3, 30:15, 34:23, 36:20, 37:16, 55:16, 57:1

**essentially** [6] - 6:25, 10:6, 14:24, 41:1, 63:17, 64:22

**established** [8] - 33:12, 33:15, 35:4, 51:15, 55:16, 56:21, 58:13, 59:20

**et** [4] - 1:3, 1:6, 2:3

**event** [4] - 26:6, 54:7, 55:7, 56:20

**events** [4] - 54:20, 54:22, 56:23, 66:3

**everyday** [1] - 5:20

**evidence** [19] - 9:17, 15:13, 17:25, 20:1, 32:21, 33:23, 34:4, 34:5, 34:6, 34:10, 34:12, 35:5, 35:15, 35:19, 35:24, 36:1, 36:3, 60:10, 63:8

**evolve** [1] - 12:1

**exact** [1] - 16:25

**exactly** [6] - 6:13, 6:17, 45:14, 45:15, 45:20, 61:17

**example** [10] - 6:5, 6:12, 12:20, 13:20, 26:4, 33:9, 35:20, 53:24, 54:5, 54:8

**examples** [1] - 8:4

**excepted** [1] - 24:23

**excluded** [4] - 4:12, 39:16, 41:23, 42:19

**excludes** [1] - 48:14

**excluding** [1] - 49:25

**exclusion** [2] - 48:3, 48:10

**exclusive** [4] - 52:6, 53:1, 64:1, 64:5

**exclusively** [1] - 17:22

**executive** [16] - 5:24, 7:1, 11:25, 19:12, 41:23, 42:19, 44:13, 44:15, 44:19, 45:20, 49:13, 51:12, 53:6, 63:4, 64:5, 66:5

**exercise** [1] - 23:7

**exhausted** [1] - 46:9

**exhaustion** [5] - 63:3, 64:16, 65:8, 65:13

**exhaustive** [1] - 8:2

**existed** [5] - 18:6,

42:11, 43:8, 43:18, 61:18

**existence** [2] - 18:5, 63:24

**existing** [3] - 19:7, 28:6, 63:11

**expedited** [1] - 60:21

**expert** [3] - 9:20, 35:21

**experts** [2] - 9:21, 58:6

**explain** [1] - 9:22

**explained** [1] - 7:19

**explains** [1] - 63:24

**explicitly** [1] - 32:9

**express** [4] - 41:10, 41:12, 49:14, 49:24

**expressed** [1] - 58:12

**extends** [1] - 54:23

**extent** [3] - 7:25, 57:24, 58:8

**extremely** [1] - 10:5

**eye** [1] - 59:14

## F

**face** [1] - 27:19

**faced** [1] - 29:22

**fact** [11] - 10:17, 11:12, 19:13, 23:4, 23:7, 23:20, 44:7, 52:19, 52:22, 53:8, 55:13

**fact-dependent** [1] - 23:7

**factor** [1] - 6:20

**factors** [1] - 7:2

**facts** [1] - 12:17

**failure** [3] - 7:17, 7:22, 29:15

**far** [3] - 29:25, 31:16, 48:10

**fashion** [3] - 8:8, 22:11, 60:19

**fashioning** [1] - 22:10

**fast** [3] - 3:23, 58:5, 58:6

**fault** [1] - 15:22

**fear** [1] - 22:22

**feasibility** [2] - 23:17, 59:6

**feasible** [11] - 4:20, 12:6, 12:8, 12:13, 12:14, 14:24, 15:13, 23:10, 59:9, 59:11

**federal** [10] - 1:24, 18:12, 28:23, 28:25, 29:1, 39:8, 44:7,

44:18, 44:24, 49:5

**Federal** [1] - 67:15

**FEDERAL** [1] - 67:22

**fee** [3] - 18:20, 19:1, 20:1

**fee-shifting** [2] - 18:20, 20:1

**feed** [10] - 13:9, 13:11, 13:13, 13:14, 14:8, 14:18, 14:20, 15:12

**feeds** [1] - 13:7

**Fees** [1] - 27:21

**fees** [5] - 18:9, 18:22, 19:14, 27:1, 27:20

**Fenton** [1] - 1:18

**few** [1] - 20:4

**figure** [1] - 35:6

**figuring** [1] - 58:7

**filed** [1] - 64:23

**financial** [9] - 18:13, 27:25, 29:1, 39:8, 39:16, 44:8, 44:18, 48:22, 49:8

**fine** [7] - 16:9, 21:9, 35:22, 43:3, 43:10, 57:8, 60:2

**finish** [4] - 37:24, 38:5, 39:11, 47:3

**finished** [1] - 48:17

**firm** [2] - 2:11, 65:8

**First** [2] - 8:11, 61:10

**first** [19] - 3:5, 8:25, 11:9, 18:15, 18:18, 19:4, 21:4, 21:13, 22:21, 25:20, 31:25, 34:14, 47:7, 53:12, 55:8, 58:21, 60:18, 64:25, 65:22

**fit** [1] - 16:13

**flexibility** [3] - 13:3, 25:18, 59:3

**Florida** [5] - 7:15, 7:17, 8:11, 33:10, 51:16

**focus** [4] - 44:23, 45:19, 55:20, 61:17

**focused** [5] - 8:25, 20:8, 37:22, 38:2, 51:1

**focusing** [4] - 10:12, 17:21, 20:5, 38:3

**follow** [2] - 4:25, 21:6

**following** [2] - 22:14, 28:19

**follows** [1] - 21:20

**footnote** [3] - 18:22, 20:14, 20:15

**FOR** [3] - 1:1, 1:13,

1:20

**forbid** [1] - 9:4

**forced** [1] - 60:9

**foregoing** [1] - 67:16

**foreign** [1] - 11:3

**form** [2] - 22:21, 32:13

**format** [1] - 67:17

**forward** [2] - 7:14, 29:24

**forward-looking** [1] - 29:24

**four** [1] - 4:21

**frame** [2] - 3:7, 14:15

**frankly** [1] - 3:20

**free** [1] - 4:6

**friend** [1] - 39:5

**front** [2] - 3:9, 56:17

**fundamental** [8] - 4:11, 5:17, 7:21, 23:11, 59:18, 59:21, 60:13, 62:22

**fundamentally** [1] - 23:22

**fuse** [1] - 14:19

**futile** [1] - 64:19

**futility** [1] - 65:13

## G

**general** [1] - 46:19

**generality** [1] - 8:10

**given** [5] - 11:18, 31:9, 33:16, 34:10, 36:17

**God** [1] - 9:4

**gotcha** [1] - 57:16

**governing** [1] - 47:19

**government** [19] - 5:4, 6:4, 8:12, 8:13, 12:23, 12:25, 28:24, 29:6, 30:11, 30:23, 34:2, 35:6, 35:16, 36:11, 55:23, 57:14, 58:25, 59:4, 59:7

**government's** [5] - 9:9, 24:6, 35:7, 45:16, 47:4

**grant** [2] - 58:11, 60:20

**grapple** [1] - 63:22

**great** [1] - 66:19

**greater** [3] - 13:3, 25:18, 49:15

**grievances** [2] - 8:12, 8:14

**groundbreaking** [2] - 11:14, 11:16

**grounded** [1] - 55:11

**groups** [1] - 15:16

**guess** [17] - 5:25, 6:7, 12:11, 14:7, 27:7, 27:15, 29:10, 42:1, 46:2, 50:2, 50:19, 52:11, 53:7, 56:7, 56:11, 56:24, 65:17

**guidance** [1] - 4:6

## H

**hand** [3] - 9:23, 61:22, 62:12

**handle** [1] - 52:6

**Happy** [1] - 30:21

**happy** [3] - 34:8, 60:21, 61:22

**harm** [34] - 5:10, 6:21, 7:3, 7:4, 7:5, 7:7, 7:11, 7:24, 8:5, 26:7, 26:14, 29:9, 29:11, 29:20, 30:1, 30:4, 30:11, 31:21, 31:25, 32:6, 33:2, 33:18, 36:21, 37:7, 37:11, 38:7, 38:11, 38:22, 54:21, 55:18, 58:2, 66:11, 67:1

**harmed** [1] - 38:10

**harmful** [2] - 4:14, 8:20

**harming** [3] - 36:21, 37:16, 37:19

**harms** [1] - 9:2

**head** [2] - 64:25, 65:1

**health** [4] - 7:6, 9:1, 9:4, 58:3

**healthcare** [1] - 26:10

**hear** [3] - 3:3, 30:23, 66:14

**heard** [5] - 20:3, 32:16, 36:16, 54:9, 54:20

**HEARING** [1] - 1:9

**heartening** [1] - 66:19

**heavily** [1] - 21:19

**HEDGES** [63] - 1:21, 2:23, 31:3, 31:5, 31:24, 32:23, 34:11, 35:13, 35:18, 36:5, 36:13, 37:4, 38:6, 38:12, 38:21, 39:20, 40:1, 40:9, 40:13, 40:18, 40:21, 41:2, 41:13, 41:25, 42:6, 42:24, 43:6, 43:12, 43:19, 43:24, 44:6,

44:12, 45:21, 46:14, 46:19, 46:21, 47:7, 47:25, 48:9, 49:20, 50:22, 51:5, 52:1, 52:9, 52:11, 52:19, 53:5, 53:10, 53:14, 53:24, 55:24, 56:3, 56:10, 56:15, 57:6, 57:10, 57:20, 57:23, 58:17, 59:13, 60:12, 60:17, 61:12

**Hedges** [3] - 2:23, 3:1, 31:5

**held** [1] - 7:19

**help** [13] - 4:4, 6:17, 11:11, 11:17, 11:20, 13:15, 15:21, 15:22, 22:17, 32:11, 32:20, 47:3, 56:25

**helpful** [10] - 3:14, 3:21, 3:24, 4:7, 38:14, 39:11, 39:25, 57:19, 60:6, 67:9

**hereby** [1] - 67:16

**hide** [1] - 59:4

**high** [4] - 6:15, 10:5, 15:25, 24:14

**highlight** [1] - 55:23

**highlighting** [1] - 37:14

**highlights** [1] - 61:24

**hire** [3] - 35:9, 35:10, 36:15

**history** [8] - 11:21, 15:15, 16:14, 17:23, 18:3, 19:6, 28:4, 62:1

**Hoffman** [1] - 2:10

**HOFFMAN** [58] - 1:14, 2:10, 4:1, 5:11, 6:19, 8:9, 9:12, 9:16, 10:14, 11:10, 11:23, 13:11, 13:16, 14:4, 14:10, 16:5, 16:10, 17:13, 18:18, 19:5, 19:11, 19:17, 19:21, 19:24, 20:6, 20:10, 20:13, 21:1, 21:11, 21:14, 21:18, 22:19, 23:3, 24:11, 24:16, 24:20, 24:24, 25:1, 25:6, 25:13, 25:20, 26:22, 27:17, 28:3, 28:12, 28:16, 29:9, 30:7, 30:24, 31:2, 56:11, 61:14, 62:4, 62:8, 62:10, 64:15, 65:12, 65:16

**hold** [1] - 64:3

**holds** [1] - 21:7

**Honor** [100] - 2:10,

2:23, 4:1, 4:8, 5:11, 6:19, 6:20, 6:23, 8:10, 8:17, 9:3, 9:12, 9:16, 10:14, 10:25, 11:23, 13:12, 14:10, 14:22, 15:4, 16:5, 17:2, 17:19, 17:25, 18:18, 18:21, 19:5, 21:18, 22:19, 23:15, 24:11, 25:6, 25:20, 26:2, 26:22, 26:23, 28:3, 28:21, 29:10, 30:7, 30:19, 31:2, 31:3, 32:23, 33:3, 34:11, 35:13, 35:18, 36:13, 36:14, 37:4, 38:6, 38:12, 38:21, 38:24, 39:2, 39:20, 40:9, 40:13, 40:21, 41:3, 41:5, 42:1, 42:6, 42:24, 43:6, 43:19, 44:6, 45:1, 46:19, 46:21, 47:13, 47:25, 48:9, 49:20, 50:22, 51:5, 52:1, 52:9, 52:19, 53:10, 53:14, 55:24, 56:3, 56:10, 56:15, 57:10, 57:23, 59:13, 60:12, 60:17, 61:12, 61:14, 61:17, 62:16, 62:24, 65:2, 65:17, 66:20, 67:5

**Honor's** [1] - 27:17

**HONORABLE** [1] - 1:10

**Hook** [1] - 2:18

**HOOK** [1] - 1:17

**hospitals** [1] - 12:21

**House** [13] - 4:9, 4:17, 4:19, 5:1, 5:13, 13:20, 13:22, 14:15, 14:21, 14:25, 15:3, 66:17, 66:21

**house** [2] - 64:7, 65:5

**hypothetical** [2] - 23:12, 23:15

**hypotheticals** [2] - 11:2, 24:1

---

**I**

**IAN** [1] - 1:14

**Ian** [1] - 2:10

**idea** [5] - 10:7, 11:19, 37:20, 37:21, 63:3

**identify** [1] - 2:4

**ignore** [1] - 36:3

**image** [3] - 12:24, 12:25, 59:12

**imagine** [1] - 13:4

**immigration** [1] - 8:16

**imminent** [2] - 6:20, 9:1

**immunity** [3] - 27:10, 27:12, 49:3

**immunize** [1] - 30:14

**impediment** [1] - 38:25

**impinges** [1] - 8:14

**implement** [1] - 44:25

**implementation** [1] - 13:4

**implemented** [2] - 16:15

**implicated** [1] - 7:22

**implied** [8] - 17:15, 20:2, 21:5, 26:25, 48:11, 48:14, 52:4, 61:16

**impliedly** [1] - 49:16

**importance** [1] - 8:24

**important** [8] - 4:13, 5:19, 16:14, 21:19, 42:9, 46:5, 49:22, 51:4

**improper** [1] - 60:19

**in-house** [2] - 64:7, 65:5

**inaccessible** [1] - 36:9

**inclined** [2] - 21:23, 58:11

**include** [4] - 27:11, 27:15, 31:8, 46:24

**included** [1] - 49:11

**includes** [3] - 14:8, 15:3, 19:1

**including** [4] - 3:11, 13:7, 19:11, 54:16

**inclusion** [1] - 22:24

**indeed** [1] - 31:16

**independently** [1] - 55:21

**indication** [1] - 30:3

**indifference** [1] - 30:18

**indisputably** [1] - 4:16

**individual** [5] - 10:15, 39:15, 41:21, 42:17, 65:22

**individualized** [1] - 23:17

**individuals** [2] - 44:23, 64:9

**inexpensive** [4] -

59:9, 59:11, 59:13, 59:16

**inference** [1] - 29:2

**information** [8] - 33:16, 34:16, 36:22, 36:24, 37:22, 46:25, 58:3, 58:5

**inherent** [5] - 22:1, 48:11, 63:13, 63:18, 64:2

**injunction** [14] - 3:2, 14:11, 22:11, 22:17, 26:3, 26:13, 26:16, 31:11, 42:14, 42:21, 49:3, 55:17, 57:11, 60:18

**injunctive** [11] - 27:16, 28:2, 40:11, 43:15, 44:1, 48:25, 50:6, 50:8, 50:18, 52:15, 63:7

**injury** [1] - 29:17

**inquiry** [2] - 23:23, 26:14

**instance** [2] - 3:9, 21:5

**instances** [1] - 66:16

**instructs** [1] - 44:24

**insufficient** [1] - 35:4

**intended** [2] - 61:21, 63:6

**intention** [3] - 18:1, 29:3

**interactions** [1] - 15:25

**interest** [2] - 58:4, 58:13

**interested** [2] - 56:12, 66:5

**interesting** [1] - 12:22

**interests** [1] - 65:24

**interpretation** [8] - 2:8, 31:8, 32:8, 33:13, 39:1, 49:19, 52:16, 53:20

**interpreted** [1] - 31:19

**interpreter** [12] - 12:20, 13:17, 13:24, 14:13, 14:18, 15:2, 15:3, 22:14, 54:3, 54:7, 66:18, 66:21

**interpreters** [14] - 2:7, 2:8, 4:2, 4:14, 4:20, 5:1, 5:14, 5:16, 5:19, 17:9, 26:1, 54:14, 66:14, 66:23

**interpreting** [2] - 12:20, 49:23

**interrupt** [1] - 3:22

**introduce** [1] - 2:12

**introduced** [1] - 34:4

**invidious** [1] - 30:17

**involve** [2] - 23:16, 49:8

**involving** [2] - 49:5, 49:13

**iPad** [1] - 12:20

**irreparable** [30] - 5:10, 6:21, 7:3, 7:4, 7:5, 7:7, 7:24, 8:5, 26:7, 26:14, 29:9, 29:10, 29:21, 30:1, 30:4, 30:12, 31:21, 31:25, 32:6, 33:2, 33:18, 36:21, 37:7, 37:11, 37:19, 38:7, 38:22, 54:21, 55:18, 67:1

**irreparably** [3] - 36:21, 37:16, 38:9

**issue** [13] - 4:22, 10:25, 11:4, 14:22, 23:5, 26:25, 29:5, 32:25, 36:2, 48:3, 49:3, 67:7

**issues** [5] - 8:16, 9:1, 9:4, 28:17, 66:5

**itself** [4] - 29:17, 43:18, 44:2, 63:6

**IX** [5] - 16:17, 16:22, 17:16, 28:17, 63:10

---

**J**

**Judge** [42] - 3:12, 4:4, 4:23, 16:13, 17:18, 17:20, 19:16, 19:25, 20:13, 20:15, 20:17, 20:18, 21:6, 24:7, 24:16, 28:16, 29:12, 29:13, 29:14, 30:10, 32:9, 33:17, 39:3, 45:15, 51:21, 51:23, 56:4, 56:12, 56:16, 57:3, 57:25, 58:1, 58:8, 61:6, 62:5, 62:16, 63:14, 63:18, 63:21, 63:22

**JUDGE** [1] - 1:10

**judge's** [4] - 3:11, 12:10, 20:9, 20:11

**judges** [1] - 17:19

**Judicial** [1] - 67:18

**judicial** [2] - 64:18, 65:4

**July** [2] - 1:10, 67:19

**jumped** [1] - 15:21

**jumping** [1] - 17:2

**Justice** [3] - 1:20, 2:24, 17:8

**K**

**KATERBERG** [1] - 1:14
**Katerberg** [1] - 2:16
**Kaye** [1] - 1:13
**keep** [2] - 29:12, 44:2
**KELLERMAN** [1] - 1:14
**key** [1] - 31:24
**keys** [1] - 17:15
**kind** [22] - 3:7, 3:9, 5:2, 6:8, 6:10, 6:20, 9:13, 10:8, 11:21, 13:3, 15:11, 22:11, 25:19, 26:8, 29:20, 39:25, 42:9, 49:9, 52:8, 55:21, 56:24, 60:7
**kinds** [2] - 8:19, 50:20
**Kleinman** [1] - 2:16
**KLEINMAN** [1] - 1:14
**knowledge** [1] - 55:9
**known** [1] - 54:1
**knows** [2] - 3:22, 35:25

**L**

**lack** [6] - 33:3, 33:6, 37:7, 52:23, 58:3, 63:17
**lady** [4] - 26:4, 54:22, 55:8
**laid** [2] - 9:14, 50:12
**language** [44] - 6:9, 9:21, 9:25, 10:1, 10:6, 11:2, 11:4, 16:20, 16:21, 16:25, 17:3, 17:16, 17:24, 18:24, 19:13, 34:14, 39:14, 39:17, 40:3, 40:6, 40:15, 40:22, 41:6, 42:4, 42:12, 42:13, 42:14, 42:17, 42:21, 43:13, 43:17, 44:4, 44:14, 44:22, 45:22, 48:5, 48:8, 48:21, 49:17, 50:14, 51:2, 61:20
**Language** [11] - 9:21, 9:23, 10:2, 10:24, 13:24, 14:12, 14:17, 15:2, 26:1, 66:14, 66:22
**languages** [1] - 11:3

**last** [9] - 25:2, 25:5, 25:15, 25:18, 25:23, 30:7, 30:9, 41:17, 65:16
**law** [23] - 2:11, 3:9, 6:25, 11:15, 11:19, 11:20, 11:24, 12:9, 12:14, 12:16, 13:3, 24:3, 24:4, 25:16, 29:23, 30:10, 33:8, 36:8, 55:12, 57:7, 60:14, 63:10, 64:16
**Law** [1] - 62:11
**lay** [1] - 29:11
**laying** [1] - 42:1
**leader** [1] - 7:10
**leadership** [1] - 7:9
**least** [4] - 3:7, 16:12, 28:5, 55:21
**leave** [1] - 61:4
**left** [3] - 20:24, 29:24, 34:25
**legal** [9] - 5:18, 18:9, 23:1, 31:14, 38:16, 56:1, 57:1, 57:4, 60:7
**legally** [3] - 31:18, 58:25, 59:1
**legislative** [5] - 7:18, 18:3, 19:6, 28:4, 62:1
**legislature's** [1] - 7:17
**less** [3] - 6:22, 10:9
**letter** [1] - 64:22
**level** [6] - 6:15, 10:3, 10:5, 15:25, 24:14, 64:25
**Lewis** [1] - 2:17
**license** [1] - 3:22
**life** [1] - 26:17
**light** [3] - 19:5, 66:10, 67:1
**likely** [1] - 21:1
**limit** [1] - 66:9
**limited** [3] - 22:7, 22:8, 61:7
**limiting** [1] - 9:7
**limits** [1] - 32:17
**line** [2] - 6:14, 34:21
**linguists** [1] - 9:21
**list** [1] - 8:2
**litigants** [1] - 40:15
**live** [14] - 6:3, 8:7, 10:11, 13:8, 13:11, 13:13, 13:20, 14:8, 37:22, 37:23, 37:25, 38:2, 54:3, 54:6
**living** [1] - 51:10
**LLP** [1] - 1:13
**location** [1] - 14:18
**logic** [2] - 21:13,

27:2
**logical** [2] - 23:2, 29:2
**look** [17] - 12:16, 12:17, 18:12, 30:2, 33:17, 33:18, 34:20, 36:10, 39:22, 42:16, 43:4, 49:5, 50:4, 50:9, 54:12, 54:24, 65:9
**looked** [5] - 37:5, 37:6, 39:4, 55:25, 58:2
**looking** [2] - 29:24, 48:20
**looks** [2] - 33:9, 54:13
**loss** [1] - 8:4
**luck** [2] - 16:3, 49:14

**M**

**main** [2] - 13:8, 14:9
**maintain** [1] - 26:17
**maintained** [1] - 24:12
**majority** [1] - 28:20
**manageable** [1] - 4:20
**mandamus** [1] - 61:10
**mandatory** [1] - 64:17
**manner** [1] - 29:16
**map** [1] - 29:5
**Maryland** [1] - 1:18
**Massachusetts** [1] - 1:15
**Mathis** [19] - 17:17, 18:21, 19:17, 19:18, 19:19, 20:14, 21:20, 21:24, 22:1, 29:13, 29:14, 30:10, 39:3, 41:16, 47:14, 51:21, 62:22, 63:14
**Mathis'** [4] - 20:13, 29:12, 63:21, 63:22
**matter** [6] - 10:20, 10:22, 21:13, 64:18, 67:17
**matters** [4] - 8:24, 32:18, 33:8, 34:5
**McFadden** [4] - 20:18, 51:23, 63:14, 63:18
**McFadden's** [4] - 3:12, 20:15, 29:14, 51:21
**mean** [25] - 6:1, 8:9, 9:13, 12:9, 12:23, 13:1, 15:5, 16:24,

18:12, 21:2, 27:18, 28:14, 30:20, 32:11, 39:21, 41:18, 45:10, 46:6, 47:14, 49:14, 53:5, 56:11, 57:21, 58:23, 59:24
**meaningful** [9] - 4:18, 9:19, 10:19, 10:22, 11:24, 12:13, 23:14, 34:19, 36:1
**means** [5] - 10:10, 11:25, 32:5, 45:23, 48:3
**mechanism** [1] - 24:9
**media** [1] - 32:3
**Medicaid** [2] - 8:16, 66:6
**medical** [1] - 58:6
**Medicare** [2] - 8:15, 66:6
**Medina** [1] - 41:17
**meet** [1] - 12:1
**member** [1] - 41:7
**mentioned** [1] - 28:9
**mentioning** [1] - 37:23
**merely** [1] - 12:7
**merits** [5] - 6:22, 22:3, 38:23, 57:7, 65:10
**message** [1] - 10:22
**method** [1] - 14:16
**might** [17] - 12:13, 12:14, 16:6, 16:11, 19:21, 20:3, 23:19, 26:15, 32:20, 33:22, 34:15, 37:3, 43:17, 45:17, 47:10, 54:22, 56:23
**mind** [6] - 6:1, 8:1, 8:5, 16:12, 26:23, 61:23
**minutes** [2] - 3:4, 3:7
**misheard** [2] - 19:23, 20:4
**missing** [3] - 8:8, 42:23, 57:21
**misspoke** [1] - 19:22
**mixed** [1] - 41:8
**moment** [2] - 15:24, 17:10
**money** [3] - 27:11, 27:14, 29:23
**morning** [4] - 2:10, 3:1, 4:3, 33:7
**Moss** [1] - 45:15
**Moss's** [2] - 3:12, 24:7
**most** [7] - 4:7, 6:21,

15:9, 29:11, 30:16, 51:4
**MOTION** [1] - 1:9
**motion** [2] - 3:2, 3:5
**mounting** [1] - 64:9
**move** [1] - 43:4
**MR** [57] - 2:10, 4:1, 5:11, 6:19, 8:9, 9:12, 9:16, 10:14, 11:10, 11:23, 13:11, 13:16, 14:4, 14:10, 16:5, 16:10, 17:13, 18:18, 19:5, 19:11, 19:17, 19:21, 19:24, 20:6, 20:10, 20:13, 21:1, 21:11, 21:14, 21:18, 22:19, 23:3, 24:11, 24:16, 24:20, 24:24, 25:1, 25:6, 25:13, 25:20, 26:22, 27:17, 28:3, 28:12, 28:16, 29:9, 30:7, 30:24, 31:2, 56:11, 61:14, 62:4, 62:8, 62:10, 64:15, 65:12, 65:16
**MS** [62] - 2:23, 31:3, 31:5, 31:24, 32:23, 34:11, 35:13, 35:18, 36:5, 36:13, 37:4, 38:6, 38:12, 38:21, 39:20, 40:1, 40:9, 40:13, 40:18, 40:21, 41:2, 41:13, 41:25, 42:6, 42:24, 43:6, 43:12, 43:19, 43:24, 44:6, 44:12, 45:21, 46:14, 46:19, 46:21, 47:7, 47:25, 48:9, 49:20, 50:22, 51:5, 52:1, 52:9, 52:11, 52:19, 53:5, 53:10, 53:14, 53:24, 55:24, 56:3, 56:10, 56:15, 57:6, 57:10, 57:20, 57:23, 58:17, 59:13, 60:12, 60:17, 61:12

**N**

**NAD** [7] - 2:17, 4:24, 7:3, 7:15, 21:25, 31:17, 65:23
**NAD's** [1] - 66:10
**narrowly** [1] - 26:16
**nation** [2] - 8:16, 26:9
**nation's** [2] - 7:9, 7:10
**NATIONAL** [1] - 1:3
**national** [3] - 7:6,

8:24, 9:5
**National** [3] - 1:16, 2:2, 2:17
**nationally** [1] - 4:13
**natural** [2] - 9:5, 33:14
**nature** [7] - 7:12, 7:23, 9:24, 9:25, 10:11, 59:18
**navigates** [1] - 13:22
**necessarily** [1] - 14:1
**necessary** [3] - 21:13, 31:18, 54:18
**need** [22] - 6:20, 14:1, 17:9, 23:17, 25:3, 33:15, 36:10, 36:24, 40:25, 42:24, 43:23, 43:24, 43:25, 44:3, 46:7, 49:2, 54:24, 55:11, 55:16, 56:19, 56:20, 58:13
**needs** [5] - 6:16, 13:9, 40:22, 43:20, 56:25
**negate** [4] - 62:20, 63:7, 63:8, 63:24
**negated** [1] - 63:11
**neglect** [1] - 30:18
**never** [6] - 31:19, 50:23, 51:2, 53:18, 59:23
**new** [1] - 12:21
**next** [5] - 13:6, 14:2, 14:5, 24:1, 50:14
**NO** [1] - 1:5
**nondisabled** [1] - 29:19
**nonemployment** [1] - 64:17
**Northern** [2] - 33:10, 51:16
**notably** [1] - 49:25
**note** [2] - 32:1, 46:5
**noted** [1] - 2:19
**notes** [1] - 6:24
**nothing** [6] - 20:10, 41:24, 41:25, 42:5, 42:7
**notice** [2] - 22:8, 34:20
**nowadays** [1] - 23:21
**number** [4] - 27:9, 50:8, 63:12, 63:13
**NW** [2] - 1:15, 1:21

