ORAL ARGUMENT NOT YET SCHEDULED
No. 25-5402

# In the United States Court of Appeals for the District of Columbia Circuit

NATIONAL ASSOCIATION OF THE DEAF and DERRICK FORD,

*Appellees*,

*v.*

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Appellants*.

On Appeal from the United States District Court
for the District of Columbia
No. 25-cv-01683 (Hon. Amir H. Ali)

**BRIEF FOR APPELLEES**

Ian S. Hoffman
Robert J. Katerberg
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5000
ian.hoffman@arnoldporter.com
robert.katerberg@arnoldporter.com

*Counsel for Appellees*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Appellees certifies as follows:

### I. Parties and *Amici*

Plaintiffs-Appellees are the National Association of the Deaf and Derrick Ford. Matthew Bonn was previously a plaintiff.

Defendants-Appellants are Donald J. Trump, in his official capacity as President of the United States; the Executive Office of the President; the White House Office; the Office of the Vice President; Susan Wiles, in her official capacity as White House Chief of Staff; and Karoline Leavitt, in her official capacity as Press Secretary to the President of the United States.

No amici or intervenors participated in the district court.

### II. Rulings Under Review

The ruling under review is a memorandum opinion and order (Dkt. 29) issued by the Honorable Amir H. Ali on November 4, 2025, granting a preliminary injunction.

### III. Related Cases

This case was not previously before this Court or any other court other than the district court. Counsel is not aware of any pending related cases.

# TABLE OF CONTENTS


CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..... i

TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iv

GLOSSARY ..... ix

INTRODUCTION ..... 1

STATEMENT OF THE ISSUES ..... 4

STATUTORY PROVISIONS ..... 5

STATEMENT OF THE CASE ..... 5

A. Legal Framework ..... 5

B. Factual Background ..... 8

C. Proceedings Below ..... 10

SUMMARY OF ARGUMENT ..... 12

STANDARD OF REVIEW ..... 14

ARGUMENT ..... 15

I. Section 504(a) of the Rehabilitation Act Creates a Private Right of Action To Challenge Disability Discrimination in Federally Conducted Programs and Activities ..... 15

A. Section 504(a) Uses the Same Rights-Creating Language That the Supreme Court Has Held Creates a Private Right of Action ..... 15

B. Neither Section 505 Nor Section 504(a)'s Directive To Promulgate Regulations Negates the Private Right of Action ..... 24

1. The Government Errs in Relying on Section 505 ..... 25

2. The Government Errs in Relying on Section 504(a)'s Directive To Promulgate Implementing Regulations ......................32

C. Prior Cases Support a Private Right of Action, and the Cases Cited by the Government Are Distinguishable or Wrong................37

II. Alternatively, Plaintiffs May Seek Prospective Equitable Relief to Halt Ongoing Violations of Section 504 ....................................................43

A. Federal Courts Retain Traditional Equitable Power To Enjoin Ongoing Violations of Federal Law Unless Congress Has Displaced That Remedy ..........................................................44

B. The Rehabilitation Act Does Not Displace Courts' Traditional Equitable Power......................................................................45

C. The Government's Authorities Are Inapposite ................................48

III. The District Court Correctly Held That Plaintiffs Are Likely To Succeed on the Merits of Their Rehabilitation Act Claim ........................51

A. The District Court Correctly Held That ASL Interpretation Is Necessary To Provide Meaningful Access to Press Briefings ..........................................................................52

B. The Government Is Wrong That Closed Captions and After-the-Fact Transcripts Provide Meaningful Access.............................57

C. The Government's Claimed "Enormous Implications" Ignore the Fact-Specific Nature of Section 504 .............................................63

CONCLUSION.................................................................................64

CERTIFICATE OF COMPLIANCE ..........................................................65

CERTIFICATE OF SERVICE...............................................................66

# TABLE OF AUTHORITIES*

**Page(s)**

## Cases

*Alexander v. Choate*,
469 U.S. 287 (1985) .......... 53

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......... 15, 16, 17, 18, 19, 35

*Am. Council of the Blind v. Astrue*,
2008 WL 1858928 (N.D. Cal. Apr. 23, 2008) .......... 37

*Am. Council of the Blind v. Mnuchin*,
878 F.3d 360 (D.C. Cir. 2017) .......... 53

*Am. Council of the Blind v. Paulson*,
463 F. Supp. 2d 51 (D.D.C. 2006) .......... 37

*Am. Council of the Blind v. Paulson*,
525 F.3d 1256 (D.C. Cir. 2008) .......... 38, 47, 52, 53

*Armstrong v. Exceptional Child Center, Inc.**,
575 U.S. 320 (2015) .......... 43, 44, 45, 47

*Cannon v. University of Chicago**,
441 U.S. 677 (1979) .......... 7, 16, 17, 35

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) .......... 49

*Clark v. Skinner*,
937 F.2d 123 (4th Cir. 1991) .......... 39

*Clevinger v. Advocacy Holdings, Inc.*,
134 F.4th 1230 (D.C. Cir. 2025) .......... 14

* Authorities upon which Appellee chiefly relies are marked with asterisks.

*Cousins v. Sec'y of U.S. Dep't of Transp.*,
880 F.2d 603 (1st Cir. 1989) ....................................................................39, 41

*Davis v. Se. Cmty. Coll.*,
574 F.2d 1158 (4th Cir. 1978)...................................................................19, 27

*DCH Reg'l Med. Ctr. v. Azar*,
925 F.3d 503 (D.C. Cir. 2019)..........................................................................49

*Doe A v. Spahn*,
2025 WL 1305360 (D.D.C. May 6, 2025)....................................................39, 40

*Doe v. Attorney General**,
941 F.2d 780 (9th Cir. 1991).....................................................................37, 38

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ...................................................................49, 51

*Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*,
830 F.3d 515 (D.C. Cir. 2016)..........................................................................49

*Franklin v. Gwinnett Cnty. Pub. Schs.*,
503 U.S. 60 (1992)...........................................................................................18

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) ......................................................................50, 51

*Gottfried v. FCC*,
655 F.2d 297 (D.C. Cir. 1981).......................................................................5, 19

*J.L. v. U.S. Soc. Sec. Admin.*,
971 F.2d 260 (9th Cir. 1992).....................................................................37, 38

*Kampmeier v. Nyquist*,
553 F.2d 296 (2d Cir. 1977) ............................................................................20

*Lane v. Peña*,
518 U.S. 187 (1996)...................................................................................37, 38

*Lane v. Peña*,
867 F. Supp. 1050 (D.D.C. 1994) ....................................................................38

*Leedom v. Kyne*,
358 U.S. 184 (1958)....................................................................................44

*Lloyd v. Reg'l Transp. Auth.*,
548 F.2d 1277 (7th Cir. 1977)...........................................................19, 27

*Martinez v. Cuomo*,
459 F. Supp. 3d 517 (S.D.N.Y. 2020)..................................................62

*Mathis v. U.S. Parole Comm'n**,
749 F. Supp. 3d 8 (D.D.C. 2024) ...................................................39, 44, 48

*McRaniels v. U.S. Dep't of Veterans Affs.*,
2017 WL 2259622 (W.D. Wis. May 19, 2017) ......................................37

*Medina v. Planned Parenthood S. Atl.*,
145 S. Ct. 2219 (2025) ..........................................................................23

*Moya v. U.S. Dep't of Homeland Sec.*,
975 F.3d 120 (2d Cir. 2020) ...........................................................39, 40

*Nat'l Ass'n of the Deaf v. Trump**,
486 F. Supp. 3d 45 (D.D.C. 2020) .............................9, 20, 34, 37, 39, 40, 56, 62

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025)...................................................................................50

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009)...........................................................48, 49

*Pierce v. D.C.*,
128 F. Supp. 3d 250 (D.D.C. 2015) .......................................................56

*Ryan v. Federal Deposit Insurance Corporation*,
565 F.2d 762 (D.C. Cir. 1977).................................................................30

*Sai v. U.S. Dep't of Homeland Sec.*,
149 F. Supp. 3d 99 (D.D.C. 2015) ..................................................40, 41

*Se. Cmty. Coll. v. Davis*,
442 U.S. 397 (1979)...................................................................................19

*Seminole Tribe of Fla. v. Florida*,
517 U.S. 44 (1996)....................................................................................46

*United Handicapped Fed'n v. Andre*,
558 F.2d 413 (8th Cir. 1977)...........................................................................20

*Universities Research Association v. Coutu*,
450 U.S. 754 (1981)....................................................................................35

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
535 U.S. 635 (2002)....................................................................................46

*Yelapi v. DeSantis*,
487 F. Supp. 3d 1278 (N.D. Fla. 2020)..........................................................60

**Statutes**

20 U.S.C. § 1681(a)....................................................................................6, 16

29 U.S.C. § 794(a)..................................................7, 16, 17, 18, 19, 33, 46, 47, 51

29 U.S.C. § 794a(a)....................................................................................27

29 U.S.C. § 794a(a)(1)....................................................................................7

29 U.S.C. § 794a(a)(2)....................................................................................7

29 U.S.C. § 794a(b)....................................................................................7, 30

42 U.S.C. § 2000d....................................................................................17

Pub. L. No. 93-112, § 504, 87 Stat. 355 (1973)....................................................5

Pub. L. No. 95-602, § 119, 92 Stat. 2955 (1978)...............................................6, 7

**Regulations**

3 C.F.R. § 102.103....................................................................................54

3 C.F.R. § 102.160(a)....................................................................................54

3 C.F.R. § 102.160(a)(1)....................................................................................54

3 C.F.R. § 102.160(a)(1)(i) .......... 54

49 Fed. Reg. 35,724 (Sept. 11, 1984) .......... 34

**Legislative Materials**

124 Cong. Rec. 13,901 (May 16, 1978) .......... 21

124 Cong. Rec. 30,346 (Sept. 20, 1978) .......... 20, 32

124 Cong. Rec. 38,551 (Oct. 14, 1978) .......... 21, 22

138 Cong. Rec. 31,520 (Oct. 5, 1992) .......... 22, 42

1974 U.S.C.C.A.N. 6373 .......... 19

S. Rep. No. 93-1297, 93d Cong., 2d Sess. .......... 19

S. Rep. No. 95-890 (1978) .......... 20, 31

## GLOSSARY

| | |
|---|---|
| ASL | American Sign Language |
| NAD | National Association of the Deaf |

## INTRODUCTION

For four years, the White House provided American Sign Language ("ASL") interpretation for its public press briefings. Using ordinary picture-in-picture technology, the White House displayed a qualified ASL interpreter on its official communication channels while the President, White House Press Secretary, and other senior officials addressed the American public on matters of national importance. The accommodation was effective, routine, and indisputably feasible.

