[ORAL ARGUMENT NOT YET SCHEDULED]

**No. 25-5402**

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

NATIONAL ASSOCIATION OF THE DEAF and DERRICK FORD,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the District of Columbia

# BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION OF THE DISTRICT OF COLUMBIA AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Aditi Shah
Scott Michelman
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, DC 20045
202-457-0800
ashah@acludc.org

June 2, 2026

*Counsel for Amicus Curiae*

# COMBINED CERTIFICATES

## Certificate as to Parties, Rulings, and Related Cases

Except for American Civil Liberties Union of the District of Columbia, all parties appearing before the district court and in this Court are listed in the parties' briefs. References to the rulings at issue and any related cases also appear in the parties' briefs. No intervenors or *amici* appeared in the district court.

## Statutes and Regulations

All applicable statutes are contained in the addendum to the Brief for Defendants-Appellants.

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(A), *amicus* American Civil Liberties Union of the District of Columbia states that it is a 501(c)(3) non-profit organization and has no parent corporations. It does not issue any stock, and therefore no publicly owned corporation holds ten percent or more of its stock.

*/s/ Aditi Shah*
Aditi Shah
*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**


COMBINED CERTIFICATES ........................................................................ i

TABLE OF AUTHORITIES ........................................................................ iii

GLOSSARY ........................................................................................ viii

IDENTITY AND INTEREST OF *AMICUS CURIAE* ........................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

ARGUMENT ........................................................................................ 7

I. The District Court Had Inherent Equitable Power To Enjoin the Government from Violating Section 504 of the Rehabilitation Act. .................................. 7

A. Federal Courts Have Inherent Equitable Power To Enjoin Government Officials from Acting Ultra Vires Their Statutory Authority ........................................................................ 7

B. Congress Did Not Preclude Equitable Review of Plaintiffs' Rehabilitation Act Claim.……………………………..………...10

II. Where a Statute Does Not Limit Judicial Review, the Ordinary *McAnnulty* Standard Applies to Statutory Authority Ultra Vires Claims. ......................12

A. *McAnnulty* Provides the Default Standard for Statutory Authority Ultra Vires Claims…...…………………………………………12

B. The Heightened *Leedom* Standard Applies Only If the Statute Limits Judicial Review of the Challenged Act..……………………………15

C. Applying the *Leedom* Standard to All Statutory Authority Ultra Vires Claims Would Undermine Separation-of-Powers Principles and Courts' Ability To Enjoin Violations of Federal Law………………21

III. The Ordinary *McAnnulty* Standard Applies to Plaintiffs' Rehabilitation Act Claim. ........................................................................................24

CONCLUSION ..................................................................................... 27

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
321 F.3d 1166 (D.C. Cir. 2003) ....................23

*Am. Council of the Blind v. Paulson*,
463 F. Supp. 2d 51 (D.D.C. 2006)....................12

*Am. Council of the Blind v. Paulson*,
525 F.3d 1256 (D.C. Cir. 2008) ....................12

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*,
618 F.2d 784 (D.C. Cir. 1979) ....................20

*American School of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902) .................... 4, 5, 13, 14, 22

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) ....................2, 3, 7, 8, 9, 11, 12

*Ass'n for Gov't Accountability v. Simon*,
128 F.4th 976 (8th Cir. 2025) ....................9

*Ass'n for Gov't Accountability v. Simon*,
146 S. Ct. 105 (2025)....................9

*Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
502 U.S. 32 (1991) ....................24

*Boire v. Greyhound Corporation*,
376 U.S. 473 (1964) ....................17

*Bowen v. Michigan Acad. of Fam. Physicians*,
476 U.S. 667 (1986) ....................21

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ....................8

*Chamber of Com. of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .......................................................... 14, 15, 20, 22

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) ..........................................................................18

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) .........................................................................................19

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .........................................................................................10

*Dreamland Baby Co. v. Consumer Prod. Safety Comm'n*,
2025 WL 2758476 (D.D.C. Sept. 26, 2025).......................................................24

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
426 U.S. 548 (1976) .........................................................................................19

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) .................................................... 16, 18, 23, 24, 25

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ...........................................................................................4

*Glob. Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) .............................................................................18

*Harmon v. Brucker*,
355 U.S. 579 (1958) .................................................................................. 6, 19, 22

*Humane Society of the U.S. v. Glickman*,
217 F.3d 882 (D.C. Cir. 2000) ..........................................................................20

*Immigr. & Naturalization Serv. v. Chadha*,
462 U.S. 919 (1983) .........................................................................................21

*J.W. Hampton, Jr. & Co. v. United States,*
276 U.S. 394 (1928) .........................................................................................21

*King v. Youngkin*,
122 F.4th 539 (4th Cir. 2024) ....................................................................9

*Lane v. Pena*,
518 U.S. 187 (1996) ....................................................................12

*Lane v. Pena*,
867 F. Supp. 1050 (D.D.C. 1994)....................................................................12

*Learning Res., Inc. v. Trump*,
146 S. Ct. 628 (2026)....................................................................19

*Leedom v. Kyne*,
358 U.S. 184 (1958) .................................................................... 3, 5, 16, 17, 25

*Marbury v. Madison*,
5 U.S. 137 (1803) ....................................................................21

*Marin Audubon Soc'y v. Fed. Aviation Admin.*,
121 F.4th 902 (D.C. Cir. 2024) ....................................................................20

*Mathis v. United States Parole Comm'n*,
749 F. Supp. 3d 8 (D.D.C. 2024)....................................................................1, 12