## O

**objective** [1] - 4:3

**obligations** [1] - 12:1
**obvious** [1] - 5:2
**obviously** [10] - 3:2, 5:4, 7:4, 15:11, 20:18, 21:21, 22:16, 26:17, 57:8, 66:8
**OF** [3] - 1:1, 1:3, 1:9
**offer** [1] - 25:17
**Office** [2] - 46:23, 47:1
**Official** [2] - 1:24, 67:15
**official** [2] - 14:25, 15:2
**OFFICIAL** [1] - 67:22
**often** [1] - 30:17
**Oklahoma** [2] - 7:20, 8:11
**one** [34] - 6:1, 12:11, 13:14, 14:10, 14:14, 14:20, 14:24, 14:25, 18:16, 18:18, 21:12, 21:22, 22:15, 24:7, 25:21, 27:1, 27:9, 36:6, 37:13, 39:25, 43:17, 44:13, 47:18, 48:20, 52:23, 55:1, 60:4, 60:8, 62:13, 62:16, 63:1, 63:12
**one-way** [1] - 60:8
**ones** [2] - 22:8, 28:11
**ongoing** [5] - 4:12, 4:15, 5:6, 7:23, 67:1
**opening** [1] - 26:5
**opinion** [30] - 3:12, 4:5, 17:8, 17:17, 17:18, 18:21, 19:16, 19:25, 20:9, 20:11, 20:14, 20:15, 29:12, 29:13, 29:14, 30:10, 32:9, 33:17, 33:19, 38:2, 39:4, 41:4, 61:6, 62:5, 63:14, 63:22, 63:23
**opinions** [5] - 3:10, 3:13, 3:14, 17:17, 32:7
**opportunities** [1] - 13:7
**opportunity** [5] - 37:15, 37:17, 57:15, 57:18, 57:22
**opposed** [1] - 65:2
**opposing** [4] - 31:22, 32:7, 38:24, 45:2
**order** [5] - 4:25, 20:21, 58:8, 60:24, 61:2
**Order** [1] - 2:1

**orders** [1] - 66:5
**organizational** [2] - 31:17, 37:16
**orient** [1] - 3:8
**original** [3] - 39:13, 48:23, 67:16
**otherwise** [5] - 16:23, 39:14, 41:21, 42:17, 47:24
**outcomes** [1] - 23:19
**overcome** [1] - 49:22
**overly** [1] - 59:5
**overwhelming** [2] - 28:20, 63:8
**overwhelmingly** [1] - 9:17
**own** [7] - 16:5, 23:16, 35:10, 35:11, 35:21, 36:15, 45:25

## P

**p.m** [2] - 1:11, 67:12
**pace** [2] - 3:18, 12:11
**page** [8] - 13:19, 14:24, 14:25, 15:3, 33:18, 41:3, 67:17
**pandemic** [12] - 5:3, 5:8, 6:3, 8:2, 8:3, 9:5, 9:15, 37:2, 37:22, 37:23, 38:2, 56:18
**papers** [6] - 5:21, 11:1, 29:11, 36:16, 63:20, 67:5
**paragraphs** [1] - 48:2
**paraphrasing** [2] - 16:24, 46:17
**part** [11] - 14:7, 19:15, 28:12, 33:7, 38:4, 41:4, 51:21, 51:25, 52:1, 53:3, 57:11
**participants** [1] - 66:18
**participate** [4] - 4:11, 7:13, 7:21, 8:7
**participation** [5] - 8:4, 10:12, 39:16, 41:23, 42:19
**particular** [12] - 8:6, 12:15, 20:21, 23:9, 24:22, 32:13, 37:13, 48:21, 58:12, 65:19, 65:20, 66:3
**particularized** [1] - 23:23
**particularly** [1] - 9:14
**parts** [3] - 3:15, 3:16,

6:16
**pass** [1] - 62:7
**passed** [2] - 16:21, 44:1
**passing** [1] - 16:25
**path** [1] - 4:25
**pathway** [1] - 52:20
**patience** [1] - 4:3
**pause** [2] - 17:10, 39:10
**Pause** [1] - 17:12
**Pennsylvania** [1] - 1:21
**people** [10] - 7:11, 8:22, 8:23, 15:8, 26:10, 33:24, 35:9, 54:2, 54:5, 66:24
**per** [1] - 29:25
**perhaps** [1] - 25:16
**permits** [1] - 30:25
**person** [5] - 14:5, 14:15, 16:23, 35:10, 35:11
**personally** [1] - 53:25
**persons** [3] - 8:19, 10:2, 18:8
**perspective** [4] - 22:10, 23:1, 45:16, 52:16
**persuasive** [1] - 45:15
**petition** [2] - 8:12, 8:14
**phrase** [1] - 54:19
**physical** [1] - 14:13
**physically** [1] - 14:12
**PI** [2] - 37:21, 67:7
**piece** [8] - 6:7, 6:21, 13:15, 19:24, 60:25, 62:1, 62:4, 62:16
**pieces** [2] - 34:12, 46:25
**place** [8] - 5:3, 11:9, 15:7, 15:20, 18:21, 19:4, 20:24, 53:13
**places** [1] - 32:10
**placing** [1] - 14:12
**plain** [1] - 18:24
**plainly** [1] - 4:17
**plaintiff** [5] - 31:17, 37:16, 41:7, 45:5, 65:23
**Plaintiffs** [1] - 1:4
**plaintiffs** [48] - 2:12, 9:19, 21:1, 21:2, 21:4, 21:14, 21:15, 26:8, 29:17, 29:22, 31:9, 31:14, 31:16, 32:1, 32:23, 33:12, 33:23,

34:4, 34:5, 34:13, 35:24, 35:25, 36:18, 37:10, 37:21, 40:3, 46:8, 46:12, 47:2, 47:5, 47:11, 51:14, 54:15, 55:5, 56:21, 57:25, 58:9, 58:12, 59:8, 59:25, 61:5, 64:9, 64:21, 65:19, 65:20, 65:22, 65:23, 66:4
**PLAINTIFFS** [1] - 1:13
**plaintiffs'** [12] - 2:5, 3:2, 3:5, 11:4, 31:7, 33:4, 39:1, 46:8, 48:17, 54:10, 54:25, 59:20
**plan** [2] - 3:4, 31:9
**plenty** [1] - 37:9
**plus** [2] - 50:15
**podium** [3] - 8:21, 14:2, 14:13
**point** [42] - 3:11, 7:20, 8:3, 9:3, 9:22, 20:16, 21:17, 21:22, 27:4, 27:6, 28:8, 29:7, 30:5, 30:7, 32:20, 34:10, 36:14, 38:13, 40:21, 42:11, 43:22, 47:13, 47:14, 51:15, 51:19, 53:21, 56:1, 58:24, 59:10, 59:21, 60:13, 61:16, 62:15, 62:17, 62:22, 62:24, 63:23, 64:13, 65:16
**pointed** [4] - 20:13, 33:21, 44:4, 66:16
**pointing** [1] - 38:24
**points** [8] - 5:4, 6:4, 26:23, 27:8, 29:10, 40:15, 65:17, 67:3
**policy** [7] - 25:24, 31:13, 31:18, 54:12, 59:22, 59:23
**population** [2] - 10:13, 32:19
**Porter** [3] - 1:13, 2:11, 2:15
**portion** [1] - 61:24
**position** [6] - 35:7, 35:16, 47:5, 56:5, 57:9, 60:14
**possibly** [1] - 50:10
**posture** [3] - 32:25, 35:21, 38:21
**power** [5] - 20:24, 21:3, 51:24, 52:17, 53:9
**powers** [2] - 20:20,

38:19

**practicality** [1] - 22:10

**practices** [2] - 30:12, 30:14

**prayer** [1] - 25:24

**precedent** [2] - 31:15, 61:8

**preceding** [1] - 19:10

**precluded** [1] - 38:4

**preclusion** [1] - 38:17

**predated** [1] - 39:3

**preempt** [1] - 63:17

**preferred** [1] - 34:14

**preliminary** [4] - 3:2, 26:3, 55:17, 57:1

**prepared** [1] - 59:15

**prerogative** [1] - 60:2

**prescribes** [1] - 64:8

**present** [2] - 12:17, 37:17

**presentation** [2] - 62:25, 63:1

**presented** [1] - 59:19

**presenting** [1] - 56:23

**president** [8] - 8:21, 13:6, 13:23, 31:8, 55:7, 59:11, 66:23

**President** [1] - 13:18

**president's** [1] - 12:24

**press** [38] - 4:9, 4:19, 5:1, 5:6, 5:13, 5:14, 5:19, 5:20, 7:12, 8:6, 8:20, 8:22, 9:8, 10:4, 11:13, 13:19, 13:21, 14:6, 15:1, 15:8, 22:7, 26:4, 26:8, 31:8, 32:3, 33:13, 33:16, 36:18, 53:20, 54:14, 54:25, 55:6, 55:8, 56:18, 65:20, 66:1

**pretty** [3] - 3:11, 40:4, 44:3

**prevalent** [2] - 12:3, 12:4

**prevent** [1] - 26:7

**previously** [2] - 2:9, 45:17

**primary** [1] - 57:6

**prime** [1] - 4:3

**principle** [2] - 24:17, 62:18

**principles** [1] - 30:19

**printed** [1] - 62:12

**printout** [1] - 61:23

**private** [24] - 17:3,

18:2, 18:6, 19:7, 20:17, 21:5, 24:8, 26:25, 28:6, 41:14, 41:15, 42:8, 43:14, 45:17, 46:6, 46:11, 47:12, 51:22, 52:23, 61:16, 61:19, 62:19, 62:20, 63:12

**problem** [3] - 32:6, 37:14, 45:11

**problematic** [1] - 30:12

**problems** [1] - 15:16

**procedure** [1] - 40:16

**procedures** [1] - 28:19

**proceed** [1] - 2:9

**Proceedings** [1] - 67:12

**proceedings** [1] - 7:18

**process** [8] - 3:21, 4:12, 7:22, 45:5, 45:7, 46:9, 46:14, 47:9

**Produced** [1] - 1:25

**product** [1] - 30:17

**program** [7] - 6:9, 22:4, 23:22, 23:23, 59:18, 64:10, 66:18

**programs** [8] - 5:13, 5:22, 5:23, 6:24, 19:12, 29:15, 42:20, 64:4

**promulgate** [8] - 44:15, 44:22, 45:3, 45:22, 47:22, 53:6, 63:5, 63:11

**promulgated** [2] - 45:4, 53:8

**proof** [1] - 65:20

**properly** [2] - 52:2, 57:11

**propose** [1] - 25:17

**proposed** [5] - 6:11, 13:8, 13:10, 15:11, 22:17

**proposing** [1] - 14:2

**protected** [1] - 44:24

**provide** [25] - 4:18, 5:1, 7:17, 9:18, 10:19, 11:7, 12:12, 15:5, 29:15, 29:23, 35:19, 40:23, 42:15, 45:13, 47:16, 51:7, 53:16, 53:17, 53:18, 53:20, 54:13, 60:4, 66:20, 66:22

**provided** [16] - 6:2, 6:16, 10:17, 12:9,

15:17, 15:19, 25:5, 25:15, 25:23, 31:11, 34:6, 50:23, 54:3, 63:25, 66:17

**provides** [2] - 48:2, 49:15

**providing** [14] - 2:8, 4:20, 5:16, 23:13, 27:22, 27:24, 29:6, 38:3, 48:14, 49:15, 51:11, 53:22, 54:7, 66:13

**provision** [21] - 16:16, 17:4, 17:5, 17:22, 18:14, 18:19, 18:20, 18:22, 18:24, 19:14, 20:1, 20:5, 27:1, 27:3, 39:8, 44:2, 46:1, 49:24, 53:12, 58:22, 64:10

**provisions** [7] - 16:4, 18:13, 18:15, 28:18, 44:25, 45:23

**proximity** [1] - 14:13

**publicly** [1] - 22:16

**pull** [1] - 55:24

**purport** [1] - 46:8

**purpose** [1] - 18:1

**purposes** [2] - 26:2, 26:3

**push** [2] - 14:20, 42:25

**pushc** [1] - 46:7

**pushes** [1] - 14:25

**put** [5] - 2:6, 5:21, 15:9, 22:11, 60:13

## Q

**qualified** [4] - 16:23, 39:14, 41:21, 42:17

**questions** [10] - 3:6, 23:12, 23:25, 25:11, 26:24, 30:21, 51:18, 57:13, 57:15, 61:17

**quick** [1] - 65:17

**quickly** [1] - 26:23

**quite** [3] - 6:10, 6:24, 33:23

**quote** [1] - 5:20

## R

**race** [1] - 16:24

**raised** [1] - 36:14

**raising** [1] - 14:22

**ratchet** [1] - 60:8

**rather** [2] - 30:17, 62:7

**RDR** [1] - 67:21

**RDR-CRR** [1] - 67:21

**reaching** [1] - 4:4

**read** [10] - 3:8, 15:25, 33:4, 33:6, 35:22, 36:7, 39:23, 45:17, 62:7

**reading** [3] - 41:21, 42:3, 48:18

**real** [3] - 33:6, 36:22, 36:25

**real-time** [3] - 33:6, 36:22, 36:25

**realize** [1] - 8:1

**really** [10] - 5:19, 7:5, 16:1, 30:11, 36:21, 37:15, 48:1, 50:7, 58:5, 58:6

**realtime** [1] - 33:3

**Realtime** [1] - 1:24

**reason** [5] - 33:8, 41:22, 42:18, 53:3, 59:3

**reasons** [2] - 3:17, 31:25

**rebut** [1] - 35:24

**rebuttal** [2] - 26:21, 30:24

**rebutting** [1] - 34:4

**recent** [1] - 17:17

**recently** [1] - 11:13

**recipients** [4] - 29:1, 39:8, 44:7, 44:18

**recognize** [2] - 21:19, 31:12

**recognized** [5] - 32:7, 32:8, 39:2, 45:12, 55:12

**recognizes** [1] - 32:9

**recognizing** [1] - 17:23

**Record** [1] - 1:25

**record** [15] - 2:4, 2:7, 2:20, 3:20, 9:16, 15:12, 16:7, 18:7, 32:21, 35:24, 59:25, 62:7, 62:14, 66:7, 67:17

**recourse** [2] - 45:24, 46:7

**Reeves** [2] - 67:15, 67:21

**REEVES** [2] - 1:23, 67:21

**refer** [3] - 16:6, 16:11, 62:6

**reference** [1] - 16:6

**referenced** [1] - 28:18

**references** [1] - 11:1

**reflected** [1] - 25:23

**regarding** [1] - 61:2

**regardless** [2] - 31:9, 31:10

**regards** [1] - 63:10

**regime** [2] - 49:7, 49:10

**regimes** [1] - 49:10

**Registered** [1] - 1:23

**regs** [3] - 46:1, 46:9, 46:25

**regularly** [1] - 55:2

**regulation** [1] - 63:16

**regulations** [13] - 44:15, 44:22, 45:4, 45:22, 46:14, 47:23, 52:25, 53:6, 53:8, 63:5, 63:11, 67:17

**regulatory** [2] - 52:20, 63:15

**Rehab** [6] - 18:23, 30:16, 32:5, 61:8, 64:8, 64:16

**Rehabilitation** [25] - 4:16, 5:9, 5:11, 5:22, 6:23, 11:7, 11:18, 15:23, 16:8, 16:11, 16:18, 17:1, 18:4, 20:18, 20:19, 21:24, 24:14, 25:25, 29:15, 31:19, 37:18, 38:18, 51:24, 59:17, 64:4

**reinstatements** [1] - 28:20

**reiterate** [3] - 3:17, 60:20, 61:1

**rejected** [2] - 63:19, 65:9

**rejects** [1] - 64:25

**related** [8] - 25:12, 28:17, 29:4, 36:24, 37:8, 54:19, 55:7, 56:18

**relates** [1] - 5:9

**relationship** [1] - 21:10

**relative** [1] - 14:20

**relatively** [1] - 11:13

**relegating** [1] - 15:7

**relevant** [16] - 3:8, 5:25, 6:6, 6:16, 6:21, 6:22, 16:14, 28:4, 28:11, 28:12, 28:14, 33:24, 61:23, 61:24, 63:13, 65:14

**relied** [1] - 33:21

**relief** [53] - 6:10, 6:11, 8:25, 9:7, 13:10, 13:16, 15:19, 15:21, 21:2, 21:3, 21:15,

22:6, 22:10, 23:7, 23:9, 23:24, 25:4, 25:7, 25:17, 25:24, 27:16, 28:2, 28:21, 31:7, 31:16, 32:13, 40:11, 43:15, 44:2, 48:25, 50:6, 50:8, 50:18, 54:15, 54:17, 54:23, 55:16, 55:21, 55:22, 56:8, 56:13, 56:19, 56:20, 56:25, 57:3, 57:4, 58:11, 58:18, 60:20, 63:7, 65:3, 66:9

**rely** [4] - 10:23, 21:19, 51:20, 65:25
**remains** [1] - 24:15
**remedial** [12] - 18:15, 18:19, 19:2, 20:5, 49:7, 49:9, 49:10, 52:6, 53:1, 63:16, 64:1, 64:6
**remediating** [2] - 48:3, 48:4
**remedied** [1] - 4:23
**remedies** [27] - 16:16, 16:17, 17:4, 17:5, 17:22, 18:4, 27:2, 27:10, 27:12, 27:20, 27:22, 27:24, 28:6, 28:10, 28:23, 29:4, 29:24, 40:16, 49:11, 49:16, 50:17, 50:20, 50:21, 61:21, 62:19, 62:21
**Remedies** [1] - 27:21
**remedy** [19] - 22:2, 23:14, 24:15, 41:10, 41:12, 41:15, 41:19, 42:15, 45:24, 46:11, 47:11, 48:14, 49:24, 50:1, 50:3, 50:24, 63:25, 64:8, 65:13
**reminded** [1] - 41:17
**remote** [1] - 12:19
**reply** [1] - 7:16
**report** [3] - 61:23, 62:7, 62:18
**Reporter** [4] - 1:23, 1:24, 1:24, 67:15
**REPORTER** [1] - 67:22
**reporter** [2] - 3:22, 16:3
**reporters** [1] - 3:19
**request** [4] - 9:7, 13:11, 60:20, 64:25
**requested** [7] - 5:16, 15:19, 23:6, 23:24, 31:7, 31:11, 65:2

**requesting** [5] - 9:8, 14:12, 14:23, 15:4, 26:13
**require** [5] - 11:15, 12:9, 25:25, 31:7, 31:20
**required** [14] - 6:4, 11:24, 12:15, 22:13, 25:16, 30:21, 35:20, 35:23, 59:1, 59:19, 60:8, 65:12
**requirement** [6] - 11:6, 49:14, 63:4, 63:11, 63:15, 65:8
**requires** [5] - 4:17, 10:5, 13:3, 30:10, 37:18
**requiring** [2] - 56:18, 59:22
**reserve** [2] - 30:24, 31:1
**residual** [1] - 52:17
**resources** [1] - 35:10
**respect** [6] - 9:13, 44:7, 44:18, 44:19, 56:4, 58:19
**respectfully** [2] - 17:19, 42:24
**respond** [4] - 22:12, 55:20, 57:18, 61:13
**responds** [1] - 33:23
**response** [8] - 10:7, 10:8, 18:11, 18:17, 48:16, 57:19, 59:5, 59:9
**responses** [4] - 14:10, 38:18, 38:19, 65:21
**responsive** [1] - 26:24
**rest** [7] - 15:7, 21:25, 59:19, 60:12, 61:9, 67:4, 67:5
**review** [2] - 64:25, 65:4
**ribbon** [1] - 26:5
**rid** [2] - 35:7, 36:11
**Rights** [2] - 16:22, 40:15
**rights** [18] - 15:15, 17:3, 17:15, 18:1, 19:7, 24:4, 28:7, 40:3, 40:6, 42:14, 48:5, 48:8, 48:21, 49:17, 50:14, 51:2, 62:19, 63:12
**rights-creating** [11] - 17:3, 18:1, 40:3, 40:6, 42:14, 48:5, 48:8, 48:21, 49:17, 50:14,

51:2
**rigid** [1] - 32:13
**rings** [1] - 30:15
**risk** [1] - 26:7
**Rob** [1] - 2:15
**ROBERT** [1] - 1:14
**Roll** [3] - 54:1, 66:17, 66:21
**rule** [1] - 21:4
**rulemaking** [1] - 64:7
**ruling** [2] - 4:5, 67:7

## S

**safety** [1] - 58:3
**Sai** [2] - 39:3, 44:20
**Sam** [1] - 2:16
**SAMUEL** [1] - 1:14
**Sandoval** [9] - 17:8, 17:14, 40:4, 40:24, 41:3, 41:4, 48:1, 48:7, 51:10
**Sandoval-type** [1] - 48:7
**satisfied** [1] - 21:15
**satisfy** [1] - 14:11
**saw** [2] - 59:7, 59:9
**Scalia's** [1] - 17:8
**scheme** [5] - 52:6, 53:1, 63:16, 64:1, 64:6
**Scholer** [1] - 1:13
**scope** [6] - 54:15, 54:17, 54:22, 55:21, 65:18, 66:9
**screen** [2] - 13:17, 13:24
**se** [1] - 30:1
**second** [9] - 6:7, 10:6, 11:1, 14:22, 26:4, 29:7, 54:22, 55:8
**secretary** [2] - 13:19, 55:8
**section** [6] - 5:23, 16:14, 19:10, 27:21, 40:14, 50:14
**Section** [15] - 16:8, 16:10, 16:15, 16:16, 39:17, 40:7, 43:13, 44:13, 44:17, 48:21, 50:5, 50:6, 50:13, 51:8
**sections** [1] - 28:10
**see** [5] - 13:23, 13:24, 48:19, 56:21, 59:5
**seek** [3] - 31:16, 48:25, 49:1
**seeking** [5] - 13:16,

18:9, 21:15, 23:9, 26:12
**seeks** [1] - 31:18
**seem** [1] - 54:15
**Seminole** [2] - 48:12, 52:3
**Senate** [2] - 28:5, 61:23
**send** [3] - 46:15, 46:22, 46:24
**sense** [3] - 26:18, 27:2, 60:6
**sensible** [1] - 15:9
**sensitive** [1] - 10:9
**sentence** [3] - 37:24, 38:4, 38:5
**separate** [7] - 14:18, 15:2, 15:6, 15:12, 15:16, 17:4
**separated** [1] - 18:24
**serious** [1] - 38:25
**service** [3] - 23:22, 23:23, 66:19
**services** [10] - 5:14, 5:23, 6:24, 19:12, 26:10, 29:6, 29:16, 64:4, 67:9
**set** [3] - 52:20, 52:24, 60:21
**sets** [2] - 63:16, 63:23
**setting** [2] - 13:2, 55:13
**settlement** [1] - 38:17
**several** [3] - 31:25, 32:10, 48:1
**sex** [1] - 16:24
**shall** [4] - 16:23, 39:15, 41:22, 42:18
**share** [1] - 29:18
**shifting** [2] - 18:20, 20:1
**show** [4] - 32:24, 33:2, 47:11, 55:17
**showed** [1] - 44:23
**showing** [1] - 34:6
**shown** [2] - 31:14, 33:1
**shows** [1] - 9:17
**SHRADER** [1] - 1:17
**Shrader** [1] - 2:18
**sic** [3] - 20:14, 63:21, 63:23
**side** [10] - 13:23, 16:4, 32:22, 34:7, 39:6, 46:8, 49:21, 54:20, 62:1
**side-by-side** [1] - 16:4

**sides** [1] - 3:3
**Sign** [11] - 9:21, 9:23, 10:2, 10:23, 13:24, 14:12, 14:17, 15:2, 25:25, 66:14, 66:22
**significance** [2] - 8:24, 11:22
**significant** [2] - 9:4, 26:10
**signs** [1] - 9:23
**silent** [2] - 49:25
**Silver** [1] - 1:18
**similar** [2] - 22:20, 33:10
**similarly** [2] - 4:23, 25:17
**simple** [1] - 12:6
**simultaneous** [2] - 44:14, 44:17
**single** [2] - 53:20, 55:1
**Sirio** [1] - 2:16
**SIRIO** [1] - 1:14
**sit** [2] - 26:20, 60:16
**situate** [1] - 11:21
**slightly** [2] - 16:12, 25:10
**slippery** [4] - 22:21, 22:22, 22:23, 22:25
**slope** [4] - 22:22, 22:23, 23:1
**slow** [1] - 3:24
**solely** [3] - 39:15, 41:22, 42:18
**someone** [6] - 13:5, 13:22, 14:2, 30:5, 36:15, 49:12
**sometimes** [2] - 45:12, 54:18
**somewhat** [1] - 5:5
**SONJA** [2] - 1:23, 67:21
**Sonja** [2] - 67:15, 67:21
**sorry** [3] - 20:14, 29:13, 37:5
**sort** [16] - 5:20, 6:17, 6:19, 6:22, 9:3, 14:19, 17:25, 21:7, 24:1, 24:2, 27:2, 29:2, 30:8, 58:11, 63:16
**sorts** [3] - 27:22, 35:1, 52:25
**sought** [3] - 8:25, 23:8, 23:18
**sounds** [3] - 42:5, 52:13, 52:14
**source** [1] - 7:9
**sovereign** [3] -

27:10, 27:12, 49:3
 **speaker** [2] - 13:18, 14:14
 **speaking** [1] - 14:5
 **speaks** [1] - 66:23
 **specialized** [1] - 28:10
 **specific** [16] - 7:25, 8:3, 18:7, 19:6, 25:1, 38:11, 46:25, 47:18, 50:19, 58:2, 58:4, 58:13, 58:16, 62:6, 66:4
 **specifically** [4] - 15:23, 18:5, 50:9, 66:9
 **spinning** [1] - 11:2
 **spoken** [1] - 10:1
 **spread** [2] - 5:6, 5:7
 **spring** [1] - 54:1
 **Spring** [1] - 1:18
 **stand** [1] - 46:10
 **standing** [2] - 65:24, 66:11
 **standpoint** [1] - 58:17
 **stands** [1] - 51:6
 **stark** [1] - 66:25
 **start** [6] - 2:6, 6:15, 8:9, 11:9, 31:21, 38:23
 **started** [4] - 11:13, 31:22, 32:12, 58:20
 **starts** [1] - 63:23
 **state** [2] - 30:8, 63:9
 **State** [1] - 7:15
 **States** [6] - 1:20, 16:7, 41:22, 42:18, 67:15, 67:18
 **STATES** [1] - 1:1
 **statue** [1] - 39:23
 **statute** [29] - 6:9, 6:14, 15:23, 16:7, 31:14, 34:20, 38:25, 39:4, 39:21, 41:6, 41:7, 42:2, 44:16, 45:23, 47:12, 48:5, 48:18, 49:22, 49:23, 50:4, 50:6, 50:9, 51:6, 51:7, 52:14, 52:21, 53:3, 53:5, 61:18
 **statutes** [1] - 47:17
 **statutorily** [1] - 65:12
 **statutory** [12] - 20:25, 28:17, 43:10, 44:5, 49:7, 49:14, 49:18, 50:24, 51:3, 51:22, 52:15, 52:16
 **stayed** [1] - 61:2