In January 2025, the White House abruptly stopped.

The result was to exclude many deaf Americans—including Plaintiff Derrick Ford and numerous members of Plaintiff National Association of the Deaf ("NAD")—from meaningful access to White House press briefings. Plaintiffs presented unrebutted evidence that ASL and English are distinct languages; that many deaf Americans who rely primarily on ASL cannot effectively understand complex spoken information through written English captions or transcripts; and that, without ASL interpretation, they cannot meaningfully access the White House's public communications regarding war, public health, economic policy, federal benefits, natural disasters, and major legislation. The government offered no contrary evidence.

The district court correctly held that Plaintiffs are likely to succeed on their claim under Section 504(a) of the Rehabilitation Act. In enacting Section 504(a), Congress used the same rights-creating language that the Supreme Court has repeatedly held creates a private right of action under Title VI and Title IX: no covered person shall be excluded from participation in, denied the benefits of, or subjected to discrimination under any program or activity receiving federal financial assistance. In 1978, Congress extended that same rights-creating language to disability discrimination in any program or activity conducted by any Executive agency.

The government scarcely engages with that statutory text or the Supreme Court's decisions interpreting materially identical language. Instead, the government argues that Congress impliedly negated the private right of action when the government itself, rather than a contractor or grantee, effects the discrimination, and did so indirectly through neighboring statutory provisions concerning remedies and agency regulations. But the remedies provision (Section 505) did not create the underlying private right of action in Section 504(a), much less eliminate it for one portion of the same sentence. Nor did Congress erase the ordinary effect of Section 504(a)'s rights-creating language merely by directing federal agencies to promulgate regulations

implementing the prohibition on disability discrimination in federally conducted programs. The government's theory would require this Court to conclude that Congress simultaneously used language the Supreme Court has repeatedly held creates a private right of action and, in the very next sentence, silently extinguished that right when the government engages in the discrimination itself—and only in that situation. The statute's text and history refute that theory.

Alternatively, even if Section 504 did not itself create a cause of action (and it does), the district court correctly held that federal courts retain traditional equitable authority to prospectively enjoin ongoing violations of federal law. The Rehabilitation Act contains no detailed and exclusive remedial scheme displacing that settled equitable authority.

The district court also correctly found that Plaintiffs are likely to succeed on the merits of their discrimination claim. Section 504 requires meaningful access to federal programs and activities. The unrebutted record established that written English captions and transcripts do not provide meaningful access to White House press briefings for many deaf ASL users, including Ford and other NAD members. The government did not argue that ASL interpretation would impose an undue burden or fundamentally alter

White House press briefings, and for good reason: the White House itself successfully provided the same accommodation for years.

Finally, the government does not dispute the district court's findings on the remaining preliminary injunction factors, including that Plaintiffs will suffer irreparable harm absent relief, that the equities favor Plaintiffs, or that the injunction serves the public interest. Its appeal instead turns on likelihood of success on the merits—and the district court correctly held that Plaintiffs are likely to succeed.

The Court should affirm the preliminary injunction.

## STATEMENT OF THE ISSUES

1. Whether Section 504 of the Rehabilitation Act creates a private right of action to challenge disability discrimination in programs and activities conducted by federal Executive agencies.

2. Alternatively, whether federal courts possess traditional equitable authority to prospectively enjoin ongoing violations of Section 504 by federal officials and agencies.

3. Whether the district court correctly held that Plaintiffs are likely to succeed on their claim that the White House's refusal to provide ASL interpretation denies them meaningful access to White House press briefings.

4. Whether the district court acted within its discretion in granting a preliminary injunction requiring ASL interpretation for publicly announced White House press briefings conducted by the President or Press Secretary.

## STATUTORY PROVISIONS

Appellees incorporate by reference the statutory provisions reproduced in Appellants' Addendum, including 29 U.S.C. §§ 794 and 794a.

## STATEMENT OF THE CASE

### A. Legal Framework

Congress enacted Section 504 of the Rehabilitation Act in 1973 to prohibit disability discrimination by recipients of federal financial assistance. As originally enacted, Section 504 provided: "No otherwise qualified handicapped individual in the United States … shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Pub. L. No. 93-112, § 504, 87 Stat. 355, 394 (1973) (capitalization omitted). In adopting that language, Congress borrowed the operative formulation from Section 601 of Title VI of the Civil Rights Act of 1964. "Section 504 of the Rehabilitation Act was expressly modeled on Section 601 of Title VI." *Gottfried v. FCC*, 655 F.2d 297, 312 (D.C. Cir. 1981)

(citing S. Rep. No. 93-1297, 93d Cong., 2d Sess., *reprinted at* [1974] U.S.C.C.A.N. 6373, 6390) ("Section 504 was patterned after, and is almost identical to, the anti-discrimination language of section 601 of the Civil Rights Act of 1964.")).

Congress had used the same operative language one year earlier when it enacted Section 901 of Title IX of the Education Amendments of 1972, which likewise provides that "[n]o person" shall, on a prohibited ground, "be excluded from participation in, be denied the benefits of, or be subjected to discrimination" under covered programs. 20 U.S.C. § 1681(a).

In 1978, Congress amended the Rehabilitation Act in two respects relevant here. First, Congress expanded Section 504 beyond federal funding recipients to prohibit disability discrimination in "any program or activity conducted by any Executive agency," and directed covered agencies to issue implementing regulations. Pub. L. No. 95-602, § 119, 92 Stat. 2955, 2982 (1978). As amended, Section 504 provides:

> No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section

> made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978.

29 U.S.C. § 794(a).

Second, Congress added Section 505, entitled "Remedies and attorneys' fees." Pub. L. No. 95-602, § 120, 92 Stat. at 2982-83 (capitalization omitted). Section 505 provides that the "remedies, procedures, and rights" applicable to Title VII federal-employment claims are available for disability-discrimination claims by federal employees under Section 501, 29 U.S.C. § 794a(a)(1), and that the "remedies, procedures, and rights" applicable to Title VI funding-recipient claims are available for disability-discrimination claims against federal funding recipients under Section 504, *id.* § 794a(a)(2). Section 505 also authorizes attorney's fees in "any action or proceeding to enforce or charge a violation" of the Rehabilitation Act. *Id.* § 794a(b).

The next year, in *Cannon v. University of Chicago*, 441 U.S. 677 (1979), the Supreme Court held that Section 901 of Title IX creates a private right of action because Congress modeled Title IX's operative language on Section 601 of Title VI—language that had already been construed to create a private remedy. *Id.* at 694, 696. That same operative language appears in Section 504.

### B. Factual Background

Plaintiff National Association of the Deaf ("NAD") is the nation's oldest and largest civil-rights organization of, by, and for deaf and hard-of-hearing individuals. JA14, 153. Plaintiff Derrick Ford is deaf and relies primarily on American Sign Language ("ASL") to communicate. JA155, 170. Ford and many NAD members have limited proficiency in written English. *Id.*

ASL and English are distinct languages with different vocabularies, grammar, and syntax. *Id.* As Plaintiffs' unrebutted expert evidence established below, many deaf Americans who communicate primarily through ASL cannot effectively understand complex spoken information through written English captions or transcripts. JA170-71. Relevant here, White House press briefings often involve fast-paced discussions of complicated issues of national and international importance, including war, public health, immigration, economic policy, natural disasters, federal benefits, and major legislation. JA154, JA173-74.

Modern technology readily permits simultaneous ASL interpretation of live video events. Through remote interpretation and picture-in-picture technology, a qualified ASL interpreter can interpret a briefing in real time without being physically present in the same room as the speaker, and the

interpreter's video feed can be inserted into the broadcast feed. JA155. Plaintiffs' evidence further established that this can be done "without difficulty or significant logistical or financial burden." *Id.*

Before 2021, the White House generally did not provide ASL interpretation for press briefings. During the COVID-19 pandemic, however, NAD and several deaf individuals sued to require ASL interpretation for White House coronavirus briefings. *See Nat'l Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45 (D.D.C. 2020). The district court granted a preliminary injunction requiring the White House to provide ASL interpretation for those briefings. *Id.* at 60-61.

Following that litigation, the White House adopted a broader policy of providing ASL interpretation during press briefings conducted by the President, Vice President, First Lady, Second Gentleman, or White House Press Secretary for which the White House provided public notice. JA155-56. From 2021 until January 2025, the White House routinely provided simultaneous ASL interpretation for such briefings using picture-in-picture technology on official White House communication channels. JA155-56, JA172.

Beginning in January 2025, however, the White House stopped providing ASL interpretation during press briefings. JA156. Ford and other NAD members attempted to follow the briefings through closed captions but could not effectively understand the information conveyed. JA170-71. Ford explained that after the White House discontinued ASL interpretation, he "tried to watch the White House press briefings" but "could not understand much of what was being said, even with closed captioning." JA171.