*McQuiggin v. Perkins*,
569 U.S. 383 (2013) ....................................................................8

*Miller v. French*,
530 U.S. 327 (2000) ....................................................................7

*Nat'l Ass'n of Postal Supervisors v. United States Postal Serv.*,
26 F.4th 960 (D.C. Cir. 2022) ....................................................................18

*Nat'l Tr. for Historic Pres. in the U.S. v. Nat'l Park Serv.*,
Nos. 26-5123, 26-5134 (D.C. Cir. 2026)....................................................................1

*New Mexico v. Musk*,
784 F. Supp. 3d 174 (D.D.C. 2025)....................................................................24

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) .................................................. 5, 13, 16, 17, 18, 22, 23, 26

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) ................................................... 3, 14, 18

*Patel v. Garland*,
596 U.S. 328 (2022) ...........................................................................9

*Philadelphia Co. v. Stimson*,
223 U.S. 605 (1912) .........................................................................14

*Porter v. Warner Holding Co.*,
328 U.S. 395 (1946) ...........................................................................8

*Seminole Tribe v. Florida*,
517 U.S. 44 (1996) .........................................................................8, 11

*Stark v. Wickard*,
321 U.S. 288 (1944) .........................................................................14

*Train v. City of New York*,
420 U.S. 35 (1975) ...................................................................... 19, 22

*United States v. Nourse*,
34 U.S. 8 (1835) .............................................................................21

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
535 U.S. 635 (2002) ......................................................................8, 11

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .......................................................................26

**Statutes**

29 U.S.C. § 794(a) ...............................................................................3

42 U.S.C. § 1396a(a)(30)(A) .................................................................11

5 U.S.C. § 559 .....................................................................................26

**Other Authorities**

Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*,
97 Colum. L. Rev. 1612 (1997) ....................................................................26

S. Bray & P. Miller, *Getting into Equity*,
97 Notre Dame L. Rev. 1763 (2022) ..............................................................7

# GLOSSARY

| | |
|---|---|
| **ACLU-DC** | American Civil Liberties Union of the District of Columbia |
| **Defs. Br.** | Brief of Defendants-Appellants |
| **J.A.** | Joint Appendix |
| **NLRA** | National Labor Relations Authority |
| **NLRB** | National Labor Relations Board |

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

*Amicus curiae* American Civil Liberties Union of the District of Columbia ("ACLU-DC") is a non-profit, non-partisan organization with more than 10,000 members. It is dedicated to the principles of liberty, separation of powers, and the rule of the law enshrined in the Constitution. ACLU-DC regularly appears in the courts of this Circuit as counsel or *amicus* in cases seeking to enjoin unlawful actions by government officials, including cases involving claims that federal officials acted ultra vires their statutory authority. *E.g.*, *Nat'l Tr. for Historic Pres. in the U.S. v. Nat'l Park Serv.*, Nos. 26-5123, 26-5134 (D.C. Cir. 2026) (*amicus*); *Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8 (D.D.C. 2024) (counsel).

Pursuant to Circuit Rule 29(a)(4)(E), *amicus* certifies that no counsel for a party authored this brief in whole or in part and that no person or entity other than *amicus*, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief. All parties have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs-Appellees the National Association of the Deaf and Derrick Ford filed this lawsuit to challenge the government's refusal to provide American Sign Language interpretation during White House press briefings. The district court granted Plaintiffs a preliminary injunction based on Section 504 of the Rehabilitation Act, which prohibits discrimination against people with disabilities in any program

receiving federal funding or conducted by any Executive agency. The court held that Section 504 is enforceable because it implies a private right of action and, alternatively, even if it does not, it is enforceable under the court's inherent equitable power. It further held that Plaintiffs are likely to succeed on the merits of their claim and that the other preliminary injunction factors favor them.

The government argues that the district court erred in granting the preliminary injunction because (1) Section 504 does not imply a private right of action, (2) Section 504 is unenforceable under the court's inherent equitable power, and (3) Plaintiffs are unlikely to succeed on the merits of their Section 504 claim.

*Amicus* agrees with Plaintiffs and the district court that Section 504 implies a private right of action for the reasons they identify. It writes to address only the government's second argument, which implicates a critical check on the Executive Branch's ability to violate laws duly enacted by Congress.

The district court's inherent equitable power holding relies principally on *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), where the Supreme Court held that "federal courts may in some circumstances grant injunctive relief against state [and federal] officers who are violating, or planning to violate, federal law" even in the absence of a private right of action. *Id.* at 326. Although "this equitable power 'is subject to express and implied statutory limitations,'" the district court held "there is no such limitation here." J.A. 168 (quoting *Armstrong*,

575 U.S. at 327).

When a federal official violates federal law, the official acts "ultra vires"—*i.e.*, in excess of their constitutional or statutory authority. The holding in *Armstrong* reflects the well settled principle, tracing back to English equity practice, that federal courts can enjoin government officials from acting ultra vires their statutory authority, even absent a private right of action.

The government raises two objections to the district court's analysis. First, it argues Congress precluded judicial review of Plaintiffs' claim because it "provid[ed] for direct judicial enforcement of Section 504 against funding recipients (but not federal programs)" and "provid[ed] for Section 504's expansion to federal programs to be 'carr[ied] out' through agency action." Defs. Br. 42 (quoting 29 U.S.C. § 794(a)). Second, it argues Plaintiffs' claim fails because it does not satisfy the heightened standard for ultra vires claims under *Leedom v. Kyne*, 358 U.S. 184 (1958), which requires the agency to have acted "'in excess of its delegated powers and *contrary to a specific prohibition in the*' *statute that is* '*clear and mandatory*.'" Defs. Br. 39-40 (emphasis added) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009), which applies *Leedom*). The government describes this standard as a "Hail Mary pass." *Id.* 40 (quoting *Nyunt*, 589 at 449).