**Stenographic** [1] - 1:25
 **stenographic** [1] - 67:16
 **step** [2] - 36:5, 39:25
 **steps** [1] - 20:4
 **stick** [1] - 8:6
 **still** [8] - 20:19, 28:1, 33:22, 42:7, 45:6, 46:2, 51:5, 51:23
 **stopped** [1] - 66:13
 **story** [1] - 49:2
 **Street** [1] - 1:18
 **strong** [4] - 17:25, 30:3, 38:22, 50:7
 **stronger** [1] - 18:9
 **strongest** [1] - 38:19
 **struck** [1] - 22:19
 **structural** [1] - 38:25
 **stuff** [1] - 37:9
 **subchapter** [1] - 19:1
 **subject** [2] - 27:19, 66:4
 **subjects** [1] - 33:13
 **submissions** [3] - 26:19, 60:15, 67:8
 **submit** [1] - 28:21
 **submitted** [1] - 9:20
 **Subsection** [3] - 16:1, 43:14, 49:9
 **substantive** [3] - 39:7, 41:14, 44:25
 **success** [1] - 29:18
 **successfully** [1] - 4:21
 **sue** [2] - 28:1, 63:7
 **sued** [1] - 46:3
 **sufficient** [7] - 9:11, 9:13, 9:15, 32:5, 35:16, 36:8, 36:19
 **sufficiently** [1] - 35:3
 **suggest** [1] - 19:9
 **suggested** [1] - 32:15
 **suggests** [3] - 41:8, 48:3, 53:8
 **suing** [1] - 45:8
 **Suite** [1] - 1:18
 **supervision** [1] - 29:23
 **support** [1] - 63:6
 **supported** [2] - 61:6, 61:7
 **supports** [3] - 32:22, 47:20, 62:18
 **suppose** [1] - 19:8
 **supposed** [3] - 45:18, 46:10, 46:22

**Supreme** [12] - 17:6, 17:7, 17:13, 17:14, 17:23, 40:5, 41:16, 43:21, 45:12, 47:15, 47:20, 52:3
 **switch** [1] - 17:9
 **sworn** [1] - 2:9

**T**

**table** [2] - 2:25, 56:17
 **tailored** [9] - 22:6, 25:7, 26:16, 56:25, 57:4, 57:11, 57:16, 58:12, 58:15
 **talks** [3] - 16:16, 18:5, 19:25
 **target** [1] - 30:16
 **team** [2] - 2:15, 2:17
 **technological** [2] - 12:7, 12:12
 **technologically** [2] - 14:19, 23:21
 **technology** [3] - 12:2, 12:5, 13:2
 **televised** [1] - 7:18
 **television** [2] - 34:22, 34:25
 **terms** [13] - 3:19, 5:8, 6:1, 7:2, 12:15, 13:4, 22:10, 23:5, 27:6, 28:23, 46:9, 48:8, 60:22
 **test** [1] - 63:24
 **testimony** [1] - 10:11
 **text** [4] - 38:25, 42:23, 49:22, 49:23
 **textual** [1] - 63:6
 **THE** [121] - 1:1, 1:3, 1:10, 1:13, 1:20, 2:21, 3:1, 5:2, 5:25, 7:25, 9:9, 9:13, 10:7, 11:8, 11:11, 12:22, 13:13, 14:1, 14:5, 15:21, 16:9, 17:9, 18:11, 19:3, 19:8, 19:15, 19:18, 19:23, 20:3, 20:7, 20:12, 20:16, 21:9, 21:12, 21:16, 22:3, 22:25, 24:6, 24:14, 24:18, 24:22, 24:25, 25:2, 25:9, 25:14, 26:18, 27:14, 27:19, 28:8, 28:14, 29:7, 30:6, 30:22, 31:1, 31:4, 31:23, 32:11, 33:20, 35:5, 35:14, 35:23, 36:11, 37:1, 37:20, 38:11,

38:14, 39:10, 39:23, 40:2, 40:10, 40:17, 40:19, 40:25, 41:11, 41:20, 42:3, 42:9, 43:3, 43:10, 43:13, 43:22, 43:25, 44:9, 45:14, 46:13, 46:18, 46:20, 47:3, 47:18, 48:7, 48:16, 50:2, 50:25, 51:19, 52:8, 52:10, 52:13, 53:3, 53:7, 53:11, 53:22, 55:19, 56:1, 56:7, 56:24, 57:8, 57:13, 57:21, 58:15, 58:20, 60:6, 60:15, 61:11, 61:13, 62:3, 62:6, 62:9, 64:13, 65:7, 65:15, 67:6
 **THEMINS** [1] - 1:21
 **themselves** [2] - 5:13, 24:12
 **theory** [1] - 49:18
 **therefore** [4] - 10:9, 37:24, 60:9
 **they've** [4] - 18:14, 34:6, 35:4, 54:19
 **thinking** [1] - 51:6
 **third** [1] - 18:16
 **thoughtful** [1] - 3:14
 **thoughtlessness** [1] - 30:18
 **three** [1] - 50:4
 **tie** [2] - 56:19, 56:20
 **timeline** [1] - 42:11
 **timeliness** [3] - 6:5, 33:4, 33:25
 **Title** [14] - 16:17, 16:21, 16:22, 17:16, 27:23, 27:25, 28:17, 49:7, 49:10, 63:10
 **today** [10] - 4:2, 4:4, 12:9, 36:16, 37:25, 41:9, 49:23, 50:1, 51:6, 67:10
 **together** [5] - 14:19, 14:20, 15:10, 15:17, 16:13
 **took** [1] - 48:17
 **tool** [1] - 3:14
 **topics** [2] - 37:12, 58:16
 **totally** [3] - 36:9, 60:2
 **touch** [1] - 63:2
 **touched** [1] - 39:6
 **track** [1] - 17:19
 **transcribe** [1] - 35:11
 **TRANSCRIPT** [1] -

1:9
 **Transcript** [1] - 1:25
 **transcript** [4] - 10:16, 67:16, 67:16, 67:17
 **transcriptions** [3] - 32:15, 34:9, 36:12
 **transcripts** [9] - 6:5, 9:10, 9:18, 32:2, 34:3, 35:8, 36:15, 36:17, 66:1
 **translate** [1] - 35:11
 **translation** [5] - 3:20, 6:3, 10:13, 14:8, 32:18
 **translator** [1] - 67:9
 **translators** [2] - 53:12, 58:22
 **treatment** [1] - 29:17
 **tried** [1] - 36:18
 **trouble** [2] - 34:22, 62:11
 **true** [3] - 22:12, 30:15, 67:16
 **TRUMP** [1] - 1:6
 **Trump** [2] - 2:3, 13:18
 **try** [1] - 25:12
 **trying** [7] - 5:6, 21:9, 32:13, 35:5, 50:2, 59:4, 60:10
 **turned** [1] - 9:23
 **turning** [1] - 22:3
 **two** [15] - 6:1, 6:16, 9:11, 14:10, 16:3, 18:15, 25:11, 26:22, 27:7, 29:10, 63:13, 65:17, 65:22
 **Tyler** [1] - 2:25
 **TYLER** [1] - 1:21
 **type** [18] - 7:7, 10:12, 12:15, 23:18, 26:7, 32:17, 32:18, 33:15, 45:8, 46:18, 46:20, 48:7, 49:13, 50:15, 50:16, 60:10, 64:3
 **types** [29] - 5:22, 6:12, 10:4, 12:5, 16:18, 16:19, 18:23, 22:20, 23:5, 23:9, 26:1, 26:13, 26:15, 27:3, 27:5, 28:9, 28:21, 29:5, 49:24, 50:4, 50:7, 50:17, 51:9, 52:6, 54:21, 58:4, 62:15, 66:12

**U**

**U.S** [2] - 16:10, 41:3

**ultimately** [1] - 29:18
**unanswered** [1] - 51:17
**under** [24] - 16:17, 17:16, 18:6, 18:14, 19:1, 19:8, 20:18, 21:3, 27:5, 27:23, 27:24, 32:5, 33:8, 34:19, 36:8, 42:21, 45:23, 46:3, 47:12, 51:10, 53:18, 61:8, 64:9, 67:7
**undercuts** [1] - 38:8
**underlying** [2] - 6:23, 9:2
**underscores** [1] - 66:25
**understood** [7] - 10:13, 11:23, 20:16, 26:18, 32:11, 47:21, 61:11
**undo** [3] - 29:21, 49:16
**undue** [1] - 23:10
**unduly** [1] - 5:16
**unestablished** [1] - 35:1
**United** [6] - 1:20, 16:7, 41:22, 42:18, 67:15, 67:18
**UNITED** [1] - 1:1
**unlawful** [1] - 30:14
**unprecedented** [2] - 55:15, 61:5
**up** [20] - 6:25, 8:15, 11:20, 15:22, 19:24, 22:20, 25:21, 29:3, 32:25, 41:8, 47:11, 52:20, 52:25, 55:24, 61:22, 62:7, 62:12, 63:16, 63:24, 64:25
**urgency** [5] - 6:2, 6:20, 32:17, 35:9, 58:16
**urgent** [3] - 9:1, 10:9, 33:15
**uses** [1] - 50:13

## V

**Van** [1] - 2:18
**VAN** [1] - 1:17
**variety** [1] - 8:15
**various** [2] - 6:11, 62:15
**vary** [1] - 23:19
**vehemently** [1] - 65:2
**Verizon** [4] - 48:12, 52:3, 63:22, 63:23

**version** [3] - 39:13, 50:12, 62:13
**versus** [3] - 2:3, 5:20, 7:15
**VI** [7] - 16:17, 16:21, 17:16, 27:25, 28:17, 49:10, 63:10
**via** [1] - 61:20
**vice** [1] - 55:7
**video** [3] - 12:19, 13:23, 14:18
**view** [3] - 21:24, 21:25, 66:8
**viewers** [1] - 15:7
**VII** [2] - 27:23, 49:7
**violating** [1] - 11:20
**violation** [4] - 18:25, 19:8, 19:9, 57:4
**violations** [8] - 16:18, 16:19, 18:23, 19:11, 22:2, 27:3, 27:5, 57:1
**virus** [1] - 5:6
**vis** [2] - 42:14
**vis-a-vis** [1] - 42:14
**vis-à-vis** [1] - 42:16
**visualize** [1] - 39:21
**vs** [1] - 1:5

## W

**waiver** [3] - 27:9, 27:12, 49:2
**walk** [5] - 15:24, 15:25, 39:6, 45:14, 46:25
**walking** [1] - 42:10
**walks** [1] - 48:2
**war** [4] - 8:17, 26:9, 37:2, 66:24
**warranted** [1] - 56:14
**Washington** [3] - 1:11, 1:15, 1:22
**watch** [7] - 15:8, 31:9, 34:22, 55:1, 55:3, 65:20
**watching** [2] - 34:25, 66:5
**ways** [5] - 6:1, 6:11, 22:7, 25:19, 55:19
**web** [1] - 14:24
**website** [4] - 13:20, 13:22, 14:9, 14:21
**Wednesday** [1] - 1:10
**week** [1] - 41:17
**welcome** [1] - 2:22
**West** [1] - 62:11
**whatsoever** [1] - 53:19

**wheelchair** [1] - 12:4
**White** [13] - 4:9, 4:17, 4:19, 5:1, 5:13, 13:20, 13:22, 14:14, 14:21, 14:25, 15:3, 66:17, 66:21
**whole** [3] - 39:23, 45:25, 62:20
**willing** [2] - 66:20, 66:22
**win** [1] - 21:16
**window** [1] - 61:18
**wish** [1] - 4:7
**wondered** [1] - 32:14
**word** [7] - 10:21, 50:3, 50:20, 55:2, 59:13, 63:17
**word-for-word** [1] - 10:21
**words** [1] - 20:22
**works** [3] - 25:7, 58:18, 59:21
**world** [7] - 30:9, 37:9, 41:9, 43:8, 47:8, 50:25, 51:10
**worried** [1] - 22:25
**worry** [1] - 3:23
**would-be** [1] - 41:6
**writing** [2] - 3:10, 4:5
**written** [12] - 6:4, 9:10, 9:18, 10:1, 10:3, 10:11, 10:16, 34:3, 35:8, 36:12, 64:22, 67:7

## Y

**year** [1] - 62:13
**years** [2] - 4:21, 30:9
**Yelapi** [3] - 33:9, 51:17, 56:22
**yourself** [1] - 3:18
**yourselves** [1] - 2:4
**YouTube** [3] - 13:19, 14:25, 15:3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION OF THE DEAF, *et al.*,

        *Plaintiffs*,

  v.

DONALD J. TRUMP, *et al.*,

        *Defendants*.

Civil Action No. 25-cv-1683

**PLAINTIFF MATTTHEW BONN'S NOTICE OF VOLUNTARY DISMISSAL**
**OF HIS CLAIMS AGAINST DEFENDANTS**

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), Plaintiff Matthew Bonn voluntarily dismisses without prejudice his claims against Defendants. This notice is proper under Rule 41(a)(1)(A)(i) because no Defendant has served an answer or motion for summary judgment.

This notice has no effect on the claims of Plaintiff National Association of the Deaf or Plaintiff Derrick Ford.

Dated: July 25, 2025

/s/ Ian Hoffman

Ian S. Hoffman (D.C. Bar No. 983419)
Alex E. Sirio (D.C. Bar No. 1724703)
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001-3743
Telephone: (202) 942-5000
Fax: (202) 942-5999
ian.hoffman@arnoldporter.com
alex.sirio@arnoldporter.com

Caitlyn Lewis Kellerman (admitted *pro hac vice*)
ARNOLD & PORTER
KAYE SCHOLER LLP
250 W 55th Street
New York, NY 10019
Telephone: (212) 836-7751
caitlyn.kellerman@arnoldporter.com

Brittany Shrader (admitted *pro hac vice*)
Drake W. Darrah (admitted *pro hac vice*)
Alexander Van Hook (admitted *pro hac vice*)
NAD Law and Advocacy Center
86 30 Fenton Street, Suite 820
Silver Spring, MD 20910
Telephone: (301) 587-1788
Fax: (301) 587-1791
brittany.shrader@nad.org

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
| --- | --- |
| NATIONAL ASSOCIATION OF THE DEAF, *et al.*,<br><br>      *Plaintiffs*,<br><br>   v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>      *Defendants*. | Civil Action No. 25-01683 (AHA) |

**<u>Memorandum Opinion and Order</u>**

Congress has dictated that people cannot, on account of their disability, "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination" in "any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). The National Association of the Deaf ("NAD"), an organization dedicated to protecting the rights of Americans who are deaf, and Derrick Ford, a deaf individual, sue to end the exclusion of deaf Americans from the White House's direct engagement with the public during press briefings. They sue the President, as well as the relevant senior staff and executive offices, who concede the prohibition on excluding people with disabilities from government programming applies to White House press briefings and do not contest that American Sign Language ("ASL") interpretation is a feasible accommodation. The defendants say they can nonetheless hold press briefings without ASL, regardless of whether that excludes deaf Americans, because this particular prohibition is unenforceable. Alternatively, they ask the court to find that English captioning and transcripts are good enough to accommodate deaf Americans who rely on ASL, even though unrebutted evidence shows they are not.

The court concludes the plaintiffs are likely to succeed on their Rehabilitation Act claim. In doing so, the court agrees with courts that have concluded the Rehabilitation Act's prohibition

of discrimination in government programming is enforceable under the statute itself, *see Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45, 53–57 (D.D.C. 2020) (Boasberg, C.J.), and, alternatively, with courts that have concluded the prohibition is enforceable through a court's "inherent equitable power to enjoin the Government," *Mathis v. United States Parole Comm'n*, 749 F. Supp. 3d 8, 22 (D.D.C. 2024) (McFadden, J.). White House press briefings engage the American people on important issues affecting their daily lives—in recent months, war, the economy, and healthcare, and, in recent years, a global pandemic. The exclusion of deaf Americans from that programming, in addition to likely violating the Rehabilitation Act, is clear and present harm that the court cannot meaningfully remedy after the fact. Because the record shows exclusion is a reality for Ford, NAD members, and many other deaf Americans, and that providing ASL interpretation is readily feasible, the court finds the plaintiffs are entitled to preliminary relief.

The court is also mindful that preliminary relief is just that—an interim measure that, here, partially restores a recent status quo until the case is resolved. The court limits its relief at this stage to the provision of simultaneous and publicly accessible ASL interpretation by a qualified interpreter for all publicly announced White House press briefings conducted by the President or White House Press Secretary, finding that to be the least relief that is both necessary and supported by the record. The plaintiffs ask for more, including that ASL interpretation be required at press briefings and events conducted by the Vice President, First Lady, and Second Lady; that the feed with ASL interpretation be provided to networks; that interpretation be provided for all videos streamed on or uploaded to the White House's website and social media pages; and that the interpreter feed occupy a certain width of the screen. ECF No. 2-1 at 1–2. But, the plaintiffs have not, at this stage, submitted evidence to support that broader relief.

## I.   Background

Ford and many deaf NAD members use ASL as their primary language and have limited proficiency in English. ECF No. 2-2 ¶¶ 2–3; ECF No. 2-5 ¶¶ 3–5. According to unrebutted record evidence, ASL and English "are two completely distinct languages." ECF No. 2-4 ¶ 27. ASL has its own vocabulary, grammar, and syntax. *Id.* ¶¶ 27–29. And English fluency "is not widespread" in the deaf community. *Id.* ¶ 32. Accordingly, many deaf Americans have very limited ability to read, write, or otherwise communicate in English. *Id.* ¶¶ 31–39; ECF No. 2-5 ¶ 3.

Because many people who use ASL cannot communicate in English, providing them with English captions or transcripts does not make speech accessible to them. ECF No. 2-4 ¶¶ 31, 39. For them to receive the information, it needs to be to be provided in the language they use, ASL. This has become significantly easier with advances in technology. Today, via remote interpretation, ASL interpreters can provide live interpretation without needing to be in the same room as the speaker, and a video feed of the interpreter can be inserted into the video of the speaker through picture-in-picture technology. *Id.* ¶¶ 17, 40–41. This can be done "without difficulty or significant logistical or financial burden." *Id.* ¶ 17.

Before 2021, the White House did not provide ASL interpretation during press briefings. The importance of providing ASL interpretation came to the fore during the COVID-19 pandemic, as White House briefings on emerging updates and safety protocols became a daily norm. In 2020, several individuals, along with NAD, sued to require ASL interpretation for COVID-19 press briefings, resulting in a preliminary injunction that required ASL interpretation during those briefings. *See Nat'l Ass'n of the Deaf v. Trump*, No. 20-cv-2107, 2020 WL 5757463, at *1 (D.D.C. Sept. 23, 2020). That case settled after the White House adopted a much broader policy of providing ASL interpretation during press briefings "conducted by the President, Vice President, First Lady, Second Gentleman, or White House Press Secretary, for which the White House Press

Office or the White House Office of the Press Secretary provide public notice." ECF No. 2-7 at 2; *see* ECF No. 14-1. The White House stopped providing ASL interpretation during press briefings beginning in January 2025. *See* ECF No. 2-2 ¶ 5; ECF No. 2-5 ¶ 7.

The plaintiffs bring this action, asserting that the failure to provide ASL interpretation during press briefings and other events violates their rights under the Rehabilitation Act, as well as the First and Fifth Amendments to the U.S. Constitution. *See* ECF No. 1 ¶¶ 62–98. The plaintiffs move for a preliminary injunction requiring the defendants to provide ASL interpretation by qualified interpreters at press briefings, press conferences, and related events "conducted by the President, Vice President, First Lady, Second Lady, or White House Press Secretary." ECF No. 2-1 at 1. The parties had the opportunity to brief the issues and submit evidence, and the court held a preliminary injunction hearing.

## II.   Discussion

"A preliminary injunction is an extraordinary remedy" that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008). A plaintiff must establish four factors: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The court finds the plaintiffs have satisfied their burden for preliminary relief, but tailors the proposed relief to the least necessary based on the record before the court at this preliminary stage—namely, to providing a simultaneous and publicly accessible feed with visible ASL interpretation by a qualified interpreter for all publicly announced White House press briefings conducted by the President or White House Press Secretary captured by White House communication channels.

**A.  The Plaintiffs Are Likely To Succeed On Their Rehabilitation Act Claim**

Congress passed the Rehabilitation Act "to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society" through, among other things, "the guarantee of equal opportunity." 29 U.S.C. § 701(b)(1)(F). As originally enacted in 1973, the statute prohibited the government from discriminating based on a person's disability in two contexts: Section 501 of the act, codified at 29 U.S.C. § 791, prohibited the government from discriminating as an employer. *See* Rehabilitation Act of 1973, Pub. L. No. 93-112, § 501, 87 Stat. 355, 390–91. And section 504, codified at 29 U.S.C. § 794, prohibited federal funding recipients from excluding people with disabilities from, denying them the benefits of, or discriminating against them in "any program or activity receiving Federal financial assistance." *Id.* § 504, 87 Stat. at 394.

Congress later amended the Rehabilitation Act in 1978 to expand its protection in various ways, two of which are most relevant here. *See* Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. No. 95-602, 92 Stat. 2955. First, Congress extended section 504's prohibition beyond federal funding recipients, to also prohibit the government from excluding people with disabilities from, denying them the benefits of, or discriminating against them in "any program or activity conducted by any Executive agency," *id.* § 119, 92 Stat. at 2982 (codified at 29 U.S.C. § 794(a))—the prohibition that plaintiffs rely on in this suit.

Second, Congress specified new forms of relief for violations of the act by adding section 505. *Id.* § 120, 92 Stat. at 2982–83 (codified at 29 U.S.C. § 794a); *see Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 635 (1984) (observing that the addition of section 505 was "designed to enhance the ability of handicapped individuals to assure compliance with [§ 504]" (alteration in original) (quoting S. Rep. No. 95-890, at 18 (1978))). In section 505's first subsection, Congress

expanded the relief available for the act's two original prohibitions by incorporating "remedies, procedures, and rights set forth" in related statutory regimes. 29 U.S.C. § 794a(a). In particular, Congress expanded the remedies for disability discrimination claims against the federal government as an employer to include those available against employers under Title VII, *id.* § 794a(a)(1), and it expanded the remedies for disability discrimination claims against federal funding recipients to include those available against federal funding recipients under Title VI, *id.* § 794a(a)(2). Then, in section 505's second subsection, Congress specified that attorney's fees are available for all types of claims brought under the Rehabilitation Act. *See* 29 U.S.C. § 794a(b) (providing that attorney's fees are available in "any action or proceeding to enforce or charge a violation").

The defendants concede that the Rehabilitation Act's prohibition on excluding people with disabilities from participating in, denying them the benefits of, or discriminating against them in Executive agency programming applies to their offices. *See* ECF No. 18 at 4 (recognizing that "the White House Office, the Office of the Vice President, . . . and any committee, board, commission, or similar group established in the Executive Office of the President" are covered by the provision (quoting 3 C.F.R. § 102.103)). And they do not dispute that the text of the prohibition encompasses the type of claim alleged here—namely, failing to make the information communicated in White House press briefings accessible to people who are deaf. The defendants argue instead that the plaintiffs' Rehabilitation Act claim is unlikely to succeed for three reasons: First, because the plaintiffs' suit is claim precluded by a previous case brought and settled by one of the plaintiffs here; second, because the act's prohibition of discrimination in government programming is unenforceable; and third, because, even if the prohibition of discrimination in government

programming and activities is enforceable, the court should deem the provision of English captions or transcripts a sufficient accommodation. The court addresses each argument in turn.

1. *The Plaintiffs' Rehabilitation Act Claim Is Not Claim Precluded Or Barred By The Referenced Settlement Agreement*

The defendants first argue that the plaintiffs are unlikely to succeed on their Rehabilitation Act claim because it is precluded by a case brought and settled by five deaf individuals and NAD five years ago, *National Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45 (D.D.C. 2020). *See* ECF No. 18 at 12–18. This argument is not persuasive.

The plaintiffs' Rehabilitation Act claim is not barred by claim preclusion. Claim preclusion applies "if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." *Nat. Res. Def. Council v. EPA*, 513 F.3d 257, 260 (D.C. Cir. 2008) (quoting *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006)). The defendants' argument fails at the first step. The plaintiffs' claim here cannot be said to be the same as in the prior suit—or, as courts have put it, to "share the same nucleus of facts" as that case— because they are challenging their exclusion from, and denial of the benefits of, press briefings that had not even occurred at the time of the prior suit. *Id.* at 261 (quoting *Apotex, Inc. v. FDA*, 393 F.3d 210, 217 (D.C. Cir. 2004)). It is well established that "[c]laim preclusion generally does not bar claims that are predicated on events that postdate the filing of the initial complaint." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 590 U.S. 405, 414 (2020) (quotation marks and citation omitted); *see also Stanton v. D.C. Ct. of Appeals*, 127 F.3d 72, 78 (D.C. Cir. 1997) ("Federal law is clear that post-judgment *events* give rise to new claims, so that claim preclusion is no bar."). According to the unrebutted evidence in the record, the defendants have conducted White House press briefings without ASL interpretation since January 2025. *See* ECF No. 2-2 ¶ 5;

ECF No. 2-5 ¶ 7. The plaintiffs claim that doing so has violated and continues to violate their rights; these violations were not challenged—and, indeed, could not yet have been challenged—in the suit five years ago.

If the defendants' preclusion argument did not fail at the first step, it would fail at the second: They have not shown, at least at this stage, that the suit is brought by the same parties or their privies. Although NAD is a common plaintiff to both suits, it is undisputed Ford is not. ECF No. 18 at 15. The defendants assert that Ford is nonetheless precluded from suing because he is a member of NAD and, in the defendants' view, NAD adequately represented Ford's interests either because he might have been a NAD member during the suit or because he is deaf. *See id.* at 15–16. But this argument is not supported by law. *See Cigar Ass'n of Am. v. FDA*, 436 F. Supp. 3d 70, 82 (D.D.C. 2020) (recognizing that a plaintiff's "mere membership in or affiliation" with an association that litigated a prior case "does not foreclose" them from bringing claims); *see also Cal. Cosmetology Coal. v. Riley*, 871 F. Supp. 1263, 1267 (C.D. Cal. 1994) ("Under federal law, mere membership in a trade association alone does not create the privity necessary to bind the member to a judgment against an organization.").

Nor does the settlement agreement in the prior suit bar this action. The agreement, by its terms, does not relinquish "claims based on any acts or omissions that may occur after the date of execution" of the agreement. ECF No. 14-1 at 4. The defendants' decision to hold briefings without ASL interpretation since January 2025 clearly occurred after the agreement's execution. And, as noted, Ford was not a party to the earlier action or a party to the settlement agreement, and therefore it is hard to see how it could possibly bar his legal claims.

The defendants' arguments that the claims here arise from the same nucleus as the earlier suit, so as to be barred by the suit or its settlement agreement, is hard to square with their prior

representations in this case. After this case was initially assigned to the judge in the prior case as related, the defendants argued—successfully—that it should be reassigned because the two cases "do not 'relat[e] to the same subject matter.'" ECF No. 7 at 3 (alteration in original) (quoting LCvR 40.5(a)(4)). Their argument also has an incoherence to it. The suit that the defendants rely upon as preclusive of this one, which challenged the failure to provide ASL during COVID-19 press briefings, was settled after the government voluntarily provided ASL interpretation across a far broader array of press briefings, in a manner "consistent with the relief" the plaintiffs sought in that case. ECF 14-1 at 3. Under the defendants' theory, they could have ceased providing any ASL interpretation in press briefings the very next day, and the plaintiffs (and even non-plaintiffs like Ford) would be barred from suing again.

The defendants' preclusion arguments are not convincing, and do not impact the plaintiffs' likelihood of success in this case.