### C. Proceedings Below

After unsuccessful efforts to persuade the White House to resume providing ASL interpretation voluntarily, Plaintiffs filed this action in May 2025 against President Trump, the Executive Office of the President, the White House Office, the Office of the Vice President, White House Chief of Staff Susan Wiles, and White House Press Secretary Karoline Leavitt. Plaintiffs asserted claims for violations of Section 504 of the Rehabilitation Act, the First Amendment, and the Fifth Amendment, and sought declaratory and injunctive relief. JA28-29, 156. Plaintiffs at the same time moved for a preliminary injunction requiring Defendants to provide ASL interpretation for White House press briefings and related events. JA156.

The district court granted Plaintiffs' motion in part. JA153-77. It held that Plaintiffs were likely to succeed on their Rehabilitation Act claim for three reasons: Section 504's federally conducted programs prong is privately enforceable; alternatively, federal courts may exercise their equitable authority to enjoin federal officials from violating Section 504; and the White House's refusal to provide ASL interpretation denied deaf ASL users meaningful access to press briefings. JA161-72. The court further found that Plaintiffs were suffering irreparable harm because they were being denied timely access to important White House communications, and that the balance of equities and public interest favored relief in light of the feasibility of ASL interpretation and the public interest in compliance with disability-rights law. JA172-74.

The district court entered a narrow preliminary injunction requiring the Executive Office of the President, White House Office, White House Chief of Staff, and White House Press Secretary to provide "a simultaneous and publicly accessible feed with visible American Sign Language interpretation by a qualified interpreter for all publicly announced White House press briefings conducted by the President or White House Press Secretary that are captured by White House communication channels." JA177. The court

emphasized that the government did not challenge the feasibility of providing ASL interpretation for press briefings by qualified interpreters, had recently provided ASL interpretation for a broader set of events and officials, and submitted no evidence of feasibility challenges. JA176. At the same time, the court declined to grant broader relief Plaintiffs had requested, including relief covering other White House officials and events, a specified minimum screen width for the interpreter, feeds provided to networks, and all videos streamed or uploaded by the White House. JA175-76.

After Defendants sought clarification, the district court clarified which press briefings are covered and confirmed that the injunction does not require the White House to delay a briefing when ASL interpretation cannot be arranged on short notice, but requires Defendants to take all reasonable steps within their power to comply. JA181-85.

The government appealed.

## SUMMARY OF ARGUMENT

The district court's preliminary injunction should be affirmed.

**I.** Plaintiffs are likely to succeed on their Rehabilitation Act claim. Section 504(a) creates a private right of action to challenge disability discrimination in activities the federal government itself conducts. Congress

used the same rights-creating language that the Supreme Court has held creates a private right of action under Section 601 of Title VI and Section 901 of Title IX: no covered person shall be excluded from participation in, denied benefits of, or subjected to discrimination under covered programs. Congress first used that language in Section 504(a) to prohibit disability discrimination by federal funding recipients, then in 1978 extended the same sentence to programs and activities conducted by Executive agencies. Nothing in Section 505's remedial provisions or Section 504(a)'s directive to promulgate implementing regulations displaces that private right of action.

Alternatively, even if Section 504(a) did not supply a cause of action, the district court correctly held that Plaintiffs may seek prospective equitable relief to halt ongoing violations of federal law. The Rehabilitation Act contains no detailed and exclusive remedial scheme for claims challenging discrimination in programs and activities conducted by federal Executive agencies, and it does not displace federal courts' traditional equitable power to enjoin unlawful government action. The government's arguments to the contrary rest on inapposite cases and inapplicable legal requirements.

**II.** The district court correctly held that Plaintiffs are likely to establish a Section 504 violation. Unrebutted evidence establishes that ASL

and English are distinct languages; that Ford and many NAD members rely on ASL as their primary language and cannot effectively understand complex White House press briefings through written English captions or transcripts; and that ASL interpretation is readily feasible, as the White House provided it for four years. The government offered no contrary evidence and did not argue that providing ASL interpretation would impose an undue burden or fundamentally alter the program. The district court therefore properly concluded that the White House's refusal to provide ASL interpretation denies Plaintiffs meaningful access to White House press briefings.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for abuse of discretion. *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1233 (D.C. Cir. 2025). Under that standard, the Court reviews legal conclusions *de novo* and factual findings for clear error. *Id.* at 1233-34. A district court's weighing of the preliminary-injunction factors is reviewed for abuse of discretion. *Id.* at 1233.

The district court's findings that ASL and English are distinct languages, that written English captions and transcripts do not provide Plaintiffs meaningful access to White House press briefings, and that ASL

interpretation is feasible were factual findings based on unrebutted record evidence. Those findings may be set aside only if clearly erroneous.

## ARGUMENT

### I. Section 504(a) of the Rehabilitation Act Creates a Private Right of Action To Challenge Disability Discrimination in Federally Conducted Programs and Activities

The Government contends the Rehabilitation Act provides no private right of action to challenge disability discrimination in federally conducted programs and activities. That is incorrect. The district court correctly held that, under controlling Supreme Court precedent, Section 504(a) creates such a private right of action. The government largely ignores the controlling Supreme Court precedent and the operative text of Section 504(a). And contrary to the government's argument, nothing else in the Rehabilitation Act impliedly negates the private right of action created by Section 504(a).

#### A. Section 504(a) Uses the Same Rights-Creating Language That the Supreme Court Has Held Creates a Private Right of Action

"[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). In evaluating whether a statute creates a private right of action, courts "interpret the statute Congress has passed to determine whether it displays an intent to create not

just a private right but also a private remedy." *Id.* "Statutory intent on this latter point is determinative." *Id.*

Section 504(a) uses the same operative language that the Supreme Court has held creates a private right of action. It provides, in relevant part: "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency …." 29 U.S.C. § 794(a). The Supreme Court has repeatedly held that this formulation, first used in Title VI in 1964, creates a private right of action. Those holdings are dispositive here.

In *Cannon v. University of Chicago*, the Supreme Court held that Section 901(a) of Title IX creates a private right of action. 441 U.S. at 688. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination" under a federally funded education program. 20 U.S.C. § 1681(a). The Court explained that this language was "patterned after Title VI of the Civil Rights Act of 1964," *Cannon*, 441 U.S. at 694, whose

Section 601, codified at 42 U.S.C. § 2000d, similarly provides that "[n]o person in the United States shall, on the ground of race, color, or national origin," be excluded from participation in, denied the benefits of, or subjected to discrimination under a federally funded program or activity, 42 U.S.C. § 2000d. Because Title VI's materially identical language had already been construed to create a private remedy, the Court concluded that Title IX's use of the same "critical language" did so as well. *Cannon*, 441 U.S. at 694, 696. Section 504(a) uses the same language. 29 U.S.C. § 794(a).

*Sandoval* reaffirmed the point. The Supreme Court explained that "it is clear from our decisions" and "must be taken as given" that "private individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages." 532 U.S. at 279-80. It then distinguished Section 601's privately enforceable rights-creating language from Section 602, which lacks such language and merely authorizes agency rulemaking. *Id.* at 288-90. The Court explained that, by using the same statutory language, "Congress had intended Title IX, like Title VI, to provide a private cause of action." *Id.* at 280. The Court ultimately held that there was no private right of action to enforce disparate-impact regulations adopted under Title VI because those regulations were promulgated *not* under § 601, but rather under § 602—a

separate provision containing no rights-creating language. *Id.* at 288-90. The Court emphasized that the "rights-creating" language "so critical to the Court's analysis in *Cannon*" was present in § 601 yet "completely absent" from § 602. *Id.* at 288-89 (internal quotation marks and citation omitted). That key language *is* in Section 504(a).

What's more, the Supreme Court has repeatedly recognized that Congress ratified *Cannon*'s holding when it enacted the Civil Rights Restoration Act of 1987. In *Franklin*, the Court explained that the Restoration Act's amendment of Title IX "cannot be read except as a validation of *Cannon*'s holding" that Title IX creates a private cause of action. 503 U.S. 60, 72 (1992); *see also id.* at 78 (Scalia, J., concurring in judgment) (same). That reasoning applies with equal force here. Section 504(a) uses the same rights-creating formulation as Title VI and Title IX: "No otherwise qualified individual with a disability" shall be excluded from participation in, denied benefits of, or subjected to discrimination. 29 U.S.C. § 794(a). Congress's use of that language reflects the same intent to create a privately enforceable right.

In addition to its text, Section 504's history also confirms Congress's intent to create a private right of action. When Congress enacted Section 504,

it was not writing on a blank slate. This Court has recognized that, like § 901 of Title IX (the statute at issue in *Cannon*), "Section 504 of the Rehabilitation Act was expressly modeled on Section 601 of Title VI of the Civil Rights Act of 1964." *Gottfried*, 655 F.2d at 312. Indeed, as the Senate report this Court relied on makes clear, "Section 504 was patterned after, and is almost identical to, the anti-discrimination language of section 601 of the Civil Rights Act of 1964." S. Rep. No. 93-1297, 93d Cong., 2d Sess., reprinted at 1974 U.S.C.C.A.N. 6373, 6390. Thus, in enacting Section 504(a), Congress chose the same rights-creating language used in Title VI and later recognized in *Cannon* and *Sandoval* as critical to finding a private right of action. *See also Sandoval*, 532 U.S. at 288 (explaining that Congress creates a private cause of action when it uses "the verbatim statutory text that courts had previously interpreted to create a private right of action").

Further, by the time Congress amended Section 504 in 1978 to prohibit discrimination in "program[s] or activit[ies] conducted by any Executive agency," 29 U.S.C. § 794(a), every court of appeals to address the question had recognized an implied private right of action under Section 504, including actions for injunctive relief, *see Davis v. Se. Cmty. Coll.*, 574 F.2d 1158, 1159 (4th Cir. 1978), *rev'd on other grounds*, 442 U.S. 397 (1979); *Lloyd v. Reg'l*

*Transp. Auth.*, 548 F.2d 1277, 1284 (7th Cir. 1977); *United Handicapped Fed'n v. Andre*, 558 F.2d 413, 415 (8th Cir. 1977); *Kampmeier v. Nyquist*, 553 F.2d 296, 299 (2d Cir. 1977).