Both arguments fail. The government's first point is easily rejected: nothing

in the statutory scheme suggests that Congress intended to preclude judicial review of Plaintiffs' Rehabilitation Act claim. As the district court correctly determined, the Rehabilitation Act "bears no resemblance to [the] detailed and exclusive remedial schemes that the Supreme Court has found to displace the court's equitable power." J.A. 168. Justice Scalia's opinion for the Court in *Armstrong* refutes the government's position, both in terms of what is necessary to displace courts' inherent equitable power and regarding the significance of the Court's other precedents on which the district court relied.

The government's second argument is more complex but no less wrong, as it rests on a false premise: that ultra vires claims pertaining to statutory authority are categorically subject to the "Hail Mary" standard of *Leedom*. Defs.' Br. at 40.[1] The government's blanket assertion is contrary to binding precedent and ignores a critical distinction that is foundational to this Court's and the Supreme Court's ultra vires jurisprudence: The heightened standard applies to ultra vires claims that an official exceeded their statutory authority *only* where there is a statutory limitation on judicial review. Where there is no statutory limitation on judicial review, the ordinary, century-old standard of *American School of Magnetic Healing v.*

[1] There is no dispute in this case that the "Hail Mary" standard is inapposite to claims that a federal official's action is ultra vires their *constitutional* authority. *See, e.g.*, *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); Defs. Br. 38-39.

*McAnnulty*, 187 U.S. 94 (1902), applies. Under that standard, courts exercise their powers in equity to determine whether the challenged conduct is authorized by law. This is the default standard courts apply to determine whether officials have acted ultra vires their statutory authority.

In contrast, the heightened *Leedom* standard for ultra vires claims applies only where Congress intended to limit judicial review of the challenged action. In *Leedom*, the plaintiff sought to vacate an action by the National Labor Relations Board ("NLRB") that was contrary to the express requirements of the National Labor Relations Act ("NLRA") but was not a type of action within the scope of the reticulated judicial review scheme set by Congress. 358 U.S. at 185-87. The Court authorized the plaintiff to proceed, but its explanation of the suit—"one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act," *id.* at 188—has come to stand for a key limitation on ultra vires review in circumstances like those in *Leedom*. Specifically, where a challenger to executive action proceeds outside the confines of a reticulated judicial review scheme set by Congress, the challenger is required to show not only that the action was contrary to the law, but that it was "in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (cleaned up). This requirement exists to prevent "an easy end-run around the limitations of . . . judicial-review statutes." *Id.*

The *Leedom* standard of review for ultra vires claims is an exception to the default *McAnnulty* standard. Where plaintiffs are not trying to proceed in the face of a statutory limitation on judicial review, courts exercise their equitable power to consider a claim that an official acted ultra vires and apply the default *McAnnulty* standard to assess the merits of that claim: If the plaintiff demonstrates that the action was unauthorized by the statute, it will prevail. Indeed, the same year as *Leedom*, the Court decided the ultra vires claim in *Harmon v. Brucker*, 355 U.S. 579 (1958), where there was no private right of action and no statutory limitation on judicial review, by assessing simply "whether the [official] did exceed his powers" under the statutes at issue. *Id.* at 582. Subsequent decisions from the Supreme Court and this Court have toed the line between *McAnnulty*'s ordinary rule and *Leedom*'s special one. Because the Rehabilitation Act does not indicate any intent to limit judicial review of Plaintiffs' claim, the government is incorrect that *Leedom* applies here.

Subjecting all statutory authority ultra vires claims to the heightened *Leedom* standard, as the government urges, would contravene a century of binding precedent and undermine courts' authority to remedy harms caused by executive action in violation of limits set by Congress. Accordingly, if this Court reaches the inherent equitable power issue, it should (1) hold that Congress did not preclude judicial review of Plaintiffs' Rehabilitation Act claim, and (2) reject the government's argument that the heightened *Leedom* standard applies to all ultra vires claims that a

federal official exceeded their statutory authority, and apply the ordinary *McAnnulty* standard to Plaintiffs' Rehabilitation Act claim.

## ARGUMENT

### I. The District Court Had Inherent Equitable Power To Enjoin the Government from Violating Section 504 of the Rehabilitation Act.

#### A. Federal Courts Have Inherent Equitable Power To Enjoin Government Officials from Acting Ultra Vires Their Statutory Authority.

Federal courts have inherent equitable power to enjoin government officials who act ultra vires (exceed) their statutory authority. The Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against state [and federal] officers who are violating, or planning to violate, federal law." *Armstrong*, 575 U.S. at 326. Such equitable authority "reflects a long history of judicial review of illegal executive action, tracing back to England" and "is a judge-made remedy." *Id.* at 327. No statutory cause of action is needed to invoke a court's equity jurisdiction. *See* S. Bray & P. Miller, *Getting into Equity*, 97 Notre Dame L. Rev. 1763, 1798-99 (2022).