2. *Section 504(a)'s Prohibition On Excluding Or Discriminating Against People Because Of Their Disability In Government Programming Is Enforceable*

In *Lane v. Pena*, 518 U.S. 187 (1996), the Supreme Court considered whether a plaintiff asserting that the government has discriminated in programming in violation of § 504(a) may obtain monetary damages and held that damages were not available because the Rehabilitation Act does not unequivocally waive the federal government's sovereign immunity against monetary damages awards. *Id*. at 200. Although the plaintiff in *Lane* had obtained injunctive relief, there, the government "did not dispute the propriety" of such relief under the Rehabilitation Act. *Id*. at 190. The government now argues that the Rehabilitation Act provides no private cause of action to seek injunctive relief when it excludes or discriminates against people with disabilities in its programming or activities. ECF No. 18 at 18–20. That is not a sound reading of the statute's text, history, or structure. *See Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 53–57 (D.D.C. 2020)

9

(explaining that the statute's text, history, and structure support the conclusion that Congress provided a private cause of action for such claims). And, even if it were a sound interpretation, it would not get the defendants very far: As another judge of this court has recognized, in the event the statute itself does not provide a private cause of action, the prohibition would be enforceable under the court's "inherent equitable power to enjoin the Government from violating the Rehabilitation Act." *Mathis*, 749 F. Supp. 3d at 22.

It is well established that not all statutory violations give rise to a private cause of action. As the Supreme Court has put it, "the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688 (1979). Rather, "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). So, the "determinative" question for courts is one of statutory intent—whether the statute "displays an intent to create not just a private right but also a private remedy." *Id.* (citing *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979)). Courts begin this inquiry with the "text and structure" of the statute. *Id.* at 288.

The Rehabilitation Act's text and structure create a private cause of action. In the text of section 504(a), Congress adopted the very language that the Supreme Court and Congress have recognized as prototypical to demonstrate statutory intent to have a private cause of action. The text, in relevant part, says: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). The Supreme Court has held, and consistently reaffirmed, that this formulation—"no person . . . shall be subjected to discrimination"—creates a private cause of

action. *See, e.g.*, *Cannon*, 441 U.S. at 689–90; *Sandoval*, 532 U.S. at 288. In *Cannon*, the Supreme Court considered section 901(a) of Title IX—which provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U.S.C. § 1681—and held that this language created a private cause of action. *Cannon*, 441 U.S. at 689. The court explained that the phrasing used was "patterned after Title VI of the Civil Rights Act of 1964" and that this "critical language in Title VI had already been construed as creating a private remedy." *Cannon*, 441 U.S. at 694, 696. The court reiterated the same reasoning in *Sandoval*, explaining that this "critical" phrasing led the court to conclude that "Congress had intended Title IX, like Title VI, to provide a private cause of action." 532 U.S. at 280, 288. The Supreme Court further recognized that Congress has "ratified *Cannon*'s holding," which "cannot be read except as a validation" of the court's conclusion that this formulation creates a private cause of action. *Id*. at 280 (quoting *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 72 (1992)). Congress's use of nearly identical phrasing in section 504(a) demonstrates the same statutory intent.

That is also clear from the text's history. The parallel language in section 901 of Title IX (the language in *Cannon*) and section 504(a) of the Rehabilitation Act (the language here) was not by accident, but by design. Like section 901 of Title IX, Section 504 of the Rehabilitation Act was specifically modeled after section 601 of Title VI. *Gottfried v. FCC*, 655 F.2d 297, 312 (D.C. Cir. 1981) (recognizing "Section 504 of the Rehabilitation Act was expressly modeled on Section 601 of Title VI of the Civil Rights Act of 1964") (citing S. Rep. No. 93-1297, 93d Cong., 2d Sess., reprinted at (1974) U.S. Code Cong. & Ad. News 6373, 6390 ("Section 504 was patterned after, and is almost identical to, the anti-discrimination language of section 601 of the Civil Rights Act

11

of 1964")). So, when Congress drafted section 504(a) it chose the same "critical language" that "had already been construed as creating a private remedy." *Cannon*, 441 U.S. at 696; *see also Sandoval*, 532 U.S. at 288 (recognizing Congress creates a private cause of action when it enacts "the verbatim statutory text that courts had previously interpreted to create a private right of action"). Indeed, by the time Congress added the clause prohibiting discrimination in government programming to section 504(a) in 1978, circuits to consider the issue had unanimously interpreted section 504(a) to allow suits for injunctive relief under a private cause of action. *See Davis v. Se. Cmty. Coll.*, 574 F.2d 1158 (4th Cir. 1978), *rev'd on other grounds*, 442 U.S. 397 (1979); *Lloyd v. Reg'l Transp. Auth.*, 548 F.2d 1277 (7th Cir. 1977); *United Handicapped Fed'n v. Andre*, 558 F.2d 413 (8th Cir. 1977); *Kampmeier v. Nyquist*, 553 F.2d 296 (2d Cir. 1977).

The statute's structure supports this understanding, too. As described, when Congress amended the Rehabilitation Act to include the clause prohibiting discrimination in government programming, it also added section 505, entitled "Remedies and attorney fees." 29 U.S.C. § 794a; *see also* Rehabilitation, Comprehensive Services, and Developmental Disabilities Amendments of 1978, Pub. L. No. 95-602, § 505, 92 Stat. 2955, 2982–83. There, Congress expanded relief available for claims against the federal government as an employer and federal funding recipients to include remedies available in analogous civil rights schemes. *See* 29 U.S.C. § 794a(a). In addition to expanding relief for those particular prohibitions, Congress specified that reasonable attorney's fees would be available in "any action or proceeding to enforce or charge a violation of a provision of this subchapter." *Id*. § 794a(b). Congress's expansion of the remedies available for certain actions under the statute, and broader directive that attorney's fees be available for "any action or proceeding" under the statute, confirms Congress understood there to be causes of action to bring those claims into federal court in the first place. The court accordingly concludes,

12

consistent with Chief Judge Boasberg's analysis of the statute in *National Ass'n of the Deaf*, that the text, history, and structure of the Rehabilitation Act create a private right of action. 486 F. Supp. 3d at 53–57.

The defendants argue there is no private cause of action when it comes to the clause of the sentence in section 504(a) prohibiting *the government* from excluding or discriminating against people with disabilities in programming and activities, contending there is a cause of action only for the clause of that sentence prohibiting discrimination by *federal funding recipients*. ECF No. 18 at 18–19. That is so, they say, because when Congress added section 505, it stated that claims for discrimination in federal employment and by federal funding recipients would have available the "remedies, procedures, and rights" of the analogous statutory schemes in Title VII and Title VI, respectively, and did not mention claims for discrimination in government programming. 29 U.S.C. § 794a(a). According to the defendants, the court can infer from this that Congress did not intend any private cause of action for claims of executive agency discrimination. ECF No. 18 at 18–19. Instead, Congress intended that such discrimination claims be brought under the Administrative Procedure Act, based on regulations agencies promulgate. *See id.* at 21 (citing 29 U.S.C. § 794(a) (directing agencies to "promulgate such regulations as may be necessary to carry out" the act's prohibition)).[1]

This court does not find the defendants' interpretation persuasive. To begin with, they do not meaningfully respond to the text of section 504(a). They do not dispute the Supreme Court has held that virtually identical phrasing creates a private cause of action. *Cannon*, 441 U.S. at 689; *Sandoval*, 532 U.S. at 288. And they do not meaningfully respond to the fact that, as in *Cannon*,

---

[1]    The defendants then argue that any such APA claim would be barred here because, although the Rehabilitation Act's prohibition on discrimination by Executive agencies encompasses the defendants, the APA's definition of agencies does not. ECF No. 18 at 21.

Congress specifically modeled the language of section 504(a) on "critical language in Title VI" that "had already been construed as creating a private remedy." 441 U.S. at 696. Indeed, the defendants do not even cite *Cannon*. The defendants may wish to overlook binding precedent, but this court cannot. *See Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2230 n.1 (2025) (observing that courts "remain[] bound by *Cannon*'s 'holding'" despite shifts in the approach to inferring causes of action (quoting *Sandoval*, 532 U.S. at 282)).

The defendants appear to argue that the text of section 504(a) does not matter because of structure—namely Congress's decision to connect some, but not all, Rehabilitation Act violations to the remedies available under other, analogous remedial schemes. But that is not an apt inference for two reasons. First, that Congress *expanded* the remedies available for discrimination claims against the federal government as an employer and against federal funding recipients to include those available under analogous statutory regimes does not imply an intent to *restrict* section 504(a)'s private cause of action as it relates to the government's discrimination in programming. There is an obvious reason why Congress would not include claims against the government for discrimination in programming in those provisions: the statutory schemes section 505 incorporated from Title VII and Title VI are schemes that address discrimination by employers and by federal funding recipients, respectively; they do not apply to discrimination in government programming. As the government once put it, it "would have been odd for Congress to have provided that Title VI remedies applied in section 504 cases involving discrimination by executive agencies because Title VI [unlike § 504] does not prohibit discrimination in programs or activities conducted by executive agencies." Brief for Respondents at 16, n.8, *Lane v. Pena*, 518 U.S. 187 (1996) (No. 95-365). Second, the defendants' argument is premised on an incomplete description of section 505. It overlooks that, in addition to expanding remedies for certain violations of the statute, Congress

specified that attorney's fees would be available in "any action or proceeding to enforce or charge a violation of a provision of this subchapter." 29 U.S.C. § 794a(b). The defendants do not dispute that a suit for exclusion or discrimination in government programming under section 504(a) is an "action or proceeding to enforce or charge a violation of a provision of this subchapter."

So, this is not a scheme in which Congress specifically provided the remedy sought here— injunctive relief—for some claims, but not the claim at issue here. In that case, a negative inference might have logic to it. In this case, Congress provided more expansive remedies for some claims by incorporating remedial regimes related to those particular claims and also expanded the relief available for "any" violation of the act's prohibitions by providing attorney's fees. There is no negative inference to draw from that structure.

The defendants' structure argument is even less persuasive when understood in historical context. The implication would be that after Congress, in 1973, adopted language in section 504(a) that was well established to create a private cause of action, it then, in 1978, added the prohibition against discrimination in government programming to *the very same sentence* which created that private cause of action, without intending the established cause of action to apply to this prohibition and only intending the cause of action to apply to a different part of the same sentence that prohibits discrimination by federal funding recipients. If Congress wanted that, it could have easily said so, rather than engaging in a roundabout negative inference from expanded remedial schemes that were attached to other violations. The far more natural reading is that, when Congress added this prohibition to a sentence containing language long understood to create a private cause of action, it intended to, well, provide a private cause of action.

In any event, if the defendants' understanding of the statute were sound, it would not get them far. As Judge McFadden concluded in one of the chief cases the defendants rely on, the

15

Rehabilitation Act's prohibition on disability discrimination by the government in programming would be enforceable even in the absence of a statutory cause of action, under a court's "inherent equitable power to enjoin the Government from violating the Rehabilitation Act." *Mathis*, 749 F. Supp. 3d at 22. The Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against" state or federal officials "who are violating, or planning to violate, federal law." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). While this equitable power "is subject to express and implied statutory limitations," there is no such limitation here. *Id.* at 327; *see also McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013) (recognizing that courts do not "construe a statute to displace courts' traditional equitable authority absent the clearest command" (citation omitted)).

The defendants argue the Rehabilitation Act displaces the court's equitable power to grant injunctive relief, citing cases that recognize limits on a court's equitable power where Congress has provided a "detailed and exclusive remedial scheme" for violations of the statute. *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 647 (2002); *see Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996). According to the defendants, that is so here because section 504(a) says agency heads must "promulgate such regulations as may be necessary to carry out the amendments to this section." 29 U.S.C. § 794(a). The defendants argue this language displaces the court's equitable power and limits victims of discrimination by the government to administrative remedies created by agencies followed by actions under the Administrative Procedure Act. ECF No. 18 at 21.

But a statutory directive for agencies to promulgate regulations bears no resemblance to detailed and exclusive remedial schemes that the Supreme Court has found to displace the court's equitable power. In *Seminole Tribe*, the relevant statute at issue provided "intricate procedures" that created "a detailed remedial scheme for the enforcement against a State of a statutorily created

right." 517 U.S. at 74. The scheme limited judicial forms of relief to a "modest set of sanctions"—

such as requiring the government to negotiate or submit proposals to a mediator, who would then

notify the Secretary of the Interior if mediation failed—which showed Congress's intent "not only

to define, but also to limit significantly, the duty imposed" on the government. *Id*. at 74–75; *see

also Verizon*, 535 U.S. at 647 (discussing these key features of *Seminole Tribe*). The Rehabilitation

Act, in contrast, sets forth no alternative remedial scheme for claims alleging the government has

discriminated in programming and "places no restriction on the relief a court can award." *Verizon*,

535 U.S. at 647. The defendants' notion that a direction to promulgate regulations is a detailed,

exclusive remedial scheme finds no support in precedent.[2]

The court accordingly rejects the argument that the Rehabilitation Act's prohibition against

excluding or discriminating against people because of their disability in government programming

is unenforceable.

3. *The Plaintiffs Are Likely To Succeed In Their Claim That The Defendants' Failure To Provide ASL Interpretation Violates Section 504(a)*

"To prove a violation of section 504, the plaintiffs must show that (1) they are disabled

within the meaning of the Rehabilitation Act, (2) they are otherwise qualified, (3) they were

excluded from, denied the benefit of, or subject to discrimination under a program or activity, and

(4) the program or activity is carried out by a federal executive agency." *Am. Council of the Blind*

---

[2]    The court's conclusion that the APA is not the sole remedy for such violations is reinforced by Congress's decision to define "Executive agency" more broadly in the Rehabilitation Act than in the APA. It would not "make sense to assume—particularly when the text of section 504 indicates otherwise—that Congress intended to direct [plaintiffs suing executive agencies under section 504(a)] to the APA's remedial scheme when section 504's reference to 'any Executive agency' is meant to be more inclusive of entities than is the APA's definition of an agency." *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 54–55 (citing 7 Op. O.L.C. 110, 111–15 & n.13 (1983)). The court also agrees with Judge McFadden's conclusion that the availability of APA review would not displace the court's equitable power. *See Mathis*, 789 F. Supp. 3d at 22 (observing that equitable power would remain as a "final avenue" in addition to any APA review under agency regulations).

*v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008). The defendants do not dispute that the plaintiffs will likely succeed in proving the first, second, and fourth requirements. *See* ECF No. 18 at 22–27. They instead challenge only that declining ASL interpretation excludes plaintiffs from, denies them the benefit of, or discriminates against them in press briefings. *See id.* at 22.

Section 504 requires the defendants to provide people with disabilities "meaningful access" to their programming and activities. *Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 363 (D.C. Cir. 2017) (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)). This inquiry is "necessarily fact-specific." *Paulson*, 525 F.3d at 1267. But the D.C. Circuit has recognized the "general pattern" that "[w]here the plaintiffs identify an obstacle that impedes their access to a government program or benefit, they likely have established that they lack meaningful access to the program or benefit." *Id.* "By contrast, where the plaintiffs seek to expand the substantive scope of a program or benefit, they likely seek a fundamental alteration to the existing program or benefit and have not been denied meaningful access." *Id*. Several courts applying these standards have concluded that "deaf individuals lack meaningful access to government activities or programs without the provision of interpretive assistance." *Id.* at 1268 (collecting cases).

The defendants argue otherwise here. They assert that the plaintiffs are unlikely to succeed in showing they have been excluded from or denied the benefits of White House press briefings because briefings "generally are accompanied by captioning and followed by written transcripts." ECF No. 18 at 23. But that assertion contradicts the unrebutted evidence in the record. ASL and English are distinct languages with distinct vocabularies, grammars, and syntaxes. ECF No. 2-4 ¶¶ 15, 27–29. The record shows, and the court finds, that Ford and many deaf NAD members use ASL to communicate and have limited to no proficiency in English. ECF No. 2-2 ¶¶ 2–3; ECF No. 2-5 ¶¶ 3–5. Further, deaf individuals with "little to no mastery of English" cannot "reliably

understand the intended meaning [of] written English." ECF No. 2-4 ¶ 31. The court accordingly finds that providing written English does not enable Ford, other NAD members, and the larger community of deaf Americans who communicate in ASL, not English, to receive the information conveyed during a press briefing. For the information to be received by deaf individuals who communicate in ASL and not English, there must be ASL interpretation by a qualified interpreter. *See id.* ¶ 15; *see also, e.g.*, ECF No. 2-2 ¶ 5 (explaining that Ford "tried to watch the White House press briefings" after the White House stopped providing ASL interpretation but "could not understand much of what was being said, even with closed captioning").

Aside from simply asserting that it should be good enough to provide deaf Americans with written English in the form of closed captioning or after-the-fact transcripts, the defendants make no effort to rebut the plaintiffs' evidence that many deaf Americans have no proficiency in English. The defendants correctly note that the plaintiffs are entitled only to reasonable accommodations. *See* ECF No. 18 at 22; *Choate*, 469 U.S. at 301. But it is not reasonable—indeed it can hardly be called an accommodation at all—to transcribe press briefings into a language that Ford and many NAD members do not know.

The defendants also invoke the proposition that "accommodations are not reasonable if they would entail either undue financial and administrative burdens or a fundamental alteration in the nature of a program." ECF No. 18 at 22 (cleaned up); *see Paulson*, 525 F.3d at 1266 (observing the government "may assert as an affirmative defense to liability that accommodating the plaintiffs' disabilities would constitute an undue burden"). They do not make any argument or offer any evidence to establish that offering ASL interpretation would impose "undue financial and administrative burdens." ECF No. 18 at 22. To the contrary, when given the opportunity, the defendants declined to argue that providing ASL interpretation would entail any practical burden.

*See* ECF No. 25 at 59–60. The defendants instead suggest that providing ASL interpretation for deaf Americans is a "fundamental alteration in the nature of" their press briefings. *Id.* at 59. According to the defendants, "[r]equiring the President to share his platform with ASL interpreters every time he or his Press Secretary communicates with the nation is a major incursion on his central prerogatives." ECF No. 18 at 27. This argument is puzzling—the defendants do not make clear what "fundamental alteration" or "major incursion" they are referring to, instead offering only coded language about wanting to present their "message and image in a particular way." *Id.* at 3. To the extent the defendants argue that they prefer to act free from association with accessibility for people with disabilities, their gripe is with Congress and the Rehabilitation Act itself. For the purposes of this action, the defendants concede that section 504(a) applies to them, and wanting to have an "image" free from its requirements is not a sound basis for declining to provide reasonable accommodations. Moreover, on this record, ASL interpretation does not require a speaker to "share his platform" with anyone. The evidence shows, and the court finds, that the defendants can readily implement remote ASL interpretation without an interpreter present in the same room as the speaker. ECF No. 2-4 ¶ 40. Indeed, the White House implemented ASL interpretation this way until recently. *See* ECF No. 1 ¶ 39.

On the current record, the plaintiffs are likely to succeed on their Rehabilitation Act claim by showing that the failure to provide ASL interpretation denies them meaningful access to White House press briefings.[3]

---

[3]    The plaintiffs also bring claims under the First Amendment, Fifth Amendment, and for mandamus and non-statutory review. *See* ECF No. 1 ¶¶ 73–98. Because the court concludes the plaintiffs are likely to succeed on their Rehabilitation Act claim, it need not consider whether they are likely to succeed on their other claims.

### B. The Plaintiffs Have Shown Irreparable Harm

The irreparable harm inquiry is onerous. It requires the plaintiffs to identify injury that is "certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). And that injury must also be one that is "beyond remediation." *Id.* As the D.C. Circuit has explained:

> The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

*Id.* at 297–98 (citation omitted).

The injury here clears this threshold. As explained, the court finds that without ASL interpretation, Ford and other deaf NAD members who communicate in ASL and not English are not able to receive information conveyed at White House press briefings. The record further shows that these press briefings are used by the White House to communicate directly with the public about critical issues that affect the everyday lives of Americans. *See* ECF No. 2-4 ¶ 47. In recent months, White House press briefings have included discussions of natural disasters, federal military and law enforcement deployments in cities around the country, military strikes across multiple continents and questions about whether the United States is at war, the passage of major legislation that impacts Medicare and Medicaid, and an ongoing government shutdown. *See* ECF No. 20 at 20.[4] The plaintiffs' inability to access this information constitutes irreparable harm. *See*

---

[4]    The White House's press briefings often discuss many of these and other important issues impacting Americans around the country. *See, e.g.*, Press Secretary Karoline Leavitt Briefs Members of the Media, Oct. 23, 2025, https://www.whitehouse.gov/videos/press-secretary-karoline-leavitt-briefs-members-of-the-media-oct-23-2025/; Press Briefing by the White House

ECF No. 2-2 ¶¶ 6, 7; *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 58 (concluding that "absent ASL interpretation" the plaintiffs would "suffer irreparable harm because they [would] be denied timely access to . . . critical information, leaving them less able to comply with current orders and advice, less able to prepare for the future, and more anxious about current conditions and the future" (cleaned up)).

In response, the defendants merely repeat their argument that "means like closed captioning" should be good enough for deaf Americans. ECF No. 18 at 9. As explained, however, that argument contradicts the unrebutted evidence in the record, as well as the court's findings that ASL and written English are distinct languages and that such means do not allow deaf Americans who rely on ASL, rather than English, to receive the information communicated. Given the nature of the programming at issue here—regularly scheduled briefings on critical topics implicating markets, medicine, militaries, and myriads of other issues—the court finds that denying deaf Americans access to and the benefit of it presents a clear, present, and imminent harm that cannot plausibly be addressed through corrective relief at a later date.[5]

### C. The Balance Of The Equities And The Public Interest Favor The Plaintiffs

The balance of equities and public interest factors merge here because the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The plaintiffs have readily satisfied

---

Press Secretary Karoline Leavitt, Aug. 28, 2025, https://www.whitehouse.gov/videos/press-briefing-by-the-white-house-press-secretary-karoline-leavitt/; Press Secretary Karoline Leavitt Briefs Members of the Media, Jan. 28, 2025, https://www.whitehouse.gov/videos/press-secretary-karoline-leavitt-briefs-members-of-the-media-jan-28-2025/.

[5]    The defendants argue that the plaintiffs' irreparable harm argument is undercut by the time it took them to file suit after the defendants stopped offering ASL interpretation. ECF No. 18 at 10. But according to the record, the plaintiffs used the time before filing suit to engage directly with the White House, asking it multiple times to voluntarily resume providing ASL interpretation. *See* ECF Nos. 2-6, 2-8. The court finds no unjustifiable or prejudicial delay. In any event, the D.C. Circuit has instructed that "a delay in filing is not a proper basis for denial of a preliminary injunction." *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011).

these factors. They seek access to public press briefings on topics of national importance by the executive branch, and to not be excluded from that activity because of their disability. On the other side of the ledger, the defendants have not contested that implementing ASL interpretation is readily feasible. The court has found the plaintiffs are likely to succeed in showing that the defendants are violating the Rehabilitation Act, and, as the D.C. Circuit has explained, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (quotation marks omitted) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

### D.  Scope Of Relief

Having concluded the plaintiffs have shown the factors favor preliminary relief, the court considers the appropriate scope of such relief. "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). The court "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Id.* at 580 (citation omitted). The court accordingly crafts interim relief tailored to the particular claim, irreparable harm, and equities on this record.

The plaintiffs ask for an injunction that requires the defendants to provide qualified ASL interpreters at all planned White House press briefings, press conferences, and related events conducted by the President, Vice President, First Lady, Second Lady, or White House Press Secretary captured by White House communication channels. They also ask that the defendants be required to have the ASL interpreter visible next to the speaker, either in person or by separate video feed, in a size that is at least one-third of the screen width; that the feed with the interpreter

be provided to networks; and that interpretation be provided for all videos streamed on or uploaded to the White House's website and social media pages. ECF No. 2-1 at 1–2.

The court finds that this proposed relief is overbroad in a number of respects. First, the plaintiffs' argument and evidence supporting issuance of a preliminary injunction focus almost exclusively on the importance of, and corresponding harm that would result from exclusion from, the President's and White House Press Secretary's press briefings. The plaintiffs have not introduced evidence that supports extending the court's relief to other press conferences or related events, or to events conducted exclusively by the Vice President, First Lady or Second Lady.[6] Second, while the plaintiffs have shown entitlement to a publicly accessible feed with visible ASL interpretation, they have not provided evidence supporting specific constraints on the minimum screen width of the interpreter feed. Third, the plaintiffs have not provided evidence to show that ASL interpretation must be included in feeds provided to networks or in all videos streamed or uploaded by the White House in order to provide meaningful access.

The defendants do not challenge the feasibility of providing ASL interpretation of press briefings by qualified interpreters—indeed, until earlier this year the defendants provided ASL interpretation for a broader set of events and officials than the preliminary injunction requires, and they have not submitted evidence of any feasibility challenges in doing so. At oral argument, the defendants suggested for the first time that any relief requiring ASL interpretation could be limited to the discussion of particular topics. *See* ECF No. 25 at 58. Aside from floating this possibility orally, the defendants have not provided the court with any meaningful basis to assess the

---

[6]    In crafting the preliminary injunction, the court also finds it unnecessary to enjoin the President himself where "enjoining other parties in the White House can provide" the necessary relief. *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 59.

feasibility of requiring ASL on a topic-by-topic approach, and the court accordingly declines to adopt such an approach at this stage.

### III.   Conclusion

For these reasons, the court grants the plaintiffs' motion for a preliminary injunction, ECF No. 2, in part and denies it in part. The court finds that, considering the plaintiffs' status as an individual and a nonprofit, as well as unrebutted evidence regarding the relatively low burden and expense of providing ASL interpretation, a nominal bond of $1.00 is appropriate. *See Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980); *Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 32 (D.D.C. 2025).[7]

Consistent with this opinion, the court orders:

- The Executive Office of the President, White House Office, White House Chief of Staff, and White House Press Secretary shall immediately begin providing a simultaneous and publicly accessible feed with visible American Sign Language interpretation by a qualified interpreter for all publicly announced White House press briefings conducted by the President or White House Press Secretary that are captured by White House communication channels.

- These defendants shall file a status report by November 7, 2025, that apprises the court of their compliance with this order.

---

[7]   In their briefing, the defendants request that the court stay any preliminary injunction pending appeal. ECF No. 18 at 35. That request is denied as premature. If, after reviewing this opinion and order, the defendants decide to pursue an appeal, they may move for a stay pending appeal and the court will consider it in the ordinary course.

AMIR H. ALI
United States District Judge

Date:   November 4, 2025

- JA178 -

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION OF THE DEAF, *et al.*,<br><br>      Plaintiffs,<br><br>          v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>      Defendants. | Case No. 25-cv-1683 (AHA) |

## NOTICE OF APPEAL

Defendants respectfully provide notice that they hereby appeal to the United States Court of Appeals for the D.C. Circuit the preliminary injunction entered against them in this Court's November 4, 2025, Memorandum Opinion and Order, ECF No. 29.

Dated: November 7, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

TYLER J. BECKER
ELIZABETH HEDGES
Counsel to the Assistant Attorney General
Civil Division

DIANE KELLEHER
Branch Director
Civil Division, Federal Programs Branch

1

- JA179 -

*/s/ Christian Dibblee*
CHRISTIAN DIBBLEE
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 353-5980
Email: Christian.R.Dibblee@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATIONAL ASSOCIATION OF THE DEAF, *et al.*,<br><br>        *Plaintiffs*,<br><br>   v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>        *Defendants*. | Civil Action No. 25-01683 (AHA) |

**<u>Order</u>**

On November 4, 2025, this court issued a preliminary injunction that requires the relevant defendants to "immediately begin providing a simultaneous and publicly accessible feed with visible American Sign Language interpretation by a qualified interpreter for all publicly announced White House press briefings conducted by the President or White House Press Secretary that are captured by White House communication channels." ECF No. 29 at 25. Consistent with the court's order, those defendants filed a notice apprising the court of their compliance. ECF No. 32. In their submission, the defendants also sought to confirm their understanding of two aspects of the court's injunction. *See* ECF No. 32 at 3 (requesting "notification from the Court if the White House has misunderstood the intended scope"). The court gave the plaintiffs a chance to respond, ECF No. 34, and held a hearing to further understand the issues raised. The court construes the defendants' submission as a motion for clarification and grants the motion as set forth below.