The 1978 amendments' legislative history confirms that Congress was operating against this judicial backdrop and intended to preserve—not displace—private enforcement of Section 504. The Senate Committee that designed Section 505 described the provision as assisting in "vindicating private rights of action," including those "arising under section 501 and 504." S. Rep. No. 95-890, at 19 (1978). And on the Senate floor, Senator Cranston, the principal author of Section 505, described the legislative purpose as enhancing already-existing private enforcement: "To date, we have permitted certain private enforcement of title V and, yet, we have not provided the means by which *such private rights of action* are meaningful." 124 Cong. Rec. 30,347 (Sept. 20, 1978) (emphasis added). In a colloquy with Senator Bayh, Senator Cranston confirmed "the *continuing intention of Congress that private actions be allowed* under…title V of the Rehabilitation Act of 1973." *Id.* at 30,349 (emphasis added); *see Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 53-54 (relying on this Cranston-Bayh colloquy).

The legislative history also confirms that Congress extended Section 504 to federal executive agencies to put them on the same antidiscrimination footing as recipients of federal financial assistance—not to create a different, weaker enforcement regime for claims against federal agencies. Representative Jeffords, the amendment's author, explained that the provision "simply extends the coverage of section 504 to include any function or activity of any department or agency of the Federal Government" and "applies 504 to the Federal Government as well as State and local recipients of Federal dollars." 124 Cong. Rec. 13,901 (May 16, 1978). He stated that the amendment would help develop "a uniform and equitable national policy for eliminating discrimination." *Id.* At the conference-report stage, after the House and Senate provisions had been merged, Jeffords repeated the same coverage-extension understanding, describing "a provision which I authored" that "extends coverage of section 504 to include any function or activity in every department or agency of the Federal Government." *Id.* at 38,551 (Oct. 14, 1978). Representative Sarasin likewise endorsed the parity principle: "[I]f laws are necessary and good, they should also apply to us.… No one should discriminate against an individual because he or she suffers from a handicap—

not private employers, not State and local governments, and most certainly, not the Federal Government." *Id.* at 38,552.

Further, the 1992 Rehabilitation Act reauthorization reinforces that understanding, including specifically as to federal agencies. During Senate consideration of the conference report, Senator Jeffords—the author of the 1978 federal-program amendment—explained that the 1978 amendment was intended "to cover the Federal Government with the same antidiscrimination mandate which is applied to private recipients of Federal financial assistance." 138 Cong. Rec. 31,521 (Oct. 5, 1992). He further stated that "[t]here can be no doubt that the 1978 amendments to section 504 provided a private right of action for victims of discrimination by the Federal Government," and that "[t]he language of the 1978 amendments is sufficient on its face to confer such a private right of action." *Id.* Senator Harkin, the lead Senate author of the 1992 amendments, agreed: "Congress intends that there is a private right of action against the Federal Government under section 504 of the Rehabilitation Act." *Id.* at 31,523. Congress then reauthorized the Act without narrowing Section 504 because, as Senator Harkin explained, "[t]he intent of Congress was obvious in 1978 and it remains obvious today." *Id.*

Here, as in the court below, the government "do[es] not dispute the Supreme Court has held that virtually identical phrasing [as appears in Section 504(a)] creates a private cause of action." JA165; *see also* Br. 20. And they do not meaningfully respond to the fact that, as in *Cannon*, Congress specifically modeled section 504(a) on 'critical language in Title VI' that 'had already been construed as creating a private remedy.'" JA 165-166 (citing *Cannon*, 441 U.S. at 696). Indeed, the government appears to acknowledge, albeit indirectly, that Section 504(a) "contain[s] the sort of language that *Cannon* held to imply a right of action." Br. 31. The government minimizes the Supreme Court's controlling decision in *Cannon* and *Sandoval* as "decades-old cases addressing other statutes." *Id.* 29. As the District Court correctly observed, the government "may wish to overlook binding precedent, but this court cannot." JA166. Indeed, as recently as last year, the Supreme Court reaffirmed that courts "remain[] bound by *Cannon*'s holding." *Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2230 n.1 (2025) (internal quotation marks and citation omitted).

In sum, Section 504(a)'s text and history establish that Congress intended to create a private right of action for injunctive relief against

disability discrimination in activities the federal government itself conducts, including White House press briefings.

### B. Neither Section 505 Nor Section 504(a)'s Directive To Promulgate Regulations Negates the Private Right of Action

Rather than engage with the text and history of Section 504(a)'s operative language and the binding Supreme Court decisions, the government argues that language elsewhere in the Rehabilitation Act forecloses a private right of action for injunctive relief against disability discrimination in federally conducted programs and activities. In particular, the government contends that, in amending the Rehabilitation Act in 1978, Congress "did two things that make clear it was not creating a private right of action against federal programs" (Br. 19)—it (1) enacted a "remedial provision" in Section 505 to expand the remedies available for certain types of disability discrimination claims but not others (Br. 20-21), and (2) directed federal agencies to issue regulations to "carry out" Section 504(a)'s newly added prohibition of disability discrimination in federally conducted programs and activities (Br. 21-23). The government's arguments fail, and the district court rightly rejected them.

**1. The Government Errs in Relying on Section 505**

In opposing a private right of action, the government relies primarily on Section 505. It argues that when Congress enacted Section 505 in 1978, it created private rights of action to challenge disability discrimination by federal funding recipients and government employers, but did not mention claims to challenge the federal government's direct disability discrimination in its own programs and activities. *See* Br. 20-21. Under this theory, as the District Court explained, "there is no private cause of action when it comes to the clause of the sentence in section 504(a) prohibiting *the government* from excluding or discriminating against people with disabilities in programming and activities," but only "for the clause of that sentence prohibiting discrimination by *federal funding recipients*." JA165 (emphases in original). That is wrong.

For starters, the government's overwhelming focus on whether *Section 505* creates private rights of action is a category error. Throughout their brief, the government asserts that that Section 505, not Section 504(a), creates a private right of action in the federal funding and government employer contexts. *See, e.g.*, Br. 20 (asserting that Section 505 "expressly allows persons aggrieved by two types of Rehabilitation Act violations to sue in federal

court").[1] And the government repeatedly asserts that Section 505 does *not* address disability discrimination by federal agencies in their own programs and thus does not create a private right of action to combat such discrimination. *See, e.g.*, *id*. ("Section 505 is most notable for what it does *not* provide: any express right of action for a violation of Section 504 by a federal agency in its programmatic capacity").[2]

That misses the mark entirely. As explained above and in the decision below, *Section 504(a)*—not Section 505—contains the rights-creating language that creates a private right of action with respect to both federal funding recipients and in federal programming. JA161-164. Section 504(a), not Section 505, borrows the rights-creating language from Title VI, and it does so in a single sentence that, after the 1978 amendments, covers both federal funding recipients and federally conducted programs and activities. It

[1] *See also* Br. 22 (referring to the "express rights of action otherwise provided by Section 505"); *id*. at 30 ("Congress enacted the express-right-of-action provisions in Section 505"); *id*. at 30–31(Section 505 "created an express right of action to enforce Section 504 against federal funding recipients"); *id*. at 31 (referring to "Congress's creation, in Section 505, of an express cause of action for violations of Section 501").

[2] *See also* Br. 30 ("Congress's choice to provide *other* private rights of action in Section 505, but not a private right of action to sue federal programs for Section 504 violations—even as it was simultaneously expanding Section 504 to cover federal programs—forecloses the inference that Section 504 itself implies a private right of action against federal programs.").

is *that* language in Section 504(a)—not Section 505—that the Supreme Court has repeatedly held creates a private right of action. Again, even before Section 505's enactment in 1978, courts of appeals considering the issue had unanimously held that Section 504(a) created a private right of action for disability discrimination against the entities then covered by Section 504. *See Davis*, 574 F.2d at 1159; *Lloyd*, 548 F.2d at 128.

Against this backdrop, the government asks the wrong question. The issue is not whether Section 505 independently creates a private right of action; it is whether Section 505 displaces the private right of action created by Section 504(a). It does not.

In enacting Section 505—titled "Remedies and attorney fees"—Congress did not create any new private right of action for any violation of Section 504(a). Section 505, rather, merely adds certain *remedies* for particular types of disability discrimination claims arising under Sections 504(a) and 501 of the Rehabilitation Act. In particular, Section 505 incorporates remedial frameworks for particular categories of Rehabilitation Act claims: Title VII remedies for Section 501 federal-employment claims, and Title VI remedies for certain Section 504 claims involving federal funding recipients and federal providers of assistance. *See* 29 U.S.C. § 794a(a).

Nothing about Section 505's extension of *remedies* and *procedures* originally applicable to claims against federal funding recipients and government employers indicates any intent to negate a private right of action for disability discrimination in federal programming. As the District Court explained, "that Congress *expanded* [in Section 505] the remedies available for discrimination claims against the federal government as an employer and against federal funding recipients to include those available under analogous statutory regimes does not imply an intent to *restrict* section 504(a)'s private cause of action as it relates to the government's discrimination in programming." JA166 (emphasis in original).

Indeed, there was good reason for Congress not to extend these remedies and procedures to disability discrimination claims in federal programming: "the statutory schemes section 505 incorporated from Title VII and Title VI are schemes that address discrimination by employers and by federal funding recipients, respectively; they do not apply to discrimination in government programming." *Id.* As the government itself once explained to the Supreme Court, it "would have been odd for Congress to have provided that Title VI remedies applied in Section 504 cases involving discrimination by executive agencies because Title VI [unlike § 504] does not prohibit

discrimination in programs or activities conducted by executive agencies." Br. for Resp'ts at 16 n.8, *Lane v. Peña*, 518 U.S. 187 (1996) (No. 95-365); *see also* JA166 (quoting same).