This equitable power "is subject to express and implied statutory limitations." *Armstrong*, 575 U.S. at 327. But a statute "should not [be] construe[d] . . . to displace courts' traditional equitable authority absent the 'clearest command,' or an 'inescapable inference' to the contrary." *Miller v. French*, 530 U.S. 327, 340 (2000)

(quoting, in turn, *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979), and *Porter v. Warner Holding Co.,* 328 U.S. 395, 398 (1946)). Thus, the government's fixation on distinguishing *McQuiggin v. Perkins*, 569 U.S. 383 (2013), *see* Defs.' Br. 43-45, avails it little, as *McQuiggin*'s general statement that equitable authority is difficult to displace is hardly unique.

The Supreme Court has recognized two instances in which a statute implicitly precludes equitable review: (1) where there is "a detailed and exclusive remedial scheme," *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 647 (2002), and (2) where the statute provides an alternative remedy and the right at issue is "judicially unadministrable," *Armstrong*, 575 U.S. at 328.

The first path—a detailed and exclusive remedial scheme—exists only where a statute contains "intricate procedures" that so restrict the scope of remedies as to reflect Congressional intent to displace courts' traditional equitable powers. *Verizon Md.*, 535 U.S. at 647 (cleaned up). One of the few examples of such a statute is the Indian Gaming Regulatory Act, analyzed in *Seminole Tribe v. Florida*, 517 U.S. 44 (1996). That statute contained an "intricate enforcement scheme" under which a tribe and a state at odds over a tribal gaming regulation would submit dueling proposals to a mediator and then, if the state did not accept the mediator's chosen proposal, the Secretary of the Interior would prescribe rules. *See id.* at 46, 50. The government's effort to distinguish *Verizon Maryland* and *Seminole Tribe* because they dealt with

state officers' sovereign immunity fails: *Armstrong* explicitly relied on both in explaining statutory limitations on equitable review, 575 U.S. at 327-28, and other Circuits have applied their frameworks to determine whether Congress precluded equitable review, *see Ass'n for Gov't Accountability v. Simon*, 128 F.4th 976, 978-79 (8th Cir. 2025), *cert. denied*, 146 S. Ct. 105 (2025); *King v. Youngkin*, 122 F.4th 539, 546-48 (4th Cir. 2024). There is no basis for the government's assertion that the "default rule" is different in equity suits against state versus federal officers. Defs. Br. 44. Actions by Executive Branch officials are no less presumed to be subject to judicial review than state officers' actions. *See Patel v. Garland*, 596 U.S. 328, 346 (2022).

For the second path to foreclosure of equitable enforcement, *Armstrong* requires both an alternative remedy *and* that the right at issue be judicially unadministrable. 575 U.S. at 328 (holding that the alternative remedy "might not, *by itself*, preclude the availability of equitable relief . . . [b]ut it does so when combined with the judicially unadministrable nature of [the statute's] text"). To be judicially unadministrable, the statutory right must be sufficiently "broad[]" such that it imposes a "judgment-laden standard" and one for which Congress would want to "make the agency remedy that it provided exclusive" to achieve "expertise, uniformity," and other such benefits. *Id.* (cleaned up).

These principles regarding Congressional intent to preclude equitable review

operate against the backdrop of "a strong presumption in favor of judicial review of agency action." *Dep't of Com. v. New York*, 588 U.S. 752, 824 (2019).

### B. Congress Did Not Preclude Equitable Review of Plaintiffs' Rehabilitation Act Claim.

The district court correctly determined that the Rehabilitation Act does not displace the court's equitable power to enjoin the government from violating it. The government does not dispute that there is no express preclusion of review in the statute. Instead, it argues that Congress "impliedly preclud[ed] any equitable enforcement of Section 504 against federal programs" because (1) the Rehabilitation Act makes remedies under analogous anti-discrimination statutes available for Section 504 claims against federal funding recipients but does not do the same for Section 504 claims against federal programs, and (2) the Act requires agencies to promulgate regulations, signaling that Congress intended review to be available only under the Administrative Procedure Act ("APA"), which it is not here because Defendants-Appellants are not "agencies" under the APA. Defs. Br. 42-46.

Neither theory comes within the circumstances contemplated in *Armstrong*, which lays out two specific paths to foreclosure of equitable enforcement—neither of which is an *expressio-unius* inference of the kind on which the government relies. The first path (intricate remedial scheme) is clearly inapplicable here. If the Court reaches the equitable enforcement question, it will have already concluded that no

implied right of action exists for claims like Plaintiffs'—meaning that, in that case, Congress would have prescribed no remedy at all for Plaintiffs in the Rehabilitation Act, much less an "exclusive" one that would render enforcement via courts' inherent equitable power "*inconsistent* with" a "'detailed'" and "limited" "'remedial scheme'" that "Congress had prescribed." *Verizon Md.*, 535 U.S. at 647 (emphasis added) (quoting *Seminole Tribe*, 517 U.S. at 74). That the APA may be available in other circumstances but not this one, Defs.' Br. 45, does not aid the government, as Justice Scalia's unanimous opinion in *Verizon Maryland* rejected the proposition that a partial or incomplete remedy was the same as a "detailed remedial scheme" that is "inconsistent with" equitable enforcement. 535 U.S. at 643, 647 (citation omitted).