The defendants first asked whether the term "publicly announced" allows them to forgo providing ASL interpretation for deaf Americans when a press briefing is not "scheduled at least 24 hours in advance." ECF No. 32 at 2. When prompted to explain this interpretation—namely,

that the defendants need not make any effort whatsoever to arrange ASL interpretation if they give only 23 hours' notice—they clarified they were concerned about instances in which they had only "a moment's notice" or "potentially 30 minutes' notice." Draft Morning Hr'g Tr. at 3–4, 6–11 (Nov. 13, 2025). They explained that, in a circumstance where they could not arrange simultaneous ASL interpretation before a briefing was set to begin, they would "absolutely make a good-faith effort at substantial compliance," and expressed concern about a scenario in which a briefing "might not be able to go forward because they cannot find an ASL interpreter." *Id*. at 9–10.

The court explained, first, that the defendants' concern was based on a misunderstanding: nothing in the preliminary injunction requires the government to delay press briefings. *See id*. at 4–5, 8–9; *see also id*. at 15–16 (eliciting the same understanding from plaintiffs' counsel). And the court explained, second, that in the event the defendants are not able to provide ASL interpretation because a press briefing takes place on a moment's notice, a showing that they took all reasonable steps to do so—the showing the defendants indicated they would be prepared to make—is what the court will require. *Id.* at 8–9, 11; *cf. Food Lion, Inc. v. United Food & Com. Workers Int'l Union, AFL-CIO-CLC*, 103 F.3d 1007, 1017 (D.C. Cir. 1997) ("In order to prove good faith substantial compliance, a party must demonstrate that it took all reasonable steps within its power to comply with the court's order." (cleaned up)). The court confirmed this understanding of the injunction with both parties. *See* Draft Morning Hr'g Tr. at 9, 11, 16–17. To reflect this collective understanding and avoid any doubt, the court clarifies that the injunction requires the defendants to take all reasonable steps to provide ASL interpretation in the circumstances described.[1]

---

[1]    The defendants' request that ASL interpretation be required only for press briefings announced at least 24 hours in advance apparently stems from an existing vendor agreement, in which the defendants are expected, by default, to provide 24 hours' notice. ECF No. 32 at 2. The defendants have not provided a copy of the referenced agreement in the record, during the preliminary

The defendants second ask the court to further define the types of events for which they must provide ASL interpretation for deaf Americans. ECF No. 32 at 2. The court understands this as a genuine effort to have clear guidance, and it heard submissions from both parties to that end. At the hearing, the parties agreed the defendants must provide ASL interpretation for events conducted by the Press Secretary or President that are labeled as "press briefings" or "press conferences." Draft Afternoon Hr'g Tr. at 2–3, 10–11 (Nov. 13, 2025). Recognizing that labels alone cannot control, both parties also proposed descriptive definitions of "press briefings," but they were unable to reach agreement on that language. In the interest of ensuring the parties have clear guidance, the court instructed that it would take the parties' submissions on this point under advisement and issue further guidance separately. *Id.* at 19. The court now grants the defendants' motion to clarify on this issue as follows:

The court finds the plaintiffs' understanding of what counts as a "press briefing" is broader than justified at this preliminary stage. In writing, the plaintiffs argued the preliminary injunction applies with the same scope as the White House's prior ASL policy—namely, to any event "open to the press." ECF No. 34 at 10 (quoting ECF No. 1-1 at 2 n.2). Although the defendants have not made any showing that providing ASL interpretation for such events would pose difficulties in terms of feasibility, the court finds this proposal exceeds the scope of the plaintiffs' showing, at least at this stage. *See* ECF No. 29 at 24–25.

---

injunction briefing or thereafter. The defendants do not explain how that agreement could have dictated the scope of the court's injunction or their obligations under the Rehabilitation Act. Unrebutted evidence in the record indicates that prior administrations have regularly provided ASL interpretation on much shorter timeframes. *See* ECF No. 34-1. And at the hearing, the defendants confirmed that even their existing agreement contemplates requests that are made "in less time." Draft Morning Hr'g Tr. at 12.

The court also finds the defendants' understanding too narrow. According to the defendants, they are required to provide ASL interpretation only at events whose "exclusive purpose" is "for the President or Press Secretary to provide information to the press or take questions from the press." ECF No. 32 at 2. At the hearing, it became clear this understanding is unworkable. Draft Morning Hr'g Tr. at 23–24. For example, under this interpretation, if the President planned to pardon a turkey at the start of an event that, by all other markers, is a press briefing and to then provide information and take questions from the press on pressing issues from war to the economy to healthcare, no ASL interpretation would be required for any part because briefing the press was not the "exclusive purpose." *Id*. at 20–21 (defendants accepting that their position, taken seriously, would lead to this "strange" result). That cannot be squared with the court's preliminary injunction, which was premised on the Rehabilitation Act's requirement of meaningful access to this type of direct engagement with the public. *See* ECF No. 29 at 17–22.

At the hearing, it became apparent the defendants' principal concern is that the President might choose to take questions from the press during an event that was otherwise not expected to be a press briefing. *See* Draft Morning Hr'g Tr. at 21–22, 24, 28–29 (raising this concern).[2] The court appreciates the possibility of such spontaneity and agrees the preliminary injunction does not require ASL interpretation in such circumstances. In response to this concern, the plaintiffs substantially narrowed their proposal to require ASL interpretation "where it is reasonably expected that the President or press secretary would provide information directly to the press or take questions from the press." Draft Afternoon Hr'g Tr. at 3–4. This language is similar to that adopted by Chief Judge Boasberg in *National Ass'n of the Deaf v. Trump*, No. 20-cv-2107, 2020

---

[2]    In their written submissions, the defendants otherwise offered only a conclusory reference to "practical and logistical difficulties" that could arise, without further explanation or evidence the court could meaningfully assess or rely upon. ECF No. 32 at 3.

WL 5757463, at *1 (D.D.C. Sept. 23, 2020). The court agrees this language would address the defendants' concern; however, in the interest of providing the clearest guidance for all parties, the court further limits its injunction to events for which the relevant defendants have knowledge that the President or Press Secretary plans to provide information to the press or take questions from the press. The defendants have not made any submissions, in writing or orally, that would justify failing to take all reasonable efforts to provide ASL interpretation when they have knowledge of such a plan to brief the press.

The court accordingly amends its preliminary injunction as follows:

- The Executive Office of the President, White House Office, White House Chief of Staff, and White House Press Secretary shall immediately take all reasonable steps to provide a simultaneous and publicly accessible feed with visible American Sign Language interpretation by a qualified interpreter for all publicly announced White House press briefings conducted by the President or White House Press Secretary that are captured by White House communication channels.

- For the purposes of this order, "press briefings" includes (1) events that the White House publicly announces as press briefings or press conferences; and (2) events for which the enjoined defendants have knowledge that the President or Press Secretary plans to provide information to the press or take questions from the press.

AMIR H. ALI
United States District Judge

Date:    November 17, 2025

```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


    * * * * * * * * * * * * * * *   )
   NATIONAL ASSOCIATION OF THE DEAF, )   Civil Action
   et al.,                          )   No. 25-01683
                                    )
                Plaintiffs,         )
                                    )
     vs.                            )
                                    )
   DONALD J. TRUMP, et al.,         )   Washington, D.C.
                                    )   November 13, 2025
                Defendants.         )   9:19 a.m.
                                    )
    * * * * * * * * * * * * * * *   )



                   TRANSCRIPT OF STATUS CONFERENCE
                 BEFORE THE HONORABLE AMIR H. ALI
                    UNITED STATES DISTRICT JUDGE



   APPEARANCES:

   FOR THE PLAINTIFFS:      IAN S. HOFFMAN, ESQ.
                            ROBERT J. KATERBERG, ESQ.
                            ARNOLD & PORTER KAYE SCHOLER, LLP
                            601 Massachusetts Avenue, Northwest
                            Washington, D.C. 20001

                            BRITTANY SHRADER, ESQ.
                            NATIONAL ASSOCIATION OF THE DEAF
                            LAW AND ADVOCACY CENTER
                            8630 Fenton Street
                            Suite 202
                            Silver Spring, Maryland 20910


   FOR THE DEFENDANTS:      CHRISTIAN DIBBLEE, ESQ.
                            DIANE KELLEHER, ESQ.
                            U.S. DEPARTMENT OF JUSTICE
                            FEDERAL PROGRAMS BRANCH - CIVIL
                              DIVISION
                            1100 L Street, Northwest
                            Washington, D.C. 20005
```

APPEARANCES, CONT'D:

FOR THE DEFENDANTS:        ELIZABETH T. HEDGES, ESQ.
                          U.S. DEPARTMENT OF JUSTICE
                          OFFICE OF THE ASSISTANT ATTORNEY
                            GENERAL - CIVIL DIVISION
                          950 Pennsylvania Avenue, Northwest
                          Washington, D.C. 20530


REPORTED BY:              LISA EDWARDS, RDR, CRR
                          Official Court Reporter
                          United States District Court for the
                            District of Columbia
                          333 Constitution Avenue, Northwest
                          Room 6706
                          Washington, D.C. 20001
                          (202) 354-3269

THE COURTROOM DEPUTY:  Good morning, your Honor.

THE COURT:  Good morning.

THE COURTROOM DEPUTY:  Your Honor, this is Civil Action 25-1683, *National Association of the Deaf, et al., versus Donald J. Trump, et al.*

Will the parties please come forward to the lectern and identify yourselves for the record this morning. We'll start with Plaintiffs' counsel first.

MR. HOFFMAN:  Good morning, your Honor.  Ian Hoffman with the law firm of Arnold & Porter here on behalf of the Plaintiffs, the National Association of the Deaf and Mr. Ford.  I'm joined at counsel table by my colleague, Mr. Rob Katerberg, also from Arnold & Porter, and Ms. Brittany Shrader from the National Association of the Deaf.  Good morning.

THE COURT:  Good morning to all of you.

MR. DIBBLEE:  Good morning, your Honor.  Christian Dibblee here on behalf of the Defendants in this case.  With me at counsel table, also from the civil division, Elizabeth Hedges and Diane Kelleher.

THE COURT:  All right.  Good morning.  Good to be with you.

So we're here on a status conference.  I have what was styled as a notice of compliance with the Court's preliminary injunction from the restrained Defendants and I

have Plaintiffs' response to that as well.  I'm familiar with them.  I have them with me on the bench if you want to refer to them.

As I understand it, there are two main questions raised in the Defendants' notice.  The first is whether the preliminary injunction is limited to press conferences that are announced 24 hours in advance.  The second relates generally speaking to what events are covered by the injunction.  Do I have that generally correct?

MR. HOFFMAN:  I believe so, your Honor.  Yes.

MR. DIBBLEE:  Yes.

THE COURT:  I'm seeing nodding from the Defendants.

Let me hear from the Government, since it's the one who's understanding the injunction in at least the first way about 24 hours.

So let's start with the first question.  Why don't you just let me understand your position.  I'll give you the chance to tell me exactly what it happens.

MR. DIBBLEE:  Yeah.  Sure.  Thank you, your Honor.

Good morning again.  Christian Dibblee on behalf of the Defendants in this case.

The two questions, they do go hand in hand to some extent because our interpretation of what the injunction covers -- rather, what events that it covers -- sort of

supports the idea that the events announced 24 hours ahead of time present no feasibility concerns and no issues at all.

The standard press briefings at the White House in the Brady Room given by typically the press secretary, some very -- you know, less commonly by the president, they are announced more than 24 hours ahead of time and the White House is able to get ASL interpretive services for those events.

Now, the 24-hour period also corresponds to a default advance notice period that the White House has and a current contract with a vendor for ASL interpretive services.  And it's our -- it's our position that that is a bright-line standard that is easily administrable and will not create issues where the president wishes to speak less than 24 hours ahead of time.  And he cannot do so because the White House has yet to locate and identify an ASL interpretive services vendor.

I just want to be clear, as we say in our notice, the White House is not saying that it will not provide ASL interpretive services for events that are announced less than 24 hours ahead of time.  What it is saying is that by virtue of fast-moving developments and facts, it will provide, you know, a publicly accessible feed as your order requires as soon as practicable.

Now, I guess I should also say, we did not -- we don't read your preliminary injunction to essentially block the president from engaging in press briefings. And there is, you know, a concern that sometimes because of maybe emergencies that are ongoing in the nation or presidential whim, perhaps, the president might announce a press conference or the press secretary might announce a press briefing with less notice.

And we don't want to be in a situation where they were unable to do that because they cannot find an ASL vendor in time.

THE COURT: So that's helpful. Thank you. I appreciate that.

And let me just address that at the outset just to be very clear: There is nothing that I understand in the injunction that would ever require the president or the other Defendants as well, actually, to delay any news being delivered. Let's just take that off the table. I don't think anything in my injunction says that. That's not really the question in front of us, because I don't think the fact that there might be something that needs to be done on short notice then jumps also to a 24-hour requirement. Right?

And so I'll just say that again: There's nothing in the injunction that would require, you know, news or

anything, any message being delivered, even things that aren't newsworthy, to be delayed in when it is delivered.

I guess, though, I don't understand what you're relying on to say that the injunction has a 24-hour requirement.  I understand you have the prior agreement, which was not in the record.  So I don't think that's a basis for understanding the preliminary injunction.  I don't think it's still in the record or has been provided to the Court or the Plaintiffs.

So let's just make this very simple for a moment so I can understand your position, because this is important to me.  Let's just envision something that everyone in this room would agree is a press briefing.  The press secretary is going to stand up in front of the press in the press briefing room, maybe deliver some remarks on some things that have happened and take questions from the press.  The simplest -- you know, take the narrowest definition of a press briefing.  Everyone agrees it is.

And it is announced 23 hours in advance.  Accept that for me.

Are you arguing that under the preliminary injunction -- I'm not talking about voluntary.  I'm saying under the preliminary injunction, the Administration, the Defendants that have been enjoined, don't have to lift a finger to make a good-faith effort to have ASL there?

MR. DIBBLEE:  We certainly -- the White House certainly would.

THE COURT:  I'm not asking you that question.  I'm asking whether the injunction requires you to.  If not, I want you to point me to where you understand the injunction not to require you to.  If your argument is just based on some agreement that I had never seen that you still haven't provided, tell me that.

MR. DIBBLEE:  Our position is that in that scenario, your injunction would not require the White House to provide ASL interpretive services for --

THE COURT:  Show me where in the injunction you get that conclusion.

MR. DIBBLEE:  Yeah, your Honor.

THE COURT:  You've publicly announced it 23 hours in advance.  And your position is that if that went forward, that press briefing, and there was no ASL interpretation there, it would be perfectly acceptable for you to stand up in a court of law and say, We weren't required to even lift a finger under your injunction.  Point me to the language in my injunction that makes you think that.

MR. DIBBLEE:  There's language in your injunction that does talk about this being sort of a preliminary temporary relief that is meant to maintain the ability of the Plaintiffs to understand press briefings.

And I think that the issue that I have been thinking about is, there are going to be instances where -- I mean, with respect to the sincerity of the Plaintiffs of course and their disability, ASL interpretive services cannot be -- I don't think can be just sort of procured at a moment's notice.

THE COURT:  That's a different argument.  Right?  That's not the argument -- that's not what I just asked you.

I asked you whether you would come into court in that circumstance and say:  Well, we gave 23 hours' notice, not 24, so we didn't have to lift a finger.  You would make that argument?

MR. DIBBLEE:  I think that we would say that your injunction -- I mean, I know that you told me that this is off the table.  But I do think there is an element here that needs to be addressed or that I would rely on in that circumstance, which is that it is possible that there are going to be scenarios where the White House cannot hold a press briefing --

THE COURT:  That's fine.  I guess that's my point.  Right?  Is that the law, even when there's a court order in place as I understand it, doesn't require perfection.  Right?  Even in the most extreme circumstances, I think what it asks for is substantial compliance.

And generally speaking, the question I'm asking

you is whether it would require you to make a good-faith showing.  And those are two different arguments.  Right?

If you announced it 23 hours in advance and there was no ASL interpreter there, there's a difference between coming into a court of law that has enjoined you and saying, You know what, your Honor?  Even though we don't see anything in this injunction that said this, we didn't have to lift a finger.

And there's a difference between that and coming into a court of law and saying, You know what, your Honor?  This was something that we -- a message we needed to deliver.  And here are efforts we made.  It's not that we didn't lift a finger.  It's not that we spent only time calling the press and didn't even try to get an ASL interpreter to come in under an agreement in which we could try and even though past administrations have been able to do that.

You know, there's a difference, right, between the argument you're making right now and the argument that I think you wrote in your submissions.  I want to know which of those you're actually making.

And again, I am taking off the table that anything would have to be delayed, because I think under the law what you'd be required to show is a good-faith effort.  I want to know whether you're saying to me right now that, We don't

have to make a good-faith effort if notice was given 23 hours in advance or we would come in, your Honor, and show you, Look, we tried, but we couldn't.  And you told us on November 13th, and there's nothing in your injunction that says we have to ever delay it.  Right?

Those are two different arguments.  And if you can't see the difference, you can tell me that.  But I think there's a very clear difference, and I want to know which one you're arguing.

MR. DIBBLEE:  Again, I want to be -- please tell me if I'm misunderstanding.  I very well could be.

But in that circumstance, the White House would absolutely make a good-faith effort at substantial compliance.  We would not come in here -- I don't think we would come in here and say, We've done nothing.  We take your order very seriously and the White House has been working to comply with it, to be sure.

THE COURT:  That's all the injunction -- that's all I understand the injunction to require.  So are we satisfied on that?

MR. DIBBLEE:  Your Honor, I do think that there should be some bright-line temporal limitation, because I mean, there are going to be circumstances -- I think these are rare, but I do think they happen -- where the White House decides to hold their press briefing at potentially a

moment's notice, potentially 30 minutes' notice.  And in that circumstance, I don't think it's hyperbole to say that it is possible that the briefing might not be able to go forward because they cannot find an ASL interpreter.

THE COURT:  Well, I think this has kind of proven the point against the position you've raised, which is that you're now saying 30 minutes, not 24 hours.  Right?

MR. DIBBLEE:  Yeah.

THE COURT:  So if you want to -- I think the problem is that there is no indication, certainly not at the time of the preliminary injunction and frankly still today, that there is an impracticability problem that arises at some bright-line point.  If you want to come to me with a record built about what that bright-line point is, you're now arguing 30 minutes, which is very different than 24 hours.  I'll consider that.

On the other hand, you could take great comfort in that, you know, if the Plaintiffs -- when there's clearly an instance in which it's an emergency and ASL wasn't interpreted, if the Plaintiffs want to bring an unreasonable motion to enforce to the Court, you know, I'll tell them if I think it's unreasonable.  Right?

And so I think the type of argument you're making right now is just what the injunction requires.  And Plaintiffs will be careful, I would assume, as well, about

- JA197 -

coming to the Court and making unreasonable arguments too for which they don't have a good-faith basis to make them and some evidence to support it.  And I think you've already said even in that instance you're going to do your best after the fact to make meaningful access available.  Right?

So again, I don't think injunctions ever require perfection.  Right?  What they require is good faith and substantial compliance.  And it sounds to me like you're already committing to do that.  So that's all the injunction requires.

MR. DIBBLEE:  Fair enough.

Can I ask just one question about something you've just said?

THE COURT:  Sure.

MR. DIBBLEE:  You mentioned building a record.  I mean, again, we do -- the White House does have a contract for ASL interpretive services that creates this 24-hour standard that I mentioned.

Now, would that be helpful as part of a record for some kind of practicality limitation or not?

THE COURT:  So it's hard, because I don't think the agreement was in the record.  I don't think it's still in the record.  So you may want to provide it if you want that to be considered in this.  But, you know, it's hard for me to comment on an agreement I haven't seen.

MR. DIBBLEE:  I understand.

THE COURT:  Is your argument that the agreement asks for 24 hours' notice or is it that the agreement does not allow you to request an interpreter if you haven't done so with 24 hours?  The latter seems like it would be an impediment, something that, you know, the government needs to figure out.  Are you saying that the agreement doesn't allow you to request an interpreter in less than 24 hours?

MR. DIBBLEE:  It sets 24 hours as a default period of notice that the White House must give the vendor.  Now, there is language that does acknowledge that the White House might need to ask for a vendor in less time.  And there are various provisions about how that process plays out.

THE COURT:  Can I just ask you, when was this agreement signed?

MR. DIBBLEE:  It was signed in July of this year. I don't have an exact date in July.

THE COURT:  So it's a new agreement?

MR. DIBBLEE:  That's correct.  Yes.

THE COURT:  Is it different from the terms of the prior arrangement?

MR. DIBBLEE:  I admit I do not know.  I know that the White House has contracted with this particular vendor multiple times in the past.  At least that's what the federal procurement database reflects.  I don't know the

answer to how it differs or how it's similar to previous agreements.

THE COURT:  Okay.  Well, I'm not going to tell you that something wouldn't be helpful without having seen it. But what is in the record is that not just past administrations, but state officials have been able to arrange ASL interpretation pretty expediently even in situations as short as some of the ones you've described. And I think what would be relevant is, you know, again, I don't think it's good enough under the injunction to say, We didn't lift a finger even though we had 23 hours.

But to come in and say, Look, your Honor, the agreement we have, the default is 24 hours.  We made efforts.  Here's what we did.  And, look, it just wasn't possible because we had half an hour.  And at the end of the day, you agree with us.  We can't delay getting information out and we're going to make reasonable efforts afterwards.

So I'll let you tell me if there's a context in which you think that's important to bring before the Court. You'd want to submit the agreement so I can see it and whatever other evidence is helpful.  But certainly the Court would be open to considering that type of argument.

MR. DIBBLEE:  Okay.  Thank you.

THE COURT:  So I think we've resolved the 24-hour issue.

Let me give Plaintiffs the chance to speak.  I'm not really interested in starting from the beginning on that question.  You've heard the exchange.  Is there anything more that hasn't been covered there just on the 24-hour aspect?

MR. HOFFMAN:  Yes, your Honor.  I don't intend to rehash.  We obviously agree, I think, with the sentiment in your Honor's questions that there's no 24-hour limit baked into the Court's order or anything like that.

Counsel for the enjoined Defendants said that -- I believe they said all press briefings are given with 24 hours' notice.  Yesterday the press secretary gave a press briefing.  As best we can tell, notice was given the night before, so not quite 23 hours, but otherwise very close to fitting your hypothetical.  No ASL interpreter was provided.

I have a supplemental sort of exhibit here I'd like to hand up just to make part of the record if the Court would permit it.  If the Court -- if it's not necessary, then no need.

THE COURT:  I'll let you decide whether you want to submit it formally in the record.  I'm not going to take it right now.

MR. HOFFMAN:  Okay.

THE COURT:  I mean, I appreciate that.  It's important to have the facts.  I'm focused right now on the

future.  I'm taking Defendants' notice to be a good-faith effort to understand the requirement; and I think I had a back-and-forth with counsel that shows that we're at an understanding.

So I appreciate your focus on yesterday.  I'm focused right now on tomorrow.

MR. HOFFMAN:  I understand.

THE COURT:  That was the purpose of this hearing.

MR. HOFFMAN:  Yes, your Honor.  Understood.

So I think I would just emphasize that the existing contract -- we obviously have not seen -- the existing contract it sounds like now even does contemplate requesting interpreters within 24 hours.

But even aside from any existing contract, your Honor, if -- the fact that there is an existing contract should not dictate what can be done, because there's no evidence --

THE COURT:  I think we've already established in the back-and-forth.  Right?  I didn't say, come show me a contract and it's going to dictate what can be done.

Let me get your reaction.  Do you agree at the end of the day that there are going to be some -- you can think of some circumstances in which it might just be impractical to arrange?  Now, your position will probably be it's fairly easy to arrange ASL interpretation, and you'll have your

evidence.  But you could imagine a situation in which the priority is, we've got to get this message out.  And for whatever reason, we've got a record to show we made a good-faith effort to comply and that you're not -- you know, that that's how it would play out.  Do you agree?

MR. HOFFMAN:  I do agree, your Honor.  And what I would say about that is that yes.  If good-faith efforts are made and there is exigent circumstances, substantial compliance is the standard that the Court has dictated.  That's -- we would be reasonable.  That's the position we would take.

I just want to underscore -- and it's important -- with all this talk of hypotheticals of extreme and exigent circumstances that would maybe compel an extremely short notice by the president to address the nation, those are the very kinds of substantive events that all Americans, including deaf Americans, need to hear.

So the requirement that the Defendants make good-faith substantial efforts and the requirements that they take steps in advance to line up contracts or personnel that can be in place for those types of circumstances is incredibly important.

So if there is a request that some kind of line be drawn, you know, a short time under which they don't need to make efforts, that would undermine sort of the whole point

of this lawsuit and the Court's injunction, is that in exigent emergency circumstances the need for interpretation is all the greater.

But yes, your Honor.  If the Defendants could come in and prove that, despite having taken good-faith efforts to set it up in advance in order to be able to comply with the Court's order, they made all those good-faith efforts, but still couldn't do it, then yes, your Honor.  We would be reasonable on that record.

THE COURT:  Okay.  I think we all have the same understanding of that piece of it.  And I did not hear you say -- and I'm again just going to be clear that an injunction speaking about meaningful access to communications does not require delaying the communications made by the president, the press secretary, any of the enjoined Defendants here.  It is to provide -- you know, to make the good-faith efforts to comply with the injunction for a message that is delivered.  Okay?

MR. HOFFMAN:  Thank you, your Honor.

THE COURT:  Let's move to the second issue, which is the types of events that are covered.

So have the parties -- you can just speak into your mic seated if you like or if you prefer you can came up.  Just make sure it's on.  Have the parties conferred about this question about exactly, you know, what a press

briefing is?  I understand there was, you know, a definition in understanding the order issued by Chief Judge Boasberg and there had been a definition in the prior policy.  Have you all talked about this?

MR. HOFFMAN:  Your Honor, Ian Hoffman again for the Plaintiffs.

After the Defendants, the enjoined Defendants, filed their notice, we reached out to them and requested a call, and we had a call just to try to understand their position.  And Defendants' counsel explained on that call that their position is that the injunction applies only to press briefings formally announced as such that take place in the Brady Briefing Room.

And we disagree with that limitation.  We let that be known to them.

But that's the extent so far of our meeting and conferring.

THE COURT:  Okay.  Let me give Defendants' counsel the opportunity to respond.  Sure.  You can come you on.

MR. DIBBLEE:  Thank you, your Honor.

Mr. Hoffman is correct.  We did chat about this. And I will admit maybe it is possible that some of the language that I used in that call was perhaps a bit loose. But, you know, here today, I do want to stand on what we said in our notice, which is that we interpret press

briefings to mean events -- obviously, fitting the other requirements of your injunction -- the exclusive purpose of which is to give information to the press or to take questions from the press.

Now, it is -- that would obviously encompass events that the press secretary or the -- press briefings they have in the Brady Room.  100 percent.

There are also occasionally presidential press conferences, and we think that those also could be considered press briefings.

Those are sort of the two types of events that we think are press briefings.

THE COURT:  Okay.  I will say, this strikes me as something that you all should be able to work out.  And I'll be upfront:  I'm prepared to be here as long as we need to today for you to work this out.  I'll make arrangements for you all to have a conversation about it.

But let me just lay some foundation for this, because I actually am going to say, I think both parties have points here that are good ones.  I mean, I think Plaintiffs may not like hearing me say this, but I don't think it'll be that much of a surprise based on my order. The record that was built at the PI stage was focused very much on press briefings.  And that's not to say you couldn't have built -- let me take one example that is on the other

side of the spectrum, closer to what Defendants are arguing, but even further on the spectrum -- which is, you know, a speech delivered with no one else in the Oval Office by the president to the public.

I don't think you all focused on that.  And that's not to say that you couldn't in another case or another claim or, you know, you might try to argue it's part of this one.  But you didn't.  I don't think there was a record built on that.  You did build a record on press briefings and engagement with the press.

Now, on the other side of it, I think -- and, you know, you might help me understand this if you want to come up for a moment.  The definition of "the exclusive purpose of which is for the press secretary to provide information to the press or take questions," most of that sounds pretty good.  But "the exclusive purpose of which" is the one that jumps out.