Here, the government concedes that neither "the Title VI [n]or Title VII frameworks … applies to federal programs." Br. 32. They further concede that at least "some facets of the Title VI framework (like administrative procedures for terminating funding) are inapposite to federal programs." *Id.* Yet they suggest, without elaboration, that these frameworks "could sensibly be invoked—as a basis for equitable relief, though not damages—against the federal government." *Id.* The government does not explain how it could be "sensible" to incorporate concededly inapplicable and in important respects "inapposite" frameworks, and indeed it could not.

The government also argues that Section 501, which concerns disability discrimination by government employers, "does not (and did not in 1978) contain the sort of language that *Cannon* held to imply a right of action, so in enacting Section 505, Congress was choosing to create a right of action in federal court where none had existed before." Br. 31. As an initial matter, the government cites no authority for the proposition that no cause of action for disability discrimination by government employers existed before 1978. The

government cites this Court's decision in *Ryan v. Federal Deposit Insurance Corporation*, but the Court there expressly declined to decide whether Section 501 created a private right of action. 565 F.2d 762, 763 (D.C. Cir. 1977) ("[Plaintiff] argues that [Section 501] afford[s] a basis for implication of a private right of action for disability discrimination. But we need not go so far in this case."). But even if Section 501 does not create a private right of action, Section 504(a) *does*, and nothing in the language of Section 504(a) limits the private right of action to federal funding recipients. Moreover, the relationship between Section 505 and Section 501 is neither here nor there; it is certainly not enough to impliedly negate the rights-creating language that Congress specifically added to Section 504(a) concerning disability discrimination in federal programming.

Section 505(b)'s fee-shifting provision further supports Plaintiffs' reading of the statute. It provides that, "[i]n any action or proceeding to enforce or charge a violation of a provision of this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee." 29 U.S.C. § 794a(b). On its face, Congress did not limit fee shifting to suits against federal funding recipients or government employers—the two contexts addressed in Section 505(a)(1) and (a)(2).

Instead, Congress spoke more broadly in Section 505(b), authorizing fees in "any action or proceeding" to enforce a violation of any provision of the subchapter, including Section 504(a) in full.

The government responds that Section 505(b) does not itself identify which claims are privately enforceable. But that misses the point. Section 505(b) still shows that Congress chose to speak capaciously, not narrowly, and did not confine judicial enforcement to the particular contexts addressed in Section 505(a). That broader language is at least consistent with—and thus reinforces—the ordinary reading of Section 504(a)'s rights-creating text, including as applied to disability discrimination in federal programs and activities.

Finally, Section 505's legislative history confirms what its text already shows: Congress did not enact Section 505 as the source of Section 504(a)'s private enforceability; it enacted Section 505 to supply remedial machinery and fee shifting for private enforcement Congress understood to exist. The Senate Committee that designed Section 505 described its fee-shifting provision as designed to "assist in vindicating private rights of action," including those "arising under section 501 and 504." S. Rep. No. 95-890, at 19 (1978). Senator Cranston, the principal Senate author of Section 505, likewise

explained that "private enforcement of these title V rights is an important and necessary aspect of assuring that these rights are vindicated and enforcement is uniform." 124 Cong. Rec. 30,346 (Sept. 20, 1978) (statement of Sen. Alan Cranston). He then put the point directly: "To date, we have permitted certain private enforcement of title V and, yet, we have not provided the means by which such private rights of action are meaningful." *Id.* at 30,347. And in a subsequent colloquy, Senator Bayh thanked Senator Cranston for confirming "the continuing intention of Congress that private actions be allowed under … title V of the Rehabilitation Act of 1973." *Id.* at 30,349 (statement of Sen. Birch Bayh). That contemporaneous understanding is incompatible with the government's argument that Section 505 silently withdrew private enforcement for the newly added federal-program prong of Section 504.

#### 2. The Government Errs in Relying on Section 504(a)'s Directive To Promulgate Implementing Regulations

The government separately invokes Section 504(a)'s directive that federal agencies "promulgate such regulations as may be necessary to carry out" the 1978 amendments. Br. 21-23, 33-34. According to the government, that directive shows Congress expected Section 504(a) to be enforced against federal programs through an administrative process, with judicial review available only later under the APA. *Id.* The government further argues that

this directive, together with Section 505, confirms that Congress did not envision private enforcement of Section 504(a) against federal programs. *Id.*

That is an extremely unnatural reading of the two sentences of Section 504(a). In the first sentence, Congress used the same rights-creating language the Supreme Court has repeatedly held gives rise to a private right of action. Yet the government says that, in the very next sentence, Congress implicitly undid that implication merely by directing agencies to issue regulations "to carry out" the new amendment. That makes little sense. The second sentence says nothing about private rights of action, nothing about exclusivity, nothing about exhaustion, and nothing about the APA. No ordinary reader would understand Congress to have used known rights-creating language in one sentence and then negated its ordinary legal effect in the next.

The far more natural reading is straightforward: Congress in 1978 amended the first sentence to impose a new substantive prohibition on disability discrimination in federal programs and activities, and the second sentence simply directs federal agencies to issue regulations implementing that new prohibition. 29 U.S.C. § 794(a). In other words, once Congress for the first time subjected federal agencies to Section 504(a)'s substantive prohibition against disability discrimination, it also required the agencies

subject to this new prohibition to adopt regulations to implement it. That implementation instruction has nothing to do with whether the substantive prohibition in the first sentence is privately enforceable.

The government's theory also creates an implausible temporal anomaly. The 1978 amendment made Section 504(a)'s federal-program prohibition immediately applicable, while directing each agency to promulgate regulations implementing that new coverage. But DOJ did not issue its federally conducted-program regulation until 1984, *see* Enforcement of Nondiscrimination on the Basis of Handicap in Federally Conducted Programs, 49 Fed. Reg. 35,724, 35,724 (Sept. 11, 1984), and the Executive Office of the President did not promulgate the regulations governing the White House Office until 1988, *see NAD I*, 486 F. Supp. 3d at 52. Congress did not say that the substantive prohibition would be unenforceable until each agency issued regulations, much less that a private right of action created by Section 504(a)'s rights-creating language would vanish once an agency did so. Regulations implement statutory rights; they do not repeal them. The directive to issue regulations thus cannot bear the weight the government places on it.

The cases the government cites do not help it. *Universities Research Association v. Coutu* merely observed that statutory language "phrased as a directive to federal agencies" does not itself support implication of a private remedy. 450 U.S. 754, 772-73 (1981). But plaintiffs do not contend, and the court below did not hold, that the second sentence of Section 504(a)—the sentence directing agencies to issue regulations—creates a private right of action. The private right of action arises instead from the first sentence of Section 504(a), which uses the same key language that *Cannon* held creates a private right of action. *See* 441 U.S. at 681–82, 709. *Sandoval* does not support the government's position for essentially the same reason: it held that there was no private right of action to enforce regulations promulgated pursuant to Section 602 of Title VI—a separate provision phrased as a directive to federal agencies and containing no rights-creating language. 532 U.S. at 288–89. But Section 504(a)'s first sentence contains precisely the rights-creating language that Section 602 lacked.

The government's fallback reliance on the possibility of APA review is also misplaced. Br. at 22–23. The APA is a background statute of general applicability regarding judicial review of agency action; it does not itself show congressional intent to displace a private right of action otherwise created by

a substantive statute. Nothing in Section 504(a) suggests that victims of disability discrimination directly perpetrated by the federal government must first pursue an administrative complaint, obtain an adverse agency decision, and then proceed only under the APA. Nor does it say that APA review is exclusive. That entire notion is invented by the government with no basis in the legislative text. And in any event, the availability of APA review could not overcome the far better textual indicator of congressional intent here: Congress's use, in the first sentence of Section 504(a), of the very language the Supreme Court has held creates a private right of action.

The government's APA theory is especially implausible in this case. The government itself acknowledges that the ordinary APA pathway is unavailable against the White House defendants because they are not APA "agencies." Br. 2–3, 26, 37; *see also* JA169 n.2 (district court explaining that Congress defined "Executive agency" more broadly in the Rehabilitation Act than in the APA). That mismatch undermines the government's claim that Congress silently displaced Section 504(a)'s rights-creating text in favor of administrative proceedings followed only by APA review. Congress did not make APA review the exclusive enforcement path for claims challenging disability discrimination

in programs and activities conducted by Executive agencies, including entities that Section 504(a) covers but the APA does not.

### C. Prior Cases Support a Private Right of Action, and the Cases Cited by the Government Are Distinguishable or Wrong

The case law supports a private right of action to remedy disability discrimination in federal programs and activities. Most directly, the Ninth Circuit held in *Doe v. Attorney General*, 941 F.2d 780, 795 (9th Cir. 1991), that Section 504 provides a private right of action against federal agencies for discrimination in their own programs and activities. As the court explained, "Congress intended to put the federal government on equal footing with everyone else" under Section 504, and "intended to encourage private parties to pursue enforcement of Title V, including section 504, through private rights of action." *Id.* at 792. Judge Boasberg reached the same conclusion in *NAD I*. *See NAD I*, 486 F. Supp. 3d at 53–57. Judge Ali reached the same conclusion below, JA161–69, as have other courts.[3]

3 *See J.L. v. U.S. Soc. Sec. Admin.*, 971 F.2d 260, 264 (9th Cir. 1992) (recognizing equitable relief to remedy an executive agency's Section 504 violations), *abrogated on other grounds by Lane*, 518 U.S. 187 (1996); *McRaniels v. U.S. Dep't of Veterans Affs.*, 2017 WL 2259622, at *4 (W.D. Wis. May 19, 2017) (finding private right of action); *Am. Council of the Blind v. Astrue*, 2008 WL 1858928, at *7 (N.D. Cal. Apr. 23, 2008) (same); *Am. Council of the Blind v. Paulson*, 463 F. Supp. 2d 51, 57–58 (D.D.C. 2006)

The government tries to discount *Doe* as a pre-*Sandoval* "outlier." Br. 2, 24–25. But *Doe* remains persuasive because it rested on Section 504(a)'s text and structure: Congress added the federal-program language to the same sentence "under which the private cause of action had been implied." 941 F.2d at 790. That textual reasoning remains consistent with *Sandoval.* The government also invokes *J.L.* as supposedly recognizing agencies' "primary responsibility" for Section 504 compliance. Br. 25, 37. But *J.L.* did not retreat from *Doe*; rather, it reaffirmed that "Congress unequivocally expressed its intent [in section 504] to provide handicapped victims of government discrimination a private right of action." 971 F.2d at 264. *J.L.* required exhaustion only as a prudential matter on the facts before it; it did not reject *Doe*'s recognition of a private right of action for Section 504 claims against federal agencies.