Defendants do not even try to satisfy the second path to foreclosure—that (1) there exists an alternative remedy and (2) the right at issue is "judicially unadministrable," *Armstrong*, 575 U.S. at 328—and for good reason. Here, at minimum, the right at issue is not "judicially unadministrable." *Id.* Illustrating that concept, the Medicaid Act provision at issue in *Armstrong* required states, with respect to a particular healthcare service, to "provide such methods and procedures" regarding "utilization" and "payment" as "necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers." 42 U.S.C. § 1396a(a)(30)(A), *quoted in Armstrong*, 575 U.S. at

323. The Court found this requirement "judicially unadministrable" because "[i]t is difficult to imagine a requirement broader and less specific." *Id.* at 328. By contrast, the Rehabilitation Act's prohibition on disability discrimination is neither too broad nor nonspecific for judicial enforcement—as reflected in the regular enforcement of the Rehabilitation Act (regardless of the precise cause of action invoked) in this Circuit. *See, e.g., Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8, 26 (D.D.C. 2024) (granting preliminary injunction to enforce the Rehabilitation Act against federal officials who failed to accommodate supervisees with disabilities); *Am. Council of the Blind v. Paulson*, 463 F. Supp. 2d 51, 63 (D.D.C. 2006) (enforcing the Rehabilitation Act against the Secretary of the Treasury for discrimination as to currency design), *aff'd*, 525 F.3d 1256 (D.C. Cir. 2008); *Lane v. Pena*, 867 F. Supp. 1050, 1074-75 (D.D.C. 1994) (granting injunction against the U.S. Merchant Marine Academy for violating the Rehabilitation Act), *vacated in part on other grounds as explained in Lane v. Pena*, 518 U.S. 187, 190 (1996).

The district court accordingly had inherent equitable power to enjoin the government from violating the Rehabilitation Act.

## II. Where a Statute Does Not Limit Judicial Review, the Ordinary *McAnnulty* Standard Applies to Statutory Authority Ultra Vires Claims.

### A. *McAnnulty* Provides the Default Standard for Statutory Authority Ultra Vires Claims.

Where there is no private right of action but also no statutory limitation on

judicial review, this Court and the Supreme Court have exercised their powers in equity and applied the ordinary, default standard to adjudicate claims that a government official acted ultra vires their statutory authority: whether the action was authorized by law.

More than a century ago, the Supreme Court set out the default standard for ultra vires claims in *McAnnulty*. There, the Postmaster General invoked statutory authority to stop mail service and prohibit payment of postal money orders to a business he deemed fraudulent. 187 U.S. at 100 & n.†. The Court disagreed with the Postmaster General that the plaintiffs' business activities violated mail-fraud statutes and held that the Postmaster General did not have statutory authority to withhold the plaintiffs' mail. *Id.* at 107. The Court noted that "[t]he acts of all [government] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Id.* at 108. Because the Postmaster General's order was "based on a mistaken view of the law," the Court instructed the lower courts to grant plaintiffs' motion for a temporary injunction prohibiting further withholding of the mail from the plaintiffs. *Id.* at 110. The Court did not require the plaintiffs to show that the action was "contrary to a *specific prohibition* in a statute," *Nuclear Regul. Comm'n*, 605 U.S. at 681 (cleaned up), before enjoining the Postmaster General's action as ultra vires.

As this Court recognized, "[t]he reasoning of *McAnnulty* has been employed

repeatedly." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). In *Philadelphia Co. v. Stimson*, 223 U.S. 605 (1912), the standard the Supreme Court applied to determine whether the Secretary of War acted within the scope of his authority was whether he "exceed[ed] the power which had been conferred" to him by Congress, *id.* at 638—the *McAnnulty* standard. In *Stark v. Wickard*, 321 U.S. 288 (1944), the Court held that "[t]he responsibility of determining the limits of statutory grants of authority . . . is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction," and on remand, "[t]he trial court is free to consider whether the statutory authority given the Secretary [of Agriculture] is a valid answer to the petitioners' contention." *Id.* at 310-11.

In each of these cases challenging government officials' actions as beyond their statutory powers, the Court conducted a straightforward inquiry to determine whether the action was ultra vires: It asked whether the action was authorized by Congress, *not* (per the government's proposed standard) whether the official acted "'in excess of [their] delegated powers and contrary to a specific prohibition in the' statute that is 'clear and mandatory.'" Defs. Br. 39-40 (quoting *Nyunt*, 589 F.3d at 449). Nor did the Court describe the standard in those cases as "stringent" or as requiring "extreme" error. *Id.* 41 (citation omitted). Instead, the inquiry is whether the act was "justified by some law." *McAnnulty*, 187 U.S. at 108. In cases where the act was not, courts exercise their equitable power to enjoin the unlawful action.

This Court likewise has applied the ordinary *McAnnulty* standard where there was no statutory limitation on judicial review. In *Chamber of Commerce v. Reich*, which concerned whether the President's Executive Order "barring the federal government from contracting with employers who hire permanent replacements during a lawful strike . . . conflict[ed] with the [NLRA]," this Court first held that it had jurisdiction under *McAnnulty* and its progeny to review the plaintiffs' claim notwithstanding the lack of a private right of action. 74 F.3d at 1324, 1328. On the merits, this Court "look[ed] to the extensive body of Supreme Court cases that mark out the boundaries of the field occupied by the NLRA" to determine whether the "tension between the President's Executive Order and the NLRA" was an "unacceptable conflict." *Id.* at 1333-34. It did not ask whether the Executive Order was contrary to a specific prohibition in the NLRA. Indeed, the Court made clear that it could not "possibly matter for purposes of reviewability" whether the mandate the plaintiffs seek to enforce "is found in the statute in so many words." *Id.* at 1330.

In all these cases, where Congress did not limit judicial review, this Court and the Supreme Court assessed executive action using the straightforward *McAnnulty* standard: asking simply whether the action was authorized by law.