I mean, let me just give you a timely hypothetical.  I don't know if this is exactly how it always takes place.  But let's just say two weeks from now the president or the press secretary, you know, have plenty of time, have a press conference where they're planning to do everything that looks like an ordinary press briefing in the press briefing room, but an additional purpose is to pardon a turkey.  Nothing to do with the press.  But they're going

to pardon the turkey, which I believe has happened in past years.

Now, I don't know if that's "the exclusive purpose of which is to provide information to the press and take questions from the press."  Are you saying because they're pardoning a turkey they then turn to, you know, discussions of presidential priorities and important current events, economic issues, healthcare issues, that that's not covered?

MR. DIBBLEE:  It's a good hypothetical.  I guess, you know, I think -- I do, though, think that would be a type of event that would not be covered.

And before, you know, you kind of sort of bristle at that, because I understand what I just said is a little bit strange, but it is true that the president schedules many events over the course of the weeks and months where the primary purpose -- in fact, like the announced purpose of the event -- is something that does not involve the press.  It could be a bill signing; it could be a speech, as you mentioned; last week, there was a swearing-in of the ambassador from India.  That was a ceremony, and then the press came in.  At those events, there are press in the room, obviously, to take pictures and do that sort of stuff.  The president can choose whether or not to take questions from the press at those events.

And again, your Honor, I read your injunction to

be saying:  All right.  Press briefings are included.  But then your injunction also distinguishes press briefings from, I think, other press conferences and related events.

Now, I have to admit, I don't know what that phrase means if it doesn't include these events that -- you know, where press might be present, the president might take questions.  But the exclusive purpose -- I mean, the main announced purpose of that event is not about interactions with the press, contrasted with events that are on the White House's schedule that are announced as press briefings or press conferences.

THE COURT:  Is your argument -- I mean, you've got the turkey there in the press briefing room and they're pardoning the turkey and then turning to issues of the day.  It's the general press briefing conference.  Is your argument that they don't have to provide ASL interpretation for the pardoning of the turkey, but do for the engagement with the press in the press conference?  Or is that actually covering the exact kind of important issues that affect people's lives?

Or is your argument that because there was this other purpose, right, that's in the room, that there doesn't need to be interpretation for any of it?

Feel free to take a moment if you want to consult.  It's important that you guys get this right.

MS. KELLEHER:  One moment, your Honor.

(Defense counsel confer privately.)

MS. KELLEHER:  Sorry, your Honor.  This is Diane Kelleher from the Department of Justice.  I work with Mr. Dibblee and Ms. Hedges.

I think if the event is scheduled as a conference to take questions from the press and the turkey pardoning is sort of like a plus factor because it's around the Thanksgiving holidays, I think we would view it as covered by the injunction, even though -- because the portion of the event where we are taking questions is obviously to answer those questions.  And I don't think we would -- we would essentially, sort of like with the Antideficiency Act and excepted and unexcepted work, I think we would just provide the ASL interpretations for the whole event as long as there was going to be that back-and-forth.

Because presumably, if the focus of the event was just the turkey pardoning, they wouldn't -- they would just let the press take photos and then necessarily be there to take questions and have the press secretary on hand.

THE COURT:  Then I think we do away with the "exclusive purpose" part.  What we're really focused on is the event -- about providing remarks and engaging with the press.  Is the press invited to come and ask questions?

MS. KELLEHER:  What I think what we're trying to

distinguish from, like Mr. Dibblee said, is the event where the president is swearing in the ambassador from India. People come in to take pictures. Maybe he answers a few questions. Maybe as the president walks down the hall people scream questions, and he might answer them.

The problem is there's all these interactions with the press that are just ongoing all day every day, every hour at the White House. But they're not within the zone of events that were kind of scheduled and organized around the principle of answering and fielding questions from the press.

So that's -- I mean, I think the reason we used "exclusive use" is because even if the press secretary comes in with, like, candy for reporters on Halloween or -- you know, that's why we're there. And it might have some kind of circumstances related to whatever is going on. But it was organized, and the press secretary is showing up to do that.

THE COURT: Yes. That's helpful. And I do think it's important for you all to have a clear line because we need to know when it is required and when it's not.

MS. KELLEHER: Right.

THE COURT: Can you help me on the example you gave about swearing in the ambassador? How is that announced? Is it announced as a press conference? Is it

- JA211 -

announced as -- is it announced that there will be questions taken afterwards?  You kind of suggested that what you are worried about is kind of the impromptu questions.  I understand that concern.

MS. KELLEHER:  I would let Mr. Dibblee answer that.  But I believe the White House does have ways of distinguishing those.  But I'll let him speak to that.

Thank you, your Honor.

THE COURT:  Obviously, not to say that this would happen for any improper purpose.  But, you know, it can't just turn on the classification by the Defendants as a press briefing versus press conference on the calendar.  That's not -- also not a workable line.  And so -- but help me with that question about how it would be kind of announced and billed if it were the signing -- the swearing-in of the ambassador.

MR. DIBBLEE:  My understanding from the White House communications office is that these events are announced as remarks or as the swearing-in or bill signing. There is no announcement, per se, that press questions will be taken or that that is the reason -- that's the reason why press are there.

I do think, as maybe has been mentioned, you know, the press is invited to some of these events.  Not all of them, but some of them.

But the announcement that goes onto the daily digest, I think, is the name that the White House communications office gives for the president's schedule, the announcement is just remarks in the Oval Office.  And they then denote whether press are invited or not.

THE COURT:  And I know the prior policy, I believe, defined press briefings to include any event open to the press.  Presumably, that would have swept in more.  Is that your understanding?  It would have -- if the press were invited, even if it wasn't to ask questions, would there have been ASL interpretation on hand?  Is that how the policy worked under your understanding?

MR. DIBBLEE:  That's my understanding.  I admit it's maybe not the most educated understanding.  But that's my understanding.

THE COURT:  And that's also the concern you're expressing at the moment, to understand whether you're actually required to do that?

MR. DIBBLEE:  Yes.  Yes.  I think that's right.

THE COURT:  Okay.  And then if I recall from Chief Judge Boasberg's order, the definition, I think, is including the vice president, which I haven't, because I didn't think that that was developed, at least at this stage.  But if we were to use his definition as I understand it, it would be for our purposes an event conducted by the

president or press secretary with advance notice, which we've already talked about.

Then I think he defines it based on kind of the location and the communications capturing. So he says it takes place on the White House -- or on the grounds of the White House or any federal agency and that is captured by the White House communications standard.

How would that map on to your concerns or what are the -- what are your kind of concerns with that standard?

MR. DIBBLEE: Sure. I think that our concern is -- with accepting his definition is with the location aspect. As I'm sure you know, there are lots of interactions between the president and the press, almost all of which happen in the White House. There are obviously some that do not, but there are some that do.

Again, we read your order as saying that the Plaintiffs showed entitlement to preliminarily relief as it pertains to press briefings. And we've come up with -- the standard that we've proposed is one that really does hem in the events that are on the president's schedule or the press secretary's schedule where they are there to talk to the press and to hear from the press. That's, you know, the point of the event. And that's made clear as far as how it's announced.

And so I think that our concern is that if you

were to take Judge Boasberg's definition and cover under the preliminary injunction any event that happens in the White House where the press interacts with the president, then I do think that we are in some of similar -- the similar territory that I've talked about before, you know.  Is the president sort of unable to talk to the press because an ASL interpreter is not available?  You know, your order provides for simultaneous feeds.  And as I just said, the White House communications office cannot predict with real reasonable certainty when the president will talk to the press and when he won't.

THE COURT:  Isn't that handled by the part that's talking about, you know, "that are previously announced and captured by White House communications channels"?  I didn't understand his order to capture impromptu questions answered by the president in any way in his order limiting the president's ability to answer questions.

MR. DIBBLEE:  Well, I take your point.  But you can have events that are previously announced at which the president then decides to take questions.  So it's the latter part, I think, that creates some heartburn for us, because the president might speak to the press at those events; he might not.  And we don't want to be in a position where on pain of contempt of Court the White House essentially has to guess prophylactically whether ASL

interpretation is required or not.

That's why I think that the standard -- the standard we've proposed is any consistent with the limited -- what I read as the limited reach of your order. Obviously, you'll tell me if I'm wrong. But it also ensures that the injunction is read to specifically describe the events at which the White House must have ASL interpretation present or risk your wrath as far as contempt of Court is concerned.

THE COURT: Well, I appreciate the desire to have clarity as to whether it's required. It is important. And I do kind of take you all to be walking back from the "exclusive purpose" component at least a little bit. You can see how that language could be challenging from the perspective of having clarity as to when it's required or not, which is important on both sides for the Administration and also for the Plaintiffs, so they can know when they can reasonably and not reasonably suggest that there's been a problem here. That's what we're trying to avoid.

Let me see if I have anything else for you and then I want to hear from the Plaintiffs.

But I do think this is probably going to end with me recessing for you all to have a conversation because I do think neither of the positions exactly as articulated, you know, are likely to be ones that are -- that provide that

level of clarity.

Let me hear from Plaintiffs really quick on this.

MR. HOFFMAN:  Thank you again, your Honor.

Plaintiffs agree that "the exclusive purpose" is not workable for the reasons we stated in our papers and in the questions that your Honor has posed.

And I'm happy to meet and confer with Defendants' counsel to try to see if we can reach agreement or at least narrow the kinds of ranges of issues in dispute.  Plaintiffs were certainly trying to be reasonable here.  And, you know, we recognize circumstances where there's impromptu gaggles of reporters, and we're not trying to play any gotcha games or anything like that with the Court's order.

At the same time, there are events that are previously announced addressing substantive issues to the press where remarks are given by the president, questions are taken at length from the press, but they are styled as an announcement or styled as a remark or the president is sitting at the Oval Office or he's standing in the Roosevelt Room.

And those are substantively precisely the types of events that are discussed, we submit, in your Honor's opinion that should be encompassed here.

And just because they are -- they don't have the words "press briefing" or "press conference" in front of

them, it's clearly the nature of that event and the purpose of that event is to give those remarks to the press.

I'll just point out for the record, too, I went back and looked in preparation for this hearing. Since the president took office in January of this year, he has given two press briefings only. The press secretary has given plenty of press briefings. But in terms of what is styled as press briefings standing up in the Brady Briefing Room, it's been two. One was on January 30th, I believe, and one was on June 27th, before even argument in this Court. He hasn't given a press briefing styled as such in those narrow parameters since I was last before you, your Honor.

But he has addressed the press in very formal, preannounced ways, addressing very substantive issues and taking lengthy questions from the press in a back-and-forth way that should be covered by the injunction.

I'm happy to meet and confer with opposing counsel to -- because we submit that those should be --

THE COURT: Right. So a few points.

I mean, one, you all do have the burden here. So it's not just enough to say, you know, The president hasn't had a lot of press briefings, so it should cover other stuff.

The second thing, though, that it's important to make clear is we are in this preliminary posture, as you all

know.  And so, you know, you all will have the opportunity to develop the record further, presumably, on other things. None of this is -- so the question is what you've established to date.

And it sounds like there's an agreement, which you all can start with when you start talking, about at least the traditional, you know, press briefing in the press briefing room will be covered; and that's true whether a turkey is present or not.

I don't know -- what's the Plaintiffs' position on the swearing-in of an ambassador?  Are you saying that if the ambassador is sworn in and questions are taken at the end of that, it's covered?

MR. HOFFMAN:  I think I would -- I want to understand a little bit more about how those are announced. I heard the submissions from the Defendants.

But my understanding is that there's announcements made to the White House press pool.  I'm not sure if those are the same types of communications that my opposing counsel is referring to that are coming out of the White House communications office.

But I would want to -- if a signing -- sorry.  If a swearing-in ceremony indicates, for example, there will be time for Q & A with the press afterwards, we would submit that that should be covered here, because it is an

intentional announcement that there's going to be engagement with the press about a given issue.

I mean, look, we can think of hypothetical examples where of course Plaintiffs would submit that the Rehabilitation Act requires this.

But for purposes of the preliminary injunction, if there's a brief engagement with the press with the president and a sports team that has won a championship that is shaking hands, no questions, walking off the stage, I'm not sure that we would come in here and vigorously argue to your Honor that that should be part of this preliminary injunction. But we may argue it should be part of the Court's final order.

So I'm happy to try to engage with opposing counsel to find a --

THE COURT: Well, it sounds like maybe you have a starting point. You just talked about how it would depend on whether it was announced with an indication that you'd be taking questions from the press. And I think Defendants can probably give you a little bit of that answer and maybe even started to answer it when they were up here.

And I understand your point that it seems too far on the other side of the spectrum to say it's just what's in the press briefing room if you could achieve the exact same concerns and engagement with the press, invitation to the

press, answering questions, and it just takes place in the Oval Office.  But I also heard maybe some understanding of that from the Defendants.

So why don't we do this:  I'm prepared to recess. I'll be here as long as we need today for you all to come and propose something to me.  I think that's the first step here, because you all are much better positioned to at least in the first instance figure out what your clients' interests are and how this could meaningfully be -- clarity can be provided to both sides.

I'll say that I've kind of laid out where I think each party is a little bit in excess at least at this stage in the proceedings.

So we can find -- if you all need space to confer, we can find you a space, I'm confident, in the courtroom. You know, at a minimum, we could use the jury room.  You can talk to my courtroom deputy when we recess.

Is there anything else I need from you all -- to know from you all at the moment?

MR. HOFFMAN:  I don't think so, your Honor.  I appreciate the flexibility.

THE COURT:  Let me hear from counsel for the Defendant.

MR. DIBBLEE:  Your Honor, I want to be very quick. I understand that your focus is on the future and not the

past.

I also -- I do want to say, though, for the press briefing yesterday, there actually was ASL interpretive services provided.  I don't think I've given this information to Mr. Hoffman yet.  But the White House did create a YouTube subchannel called ASL White House that has the video of Ms. Leavitt as the press secretary and press members asking questions along with -- it's hard to see from where you are maybe, but along with interpretive services sort of frame in frame.

So I just want to make sure that you know that the White House is complying, is complying at the very least when it comes to these scheduled press briefings.

I also think you should know that the original interpreter backed out at almost the eleventh hour yesterday and the White House had to scramble to find another interpreter who was able to provide these services.

So we are not trying to be cavalier about any of this.  I just want to make sure that that's on the record.

THE COURT:  That's a helpful clarification, given that it was added into the record by the Plaintiffs.  So I appreciate you providing that.  But we are focused on tomorrow, not yesterday, anyways.

Okay.  All right.  I will recess.  I will let you all -- my courtroom deputy will let you know how to get in

touch when you're ready for me to come back.  I'm here.
I've got hearings all afternoon.  I'll make time for this
when you're ready.  Okay?

MR. DIBBLEE:  Thank you.

THE COURT:  We can adjourn.

MS. KELLEHER:  Your Honor, I just don't want you
or opposing counsel to be sort of waiting, because the
difficulty with this is -- we're happy to meet and confer.
But we'll obviously have to talk to folks at the White
House.  So I was wondering if it might be better if we meet
and confer wherever we want to and then, like, file a status
report or something with the Court at the end of the day.
Would that acceptable?

THE COURT:  I think that's why I'm recessing, so
you have time to go talk to whoever you need.  I'll be ready
when you need me today.  But I do want you all to make an
effort to confer and then make an effort to contact the
White House and then come back and tell me what you guys
have agreed upon.

It seems like you're not as far as you might think
from one another at least as it relates to this preliminary
stage in the PI.  And then you all should be able to get
ahold of your clients and figure out what will work.

And I think also you've shown that you have a
pretty deep understanding of the situation and what is

feasible and what's not feasible.

MS. KELLEHER:  Understood.  Thank you, your Honor.

THE COURT:  We can go ahead and recess.  Thank you.

(Proceedings recessed.)

**CERTIFICATE**


I, LISA EDWARDS, RDR, CRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings produced to the best of my ability.


Dated this 17th day of November, 2025.


/s/ Lisa Edwards, RDR, CRR
Official Court Reporter
United States District Court for the
  District of Columbia
333 Constitution Avenue, Northwest
Washington, D.C. 20001
(202) 354-3269

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


NATIONAL ASSOCIATION                  )
OF THE DEAF, ET AL.,                  )
                                      )
        Plaintiffs,                   )
                                      )      CV No. 25-01683
                                      )      Washington, D.C.
     vs.                              )      November 13, 2025
                                      )      1:33 p.m.
DONALD J. TRUMP, ET AL.,              )
                                      )
        Defendants.                   )
_____)


TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
BEFORE THE HONORABLE AMIR H. ALI
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:          Ian S. Hoffman
                             Robert Katerberg
                             Alexander E. Sirio
                             ARNOLD & PORTER
                             KAYE SCHOLER LLP
                             601 Massachusetts Ave, NW
                             Washington, D.C. 20001
                             (202) 942-6406
                             Email:
                             ian.hoffman@arnoldporter.com

                             Alexander Sklaroff Van Hook
                             NATIONAL ASSOCIATION
                             OF THE DEAF
                             Law and Advocacy Center
                             8630 Fenton Street
                             Suite 202
                             Silver Spring, MD 20910
                             (484) 312-2001
                             Email:
                             alexander.vanhook@nad.org

For the Defendant:           Christian Dibblee
                             Diane Kelleher
                             DOJ
                             FEDERAL PROGRAMS BRANCH –
                             Civil Division
                             1100 L Street, NW
                             Washington, D.C. 20005
                             (202) 353-5980
                             Email:
                             christian.r.dibblee@usdoj.gov

3

```
APPEARANCES CONTINUED:

Court Reporter:              William P. Zaremba
                             Registered Merit Reporter
                             Certified Realtime Reporter
                             Official Court Reporter
                             E. Barrett Prettyman CH
                             333 Constitution Avenue, NW
                             Washington, D.C. 20001
                             (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription
```

3

4

PROCEEDINGS

COURTROOM DEPUTY:  We're back on the record in Civil Action 25-1683, National Association of the Deaf, et al., versus Donald J. Trump, et al.

May I have counsel identify yourselves again for the record, please, beginning with plaintiffs' counsel.

MR. HOFFMAN:  Sure.

For the plaintiffs, Ian Hoffman with the law firm of Arnold & Porter.

Here with my colleagues, Mr. Rob Katerberg, and also Alex Sirio, both from Arnold & Porter.

And Ms. Brittany Shrader from the National Association of the Deaf.

THE COURT:  Good to see you all, and welcome to the new member of your team joining us.

MR. DIBBLEE:  And for the defendants, Christian Dibblee.

And with me at counsel's table is Diane Kelleher, both from the Civil Division of the Department of Justice.

THE COURT:  All right.  Good afternoon.  Good to be with you all.

Where are we?

MR. DIBBLEE:  Thank you, Your Honor.

So during the recess, the two sides went to their sort of corners of the room and came back together, at which

plaintiffs' counsel suggested language that could be added to your injunction to clarify their meaning of, I believe the phrase is, "publicly scheduled White House press briefings."  This is on page 24 -- excuse me, 25 of your order.

We took that proposal back to our clients and talked with our clients at the White House, and they -- I mean, they have authorized us just to say that they think that our test, our exclusive purpose test, is consistent with your order, and the proposal that the plaintiffs suggested is not workable for them for a variety of reasons that I'm happy to explain if you like.

But the bottom line is that we did not -- we were unable to reach agreement on how to resolve this current dispute.

THE COURT:  Okay.

Maybe I could get a little bit more context on what plaintiffs' proposal is and then I can hear the response.

I think that would be helpful to hear.

I think what would also be helpful to hear is where there is agreement and where there is disagreement, to the extent you can get more specific about that.

And I don't -- it doesn't matter to me who starts.

Why don't I hear plaintiffs' proposal.

MR. HOFFMAN:  Your Honor, just to pick up where you left off, I do think -- and defense counsel can also clarify and confirm -- I do think there's agreement that what the parties would consider traditional announced as press briefings that occur in the White House, you know, count to qualify as to the President and the Press Secretary.

I believe defendants have also stated that things labeled as "press conferences" would also count for purposes of injunction order.

THE COURT:  You said "things like."

MR. HOFFMAN:  Things like as "press conferences."

THE COURT:  Labeled as press conferences.  Okay.

MR. HOFFMAN:  So things that are designated and announced as press conferences and press briefings would count, in defendants' view.

We think those, obviously, should be included, and we think the Court should clarify its order to include more than just those exclusive things.  We appreciate the Court's opportunity to let us meet and confer and flexibility.

Here's our proposal.  And we have added one little extra element to it that we haven't yet run past opposing counsel, but they have rejected the first part as well so I don't think it will make a difference.

Our proposal would be to keep the paragraph that's

in the Court's opinion on page 25 as is, and then add a sentence or a couple sentences that defines the term "White House press briefings."

And I'm happy to submit this to the Court, but I'll read it out for the record.

"For purposes of this order, the term 'White House press briefing,' is an event where it is reasonably expected that the President or Press Secretary would provide information directly to the press or take questions from the press."

That's what we proposed and defendants did not agree to.

But for further clarification in response to some of Your Honor's questions and some of the concerns that defendants had raised, we'd be willing to add an additional sentence.

"Notwithstanding the forgoing, 'White House press briefing' does not include purely ceremonial events, including without limitation, greeting ambassadors, recognizing sports teams, or bestowing awards."

And, Your Honor, just a bit of how we got to the proposal, we did our best, obviously, to keep the Court's language from your opinion from November 4th.

We also took elements from Judge Boasberg's 2020 order, in particular, his -- where the Court in 2020 was

trying to define which briefings were within scope, and the scope of that injunction was briefings about the coronavirus pandemic.

The Court ordered that a qualifying press briefing was one at which the coronavirus pandemic is reasonably expected to be addressed.

And that's the injunction that went into effect in the fall of 2020, where the coronavirus pandemic was reasonably expected to be addressed.

And, Your Honor, I handled that case and ordered it in front of Judge Boasberg. And I remember a not identical but a similar sort of debate happening, well, what if it's a press briefing about topic A but somebody yells out a question about the coronavirus pandemic.

And this was the Court's attempt to say, where it's reasonably expected that it would -- the coronavirus pandemic would be addressed at a briefing, that was within scope.

The sentence we added, Your Honor, about carving out ceremonial events, again, it's, of course, without prejudice that we think the Rehab Act covers all such events and interpreters should be provided and we would reserve rights to seek that at a later time and as the final -- in terms of the final injunction in this case.

However, the examples Your Honor gave about a

turkey or that I raised about harboring a sports team or greeting an ambassador, those things might be -- the press might be invited to those, and there might be some remarks made by the President or the Press Secretary at those types of events.

But we're trying to honor Your Honor's suggestions of trying to make this specific scope and tied to the types of things that we sought in our briefing, and we think this is a good place to land.

I don't know if the defendants are going to have any sort of counterproposal to this; my understanding is that they don't.

I would just submit, Your Honor, as I submitted earlier, if it's not this language, I think language or clarification that makes clear that events like the ones that we identified in our response filed on Monday would be included.

And I think the easiest one in my mind is like the event about Tylenol and autism.  You know, the President and the White House called that press -- I don't know exactly how far in advance, but they called it in advance.  It was at the White House.  Not in the press briefing room.  But it was, I think, in the Roosevelt Room.  There was a podium.  The President gave prepared remarks.  Other health officials gave prepared remarks.  It was consequential.  And then they

gave maybe 25 minutes' worth of questions.

That was not designated or announced as a "press briefing."  It was designated as an "announcement."  But in sum and substance, it tracks exactly with the kinds of press briefings addressing the press from the President of the United States about, you know, issues of health care and medicine, and both of those things are addressed in your order.

Whatever clarification comes from the Court, we think those types of events would need to be included, and the language we gave is our best attempt to do that, consistent with the judge's opinion and also trying to borrow from elements of words that they used in their submission, like "provide information to the press or take questions from the press" was from their submission last week on Friday.

We added the word "directly."  "Provide information directly to the press or take questions from the press," to try to, again, narrow this into something that is consistent with what we sought in the Court's order.

THE COURT:  All right.

A couple of questions.

One, I assume, at a minimum, you agree, at least based on this case, I'm not saying any other case or claim you might file, but this case at this stage, we're talking

about events, at a minimum, where press are invited.

You're not arguing that there's a requirement where there's no press present?

MR. HOFFMAN:  Yes, Your Honor.

THE COURT:  Okay.

And it sounds like you're focused on those types of topics like health, economy, where there might be in a discussion, and I'm not saying these are the right words, but of kind of Presidential priorities and current events, as the record showed was done at press briefings, and so you're trying to capture that.  Is that accurate?

MR. HOFFMAN:  We at least want to capture those things, Your Honor.

I understand, you know, Your Honor's opinion to -- the November 4th opinion to try not to carve out specific, subject matters.

THE COURT:  Right.

No, I understand that.

MR. HOFFMAN:  So we didn't try to wade into that.

But generally speaking, yes, it sounds accurate, what you're stating.

THE COURT:  So something like a bill signing, the press might be invited for that.

I don't know whether you call it ceremonial or not; may take questions.

That's not the example you used.  You used an example of coming to speak about a policy matter in the White House and kind of stand at the podium and take questions.

But where does the bill signing fall?

MR. HOFFMAN:  So that's one --

THE COURT:  Again, you're not waiving anything.  I'm not talking about a different case.

MR. HOFFMAN:  Understood.

THE COURT:  Just right now on this record that you've built.

MR. HOFFMAN:  So I think there can be multiple types of bill signings.

There can be what I would consider sort of a photo opportunity, where someone -- you know, where the President is surrounded by folks, signs the bill, says I'm glad we could get this done, shake hands, and leaves.

There's also a bill signing that could be, I'm going to sit down and talk to the press that I've convened about the importance of this policy, take questions about it, and sign it and do the photo op.

And, you know, again -- so there could be different types of bill signings.

And we tried to capture this by saying "purely ceremonial events" that wouldn't otherwise be designed to

address the press or take questions from the press.

So if the White House plans the event such that it's going to be a photo op and a shake, you know, that's one thing. If it's going to be a substantive address about the bill and anticipated reasonably expected.

THE COURT: And I think when you spoke earlier today, you had mentioned something like that is announced with the plan to have the press there and take questions from the press. That's a little different than what you're proposing now.

Things like the policy discussion from this past week that you mentioned, when those are announced, do they mention one way or the other whether press are invited and whether there's questions from the press?

MR. HOFFMAN: That's a very fair question Your Honor.

I don't have enough facts to know, on a broad base, how those things are typically announced or not. And so I have seen sort of a little bit of anecdotal evidence, but I feel a little bit over my skis trying to craft an injunction around that, both because I just -- there just isn't enough evidence in the record to determine like how things are announced and what words, keywords are used to trigger certain events from the press.

I also have a little bit of a fear that could lead

to the defendants just being able to control the injunction as to if I use certain magic words in the press -- I'm not saying there's any intention, of course.  But if we use certain magic words in the announcement versus other -- or omit those words from the announcement, then that would be able to control whether an interpreter is required. So I've avoided that.

THE COURT:  Okay.

All right.  Let me hear from counsel for the defendants.

Why don't we start, when you come up, with the easy part hopefully, which is what you all agree upon.

And I heard kind of the traditional announced press briefings in the White House and things labeled as "press conferences."  That is within what the parties agree upon?

MR. DIBBLEE:  Yes, it is.

THE COURT:  Okay.

All right.  And then tell me -- I took you to kind of be adhering to the exclusive purpose, articulation. Maybe it would be helpful for you to tell me more and to the extent you have an elaboration different from the discussion I had earlier with you and your co-counsel.

But I'm also interested in specifically kind of what your concerns are with what I heard from the

plaintiffs' counsel.

MR. DIBBLEE:  Sure.

I think that the main concern that we have is perhaps defined by the colloquy that was just shown, which is purely "ceremonial events."

I mean, I'll be honest with you, standing here right now, I can't think of a good way to distinguish a purely ceremonial event from whatever event that should be encompassed in the language plaintiffs suggested.

And, you know, as I mentioned earlier, a clear standard is needed for the White House to comply with your injunction, which it wants to do.  But it also, you know, should not be forced to guess, essentially, well, does this event meet the language that plaintiffs have suggested.

So, you know, that still is a major concern.

And I think that I have the same concern about the limitation where it is reasonably expected that the President and the Press Secretary will provide information directly to the press.