Most of the government's contrary cases rely on the same faulty Section 505 argument the government advances here, and thus they are wrong. *See,*

(allowing Section 504 claim for injunctive relief against federal agency to proceed), *aff'd*, 525 F.3d 1256 (D.C. Cir. 2008); *Lane v. Peña*, 867 F. Supp. 1050, 1073 (D.D.C. 1994) (recognizing that declaratory and injunctive relief are available under the Rehabilitation Act and entering injunctive relief against federal agency), *vacated in part on other grounds*, 518 U.S. 187 (1996).

*e.g.*, *Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 127–28 (2d Cir. 2020); *Cousins v. Sec'y of U.S. Dep't of Transp.*, 880 F.2d 603, 605–06 (1st Cir. 1989) (en banc); *Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8, 17–22 (D.D.C. 2024); *Doe A v. Spahn*, 2025 WL 1305360, at *4 (D.D.C. May 6, 2025). Those cases are therefore wrong for the reasons explained above: the private right of action is rooted in Section 504(a)'s rights-creating language, not Section 505's remedial provisions. Section 505 expanded remedies for certain Rehabilitation Act claims; it did not eliminate private enforcement of Section 504(a)'s prohibition on disability discrimination in programs and activities conducted by Executive agencies.

Those cases are also materially distinguishable. As Judge Boasberg explained in *NAD I*, the principal appellate decisions the government invokes "dealt with Executive agencies' acting as a *regulator*, as opposed to in a substantive capacity." 486 F. Supp. 3d at 56 (emphasis in original). That is true of *Cousins*, which involved DOT's refusal to amend, modify, or waive a trucking regulation. *See* 880 F.2d at 604; *McRaniels*, 2017 WL 2259622, at *4 (distinguishing *Cousins* as "limited to claims against the United States in a regulatory capacity"). *Clark v. Skinner* likewise involved review of DOT regulatory action, *see* 937 F.2d 123, 124 (4th Cir. 1991); and *Moya* involved

DHS's naturalization-waiver process, *see* 975 F.3d at 124. Similarly, *Doe A* involved Peace Corps medical-clearance guidelines and individual agency determinations, with APA claims available to challenge at least some of the agency's conduct. *See* 2025 WL 1305360, at *2. This case is different: Plaintiffs do not challenge a regulation, waiver process, medical-screening policy, or delayed administrative adjudication. They challenge the White House's operation of its own public-facing program.

*Sai* is especially limited. *See Sai v. U.S. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99, 111–15 (D.D.C. 2015). There, the *pro se* plaintiff's operative theory centered on DHS's alleged mishandling of his administrative complaints *about* disability discrimination, not on remedying the underlying discrimination itself. *See* 149 F. Supp. 3d at 106–07 (plaintiff described suit as "brought strictly for matters relating to defendants' handling of [his] complaints" (alteration in original)). The court therefore analyzed the claim as one to compel agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. § 706(1). *Id.* at 110–11. Perhaps most significantly, the government took the opposite position from the one it takes here. As Judge Boasberg explained in *NAD I*, the government argued in *Sai* that "Section 504 implies a private right of action to sue for injunctive relief in federal court for

violations of that section that is not dependent on administrative exhaustion." 486 F. Supp. 3d at 55. The *Sai* court rejected that position only in deciding that the plaintiff's administrative-delay claim belonged under the APA, rather than under the Rehabilitation Act. 149 F. Supp. 3d at 112, 115. *Sai* thus has little force here, where Plaintiffs allege an ongoing substantive violation of Section 504(a)'s antidiscrimination command and the government insists APA review is unavailable.

The government's reliance on *Cousins* is especially misplaced because the court there recognized that its APA-channeling theory would not necessarily apply where the plaintiff asserts disability discrimination claims against "one of the few federal bodies exempted from the APA's coverage." 880 F.2d at 606 (quoting *NAACP v. Sec'y of Hous. & Urb. Dev.*, 817 F.2d 149, 153 (1st Cir. 1987)); *see also id.* (explaining that when a federal body is exempted from the APA's coverage, "it might make sense to ask whether a substantive statute gives rise to such a [private] right [of action]"). That is the case here: the government insists the ordinary APA pathway is unavailable against the White House defendants because they are not APA agencies.

Finally, *Clark* and *Cousins* are especially weak because, after those decisions, Congress reauthorized the Rehabilitation Act with a record

expressly rejecting their no-private-right-of-action reasoning. Senator Jeffords, the author of the 1978 amendment that extended Section 504 to reach Executive agencies, stated during the 1992 reauthorization debates that "recent court decisions denying a private right of action to victims of discrimination by the Federal Government under section 504" were "in direct conflict with the congressional intent," specifically citing *Cousins* and *Clark*. 138 Cong. Rec. 31,520 (Oct. 5, 1992) (statement of Sen. Jim Jeffords). He further explained that "[t]here can be no doubt that the 1978 amendments to section 504 provided a private right of action for victims of discrimination by the Federal Government," and that "[t]he language of the 1978 amendments is sufficient on its face to confer such a private right of action." *Id.* at 31,521. Senator Harkin, the lead Senate author of the 1992 amendments, likewise stated that "there is a private right of action against Federal agencies under section 504 of the Rehabilitation Act." *Id.* at 31,523 (statement of Sen. Tom Harkin). Congress then reauthorized the Act without narrowing Section 504. Thus, the government's reliance on *Clark* and *Cousins* is misplaced not only because those cases involved regulatory challenges and available APA review, but also because Congress revisited the Rehabilitation Act in the wake of those decisions and did not amend the statute to adopt their restrictive reading.

In sum, the government's cases do not overcome Section 504(a)'s text, structure, and history. At most, they show that some courts have mistaken Section 505's remedial provisions for the source of the cause of action, or have treated APA review as adequate in cases where APA review of agency action was actually available. The better-reasoned cases rest on the statutory text and history, which point in the same direction: Section 504(a) authorizes private suits for injunctive relief when individuals with disabilities are excluded from, denied the benefits of, or subjected to discrimination in programs or activities conducted by Executive agencies, including the White House defendants here.

## II. Alternatively, Plaintiffs May Seek Prospective Equitable Relief to Halt Ongoing Violations of Section 504

Even if Section 504 does not itself supply a cause of action, the district court correctly held in the alternative that plaintiffs may seek prospective equitable relief to halt ongoing violations of that statute under its traditional equitable authority. Under *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), federal courts retain traditional equitable authority to enjoin unlawful executive action, including violations of federal law, unless Congress has displaced that remedy. *Id.* at 327–29. Here, nothing in the Rehabilitation Act displaces this traditional equitable power because the statute provides no

detailed and exclusive remedial scheme and no alternative mechanism to enforce the statute's commands. The government argues this type of review is foreclosed by *Leedom v. Kyne*, 358 U.S. 184 (1958) and other *ultra vires* and review-preclusion cases. Br. 39–40. Those arguments—which were not raised below—are wrong. *Leedom* and the other cases the government relies on involved materially different contexts—where Congress channeled or foreclosed review—and therefore does not limit the availability of ordinary equitable relief here.

### A. Federal Courts Retain Traditional Equitable Power To Enjoin Ongoing Violations of Federal Law Unless Congress Has Displaced That Remedy

The Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law," and that same equitable power extends "to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27. Crucially, the Court described that remedy not as an implied statutory cause of action, but as a traditional equitable power of federal courts to prevent unlawful executive action. *Id.* at 327. So the absence of a statutory cause of action does not end the analysis. *See also Mathis*, 749 F. Supp. 3d at 22–23 ("Courts possess inherent equitable power to enjoin the Government from

violating the Rehabilitation Act," and that power "operates even in the absence of a statutory cause of action."). The relevant question is whether Congress displaced that ordinarily available equitable remedy.

On the facts before it, the Court in *Armstrong* found displacement because the Medicaid Act provided a specific administrative remedy—funding termination by the Secretary—and because the reimbursement standard at issue was "judicially unadministrable." *Id.* at 328. *Armstrong* thus identifies the governing question here: whether Congress displaced the ordinary equitable remedy for this class of Section 504 claims. It did not.

### B. The Rehabilitation Act Does Not Displace Courts' Traditional Equitable Power

Nothing in the Rehabilitation Act displaces equitable relief for claims challenging disability discrimination in federal programs under Section 504. To begin with, the Act contains no detailed and exclusive remedial scheme for such claims. Contrary to the government's argument (Br. 42-46), Section 504's directive that federal agencies promulgate regulations does not establish any such scheme. As the district court explained, "a statutory directive for agencies to promulgate regulations bears no resemblance to detailed and exclusive remedial schemes that the Supreme Court has found to displace the court's equitable power." JA168; *see also* JA169 ("The defendants' notion that

a direction to promulgate regulations is a detailed, exclusive remedial scheme finds no support in precedent."). The Rehabilitation Act does not establish any administrative complaint process, require exhaustion, specify a reviewing court, impose time limits, or otherwise create a detailed remedial scheme for this class of claims. It thus looks nothing like the "detailed and exclusive remedial scheme" that displaces traditional equitable relief. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 647 (2002); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74-75 (1996).