### B. The Heightened *Leedom* Standard Applies Only If the Statute Limits Judicial Review of the Challenged Act.

The government's proposed standard of review for ultra vires claims, which

stems from *Leedom*, applies only when Congress has limited judicial review of the challenged act or claim at issue. In that circumstance, plaintiffs can obtain review under *Leedom* only where "(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022). As the Supreme Court noted in *Nuclear Regulatory Commission*, this approach prevents end-runs around Congress's chosen review procedures. 605 U.S. at 681. But where Congress has not restricted judicial review, *Leedom*'s heightened standard is inapposite.

In *Leedom*, a labor union challenged a decision by the NLRB to include both professional and nonprofessional employees in a bargaining unit without holding a vote by the professional employees. 358 U.S. at 185. The union sued, claiming that the NLRB's action directly conflicted with a requirement in the NLRA. *Id.* at 186. The government did not dispute that the action violated the statute, but argued that the NLRA's judicial review provisions foreclosed the lawsuit. *Id.* at 187-88.

*Leedom* decided two related but separate issues: First, it held that even though the plaintiff was proceeding outside the judicial review structure of the NLRA, the district court could exercise its equitable powers to review the plaintiff's claim that the NLRB exceeded its statutory authority. *Id.* at 188. Second, it established a

heightened standard for plaintiffs to prevail on such claims: the defendant official must have acted "in excess of [his] delegated powers and *contrary to a specific prohibition* in the Act" that was "*clear and mandatory*." *Id*. (emphasis added). That standard was directly tied to the circumstances of that case, in which the plaintiff sought judicial review "apart from the review provisions of the [statute]." *Id.*

Post-*Leedom* cases make clear that the Court continued to require plaintiffs to show that the ultra vires action was "contrary to a specific," "clear and mandatory" statutory prohibition, *id.*, *only* where there was a statutory limitation on judicial review. For example, in *Boire v. Greyhound Corp.*, 376 U.S. 473 (1964), a union challenged an NLRB decision defining a bargaining unit and ordering an election among its employees, and the parties agreed that the type of decision at issue was, "in the normal course of events . . . not directly reviewable in the courts." *Id.* at 475-76. The Court accordingly assessed whether the case fell within "the painstakingly delineated procedural boundaries of [*Leedom*]," and, because it did not, reversed the lower court's decision in the union's favor. *Id.* at 481-82.

The most recent example from the Supreme Court is *Nuclear Regulatory Commission*. There, the petitioners challenged the Commission's decision to grant a license to an entity to store spent nuclear fuel in a Texas facility. 605 U.S. at 668-69. But the Hobbs Act limited judicial review of such decisions only to applicants for licenses or those who intervened in the licensing proceeding; because petitioners

were neither, they could not obtain review under the Act. *Id.* at 680. Petitioners asserted in the alternative "claims of ultra vires agency action." *Id.* The Court applied the *Leedom* standard to petitioners' ultra vires claim because the Hobbs Act specifically circumscribed review of the decisions at issue and petitioners were trying to proceed outside of the statutorily defined process. *See id.* at 681. Otherwise, "ultra vires review could become an easy end-run around the limitations of the Hobbs Act and other judicial-review statutes.'" *Id.* That reasoning has no purchase where there is no "judicial-review statute[]" and therefore no possible end-run. *Id.*

Likewise, the common denominator across this Court's decisions applying the *Leedom* standard to ultra vires claims is the presence of a statutory limitation on judicial review. *See, e.g.*, *Glob. Health Council v. Trump*, 153 F.4th 1, 20 & n.17 (D.C. Cir. 2025) (statutory scheme barred claim under the APA to enforce the statute); *Fed. Express Corp.*, 39 F.4th at 763 (statute exempted challenged agency action from review under the APA); *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970-71 (D.C. Cir. 2022) (same); *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721 (D.C. Cir. 2022) (same); *Nyunt*, 589 F.3d at 448-49 (channeling scheme under the Civil Service Reform Act precluded plaintiff's APA claim). Indeed, as noted above, this Court has repeatedly defined the "*Leedom v. Kyne* exception" by the presence of a statutory limitation on judicial review. *See, e.g.*, *Nyunt*, 589 F.3d at 449.

Neither *Leedom* nor the enactment of the APA in 1946 displaced the default *McAnnulty* standard in the ordinary case (*i.e.*, where Congress has not limited review). In *Harmon v. Brucker*, decided the same year as *Leedom* and more than ten years after the APA was enacted, the plaintiffs claimed that the Secretary of the Army acted ultra vires by issuing other-than-honorable discharge certificates to service members based on their conduct prior to induction. 355 U.S. at 580. The Court applied the *McAnnulty* standard and simply asked whether the statute authorized the Secretary's action, concluding it did not. *See id.* at 582-83.

Following *Leedom* and right up to the present, the Court has continued to apply *McAnnulty* where there is no statutory limitation on review. *See, e.g.*, *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 646 (2026) (applying the *McAnnulty* standard to invalidate President's tariffs); *Dames & Moore v. Regan*, 453 U.S. 654, 671-74 (1981) (holding that President's actions were authorized by the statute); *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 551-52 (1976) ("What we must decide is whether [the statute] also authorizes the President to control [petroleum and petroleum product] imports by imposing on them a system of monetary exactions in the form of license fees."); *Train v. City of New York*, 420 U.S. 35, 47 (1975) (holding that President's order to impound funds was unauthorized by the statute).