You know, again, "reasonably expected," I think I know what that means.  But truth be told, that could change with the President's whim, that could change by President, it could change by who happens to be up there with him. I think there's a lot of pitfalls here for purposes of the White House communications office, and the end result will

be essentially that they need to provide ASL services any time the President gets up in front of the press corps.

And respectfully, Judge Ali, I don't read your order as providing relief that is that broad.

I think that your order as written makes a very clear distinction between press briefings, which has an accepted meaning in the White House, and the White House communications office knows what those are and they know that they'll provide ASL services for those in compliance with your order.

We've added these press conferences because I think we don't want to necessarily be hypertechnical about this.  There are instances where the President stands in front of the press corps.  And he's there for one reason only:  To answer their questions.

But the concern, I guess, that I have is that I read your order as providing more narrow relief, and noting that the plaintiffs had not shown relief as to some of these "related events."

And I think that, quite frankly, some of these suggestions about added language are now straying into the related-events territory that I think is accepted from your order as it was originally composed.

THE COURT:  That's helpful.

So can you help me understand, what is typically

17

labeled as a "press conference" versus an "announcement?"

Roughly speaking, do you understand what the distinction there is?

MR. DIBBLEE:  Yeah, it's a very fair question.

I will give you the answer that I have sort of right here right now, which is, when the President's schedule goes out, it just says "Announcement in the Oval Office on X topic."  That's it.

And then there are going to be other events that are announced as press conferences by the President. I don't have an example of one for you at the tip of my fingerprints right now, but I have been told that those do happen.  And there are obviously some instances where he's in the briefing room, but you're not asking about those.

But these other events, these remarks, or I think one of the examples in the plaintiffs' filing is -- was entitled "The message to America" about the bombing of the Iranian nuclear facility.  My understanding is that those events are announced just as they are; they provide a time and place.

And, yeah, it is true that they might say something along the lines of "credentialed media is here," or probably "credentialed media is here" and -- but that is all that they say.

And, you know, I think, again, I am more than

happy to try to find more information about that.

But I would also suggest that that is what discovery is for.  And we're early in the case, and, you know, we can have that process play out as this case continues.

THE COURT:  Okay.  That's helpful.

And then any other submissions you wanted to make, including if there's anything you wanted to add to the -- to understand the exclusive-purpose proposal --

MR. DIBBLEE:  Sure.

THE COURT:  -- or any other proposal you want to make that might be -- that the government views as one that would -- that it would invite.

MR. DIBBLEE:  Yeah, give me just a second if you don't mind.

THE COURT:  Yep.

MR. DIBBLEE:  I mean, you know, just one final point.

Your order requires simultaneous ASL services. Again, the White House takes that very seriously and very much wants to provide it.

That is a complicating factor as far as the clarity that we are seeking here, which is that, you know, simult- -- I mean, one reason why a clear standard is really needed is because the White House cannot retroactively go

back and add ASL in under the terms of your order.  It must be done simultaneous.

And I mean, again, all of my comments earlier are still on the table.

You know, we intend to make extremely good-faith efforts to provide that for briefings that are announced with a short time frame.

But I just want to emphasize that the way that the order has been written does require some really enhanced clarity, because otherwise, the White House will be left guessing.

And I do worry that we could be back in front of you before too long with a contempt discussion about, you know, where the White House just happened to guess wrong, and I would not want that.

THE COURT:  I appreciate that and I'm taking this as an effort to get clarity so you know how to comply. That's important and makes sense.

MR. DIBBLEE:  Thank you, Judge.

THE COURT:  Can I hear from plaintiffs' counsel.

I want to ask you two questions and then looks like maybe you have something you want to say and then tell you where I'm at.

My first question is, you just heard the submission about simultaneous transmission.  You're not

20

asking for any change in that regard with respect to the preliminary injunction, are you, to accommodate something different?

MR. HOFFMAN:  That's correct.

I'm not sure I totally followed what the statement was about, but I'm not asking for clarification for any --

THE COURT:  That's fine.  I just wanted to clarify that.

Let me just say, in the interest of being clear and fair to the government, it is accurate that the order requires that.

But coming back to our discussion before, right; one, it doesn't prevent -- in the instance in which perfect compliance isn't possible, it, of course, doesn't prevent the government from having ASL after the fact.  And I understood you said that the government would endeavor to do that in any instance like this.  And that would, of course, be relevant to showing a good-faith effort to comply after the fact when it's not possible to do so in advance.  I just wanted to make clear that it doesn't, of course, prevent the government from doing that even though it's not what is required by the order.

And then the second question I have for you is, in your response, you suggested that there could be some expedited discovery that would be helpful.  I think that was

21

in regards to the two issues.  We've obviously already spoken through that there's no 24-hour requirement, and what's required is compliance under the applicable legal standards.

Is there some sort of discovery that you think would help resolve this particular issue about which events qualify, or is it just an instance where kind of can see the type of events that happen in the White House.  There's obviously some formality into how they're labeled.  But there's also no science to it; there's got to be flexibility in how the Executive communicates its messages.  It's not going to all fit in neatly into buckets.  And they need clarity as to when they have to do it for this preliminary posture.

So what discovery, if anything, would be helpful on this topic?  And if the answer is "none," that's fine, but I want to know.

MR. HOFFMAN:  Your Honor, I think what comes to mind most is what I alluded to when I was up here a moment ago:  The mechanics of how the White House, and different facets at the White House, announce what -- preannounce what the President is going to be doing.

And I understand that there's communications that go from some White House entity to the White House press pool.

And I don't know if that's the same thing as the White House communication agency outputs that opposing counsel is referring to and daily agendas.

So if the Court was going to hinge the order on the particulars of the mechanics of how things go out, then I just need a little -- I would want a little more understanding and clarity on that.  But looking to counsel table, I don't have anything else particular in mind.

And, again, it was obviously an alternative request, Your Honor.  I would much prefer that we get clarity along the lines that we seek now.

But if the Court is not inclined to give it, then I would at least want to seek some expedited discovery on those kind of topics.

But I think it would be, at least sitting here today, focused on how the announcements of the President and the Press Secretary's upcoming events, how those are made?

THE COURT:  Okay.

All right.  Any other submissions you wanted to make in response?

MR. HOFFMAN:  Just one more clarification in terms of what I think we all agree upon based on both what's been said in the papers, in court, and also, I think, in our communications today and previously.

I think the parties all agree that announced

events by the President and the Press Secretary announced as press briefings or press conferences are within the scope.

We've talked a lot about the Brady Briefing Room just sort of as an example. I don't think that the defendants' position is that a press briefing that occurs elsewhere on the White House grounds, for example, or in the Rose Garden or another room is outside of scope. That obviously can be confirmed.

But if there's a press briefing announced as such but it doesn't occur in the Brady Briefing Room, I just want to be sure that the record is clear that there's agreement on that.

THE COURT: Okay.

MR. DIBBLEE: Your Honor, I can confirm that it is our position that if a press briefing or a press conference, as labeled as such, occurs outside the Brady Room, then it is covered by the term "press briefing" in your injunction.

THE COURT: Okay. Appreciate that.

This has been helpful.

I appreciate the parties' efforts to come to agreement even though it didn't pan out.

You know, we've resolved one issue, I think, clearly today on the 24-hour requirement, and I think we all understand exactly what the injunction means there.

Let me ask the parties to proceed on an

24

interpretation of the injunction that includes what the parties have agreed upon here, which I understand to be things labeled as a "press briefing" and a "press conference" that take place on the White House grounds as required by the injunction.  To the extent that I add any elaboration to it, I'll do so separately either at a future hearing or in a written order.

But I do think it's important for two things to be the case.  One is that the government have a clear indication of when they have to do this, because I want to be sensitive to all the parties and being clear when the injunction is applicable and when it's coming close to being violated and not stem unnecessary litigation or supervision that I haven't intended, and so that's why I want to take it under advisement to the extent that it extends to anything beyond that.

And the second thing that I think is important is that we are at a preliminary phase, and I do have to ground this in the evidence that the plaintiffs have put forward, which, you know, did focus on press briefings specifically.  And, again, that's not to say that there couldn't be a case under this act or law or otherwise in other context, but that's the litigation and the claims that the plaintiffs brought and supported with evidence.

And obviously this question is kind of going to

what exactly is a press briefing, but I want to make sure that anything that's awarded is specifically grounded in the evidence in the case.

And so for now, that's the clarity I want to give and the way I want everyone to operate.

And is there anything else for us to discuss today beyond that?

Yeah, go ahead.

MR. HOFFMAN:  Yes, Your Honor.

Again, Ian Hoffman for the plaintiffs.

Just to note that we are aware and tracking that I believe we have a deadline of tomorrow to meet and confer and deliver a Status Report on next steps in terms of the nature of the case.

THE COURT:  Do you all want some more time?

MR. HOFFMAN:  Yes, Your Honor.  Thank you. You've read my mind.

THE COURT:  How much time do you want?

MR. DIBBLEE:  Another week would be amenable to us.

THE COURT:  Another week's fine.

So why don't we have the next Status Report due November 20th.  Is that okay?

MR. HOFFMAN:  21st, Your Honor.

MS. KELLEHER:  20th.

Today's the 13th.

MR. HOFFMAN:  I think it's due tomorrow.

THE COURT:  Thank you.  Yes, you're right.

Seven days.

I might have said seven days from today so I think you're all right and I was being confusing.

Let's say the 21st, a week from tomorrow, okay?

MR. HOFFMAN:  Thanks very much, Your Honor.

THE COURT:  All right.

Appreciate all of your efforts today.

We can go ahead and -- I'm staying on the bench so we can go ahead and adjourn this case.  Thanks.

(Proceedings concluded at 1:59 p.m.)

C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date:__November 18, 2025____    _____

William P. Zaremba, RMR, CRR

| | | | |
|---|---|---|---|
| COURTROOM DEPUTY: [1]   4/2 | **5** | **agreement [5]**   5/14 5/22 6/3 23/11 23/21 | 19/16 23/18 23/20 26/10 |
| MR. DIBBLEE: [11] 4/16 4/23 14/17 15/2 17/4 18/10 18/14 18/17 19/19 23/14 25/19 | **5980 [1]**   2/16 | **ahead [3]**   25/8 26/11 26/12 | **are [28]** |
| | **6** | **aided [1]**   3/7 | **arguing [1]**   11/2 |
| | **601 [1]**   2/4 | **al [4]**   1/3 1/7 4/4 4/4 | **ARNOLD [3]**   2/3 4/9 4/11 |
| MR. HOFFMAN: [19] 4/7 6/1 6/12 6/14 | **6406 [1]**   2/5 | **Alex [1]**   4/11 | **arnoldporter.com [1]** 2/6 |
| 11/4 11/12 11/19 12/6 12/9 12/12 | **8** | **Alexander [2]**   2/3 2/7 | **around [1]**   13/21 |
| 13/15 20/4 21/18 22/21 25/9 25/16 | **8630 [1]**   2/9 | **alexander.vanhook [1]** 2/12 | **articulation [1]** 14/20 |
| 25/24 26/2 26/8 | **9** | **ALI [2]**   1/10 16/3 | **as [38]** |
| MS. KELLEHER: [1] 25/25 | **942-6406 [1]**   2/5 | **all [20]**   4/14 4/20 4/21 8/21 10/21 14/9 | **ask [2]**   19/21 23/25 |
| THE COURT: [29] | **A** | 14/12 14/19 17/24 19/3 21/12 22/19 | **asking [3]**   17/14 20/1 20/6 |
| **'** | **able [2]**   14/1 14/6 | 22/22 22/25 23/23 24/11 25/15 26/6 | **ASL [5]**   16/1 16/9 18/19 19/1 20/15 |
| **'White [2]**   7/6 7/17 | **about [26]**   5/23 8/2 8/13 8/14 8/19 8/25 | 26/9 26/10 | **ASSOCIATION [4]**   1/3 2/8 4/3 4/13 |
| **'White House [2]**   7/6 7/17 | 9/1 9/19 10/6 11/1 12/2 12/8 12/20 | **alluded [1]**   21/19 | **assume [1]**   10/23 |
| **0** | 12/21 13/4 15/16 16/12 16/21 17/14 | **along [2]**   17/22 22/11 | **attempt [2]**   8/15 10/11 |
| **01683 [1]**   1/5 | 17/17 18/1 19/13 19/25 20/6 21/6 23/3 | **already [1]**   21/1 | **authorized [1]**   5/8 |
| **1** | **above [1]**   27/4 | **also [14]**   4/11 5/21 6/2 6/8 6/9 7/24 | **autism [1]**   9/19 |
| **1100 [1]**   2/15 | **above-titled [1]** 27/4 | 10/12 12/18 13/25 14/24 15/12 18/2 | **Ave [1]**   2/4 |
| **13 [1]**   1/6 | **accepted [2]**   16/7 16/22 | 21/10 22/23 | **Avenue [1]**   3/4 |
| **13th [1]**   26/1 | **accommodate [1]**   20/2 | **alternative [1]**   22/9 | **avoided [1]**   14/7 |
| **1683 [1]**   4/3 | **accurate [3]**   11/11 11/20 20/10 | **am [1]**   17/25 | **awarded [1]**   25/2 |
| **18 [1]**   27/7 | **act [2]**   8/21 24/22 | **ambassador [1]**   9/2 | **awards [1]**   7/20 |
| **1:33 [1]**   1/6 | **Action [1]**   4/3 | **ambassadors [1]**   7/19 | **aware [1]**   25/11 |
| **1:59 [1]**   26/13 | **add [5]**   7/1 7/15 18/8 19/1 24/5 | **amenable [1]**   25/19 | **B** |
| **2** | **added [6]**   5/1 6/21 8/19 10/17 16/11 16/21 | **America [1]**   17/17 | **back [6]**   4/2 4/25 5/6 19/1 19/12 20/12 |
| **20001 [2]**   2/5 3/5 | **additional [1]**   7/15 | **AMIR [1]**   1/10 | **Barrett [1]**   3/4 |
| **20005 [1]**   2/16 | **address [2]**   13/1 13/4 | **anecdotal [1]**   13/19 | **base [1]**   13/18 |
| **2001 [1]**   2/11 | **addressed [4]**   8/6 8/9 8/17 10/7 | **announce [1]**   21/21 | **based [2]**   10/24 22/22 |
| **202 [4]**   2/5 2/10 2/16 3/5 | **addressing [1]**   10/5 | **announced [14]**   6/4 6/15 10/2 13/7 13/12 | **be [54]** |
| **2020 [3]**   7/24 7/25 8/8 | **adhering [1]**   14/20 | 13/18 13/23 14/13 17/10 17/19 19/6 | **because [5]**   13/21 16/11 18/25 19/10 24/10 |
| **2025 [2]**   1/6 27/7 | **adjourn [1]**   26/12 | 22/25 23/1 23/9 | **been [4]**   17/12 19/9 22/22 23/19 |
| **20910 [1]**   2/10 | **advance [3]**   9/21 9/21 20/19 | **announcement [5]** 10/3 14/4 14/5 17/1 17/7 | **before [3]**   1/10 19/13 20/12 |
| **20th [2]**   25/23 25/25 | **advisement [1]**   24/15 | **announcements [1]** 22/16 | **beginning [1]**   4/6 |
| **21st [2]**   25/24 26/7 | **Advocacy [1]**   2/9 | **another [3]**   23/7 25/19 25/21 | **being [5]**   14/1 20/9 24/11 24/12 26/6 |
| **24 [1]**   5/4 | **after [2]**   20/15 20/18 | **answer [3]**   16/15 17/5 21/16 | **believe [3]**   5/2 6/8 25/12 |
| **24-hour [2]**   21/2 23/23 | **afternoon [1]**   4/20 | **anticipated [1]**   13/5 | **bench [1]**   26/11 |
| **25 [3]**   5/4 7/1 10/1 | **again [12]**   4/5 8/20 10/19 12/7 12/22 | **any [11]**   9/11 10/24 14/3 16/1 18/7 18/11 | **best [2]**   7/22 10/11 |
| **25-01683 [1]**   1/5 | 15/20 17/25 18/20 19/3 22/9 24/21 25/10 | 20/1 20/6 20/17 22/19 24/5 | **bestowing [1]**   7/20 |
| **25-1683 [1]**   4/3 | **agency [1]**   22/2 | **anything [7]**   12/7 18/8 21/15 22/8 24/15 25/2 25/6 | **between [1]**   16/6 |
| **3** | **agendas [1]**   22/3 | | **beyond [2]**   24/16 25/7 |
| **312-2001 [1]**   2/11 | **ago [1]**   21/20 | **APPEARANCES [2]**   1/12 2/20 | **bill [7]**   11/22 12/5 12/13 12/16 12/18 12/23 13/5 |
| **3249 [1]**   3/5 | **agree [6]**   7/12 10/23 14/12 14/15 22/22 22/25 | **applicable [2]**   21/3 24/12 | **bit [5]**   5/17 7/21 13/19 13/20 13/25 |
| **333 [1]**   3/4 | **agreed [1]**   24/2 | **appreciate [5]**   6/19 | **Boasberg [1]**   8/11 |
| **353-5980 [1]**   2/16 | | | **Boasberg's [1]**   7/24 |
| **354-3249 [1]**   3/5 | | | **bombing [1]**   17/17 |
| **4** | | | |
| **484 [1]**   2/11 | | | |
| **4th [2]**   7/23 11/15 | | | |

**B**

borrow [1]   10/13
both [5]   4/11 4/19
  10/7 13/21 22/22
bottom [1]   5/13
Brady [3]   23/3 23/10
  23/16
BRANCH [1]   2/14
briefing [15]   8/4
  8/13 8/17 9/8 9/22
  10/3 17/14 23/3 23/5
  23/9 23/10 23/15
  23/17 24/3 25/1
briefing' [1]   7/18
briefing,' [1]   7/7
briefings [13]   5/4
  6/5 6/15 7/3 8/1 8/2
  10/5 11/10 14/14
  16/6 19/6 23/2 24/20
Brittany [1]   4/12
broad [2]   13/17 16/4
brought [1]   24/24
buckets [1]   21/12
built [1]   12/11

**C**

call [1]   11/24
called [2]   9/20 9/21
came [1]   4/25
can [13]   5/18 5/23
  6/2 12/12 12/14
  16/25 18/4 19/20
  21/7 23/8 23/14
  26/11 26/12
can't [1]   15/7
cannot [1]   18/25
capture [3]   11/11
  11/12 12/24
care [1]   10/6
carve [1]   11/15
carving [1]   8/19
case [13]   8/10 8/24
  10/24 10/24 10/25
  12/8 18/3 18/4 24/9
  24/21 25/3 25/14
  26/12
Center [1]   2/9
ceremonial [6]   7/18
  8/20 11/24 12/25
  15/5 15/8
certain [3]   13/24
  14/2 14/4
Certified [1]   3/3
certify [1]   27/2
CH [1]   3/4
change [4]   15/21
  15/22 15/23 20/1
Christian [2]   2/13
  4/17
Christian Dibblee [1]
  4/17
christian.r.dibblee
  [1]   2/17
Civil [3]   2/15 4/3
  4/19

claim [1]   10/24
claims [1]   24/23
clarification [5]
  7/13 9/15 10/9 20/6
  22/21
clarify [4]   5/2 6/3
  6/18 20/7
clarity [7]   18/23
  19/10 19/17 21/13
  22/7 22/11 25/4
clear [9]   9/15 15/10
  16/6 18/24 20/9
  20/20 23/11 24/9
  24/11
clearly [1]   23/23
clients [2]   5/6 5/7
close [1]   24/12
co [1]   14/23
co-counsel [1]   14/23
colleagues [1]   4/10
colloquy [1]   15/4
COLUMBIA [1]   1/1
come [2]   14/11 23/20
comes [2]   10/9 21/18
coming [3]   12/2
  20/12 24/12
comments [1]   19/3
communicates [1]
  21/11
communication [1]
  22/2
communications [4]
  15/25 16/8 21/23
  22/24
compliance [3]   16/9
  20/14 21/3
complicating [1]
  18/22
comply [3]   15/11
  19/17 20/18
composed [1]   16/23
computer [1]   3/7
computer-aided [1]
  3/7
concern [4]   15/3
  15/15 15/16 16/16
concerns [2]   7/14
  14/25
concluded [1]   26/13
confer [2]   6/20
  25/12
conference [4]   1/10
  17/1 23/15 24/4
conferences [8]   6/9
  6/12 6/13 6/15 14/15
  16/11 17/10 23/2
confirm [2]   6/3
  23/14
confirmed [1]   23/8
confusing [1]   26/6
consequential [1]
  9/25
consider [2]   6/4
  12/14
consistent [3]   5/9

claim [1] 10/24   10/12 10/20
Constitution [1]   3/4
contempt [1]   19/13
context [2]   5/17
  24/22
CONTINUED [1]   3/1
continues [1]   18/5
control [2]   14/1
  14/6
convened [1]   12/20
corners [1]   4/25
coronavirus [5]   8/2
  8/5 8/8 8/14 8/16
corps [2]   16/2 16/14
correct [2]   20/4
  27/3
could [11]   5/1 5/17
  12/17 12/18 12/22
  13/25 15/21 15/22
  15/23 19/12 20/24
couldn't [1]   24/21
counsel [11]   4/5 4/6
  5/1 6/2 6/23 14/9
  14/23 15/1 19/20
  22/3 22/7
counsel's [1]   4/18
count [3]   6/6 6/9
  6/16
counterproposal [1]
  9/11
couple [2]   7/2 10/22
course [5]   8/20 14/3
  20/14 20/17 20/20
court [11]   1/1 3/2
  3/3 6/18 7/4 7/25
  8/4 10/9 22/4 22/12
  22/23
Court's [5]   6/19 7/1
  7/22 8/15 10/20
covered [1]   23/17
covers [1]   8/21
craft [1]   13/20
credentialed [2]
  17/22 17/23
CRR [2]   27/2 27/8
current [2]   5/14
  11/9
CV [1]   1/5

**D**

D.C [4]   1/5 2/5 2/16
  3/5
daily [1]   22/3
Date [1]   27/7
days [2]   26/4 26/5
deadline [1]   25/12
DEAF [4]   1/3 2/8 4/3
  4/13
debate [1]   8/12
Defendant [1]   2/13
defendants [8]   1/8
  4/16 6/8 7/11 7/15
  9/10 14/1 14/10
defendants' [2]   6/16
  23/5

defense [1]   6/2
define [1]   8/1
defined [1]   15/4
defines [1]   7/2
deliver [1]   25/13
Department [1]   4/19
designated [3]   6/14
  10/2 10/3
designed [1]   12/25
determine [1]   13/22
Diane [2]   2/13 4/18
Dibblee [2]   2/13
  4/17
did [4]   5/13 7/11
  7/22 24/20
didn't [2]   11/19
  23/21
difference [1]   6/24
different [6]   12/8
  12/23 13/9 14/22
  20/3 21/20
directly [4]   7/9
  10/17 10/18 15/19
disagreement [1]
  5/22
discovery [5]   18/3
  20/25 21/5 21/15
  22/13
discuss [1]   25/6
discussion [5]   11/8
  13/11 14/22 19/13
  20/12
dispute [1]   5/15
distinction [2]   16/6
  17/3
distinguish [1]   15/7
DISTRICT [3]   1/1 1/1
  1/11
Division [2]   2/15
  4/19
do [18]   6/2 6/3
  10/11 12/21 13/12
  15/12 17/2 17/12
  19/12 20/16 20/19
  21/13 24/6 24/8
  24/10 24/18 25/15
  25/18
Do you [1]   25/15
does [4]   7/18 12/5
  15/13 19/9
doesn't [5]   5/24
  20/13 20/14 20/20
  23/10
doing [2]   20/21
  21/22
DOJ [1]   2/14
don't [17]   5/24 5/25
  6/24 9/10 9/12 9/20
  11/24 13/17 14/11
  16/3 16/12 17/11
  18/15 22/1 22/8 23/4
  25/22
DONALD [2]   1/7 4/4
Donald J. Trump [1]
  4/4

**D**

done [3]   11/10 12/17 19/2
down [1]   12/19
due [2]   25/22 26/2
during [1]   4/24

**E**

earlier [5]   9/14 13/6 14/23 15/10 19/3
early [1]   18/3
easiest [1]   9/18
easy [1]   14/12
economy [1]   11/7
effect [1]   8/7
effort [2]   19/17 20/18
efforts [3]   19/6 23/20 26/10
either [1]   24/6
elaboration [2]   14/22 24/6
element [1]   6/22
elements [2]   7/24 10/13
else [2]   22/8 25/6
elsewhere [1]   23/6
Email [3]   2/6 2/11 2/17
emphasize [1]   19/8
encompassed [1]   15/9
end [1]   15/25
endeavor [1]   20/16
enhanced [1]   19/9
enough [2]   13/17 13/22
entitled [1]   17/17
entity [1]   21/24
essentially [2]   15/13 16/1
et [4]   1/3 1/7 4/4 4/4
et al [1]   4/4
even [2]   20/21 23/21
event [6]   7/7 9/19 13/2 15/8 15/8 15/14
events [20]   7/18 8/20 8/21 9/5 9/15 10/10 11/1 11/9 12/25 13/24 15/5 16/19 16/22 17/9 17/15 17/19 21/6 21/8 22/17 23/1
everyone [1]   25/5
evidence [5]   13/19 13/22 24/19 24/24 25/3
exactly [4]   9/20 10/4 23/24 25/1
example [5]   12/1 12/2 17/11 23/4 23/6
examples [2]   8/25 17/16
exclusive [4]   5/9

6/19 14/20 18/9
exclusive-purpose [1]   18/9
excuse [1]   5/4
Executive [1]   21/11
expected [7]   7/7 8/6 8/9 8/16 13/5 15/17 15/20
expedited [2]   20/25 22/13
explain [1]   5/12
extends [1]   24/15
extent [4]   5/23 14/22 24/5 24/15
extra [1]   6/22
extremely [1]   19/5

**F**

facets [1]   21/21
facility [1]   17/18
fact [2]   20/15 20/19
factor [1]   18/22
facts [1]   13/17
fair [3]   13/15 17/4 20/10
faith [2]   19/5 20/18
fall [2]   8/8 12/5
far [2]   9/21 18/22
fear [1]   13/25
FEDERAL [1]   2/14
feel [1]   13/20
Fenton [1]   2/9
file [1]   10/25
filed [1]   9/16
filing [1]   17/16
final [3]   8/23 8/24 18/17
find [1]   18/1
fine [3]   20/7 21/16 25/21
fingerprints [1]   17/12
firm [1]   4/8
first [2]   6/23 19/24
fit [1]   21/12
flexibility [2]   6/20 21/10
focus [1]   24/20
focused [2]   11/6 22/16
folks [1]   12/16
followed [1]   20/5
forced [1]   15/13
foregoing [1]   27/3
forgoing [1]   7/17
formality [1]   21/9
forward [1]   24/19
frame [1]   19/7
frankly [1]   16/20
Friday [1]   10/16
front [4]   8/11 16/2 16/14 19/12
further [1]   7/13
future [1]   24/6

**G**

Garden [1]   23/7
gave [5]   8/25 9/24 9/25 10/1 10/11
generally [1]   11/20
get [5]   5/17 5/23 12/17 19/17 22/10
gets [1]   16/2
give [4]   17/5 18/14 22/12 25/4
glad [1]   12/16
go [6]   18/25 21/24 22/5 25/8 26/11 26/12
go ahead [2]   25/8 26/11
goes [1]   17/7
going [9]   9/10 12/19 13/3 13/4 17/9 21/12 21/22 22/4 24/25
good [7]   4/14 4/20 4/20 9/9 15/7 19/5 20/18
good-faith [2]   19/5 20/18
got [2]   7/21 21/10
government [6]   18/12 20/10 20/15 20/16 20/21 24/9
greeting [2]   7/19 9/2
ground [1]   24/18
grounded [1]   25/2
grounds [2]   23/6 24/4
guess [3]   15/13 16/16 19/14
guessing [1]   19/11