The government argues that Congress chose "agency action" and APA review as the exclusive path for enforcing Section 504 against federal programs. Br. 42-47. But the statute says no such thing. Section 504(a)'s direction that agencies "promulgate such regulations as may be necessary to carry out" the 1978 amendments is an implementation instruction, not a remedial scheme. 29 U.S.C. § 794(a). It does not establish a complaint mechanism for injured individuals, does not require them to proceed administratively before suing, and does not provide for exclusive APA review. Indeed, the government's theory is especially untenable here because, as noted, the government insists that defendants are not subject to the APA at all. As the district court recognized, Section 504's coverage of "Executive

agenc[ies]" is broader than the APA's definition of "agency." JA169 n.2. Congress cannot be understood to have displaced equitable relief in favor of an APA remedy that, on the government's own view, does not exist for these defendants.

Nor is this a case where the underlying statutory command is too "judicially unadministrable" to support equitable enforcement. *Armstrong* found displacement in part because the Medicaid reimbursement provision there required judgments about "efficiency, economy, and quality of care" and the enlistment of enough providers—standards the Court described as exceptionally broad and administratively complex. 575 U.S. at 328-29. Section 504 is different. Its command is one courts routinely apply: persons with disabilities may not be discriminated against in federal programs or activities. 29 U.S.C. § 794(a). Courts have long adjudicated whether federal programs provide "meaningful access" and reasonable accommodations under Section 504. *See, e.g.*, *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266-67 (D.C. Cir. 2008). As Judge McFadden explained in *Mathis*, "the antidiscrimination mandate in the Rehabilitation Act's program-conductor provision is judicially administrable" because "[f]ederal courts routinely administer antidiscrimination laws, including the Rehabilitation Act." 749 F.

Supp. 3d 8, 24 (D.D.C. 2024). The same is true here: whether deaf individuals are denied meaningful access to White House press briefings without ASL interpretation is exactly the sort of antidiscrimination issue federal courts are well equipped to decide.

### C. The Government's Authorities Are Inapposite

The government argues that the district court lacked authority to grant equitable relief here because, in the government's view, Plaintiffs' claims are subject to the *Leedom v. Kyne* framework and do not otherwise satisfy the standards for seeking nonstatutory *ultra vires* review. Br. 39-40. Those arguments fail.

The government's reliance on *Leedom v. Kyne* is misplaced because *Leedom* addresses a different problem. It provides a narrow exception permitting review when Congress has otherwise precluded review of agency action, but the agency has acted in excess of its delegated powers and no alternative path to review exists. *See Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). This case does not fit that framework. Plaintiffs are not invoking *Leedom* to circumvent a statutory bar on review; they seek prospective equitable relief for an ongoing violation of

Section 504, and Congress has not created a detailed and exclusive remedial scheme displacing that traditional remedy.

That is why the government's *Leedom* cases are inapposite. There, the courts were dealing with statutes that expressly or impliedly foreclosed review and plaintiffs who sought *ultra vires* review notwithstanding those constraints. See *Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016); *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019); *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763-65 (D.C. Cir. 2022); *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 720-22 (D.C. Cir. 2022). Indeed, in *Nyunt* the Court held that equitable relief was unavailable because the underlying statute, the Civil Service Reform Act ("CSRA"), had long been held to impliedly preclude judicial review of adverse personnel actions. *See Nyunt,* 589 F.3d 445, 448 (D.C. Cir. 2009) (discussing United States v. Fausto, 484 U.S. 439, 443 (1988)). These decisions say nothing about whether equitable relief remains available where, as here, the substantive statute contains no comparable preclusion or channeling of review.

The government's other *ultra vires* authorities are likewise distinguishable for the same basic reason. In *Nuclear Regul. Comm'n v. Texas*, the Supreme Court addressed whether nonstatutory review was

available where Congress had created a detailed review structure and the challengers had an alternative path to judicial review through intervention in the agency proceeding. 605 U.S. 665, 680-81 (2025). In *Glob. Health Council v. Trump*, this Court rejected an effort to bypass the review structure established by the Impoundment Control Act and also made clear that plaintiffs may not recast statutory claims as constitutional ones in order to obtain relief. 153 F.4th 1, 14-24 (D.C. Cir. 2025). Those cases do not hold that equitable relief is unavailable whenever a plaintiff alleges a statutory violation. Rather, they hold that courts must respect statutes that channel, limit, or otherwise structure review.

Here, Plaintiffs are not attempting to evade a statute that channels review to a particular forum, limits review to particular parties, or provides an alternative review mechanism that Congress made exclusive—the Rehabilitation Act does no such thing. Nor are they repackaging a statutory claim as a constitutional one. They seek prospective equitable relief against ongoing exclusion from a federal program in violation of Section 504.

Further, even on the government's own terms, this case would satisfy any "clear and mandatory" requirement. Section 504(a) states in direct and mandatory terms that persons with disabilities cannot be discriminated

against in federal programs or activities. 29 U.S.C. § 794(a). That is a specific statutory prohibition, not an open-ended invitation to policy balancing. And the district court found Plaintiffs likely to succeed on the merits of their claim that the refusal to provide ASL interpretation denies deaf individuals meaningful access to White House press briefings. This case therefore bears no resemblance to the "garden-variety" or policy-laden disputes in which courts have refused *ultra vires* relief. *See FedEx*, 39 F.4th at 764-65; *Global Health*, 153 F.4th at 20-22.

In short, because Congress did not preclude or limit review of claims for disability discrimination in federal programming brought under Section 504, the district court correctly held that Plaintiffs may proceed in equity, even if this Court disagrees that Section 504 itself implies a private right of action.

## III. The District Court Correctly Held That Plaintiffs Are Likely To Succeed on the Merits of Their Rehabilitation Act Claim

The government does not separately challenge the district court's findings on irreparable harm, the balance of equities, or the public interest; its appeal challenges only Plaintiffs' likelihood of success. On that score, the district court correctly held that Plaintiffs are likely to succeed on their Section 504 claim because the White House's refusal to provide ASL interpretation denies deaf ASL users meaningful access to White House press

briefings. Plaintiffs presented unrebutted evidence that many deaf Americans who rely on ASL as their primary language cannot effectively understand complex spoken briefings through written English captions or transcripts; that ASL interpretation is necessary to provide them meaningful access; and that the White House can readily provide that accommodation because it did so for four years. On appeal, the government second-guesses the unrebutted evidence and posits a slippery slope unmoored from the facts of this case. Those arguments fail.

### A. The District Court Correctly Held That ASL Interpretation Is Necessary To Provide Meaningful Access to Press Briefings

To establish a violation of Section 504, Plaintiffs must show that they or their members: (1) are disabled within the meaning of the Rehabilitation Act; (2) are otherwise qualified; (3) were excluded from participation in, denied the benefits of, or subjected to discrimination under a program or activity; and (4) the program or activity is carried out by a federal executive agency. *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008). Both here and below, the government disputes only the third requirement—namely, whether Plaintiffs were excluded, denied benefits, or discriminated against by the White House's refusal to provide ASL interpreters for press briefings.

The governing standard is well-settled. Section 504 requires covered entities, including defendants here, to provide individuals with disabilities "meaningful access" to federal programs and activities. *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 363 (D.C. Cir. 2017). This inquiry is "necessarily fact-specific." *Paulson*, 525 F.3d at 1267. But this Court has recognized the "general pattern" that "[w]here the plaintiffs identify an obstacle that impedes their access to a government program or benefit, they likely have established that they lack meaningful access to the program or benefit." *Id.* And applying that principle, this Court has recognized that "deaf individuals lack meaningful access to government activities or programs without the provision of interpretive assistance." *Id.* at 1268.

The Executive Office of the President's own regulations reflect the same principle. Those regulations require covered offices to "take appropriate steps to ensure effective communication with ... members of the public," and to "furnish appropriate auxiliary aids where necessary to afford" an individual with a disability "an equal opportunity to participate in, and enjoy the benefits of," the covered program or activity. 3 C.F.R. § 102.160(a), (a)(1). Auxiliary aids include qualified "interpreters." *Id.* § 102.103. And in determining the

appropriate auxiliary aid, the agency must give "primary consideration" to the request of the individual with a disability. *Id.* § 102.160(a)(1)(i).

The record here establishes that ASL interpretation is necessary to provide Plaintiffs and similarly situated NAD members meaningful access to White House press briefings. As the district court explained, "ASL and English are distinct languages with distinct vocabularies, grammars, and syntaxes," and "providing written English" does not enable Plaintiffs and many NAD members "to receive the information conveyed during a press briefing." JA170-71. That conclusion followed directly from Plaintiffs' unrebutted evidence.

Significantly, Plaintiffs' experts, Dr. Judy Shepard-Kegl and Dr. Amy June Rowley, explained that "American Sign Language is Not English"—they are "two completely distinct languages," JA45, and ASL is not merely English translated into hand signals. JA49-50. The experts further explained that White House press briefings "involve dense language and complex concepts that, when expressed in English text, exceed many Deaf individuals' reading ability." JA54. Put simply, "providing ASL signers with written English does not make information accessible." JA50. On the other hand, providing

interpretation in ASL, their primary language, does provide meaningful access. JA54.

NAD's then-Chief Operating Officer, Kelby Brick, reinforced the point, explaining that "many deaf persons know virtually no English." JA57. "Written English is not an effective means of communication for many deaf individuals who have limited English capabilities," and therefore "even when closed captioning is provided, those deaf individuals cannot effectively receive the messages conveyed at the White House press briefings." JA58. Brick further explained that tone and context are conveyed through ASL in ways written captions cannot capture. JA58.