This Court's precedents likewise reflect that *Leedom* and the APA did not displace *McAnnulty*. As noted above, in *Chamber of Commerce*, this Court applied

the *McAnnulty* standard rather than the *Leedom* standard in considering whether the President's Executive Order conflicted with the NLRA. 74 F.3d at 1333-34. In *Humane Society of the U.S. v. Glickman*, 217 F.3d 882 (D.C. Cir. 2000), this Court, without relying on review under the APA or any "specific review provision," applied ordinary tools of statutory interpretation to assess the plaintiffs' claim that the agency's decision that a permit was not required to kill migratory birds violated the Migratory Bird Treaty Act. *Id.* at 884, 886-88. In neither case did the Court ask whether the act was contrary to a specific, clear, and mandatory statutory prohibition. *See also Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 912 (D.C. Cir. 2024) (holding that regulations issued by an entity within the Executive Office of the President were ultra vires the entity's statutory authority because "[n]o statute confers rulemaking authority" on that entity—*i.e.*, applying the ordinary *McAnnulty* standard); *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*, 618 F.2d 784, 796 (D.C. Cir. 1979) (en banc) (applying the ordinary *McAnnulty* standard in rejecting the plaintiffs' claim that the President's Executive Order was outside the President's authority under a federal statute).

The lesson of these precedents is clear: A plaintiff challenging a government official's action as ultra vires the official's statutory authority is not automatically required to show that the action was contrary to a clear and mandatory statutory prohibition. The default rule is the opposite: The *Leedom* standard applies *if and only*

*if* there is a statutory limitation on judicial review.

### C. Applying the *Leedom* Standard to All Statutory Authority Ultra Vires Claims Would Undermine Separation-of-Powers Principles and Courts' Ability To Enjoin Violations of Federal Law.

The government's position that *all* claims challenging statutory violations as ultra vires must meet the high *Leedom* bar would frustrate courts' long-recognized power to enjoin statutory violations by federal officials at an unacceptable cost to the separation of powers. Since *Marbury v. Madison*, 5 U.S. 137 (1803), Article III courts have reviewed challenges to violations of federal law to ensure "the boundaries between each branch" are "fixed 'according to common sense and the inherent necessities of the governmental co-ordination.'" *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 962 (1983) (Powell, J., concurring) (quoting *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 406 (1928)). In recognition of the judiciary's role in enforcing statutory constraints on Executive Branch authority, Congress drafts legislation against the "strong" background presumption that judicial review will be available. *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986). Indeed, "[t]he very essence of civil liberty . . . consists in the right of every individual to claim the protection of the laws, whenever he receives an injury," *Marbury*, 5 U.S. at 163, and the judiciary's "duty . . . to decide questions of right" applies "not only between individuals, but between the government and individuals," *United States v. Nourse*, 34 U.S. 8, 28 (1835).

Applying the *Leedom* standard to all claims that an official has acted ultra vires their statutory authority would unduly limit courts' ability to enjoin illegal executive action. In *Train*, for example, the Supreme Court applied the ordinary *McAnnulty* standard in assessing whether President Nixon's order to impound funds was authorized by the Federal Water Pollution Control Act and held that it was unlawful because Congress had directed the expenditure of the funds, *not* because it had specifically prohibited impoundment. 420 U.S. at 45-47. Likewise, in *Harmon*, there was no clear and mandatory statutory prohibition barring the Secretary from issuing other-than-honorable discharge certificates based on pre-induction conduct. *Harmon*, 355 U.S. at 582-83. In *Chamber of Commerce*, too, there was no specific statutory prohibition barring the President's Executive Order. 74 F.3d at 1333-34. Had these cases applied the *Leedom* standard instead of the *McAnnulty* standard as they did, these decisions likely would have come out the other way.

Indeed, *McAnnulty* itself likely would have come out differently had the Supreme Court required the Postmaster General's action to be contrary to a specific statutory prohibition. The statute at issue there expressly authorized the Postmaster General to withhold mail "upon evidence satisfactory to him." 187 U.S. at 100 n.†. If the Court had applied the "painstakingly delineated procedural boundaries of [*Leedom*]," it likely would have upheld the Postmaster General's decision on the ground that it did not violate a specific statutory prohibition. *Nuclear Regul.*

*Comm'n*, 605 U.S. at 681 (citation omitted). That result would defy common sense and improperly hamper courts' ability to review executive action for compliance with federal law.

This Court's clarification of when each standard—*McAnnulty* or *Leedom*—applies will assist the district court in assessing ultra vires claims in two ways. First, it will prevent any blurring of the standard based on potentially ambiguous dicta in prior cases. For instance, *Federal Express* characterized the decision in *Aid Association for Lutherans v. U.S. Postal Service*, 321 F.3d 1166 (D.C. Cir. 2003), as "point[ing] to a demanding standard of review by drawing heavily on *McAnnulty*, [*Leedom*], and their progeny when determining the availability of ultra vires relief." 39 F.4th at 765. As illustrated above, conflating *McAnnulty* and *Leedom* is a mistake. Indeed, *Aid Ass'n for Lutherans* in fact did not credit *McAnnulty* for a demanding standard at all—it merely cited *McAnnulty* for the proposition that "judicial review is available when an agency acts ultra vires." 321 F.3d at 1173. Nor would reading *McAnnulty* as establishing a demanding standard like *Leedom*'s be plausible. *See supra* p. 13. The discussion in *Federal Express* appears to have been shaped by the plaintiff's curious argument that the Court's analysis should be guided not by *McAnnulty* or *Leedom* but instead by *Chevron*. *See* 39 F.4th at 764.[2]

---

[2] Another example of dicta that could confound parties and the district court is the statement that "ultra vires review imposes the same demanding standard in all cases,

Second, a decision reaffirming the border between *Leedom* and *McAnnulty* will provide needed guidance to district judges. *See, e.g.*, *Dreamland Baby Co. v. Consumer Prod. Safety Comm'n*, 2025 WL 2758476, at *9 (D.D.C. Sept. 26, 2025) (court applied *Leedom* to ultra vires claim without finding statutory limitation on judicial review); *New Mexico v. Musk*, 784 F. Supp. 3d 174, 205-06 (D.D.C. 2025) (court "agree[d] that [the *Leedom*] test applies" but also that the plaintiffs stated an ultra vires claim because they adequately alleged the defendants acted without statutory authority—*i.e.*, the *McAnnulty* standard).