**H**

had [4]   7/15 13/7 14/23 16/18
handled [1]   8/10
hands [1]   12/17
happen [2]   17/13 21/8
happened [1]   19/14
happening [1]   8/12
happens [1]   15/23
happy [3]   5/12 7/4 18/1
harboring [1]   9/1
has [3]   16/6 19/9 23/19
have [31]
haven't [2]   6/22 24/14
having [1]   20/15
he's [2]   16/14 17/13
health [3]   9/24 10/6 11/7
hear [6]   5/18 5/20 5/21 5/25 14/9 19/20
heard [3]   14/13 14/25 19/24

hearing [1]   24/7
help [2]   16/25 21/6
helpful [8]   5/20 5/21 14/21 16/24 18/6 20/25 21/15 23/19
here [10]   4/10 15/6 15/24 17/6 17/22 17/23 18/23 21/19 22/15 24/2
Here's [1]   6/21
him [1]   15/23
hinge [1]   22/4
his [1]   7/25
Hoffman [3]   2/2 4/8 25/10
honest [1]   15/6
honor [18]   4/23 6/1 7/21 8/10 8/19 8/25 9/6 9/13 11/4 11/13 13/16 21/18 22/10 23/14 25/9 25/16 25/24 26/8
Honor's [3]   7/14 9/6 11/14
HONORABLE [1]   1/10
Hook [1]   2/7
hopefully [1]   14/12
hour [2]   21/2 23/23
House [27]   5/3 5/7 6/5 7/3 7/6 7/17 9/20 9/22 12/3 13/2 14/14 15/11 15/25 16/7 16/7 18/20 18/25 19/10 19/14 21/8 21/20 21/21 21/24 21/24 22/2 23/6 24/4
how [13]   5/14 7/21 9/21 13/18 13/22 19/17 21/9 21/11 21/20 22/5 22/16 22/17 25/18
However [1]   8/25
hypertechnical [1]   16/12

**I**

I also [1]   13/25
I am [1]   17/25
I assume [1]   10/23
I believe [3]   5/2 6/8 25/12
I can [2]   5/18 23/14
I don't [5]   5/24 6/24 9/10 16/3 23/4
I don't have [2]   17/11 22/8
I have [6]   4/5 13/19 16/16 17/5 17/12 20/23
I just [2]   13/21 22/6
I mean [4]   5/8 15/6 18/17 18/24

Case 1:25-cv-01683-AHA    Document 37    Filed 11/20/25    Page 31 of 34

**I**

**I might [1]**   26/5
**I remember [1]**   8/11
**I think [25]**   5/20
5/21 9/14 9/18 12/12
13/6 15/3 15/16
15/20 15/24 16/5
16/22 17/15 17/25
20/25 21/18 22/15
22/22 22/23 22/25
23/22 23/23 24/17
26/2 26/5
**I understand [2]**
11/14 24/2
**I want [4]**   24/10
24/14 25/1 25/5
**I was [1]**   26/6
**I will [1]**   17/5
**I would [7]**   9/13
12/14 18/2 19/15
22/6 22/10 22/13
**I'll [3]**   7/5 15/6
24/6
**I'm [14]**   5/12 7/4
10/24 11/8 12/8
12/16 12/19 14/2
14/24 19/16 19/23
20/5 20/6 26/11
**I'm going [1]**   12/19
**I'm not [2]**   10/24
12/8
**I'm not sure [1]**
20/5
**I've [2]**   12/19 14/7
**Ian [3]**   2/2 4/8
25/10
**ian.hoffman [1]**   2/6
**identical [1]**   8/12
**identified [1]**   9/16
**identify [1]**   4/5
**importance [1]**   12/20
**important [3]**   19/18
24/8 24/17
**inclined [1]**   22/12
**include [2]**   6/18
7/18
**included [3]**   6/17
9/17 10/10
**includes [1]**   24/1
**including [2]**   7/19
18/8
**indication [1]**   24/10
**information [5]**   7/9
10/14 10/18 15/18
18/1
**injunction [14]**   5/2
6/10 8/2 8/7 8/24
13/21 14/1 15/12
20/2 23/17 23/24
24/1 24/5 24/12
**instance [3]**   20/13
20/17 21/7
**instances [2]**   16/13
17/13
**intend [1]**   19/5

**intended [1]**   24/14
**intention [1]**   14/3
**interest [1]**   20/9
**interested [1]**   14/24
**interpretation [1]**
24/1
**interpreter [1]**   14/6
**interpreters [1]**
8/22
**invite [1]**   18/13
**invited [4]**   9/3 11/1
11/23 13/13
**Iranian [1]**   17/18
**is [76]**
**Is there [1]**   21/5
**isn't [2]**   13/22
20/14
**issue [2]**   21/6 23/22
**issues [2]**   10/6 21/1
**it [48]**
**it would be [2]**
14/21 22/15
**it's [13]**   8/13 8/16
8/20 9/14 13/3 13/4
17/4 20/19 20/21
21/11 24/8 24/12
26/2
**its [2]**   6/18 21/11

**J**

**J. [1]**   4/4
**joining [1]**   4/15
**JUDGE [5]**   1/11 7/24
8/11 16/3 19/19
**Judge Boasberg [1]**
8/11
**Judge Boasberg's [1]**
7/24
**judge's [1]**   10/12
**just [26]**   5/8 6/1
6/19 7/21 9/13 12/10
13/21 13/21 14/1
15/4 17/7 17/19
18/14 18/17 19/8
19/14 19/24 20/7
20/9 20/19 21/7 22/6
22/21 23/4 23/10
25/11
**Justice [1]**   4/19

**K**

**Katerberg [2]**   2/2
4/10
**KAYE [1]**   2/4
**keep [2]**   6/25 7/22
**Kelleher [2]**   2/13
4/18
**keywords [1]**   13/23
**kind [8]**   11/9 12/3
14/13 14/19 14/24
21/7 22/14 24/25
**kinds [1]**   10/4
**know [28]**
**knows [1]**   16/8

**L**

**labeled [7]**   6/9 6/13
14/14 17/1 21/9
23/16 24/3
**land [1]**   9/9
**language [8]**   5/1
7/23 9/14 9/14 10/11
15/9 15/14 16/21
**last [1]**   10/15
**later [1]**   8/23
**law [3]**   2/9 4/8
24/22
**lead [1]**   13/25
**least [4]**   10/23
11/12 22/13 22/15
**leaves [1]**   12/17
**left [2]**   6/2 19/10
**legal [1]**   21/3
**let [4]**   6/20 14/9
20/9 23/25
**Let's [1]**   26/7
**like [14]**   5/12 6/11
6/12 9/15 9/18 10/14
11/6 11/7 11/22 13/7
13/11 13/22 19/22
20/17
**limitation [2]**   7/19
15/17
**line [1]**   5/13
**lines [2]**   17/22
22/11
**litigation [2]**   24/13
24/23
**little [8]**   5/17 6/21
13/9 13/19 13/20
13/25 22/6 22/6
**LLP [1]**   2/4
**long [1]**   19/13
**looking [1]**   22/7
**looks [1]**   19/21
**lot [2]**   15/24 23/3

**M**

**made [2]**   9/4 22/17
**magic [2]**   14/2 14/4
**main [1]**   15/3
**major [1]**   15/15
**make [8]**   6/24 9/7
18/7 18/12 19/5
20/20 22/20 25/1
**makes [3]**   9/15 16/5
19/18
**Massachusetts [1]**
2/4
**matter [3]**   5/24 12/2
27/4
**matters [1]**   11/16
**may [2]**   4/5 11/25
**maybe [4]**   5/17 10/1
14/21 19/22
**MD [1]**   2/10
**me [10]**   4/18 5/4
5/24 14/9 14/19
14/21 16/25 18/14
20/9 23/25

**mean [5]**   5/8 15/6
18/17 18/24 19/3
**meaning [2]**   5/2 16/7
**means [2]**   15/21
23/24
**mechanical [1]**   3/7
**mechanics [2]**   21/20
22/5
**media [2]**   17/22
17/23
**medicine [1]**   10/7
**meet [3]**   6/20 15/14
25/12
**member [1]**   4/15
**mention [1]**   13/13
**mentioned [3]**   13/7
13/12 15/10
**Merit [1]**   3/2
**message [1]**   17/17
**messages [1]**   21/11
**might [9]**   9/2 9/3
9/3 10/25 11/7 11/23
17/21 18/12 26/5
**mind [5]**   9/18 18/15
21/19 22/8 25/17
**minimum [2]**   10/23
11/1
**minutes' [1]**   10/1
**moment [1]**   21/19
**Monday [1]**   9/16
**more [10]**   5/17 5/23
6/18 14/21 16/17
17/25 18/1 22/6
22/21 25/15
**most [1]**   21/19
**Mr. [1]**   4/10
**Mr. Rob [1]**   4/10
**Ms [1]**   4/12
**much [4]**   18/21 22/10
25/18 26/8
**multiple [1]**   12/12
**must [1]**   19/1
**my [9]**   4/10 9/11
9/18 13/20 17/11
17/18 19/3 19/24
25/17

**N**

**nad.org [1]**   2/12
**narrow [2]**   10/19
16/17
**NATIONAL [4]**   1/3 2/8
4/3 4/12
**nature [1]**   25/14
**neatly [1]**   21/12
**necessarily [1]**
16/12
**need [4]**   10/10 16/1
21/12 22/6
**needed [2]**   15/11
18/25
**new [1]**   4/15
**next [2]**   25/13 25/22
**no [5]**   1/5 11/3
11/18 21/2 21/10

Case 1:25-cv-01683-AHA    Document 37    Filed 11/20/25    Page 32 of 34

**N**

none [1]    21/16
not [31]
note [1]    25/11
noting [1]    16/17
Notwithstanding [1]    7/17
November [5]    1/6
7/23 11/15 25/23
27/7
now [8]    12/10 13/10
15/7 16/21 17/6
17/12 22/11 25/4
nuclear [1]    17/18
NW [3]    2/4 2/15 3/4

**O**

obviously [8]    6/17
7/22 17/13 21/1 21/9
22/9 23/8 24/25
occur [2]    6/5 23/10
occurs [2]    23/5
23/16
off [1]    6/2
office [3]    15/25
16/8 17/8
Official [1]    3/3
officials [1]    9/24
okay [11]    5/16 6/13
11/5 14/8 14/18 18/6
22/18 23/13 23/18
25/23 26/7
omit [1]    14/5
one [17]    6/21 8/5
9/18 10/23 12/6 13/4
13/13 16/14 17/11
17/16 18/12 18/17
18/24 20/13 22/21
23/22 24/9
ones [1]    9/15
only [1]    16/15
op [2]    12/21 13/3
operate [1]    25/5
opinion [5]    7/1 7/23
10/12 11/14 11/15
opportunity [2]    6/20
12/15
opposing [2]    6/22
22/2
order [20]    5/5 5/10
6/10 6/18 7/6 7/25
10/8 10/20 16/4 16/5
16/10 16/17 16/23
18/19 19/1 19/9
20/10 20/22 22/4
24/7
ordered [2]    8/4 8/10
originally [1]    16/23
other [10]    9/24
10/24 13/13 14/4
17/9 17/15 18/7
18/11 22/19 24/22
otherwise [3]    12/25
19/10 24/22
our [13]    5/6 5/7 5/9

3/9 6/21 6/25 7/22
9/8 9/16 10/11 20/12
22/23 23/15
out [8]    7/5 8/14
8/20 11/15 17/7 18/4
22/5 23/21
outputs [1]    22/2
outside [2]    23/7
23/16
Oval [1]    17/7
over [1]    13/20

**P**

p.m [2]    1/6 26/13
page [2]    5/4 7/1
pan [1]    23/21
pandemic [5]    8/3 8/5
8/8 8/14 8/17
papers [1]    22/23
paragraph [1]    6/25
part [2]    6/23 14/12
particular [3]    7/25
21/6 22/8
particulars [1]    22/5
parties [6]    6/4
14/15 22/25 23/25
24/2 24/11
parties' [1]    23/20
past [2]    6/22 13/11
perfect [1]    20/13
perhaps [1]    15/4
phase [1]    24/18
photo [3]    12/14
12/21 13/3
phrase [1]    5/3
pick [1]    6/1
pitfalls [1]    15/24
place [3]    9/9 17/20
24/4
plaintiffs [10]    1/4
2/2 4/8 5/10 15/9
15/14 16/18 24/19
24/23 25/10
plaintiffs' [7]    4/6
5/1 5/18 5/25 15/1
17/16 19/20
plan [1]    13/8
plans [1]    13/2
play [1]    18/4
please [1]    4/6
podium [2]    9/23 12/3
point [1]    18/18
policy [3]    12/2
12/20 13/11
pool [1]    21/25
PORTER [3]    2/3 4/9
4/11
position [2]    23/5
23/15
possible [2]    20/14
20/19
posture [1]    21/14
preannounce [1]
21/21
prefer [1]    22/10

prejudice [1]    8/21
preliminary [3]    20/2
21/13 24/18
prepared [2]    9/24
9/25
present [1]    11/3
President [15]    6/6
7/8 9/4 9/19 9/24
10/5 12/15 15/18
15/22 16/2 16/13
17/10 21/22 22/16
23/1
President's [2]
15/22 17/6
Presidential [1]
11/9
press [64]
Prettyman [1]    3/4
prevent [3]    20/13
20/14 20/20
previously [1]    22/24
priorities [1]    11/9
probably [1]    17/23
proceed [1]    23/25
proceedings [4]    1/10
3/7 26/13 27/4
process [1]    18/4
produced [1]    3/7
PROGRAMS [1]    2/14
proposal [9]    5/6
5/10 5/18 5/25 6/21
6/25 7/22 18/9 18/11
proposed [1]    7/11
proposing [1]    13/10
provide [9]    7/8
10/14 10/17 15/18
16/1 16/9 17/19
18/21 19/6
provided [1]    8/22
providing [2]    16/4
16/17
publicly [1]    5/3
purely [4]    7/18
12/24 15/5 15/8
purpose [3]    5/9
14/20 18/9
purposes [3]    6/9 7/6
15/24
put [1]    24/19

**Q**

qualify [2]    6/6 21/7
qualifying [1]    8/4
question [6]    8/14
13/15 17/4 19/24
20/23 24/25
questions [14]    7/9
7/14 10/1 10/15
10/18 10/22 11/25
12/4 12/20 13/1 13/8
13/14 16/15 19/21
quite [1]    16/20

**R**

raised [2]    7/15 9/1

reach [1]    5/14
read [4]    7/5 16/3
16/17 25/17
really [2]    18/24
19/9
Realtime [1]    3/3
reason [2]    16/14
18/24
reasonably [7]    7/7
8/5 8/9 8/16 13/5
15/17 15/20
reasons [1]    5/11
recess [1]    4/24
recognizing [1]    7/20
record [8]    4/2 4/6
7/5 11/10 12/10
13/22 23/11 27/3
recorded [1]    3/7
referring [1]    22/3
regard [1]    20/1
regards [1]    21/1
Registered [1]    3/2
Rehab [1]    8/21
rejected [1]    6/23
related [2]    16/19
16/22
related-events [1]
16/22
relevant [1]    20/18
relief [3]    16/4
16/17 16/18
remarks [4]    9/3 9/24
9/25 17/15
remember [1]    8/11
Report [2]    25/13
25/22
Reporter [4]    3/2 3/2
3/3 3/3
request [1]    22/10
require [1]    19/9
required [4]    14/6
20/22 21/3 24/5
requirement [3]    11/2
21/2 23/23
requires [2]    18/19
20/11
reserve [1]    8/22
resolve [2]    5/14
21/6
resolved [1]    23/22
respect [1]    20/1
respectfully [1]
16/3
response [5]    5/19
7/13 9/16 20/24
22/20
result [1]    15/25
retroactively [1]
18/25
right [16]    4/20
10/21 11/8 11/17
12/10 14/9 14/19
15/7 17/6 17/6 17/12
20/12 22/19 26/3
26/6 26/9

Case 1:25-cv-01683-AHA   Document 37   Filed 11/20/25   Page 33 of 34

**R**

rights [1]   8/23
RMR [2]   27/2 27/8
Rob [1]   4/10
Robert [1]   2/2
room [8]   4/25 9/22
 9/23 17/14 23/3 23/7
 23/10 23/16
Roosevelt [1]   9/23
Rose [1]   23/7
Roughly [1]   17/2
run [1]   6/22

**S**

said [4]   6/11 20/16
 22/23 26/5
same [2]   15/16 22/1
say [8]   5/8 8/15
 17/21 17/24 19/22
 20/9 24/21 26/7
saying [4]   10/24
 11/8 12/24 14/3
says [2]   12/16 17/7
schedule [1]   17/7
scheduled [1]   5/3
SCHOLER [1]   2/4
science [1]   21/10
scope [6]   8/1 8/2
 8/18 9/7 23/2 23/7
second [3]   18/14
 20/23 24/17
Secretary [5]   6/7
 7/8 9/4 15/18 23/1
Secretary's [1]
 22/17
see [2]   4/14 21/7
seek [3]   8/23 22/11
 22/13
seeking [1]   18/23
seen [1]   13/19
sense [1]   19/18
sensitive [1]   24/11
sentence [3]   7/2
 7/16 8/19
sentences [1]   7/2
separately [1]   24/6
seriously [1]   18/20
services [3]   16/1
 16/9 18/19
seven [2]   26/4 26/5
shake [2]   12/17 13/3
short [1]   19/7
should [5]   6/17 6/18
 8/22 15/8 15/13
showed [1]   11/10
showing [1]   20/18
shown [2]   15/4 16/18
Shrader [1]   4/12
sides [1]   4/24
sign [1]   12/21
signing [3]   11/22
 12/5 12/18
signings [2]   12/13
 12/23
signs [1]   12/16

Silver [1]   2/10
similar [1]   8/12
simult [1]   18/24
simultaneous [3]
 18/19 19/2 19/25
Sirio [2]   2/3 4/11
sit [1]   12/19
sitting [1]   22/15
skis [1]   13/20
Sklaroff [1]   2/7
so [24]   4/24 6/14
 6/23 11/10 11/19
 11/22 12/6 12/12
 12/22 13/2 13/19
 14/7 15/15 16/25
 19/17 20/19 21/15
 22/4 24/6 24/14 25/4
 25/22 26/5 26/11
So I've [1]   14/7
some [13]   7/13 7/14
 9/3 16/18 16/20
 17/13 19/9 20/24
 21/5 21/9 21/24
 22/13 25/15
somebody [1]   8/13
someone [1]   12/15
something [6]   10/19
 11/22 13/7 17/22
 19/22 20/2
sort [8]   4/25 8/12
 9/11 12/14 13/19
 17/5 21/5 23/4
sought [2]   9/8 10/20
sounds [2]   11/6
 11/20
speak [1]   12/2
speaking [2]   11/20
 17/2
specific [3]   5/23
 9/7 11/15
specifically [3]
 14/24 24/20 25/2
spoke [1]   13/6
spoken [1]   21/2
sports [2]   7/20 9/1
Spring [1]   2/10
stage [1]   10/25
stand [1]   12/3
standard [2]   15/11
 18/24
standards [1]   21/4
standing [1]   15/6
stands [1]   16/13
start [1]   14/11
starts [1]   5/24
stated [1]   6/8
statement [1]   20/5
STATES [3]   1/1 1/11
 10/6
stating [1]   11/21
STATUS [3]   1/10
 25/13 25/22
staying [1]   26/11
stem [1]   24/13
stenography [1]   3/7

steps [1]   25/13
still [2]   15/15 19/4
straying [1]   16/21
Street [2]   2/9 2/15
subject [1]   11/16
submission [3]   10/14
 10/15 19/25
submissions [2]   18/7
 22/19
submit [2]   7/4 9/13
submitted [1]   9/13
substance [1]   10/4
substantive [1]   13/4
such [4]   8/21 13/2
 23/9 23/16
suggest [1]   18/2
suggested [5]   5/1
 5/11 15/9 15/14
 20/24
suggestions [2]   9/6
 16/21
Suite [1]   2/10
sum [1]   10/4
supervision [1]
 24/13
supported [1]   24/24
sure [6]   4/7 15/2
 18/10 20/5 23/11
 25/1
surrounded [1]   12/16

**T**

table [3]   4/18 19/4
 22/8
take [10]   7/9 10/14
 10/18 11/25 12/3
 12/20 13/1 13/8 24/4
 24/14
takes [1]   18/20
taking [1]   19/16
talk [1]   12/19
talked [2]   5/7 23/3
talking [2]   10/25
 12/8
team [2]   4/15 9/1
teams [1]   7/20
tell [3]   14/19 14/21
 19/22
term [3]   7/2 7/6
 23/17
terms [4]   8/24 19/1
 22/21 25/13
territory [1]   16/22
test [2]   5/9 5/9
than [3]   6/19 13/9
 17/25
Thank [4]   4/23 19/19
 25/16 26/3
Thank you [2]   4/23
 25/16
Thanks [2]   26/8
 26/12
that [151]
that's [21]   6/25
 7/11 8/7 12/1 12/6

 13/5 13/9 13/15
 16/24 17/8 18/6
 19/18 20/4 20/7
 21/16 22/1 24/14
 24/21 24/23 25/2
 25/4
their [5]   4/24 5/2
 10/13 10/15 16/15
them [1]   5/11
then [13]   5/18 7/1
 9/25 14/5 14/19 17/9
 18/7 19/21 19/22
 20/23 22/5 22/12
 23/16
there [21]   5/22 5/22
 9/3 9/23 11/7 12/12
 12/14 12/22 13/8
 13/21 15/23 16/13
 16/14 17/3 17/9
 17/13 20/24 21/5
 23/24 24/21 25/6
there's [15]   6/3
 11/2 11/3 12/18
 13/14 14/3 15/24
 18/8 21/2 21/8 21/10
 21/10 21/23 23/9
 23/11
these [6]   11/8 16/11
 16/18 16/20 17/15
 17/15
they [18]   5/7 5/8
 5/8 6/23 9/12 9/21
 9/25 10/13 13/12
 16/1 16/8 17/19
 17/19 17/21 17/24
 21/12 21/13 24/10
they'll [1]   16/9
they're [1]   21/9
thing [3]   13/4 22/1
 24/17
things [16]   6/8 6/11
 6/12 6/14 6/19 9/2
 9/8 10/7 11/13 13/11
 13/18 13/23 14/14
 22/5 24/3 24/8
think [41]
this [33]
those [19]   6/17 6/19
 9/2 9/3 9/4 10/7
 10/10 11/6 11/12
 13/12 13/18 14/5
 16/8 16/9 17/12
 17/14 17/18 22/14
 22/17
though [2]   20/21
 23/21
through [1]   21/2
tied [1]   9/7
time [6]   8/23 16/2
 17/19 19/7 25/15
 25/18
tip [1]   17/11
titled [1]   27/4
today [7]   13/7 22/16
 22/24 23/23 25/6

**T**

today... [2]   26/5 26/10
Today's [1]   26/1
together [1]   4/25
told [2]   15/21 17/12
tomorrow [3]   25/12 26/2 26/7
too [1]   19/13
took [3]   5/6 7/24 14/19
topic [3]   8/13 17/8 21/16
topics [2]   11/7 22/14
totally [1]   20/5
tracking [1]   25/11
tracks [1]   10/4
traditional [2]   6/4 14/13
transcript [3]   1/10 3/7 27/3
transcription [1] 3/7
transmission [1] 19/25
tried [1]   12/24
trigger [1]   13/24
true [1]   17/21
TRUMP [2]   1/7 4/4
truth [1]   15/21
try [4]   10/19 11/15 11/19 18/1
trying [6]   8/1 9/6 9/7 10/12 11/11 13/20
turkey [1]   9/1
two [4]   4/24 19/21 21/1 24/8
Tylenol [1]   9/19
type [1]   21/8
types [6]   9/4 9/7 10/10 11/6 12/13 12/23
typically [2]   13/18 16/25

**U**

unable [1]   5/14
under [4]   19/1 21/3 24/15 24/22
understand [8]   11/14 11/18 16/25 17/2 18/9 21/23 23/24 24/2
understanding [3] 9/11 17/18 22/7
understood [2]   12/9 20/16
UNITED [3]   1/1 1/11 10/6
United States [1] 10/6
unnecessary [1] 24/13

up [5]   6/1 14/11 15/23 16/2 21/19
upcoming [1]   22/17
upon [4]   14/12 14/16 22/22 24/2
us [5]   4/15 5/8 6/20 25/6 25/20
usdoj.gov [1]   2/17
use [2]   14/2 14/3
used [4]   10/13 12/1 12/1 13/23

**V**

Van [1]   2/7
variety [1]   5/11
versus [3]   4/4 14/4 17/1
very [6]   13/15 16/5 17/4 18/20 18/20 26/8
view [1]   6/16
views [1]   18/12
violated [1]   24/13
vs [1]   1/6

**W**

wade [1]   11/19
waiving [1]   12/7
want [18]   11/12 16/12 18/11 19/8 19/15 19/21 19/22 21/17 22/6 22/13 23/10 24/10 24/14 25/1 25/4 25/5 25/15 25/18
wanted [5]   18/7 18/8 20/7 20/20 22/19
wants [2]   15/12 18/21
was [23]   7/25 8/2 8/5 8/8 8/15 8/17 9/21 9/23 9/23 9/25 10/2 10/3 10/15 11/10 15/4 16/23 17/16 20/6 20/25 21/19 22/4 22/9 26/6
Washington [4]   1/5 2/5 2/16 3/5
way [4]   13/13 15/7 19/8 25/5
we [45]
we think [1]   10/10
we'd [1]   7/15
we're [4]   4/2 9/6 10/25 18/3
we've [4]   16/11 21/1 23/3 23/22
week [4]   10/16 13/12 25/19 26/7
week's [1]   25/21
welcome [1]   4/14
well [3]   6/23 8/12 15/13
went [2]   4/24 8/7
were [2]   5/13 8/1

what [30]
what's [2]   21/3 22/22
whatever [2]   10/9 15/8
when [10]   13/6 13/12 14/11 17/6 20/19 21/13 21/19 24/10 24/11 24/12
where [20]   4/22 5/22 5/22 6/1 7/7 7/25 8/8 8/15 11/1 11/3 11/7 12/5 12/15 12/15 15/17 16/13 17/13 19/14 19/23 21/7
whether [4]   11/24 13/13 13/14 14/6
which [13]   4/25 8/1 8/5 14/12 15/4 15/12 16/6 17/6 18/23 20/13 21/6 24/2 24/20
whim [1]   15/22
White [25]   5/3 5/7 6/5 7/3 9/20 9/22 12/3 13/2 14/14 15/11 15/25 16/7 16/7 18/20 18/25 19/10 19/14 21/8 21/20 21/21 21/24 21/24 22/2 23/6 24/4
White House [11]   5/7 6/5 7/3 12/3 14/14 15/11 16/7 18/20 19/10 19/14 21/21
who [2]   5/24 15/23
why [5]   5/25 14/11 18/24 24/14 25/22
will [5]   6/24 15/18 15/25 17/5 19/10
William [3]   3/2 27/2 27/8
willing [1]   7/15
within [4]   8/1 8/17 14/15 23/2
without [2]   7/19 8/20
word [1]   10/17
words [6]   10/13 11/8 13/23 14/2 14/4 14/5
workable [1]   5/11
worry [1]   19/12
worth [1]   10/1
would [30]
wouldn't [1]   12/25
written [3]   16/5 19/9 24/7
wrong [1]   19/15

**Y**

yeah [4]   17/4 17/21 18/14 25/8
yells [1]   8/13
Yep [1]   18/16

yes [6]   11/4 11/20 14/17 25/9 25/16 26/3
yet [1]   6/22
you [67]
you know [12]   9/19 11/14 12/22 13/3 15/15 15/20 18/4 18/17 19/5 19/14 19/17 24/20
you're [10]   11/2 11/6 11/11 11/21 12/7 13/9 17/14 19/25 26/3 26/6
you've [2]   12/11 25/17
You've read [1] 25/17
your [39]
Your Honor [15]   4/23 6/1 7/21 8/10 8/19 8/25 9/13 11/4 11/13 13/16 21/18 22/10 23/14 25/9 25/16
Your Honor's [3] 7/14 9/6 11/14
yourselves [1]   4/5

**Z**

Zaremba [3]   3/2 27/2 27/8