Plaintiff Ford's declaration also confirmed closed captions are inadequate. Ford is fluent in ASL, his "preferred and primary language." JA36. He has "great difficulty reading and understanding English," especially when the content is complex. JA36. After the White House stopped providing ASL interpretation, he tried to watch the briefings, but stopped because he "could not understand much of what was being said, even with closed captioning." JA36; *see also* JA38 (Bonn declaration describing same).

Other decisions confirm that written English is not an adequate accommodation for deaf ASL users. In *NAD I*, Judge Boasberg reached the

same conclusion as the district court below when considering the same federal program, the same accommodation, and the same basic access problem. He explained that for deaf people who rely on ASL, written English does not allow them to "effectively receive the messages conveyed at the White House press briefings," "no matter whether the messages are conveyed in real time through closed captioning or after the fact via transcripts." *Nat'l Ass'n of the Deaf*, 486 F. Supp. 3d at 58. Likewise, in *Pierce v. D.C.*, then-Judge Ketanji Brown Jackson rejected the District's unsupported assumption that a deaf person who uses ASL could communicate effectively through written notes and lip-reading. 128 F. Supp. 3d 250, 275-76 (D.D.C. 2015). After all, as the lower court found, ASL "has its own syntax and grammar" and "the vast majority of deaf people lack the ability to communicate effectively in English." *Id.* at 275. That reasoning applies with particular force here, given the unrebutted expert evidence and the complexity of White House press briefings.

Moreover, the requested accommodation of ASL interpretation is reasonable and feasible. The government did not argue below, and does not argue on appeal, that providing ASL interpretation would impose an undue burden or fundamentally alter White House press briefings. JA171. That is

unsurprising because, from 2021 through January 2025, the White House provided precisely this accommodation for its press briefings. JA155; *see also* JA46 (Plaintiffs' experts explaining that remote ASL interpretation can be supplied "without difficulty or significant logistical or financial burden" through existing picture-in-picture technology).

The district court thus correctly found that Plaintiffs are likely to succeed in showing that ASL interpretation is necessary to provide meaningful access to White House press briefings.

### B. The Government Is Wrong That Closed Captions and After-the-Fact Transcripts Provide Meaningful Access

Despite Plaintiffs' unrebutted record evidence—including expert linguistic evidence—and despite offering no contrary evidence of its own, the government argues there was "no basis in the record" for the district court's merits conclusion. Br. 51. It contends that the district court's analysis was "flawed in multiple ways," principally because Plaintiffs supposedly have meaningful access to White House press briefings through English closed captions and after-the-fact English transcripts. *Id.* That is wrong.

As an initial matter, the government repeatedly mischaracterizes the record as showing merely that deaf Americans face "difficulty" reading English. *See, e.g.*, Br. 47 ("difficulty understanding written English"); Br. 51

(“face difficulties in comprehending written English”); Br. 52 (“reading difficulties”); Br. 53 (“difficulty following real-time closed captioning”); Br. 54 (“may take longer to read and understand written transcripts”). But Plaintiffs’ evidence did not show mere difficulty; it showed inaccessibility. For many deaf persons who rely on ASL, written English is akin to a foreign language: “access to public press briefings via written English captions would be the same as if those captions and texts were provided in Spanish, Russian, or Chinese.” JA45. Plaintiffs’ experts further explained that recognizing isolated words does not equal comprehension. Deaf persons who rely primarily on ASL may identify individual words but misunderstand the sentence because they lack mastery of English syntax; they may even misunderstand written English to mean the *opposite* of what it says. JA53-54. Thus, “providing ASL signers with written English does not make information accessible,” because a deaf person with “little to no mastery of English can neither reliably understand the intended meaning in written English nor reliably determine when they must seek clarification of a misunderstanding.” JA50; *see also* JA57 (NAD then-Chief Operating Officer explaining inability of many deaf persons to understand captioned press briefings); JA36 (Plaintiff Ford explaining his own inability to understand captioned press briefings).

The government next argues that because some deaf Americans "can read English well," other deaf Americans' inability to understand written English cannot be "solely by reason of" deafness. Br. 51-52. Plaintiffs' experts acknowledged that some deaf individuals are bilingual and use ASL for face-to-face communication and English for written communication. Even so, as they explained, and the government did not even attempt to rebut below, "fluency in English is not widespread among the Deaf community." JA50-51. The fact that some deaf people can read English—including, for example, English speakers and writers who lost their hearing later in life and never learned ASL—does not establish that English captions or transcripts provide meaningful access to those deaf Americans who rely primarily on ASL.

Nor does it transform the language-access barriers facing those individuals into a non-disability-based problem. Plaintiffs' experts explained that many deaf children are born into hearing homes where ASL is not used, while spoken English is inaccessible because they cannot hear it in their environment. JA51. As a result, many deaf children "do not typically have a strong language foundation" when learning to read English, and many deaf adults have limited English proficiency. JA51-54. Those are disability-related barriers. The government cannot avoid Section 504 by pointing to language-

access barriers that flow from deafness and then treating those barriers as independent of disability.

Nor do NAD's prior cases seeking closed captions help the government. Effective communication and meaningful access are fact-dependent. Br. 49-50. NAD has never argued that one auxiliary aid is sufficient for all deaf people in all settings. Closed captions play an important role for many deaf people, including those who rely on written English or on a combination of ASL and captions. But that does not mean captions are sufficient for deaf ASL users who cannot effectively understand written English.

The district court decision denying a preliminary injunction to provide ASL interpretation in *Yelapi v. DeSantis*, 487 F. Supp. 3d 1278 (N.D. Fla. 2020), is also distinguishable. There, Florida's governor was already providing ASL interpretation for "many (perhaps most) briefings," *id.* at 1287, and also had no control over whether private broadcasters displayed the ASL interpreter, *id.* at 1284-86. Here, (1) the White House refused to provide *any* ASL interpretation prior to the preliminary injunction, and (2) has *its own* communication channels on which it could, and previously did, display ASL interpreters. *Yelapi* thus reinforces that meaningful access is context-specific; it does not show that captions and transcripts suffice here.

The government fares no better by shifting from real-time closed captions to after-the-fact written transcripts. Br. 52-54. At the threshold, the government identifies no record evidence establishing that complete, official transcripts are reliably available for all covered briefings. But even assuming they were, transcripts would not solve the access problem. Like captions, transcripts are written English, which many deaf ASL users cannot effectively understand. The government points to no record evidence showing that deaf ASL users who cannot understand written English can somehow obtain meaningful access by reading transcripts later. To the contrary, Plaintiffs' unrebutted evidence showed that many deaf individuals have "little to no mastery of English," cannot reliably understand written English, and cannot access dense White House briefings through English text. JA50, JA54. Judge Boasberg rejected the same argument in *NAD I*, explaining that deaf people who rely on ASL "cannot effectively receive the messages conveyed at the White House press briefings" through written English, "no matter whether the messages are conveyed in real time through closed captioning or after the fact via transcripts." 486 F. Supp. 3d at 58; see also *Martinez v. Cuomo*, 459 F. Supp. 3d 517, 525 (S.D.N.Y. 2020) (holding that live broadcasts with closed

captioning did not accommodate plaintiffs and similarly situated deaf individuals who could not read English).

Transcripts also fail for an independent reason: they provide delayed access to a different written product, not meaningful access to the live public briefing itself. White House press briefings are live events in which the President and Press Secretary communicate with the public and respond to questions in real time. Hearing Americans receive that information as it occurs, including the speaker's tone, emphasis, and context. Relegating deaf ASL users to later written English transcripts denies them equal access to the live program the government actually provides.

The government tries to downplay that real-time access by contrasting these briefings with the COVID-19 briefings at issue in *NAD I*. Br. 10-11. But as the district court recognized, White House briefings here also address urgent and consequential matters, including war, the economy, healthcare, natural disasters, government shutdowns, troop deployments, and major legislation affecting Medicare and Medicaid. JA173. Section 504 requires meaningful access to the program the government actually provides; English transcripts do not provide that access.

### C. The Government's Claimed "Enormous Implications" Ignore the Fact-Specific Nature of Section 504

Lastly, the government argues that the district court's ruling has "enormous" and "unworkable implications" because it supposedly could require ASL interpretation for every oral communication by every government official—and perhaps ASL translation of government websites, Federal Register pages, and other written materials. Br. 54-56. But as the government itself emphasizes, meaningful access and effective communication are fact-specific inquiries. Br. 49-50. There is no one-size-fits-all rule requiring the same accommodation in every setting for every deaf person. Different programs, different communications, different disabilities, different individual needs, and different proposed accommodations require different analyses.

The government's hypotheticals also ignore the limits built into disability-discrimination law. Other cases would turn on their own records, including—most significantly for the government's hypotheticals—any undue-burden or fundamental-alteration defenses the defendant chose to raise. If the government believes a requested accommodation in some future case would be "unworkable," Br. 56, it may submit evidence to support that defense, and the court would consider that evidence on the record presented. Those

context-specific questions are not presented here, where the government *chose to present no evidence at all*, and did not even argue that providing ASL interpretation for White House press briefings would impose an undue burden on the program or otherwise be infeasible. JA171. Again, that is unsurprising because the White House provided the same accommodation for four years.

The government's speculation about other cases cannot overcome the unrebutted record in this one: English captions and transcripts do not provide Plaintiffs meaningful access, and ASL interpretation is a proven, feasible accommodation.

## CONCLUSION

For the foregoing reasons, the Court should affirm.

Dated: May 26, 2026

Respectfully submitted,

*/s/ Ian S. Hoffman*

Ian S. Hoffman
Robert J. Katerberg
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
(202) 942-5000
ian.hoffman@arnoldporter.com
robert.katerberg@arnoldporter.com

*Counsel for Appellees*

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the foregoing brief contains 12,914 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point CenturyExpd BT font.

Dated: May 26, 2026

Respectfully submitted,

*/s/ Ian S. Hoffman*
Ian S. Hoffman

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2026, I caused the foregoing document to be electronically filed using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

*/s/ Ian S. Hoffman*
Ian S. Hoffman