Clear delineation of the boundary between the *McAnnulty* and *Leedom* standards will help ensure that federal courts' ability to enforce statutory limits on Executive Branch authority is not unduly diluted.

## III. The Ordinary *McAnnulty* Standard Applies to Plaintiffs' Rehabilitation Act Claim.

This Court should apply the ordinary *McAnnulty* standard of review to Plaintiffs' Rehabilitation Act claim because the Rehabilitation Act does not limit

---

including those where only APA review is foreclosed." *Fed. Express Corp.*, 39 F.4th at 766. This statement also appears to have been prompted by an incorrect argument plaintiff advanced—specifically, that *Leedom* "applies only when Congress is understood generally to have precluded *all* statutory judicial review," *id.* at 764 (emphasis added), as opposed to just one form of review. Of course, where Congress is "clear and convincing" in precluding all review, the result is not *Leedom* review, but no review at all. *Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991).

judicial review of this claim. In order for the *Leedom* standard to apply, this Court would need to hold that the Rehabilitation Act limits judicial review of claims of discrimination against people with disabilities in any program or activity conducted by any Executive agency. There is no evidence, however, that Congress intended to limit judicial review of such conduct.

Statutory limitations on judicial review that trigger the heightened *Leedom* standard typically come in the form of a reticulated judicial review scheme set by Congress, *e.g.*, *Leedom*, 358 U.S. at 187, or express judicial review carveouts in statutes, *e.g.*, *Fed. Express Corp.*, 39 F.4th at 763 (statute expressly exempted challenged action from APA review). As to the former, the archetypal example is a statute that demonstrates Congress's intent to confine judicial review to a specific scheme and set of requirements, such as the NLRA in *Leedom* or the Hobbs Act in *Nuclear Regulatory Commission*.

The Rehabilitation Act is unlike these statutes. In the NLRA and the Hobbs Act, Congress created judicial review schemes that made clear it intended actions to be reviewed only in specified ways. In *Leedom*, for instance, the NLRA limited review of plaintiff's claim because the action plaintiff challenged was "not 'a final order' and therefore is not subject to judicial review except as it may be drawn in question by a petition for enforcement or review of an order, made under [§] 10(c) of the Act, restraining an unfair labor practice." 358 U.S. at 187 (cleaned up).

Likewise, in *Nuclear Regulatory Commission*, the Hobbs Act specified that judicial review of the Commission's decision was available *only* to applicants for licenses or those who intervened in the licensing proceeding, and the petitioners were neither. 605 U.S. at 680.

The Rehabilitation Act resembles neither of these. Nor does it contain anything else in its text, context, or structure to suggest that Congress intended to limit judicial review of Plaintiffs' claim to a specific scheme. The fact that it requires agencies to promulgate regulations, indicating that APA review likely is available in some circumstances, does not evince an intent to *limit* review to APA claims. Indeed, the APA "do[es] not limit or repeal additional requirements imposed by statute or otherwise recognized by law," 5 U.S.C. § 559, and was available as an alternative remedy in cases where it was not invoked and the Supreme Court instead relied on its inherent equitable power to enjoin the ultra vires act. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *see also* Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 Colum. L. Rev. 1612, 1666 (1997) ("Nothing in the APA purports to be exclusive or suggests that the creation of APA review was intended to preclude any other applicable form of review.").

Because there is no limitation on judicial review of Plaintiffs' claim, this Court should apply the ordinary, default *McAnnulty* standard to Plaintiffs' claim rather than the heightened *Leedom* standard.

## CONCLUSION

This Court should (1) hold that Congress did not preclude judicial review of Plaintiffs' Rehabilitation Act claim, and (2) reject the government's argument that the heightened *Leedom* standard applies to ultra vires claims that a federal official exceeded their statutory authority even in the absence of any statutory limitation on judicial review, and apply the *McAnnulty* standard to Plaintiffs' Rehabilitation Act claim.

Respectfully submitted,

/s/ Aditi Shah
Aditi Shah
Scott Michelman
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
202-457-0800
ashah@acludc.org

June 2, 2026

*Counsel for Amicus Curiae*[3]

[3] Counsel wish to acknowledge the assistance of paralegal Ameerah Adetoro in the preparation of this brief.

## CERTIFICATE OF COMPLIANCE

I hereby certify that my word processing program, Microsoft Word, counted 6,498 words of the foregoing brief, excluding the items exempted by Federal Rule of Appellate Procedure 32(f) and that this complies with the word limit set forth in Federal Rule of Appellate Procedure 29(a)(5). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

*/s/ Aditi Shah*
Aditi Shah

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2026, I electronically filed the foregoing brief in support of Plaintiffs-Appellees with the Clerk of the Court of the U.S. Court of Appeals for the D.C. Circuit by using the Appellate CM/ECF system, which will send notice to all counsel who are registered CM/ECF users.

*/s/ Aditi Shah*
Aditi Shah