**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 25-5402**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

NATIONAL ASSOCIATION OF THE DEAF and DERRICK FORD,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

# REPLY BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

CHARLES W. SCARBOROUGH
DANIEL WINIK
*Attorneys, Appellate Staff*
*Civil Division, Room 7245*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-8849*

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ........ ii

GLOSSARY ........ v

INTRODUCTION AND SUMMARY ........ 1

ARGUMENT ........ 3

I. Plaintiffs Lack A Cause Of Action ........ 3

A. There Is No Private Cause Of Action To Enforce Section 504 Against Federal Programs ........ 3

B. There Is No Implied Equitable Cause Of Action To Enforce Section 504 ........ 18

II. Plaintiffs Are Unlikely To Succeed On The Merits Of Their Section 504 Claim ........ 26

CONCLUSION ........ 31

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......... 3, 4, 19

*American Council of the Blind v. Paulson*,
525 F.3d 1256 (D.C. Cir. 2008) .......... 29

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) .......... 19, 20, 22, 25

*Bostock v. Clayton County*,
590 U.S. 644 (2020) .......... 27

*Cannon v. University of Chicago*,
441 U.S. 677 (1979) .......... 1, 3, 4, 5

*Cisco Systems, Inc. v. Doe I*,
2026 WL 1791225 (U.S. June 23, 2026) .......... 1, 7, 9, 12, 14

*Clark v. Skinner*,
937 F.2d 123 (4th Cir. 1991) .......... 10

*Cousins v. Secretary of the U.S. Department of Transportation*,
880 F.2d 603 (1st Cir. 1989) .......... 10, 16, 17

*Dan's City Used Cars, Inc. v. Pelkey*,
569 U.S. 251 (2013) .......... 27-28

*Doe A v. Spahn*,
2025 WL 1305360 (D.D.C. May 6, 2025) .......... 21-22

*Federal Express Corp. v. Department of Commerce*,
39 F.4th 756 (D.C. Cir. 2022) .......... 25

*Fornaro v. James*,
416 F.3d 63 (D.C. Cir. 2005) .......... 24

*FS Credit Opportunities Corp. v. Saba Capital Master Fund, Ltd.*,
146 S. Ct. 1546 (2026) .......... 1, 7, 8, 9, 11

*Gonzaga Univ. v. Doe*,
536 U.S. 273 (2002) .......... 4

*J.L. v. Social Security Administration*,
971 F.2d 260 (9th Cir. 1992) .......... 21

*Johnson v. Interstate Management Co.*,
849 F.3d 1093 (D.C. Cir. 2017) .......... 7

*Leedom v. Kyne*,
358 U.S. 184 (1958) .......... 2, 18

*Lorillard v. Pons*,
434 U.S. 575 (1978) .......... 17

*Lyons v. Legal Aid Society*,
68 F.3d 1512 (2d Cir. 1995) .......... 21

*Mark H. v. Hamamoto*,
620 F.3d 1090 (9th Cir. 2010) .......... 21

*Mathis v. U.S. Parole Commission*,
749 F. Supp. 3d 8 (D.D.C. 2024) .......... 16, 22

*Mullin v. Doe*,
2026 WL 1825840 (U.S. June 25, 2026) .......... 15

*National Association of the Deaf v. Trump*,
486 F. Supp. 3d 45 (D.D.C. 2020) .......... 28-29, 29

*NLRB v. SW General, Inc.*,
580 U.S. 288 (2017) .......... 11

*Nuclear Regulatory Commission v. Texas*,
605 U.S. 665 (2025) .......... 18, 25

*Nyunt v. Chairman, Broadcasting Board of Governors*,
589 F.3d 445 (D.C. Cir. 2009) .......... 26

*PGA Tour, Inc. v. Martin*,
532 U.S. 661 (2001) ........................................ 21

*Pierce v. District of Columbia*,
128 F. Supp. 3d 250 (D.D.C. 2015) ........................................ 29

*Sai v. DHS*,
149 F. Supp. 3d 99 (D.D.C. 2015) ........................................ 14, 16

*Verizon Maryland, Inc. v. Public Service Commission of Maryland*,
535 U.S. 635 (2002) ........................................ 22

*Women's Equity Action League v. Cavazos*,
906 F.2d 742 (D.C. Cir. 1990) ........................................ 24

**Statutes:**

20 U.S.C. § 1682 ........................................ 4

29 U.S.C. § 794(a) ........................................ 2, 5, 8, 10, 13, 26, 28

29 U.S.C. § 794a(a) ........................................ 5

29 U.S.C. § 794a(b) ........................................ 12

29 U.S.C. § 794d(f)(3) ........................................ 13

42 U.S.C. § 2000d-1 ........................................ 4

42 U.S.C. § 2000e-16(c) ........................................ 6

**Legislative Material:**

138 Cong. Rec. 31,520 (1992) ........................................ 10, 11

## GLOSSARY

| | |
|---|---|
| ACLU | American Civil Liberties Union of the District of Columbia |
| ADA | Americans with Disabilities Act |
| APA | Administrative Procedure Act |
| ASL | American Sign Language |
| DHS | Department of Homeland Security |

## INTRODUCTION AND SUMMARY

Plaintiffs' brief confirms that reversal is warranted.

*First*, plaintiffs—like the district court—analyze the existence of a cause of action under Section 504 of the Rehabilitation Act as if Section 505 did not exist. That is wrong. In *Cannon v. University of Chicago*, 441 U.S. 677 (1979), and its progeny, courts held that statutes implied private remedies for the violation of private rights when Congress had been silent as to remedies. But here, where Section 505 expressly prescribes private remedies for some Section 504 violations but not others, it would be nonsensical to conclude that Congress nevertheless meant to make a private remedy available for *all* such violations. That is doubly true given that the APA provides a means of enforcing Section 504 in the circumstances not covered by Section 505. The Supreme Court made these points twice in the past month—first by declining "to conclude that Congress implicitly created a private remedy in one provision when it explicitly did so in another," *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, 146 S. Ct. 1546, 1555 (2026), and then by recognizing that the existence of any "'alternative remedial structure' … '*alone*' precludes the" judicial "creation of a cause of action," *Cisco Sys., Inc. v. Doe I*, 2026 WL 1791225, at *8 (U.S. June 23, 2026).

*Second*, plaintiffs offer no more persuasive argument that they can pursue nonstatutory equitable relief without satisfying the exacting standard of *Leedom v. Kyne*, 358 U.S. 184 (1958). Their argument rests on the premise that Congress has not impliedly precluded nonstatutory review for Section 504 claims. But the same features of the statutory scheme that make clear Section 504 does not imply a right of action also make clear that Congress has impliedly precluded nonstatutory review.

*Third*, plaintiffs' merits arguments only underscore the flaws in the district court's analysis. Plaintiffs' explanation of the barriers they face confirms that those barriers are not "solely by reason of … disability," 29 U.S.C. § 794(a). Plaintiffs also double down on the district court's view that their difficulty in reading written English suffices to show they lack meaningful access to communications containing "'dense language and complex concepts'" (Br. 54). If that were true, then the government would have to provide ASL translations of virtually all official communications unless it could establish an undue-burden or fundamental-alteration defense. Like the district court, plaintiffs offer no support for that extraordinary proposition.

The preliminary injunction should be reversed.

## ARGUMENT

### I. Plaintiffs Lack A Cause Of Action

#### A. There Is No Private Cause Of Action To Enforce Section 504 Against Federal Programs

1. Plaintiffs devote pages to the proposition that Section 504—standing alone—implies a private cause of action, as the Supreme Court held of Title IX in *Cannon v. University of Chicago*, 441 U.S. 677 (1979), and of Title VI (in light of post-*Cannon* congressional ratification) in *Alexander v. Sandoval*, 532 U.S. 275 (2001). But Section 504 does not stand alone. When Congress expanded Section 504 to encompass federal programs, it also enacted Section 505—an express remedial provision—and those two provisions must be construed together, giving meaning to both.

When plaintiffs eventually address Section 505, they argue that it is irrelevant because "*Section 504(a)*—not Section 505—contains the rights-creating language that creates a private right of action." Br. 26. But that argument reflects a basic misunderstanding about the logic of cases like *Cannon* and *Sandoval*. Plaintiffs read those cases as if their recognition of a private cause of action flowed simply from the "rights-creating language" (*id.*) of the statutes at issue. But as our opening brief explains (at 28), the Supreme Court

has made clear—including in *Sandoval* itself—that "even where a statute is phrased in such explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private *right* but also a private *remedy*.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (quoting *Sandoval*, 532 U.S. at 286).

Thus, the key question in *Cannon* (and later in *Sandoval*, which applied *Cannon* on this point) was whether the statutes implied a cause of action as a private *remedy* for violations of any private rights they created. *Cannon* repeatedly stated the question this way: whether "Congress intended to make a remedy available" in a private suit, 441 U.S. at 688. Indeed, the opinions in *Cannon* use the word "remedy" 91 times.

And, crucially, the analysis in those cases flowed from the premise that Congress had not *expressly* specified private remedies. Both Title VI and Title IX expressly allow the government to pursue certain remedies when a grantee, loan recipient, or contractor violates its commitment not to discriminate as a condition of receiving federal funds. *See* 42 U.S.C. § 2000d-1 (Title VI); 20 U.S.C. § 1682 (Title IX). But those are remedies for the government's injury when funds are misused, not for the private injury suffered by victims of discrimination. Congress was silent as to remedies for that injury. That

is why the *Cannon* majority asked what remedies should be "impli[ed]," *Cannon*, 441 U.S. at 709.

The question here is different. Unlike Title VI and Title IX, the Rehabilitation Act is not silent on remedies. Section 505 expressly prescribes private remedies for some violations of the private right created by Section 504—namely, violations "by any recipient of Federal assistance or Federal provider of such assistance"—and for violations of the private right created by Section 501. 29 U.S.C. § 794a(a). But it does not specify a private remedy for a federal program's violation of Section 504. Rather, when Congress amended Section 504 to apply to federal programs, it specified that the amendment should be "carr[ied] out" through agency regulations. *Id.* § 794(a).

Plaintiffs resist this reading of Section 505, arguing (Br. 27) that it merely "add[ed] certain *remedies* for particular types of disability discrimination claims arising under Sections 504(a) and 501." Their argument appears to rest on a distinction between "remedies" and "right[s] of action" (*id.*), in which a "remedy" is simply a form of relief (like damages or an injunction) available when a litigant prevails on a cause of action.

Although the word "remedy" is sometimes used in that way, that is not how it is used in *Cannon*, *Sandoval*, or Section 505. When the Supreme Court referred to the implication of a "private remedy" in *Cannon* and *Sandoval*, it was referring—as discussed above—to a private cause of action. And that is how Section 505 uses the word. For example, when Section 505 allows a person aggrieved by a Section 501 violation to invoke "[t]he remedies, procedures, and rights set forth in" Title VII, it is incorporating the cause of action provided by 42 U.S.C. § 2000e-16(c). And when it allows persons aggrieved by certain Section 504 violations to invoke "[t]he remedies, procedures, and rights set forth in" Title VI, it is incorporating the implied cause of action recognized in *Sandoval* (and at the time of Section 505's enactment by various appellate courts, *see* Plaintiffs' Br. 19-20).

Much of plaintiffs' argument therefore misses the point. The question here is not whether, in the absence of Section 505, Section 504 would imply a private cause of action as a remedy for violations of any private rights that it creates. It is whether, when Congress specified such a remedy for certain violations but not others, the Court should nonetheless infer that Congress meant to make the remedy available for *all* such violations.

That question should answer itself. Even for statutes (like Title VI and Title IX) that are silent on private remedies for violations of a private right, the Supreme Court has "virtually eliminated the practice of fashioning" "judicially created causes of action," which "offend the separation of powers in almost every circumstance." *Cisco Sys., Inc. v. Doe I*, 2026 WL 1791225, at *7 (U.S. June 23, 2026). Just last month, the Court added two more to the long list of cases in which it has declined to recognize an implied cause of action, explaining that "Congress, not the Judiciary, decides who may enforce the law." *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, 146 S. Ct. 1546, 1551 (2026); *see Cisco*, 2026 WL 1791225, at *7. The "reason for" this caution is that it defies modern principles of statutory interpretation "to conclude that Congress *intended* to provide a cause of action even though Congress did not expressly say as much in the text of the statute." *Johnson v. Interstate Mgmt. Co.*, 849 F.3d 1093, 1097-1098 (D.C. Cir. 2017).

And the bar for reaching that conclusion—already "high," *Johnson*, 849 F.3d at 1098, where Congress has been silent on private remedies—is higher here, to the point of being insurmountable, for two reasons. *First*, Congress was not silent on the available private remedies: In Section 505, it expressly provided a private remedy for *some* violations of Section 504. It makes no

sense to conclude, when Congress expressly provided a private remedy for *some* violations of a private right, that Congress must actually have meant to provide a private remedy for *all* of them.

The Supreme Court made this point in *FS Credit Opportunities*. It explained that Congress's provision of "two private rights of action" in the statute in question weighed against reading the statute to imply other private rights of action, because it showed "that 'when Congress wished to provide a private … remedy' to enforce the [statute], 'it knew how to do so and did so expressly.'" 146 S. Ct. at 1555. The Supreme Court has "traditionally been reluctant," it explained, "to conclude that Congress implicitly created a private remedy in one provision when it explicitly did so in another." *Id.*

*Second*, there is an alternative mechanism—the APA—for enforcing Section 504 against the class of entities, namely federal programs, for which Section 505 does not provide an express cause of action. And there is every reason to believe Congress had that mechanism in mind when it excluded federal programs from the cause of action created by Section 505—because at the same time Congress enacted Section 505, it provided that the expansion of Section 504 to govern federal programs would be "carr[ied] out" through agency regulations, 29 U.S.C. § 794(a). The Supreme Court

explained in *Cisco* that "if Congress has created 'an alternative remedial structure'" to enforce a given right, "then '*that alone*' precludes the" judicial "creation of a cause of action" as a remedy for violations of the right in question. 2026 WL 1791225, at *8.

2. Because the text of Sections 504 and 505 is dispositive, the Court need not consider plaintiffs' other arguments. But even on their own terms, those arguments are unpersuasive.

*First*, plaintiffs' legislative history is irrelevant. The Supreme Court in *FS Credit Opportunities* emphatically rejected legislative history as a basis to conclude that a statute implies a cause of action. *See* 146 S. Ct. at 1557-1559. And in any event, the legislative history here sheds no meaningful light on the question presented. The history showing that Section 505 was meant to protect "'private rights of action'" generally (Br. 20, 31-32) does not suggest that, when Congress provided a private right of action for some violations, it meant to do the same for other violations. And the history showing that the 1978 amendments to Section 504 were meant to "'extend[]'" its "'coverage'" to federal programs (Br. 21) does not suggest Congress meant for it to be enforced against federal programs through a private right of action, rather

than "carr[ied] out" through regulations allowing administrative complaints, 29 U.S.C. § 794(a), with subsequent judicial review under the APA.

The only bit of legislative history that does illuminate the question presented—but not in the way that plaintiffs think—is a four-page excerpt of Senate floor statements during the 1992 reauthorization of the Rehabilitation Act. In those statements, Senators Jeffords and Harkin expressed the view that the Fourth Circuit in *Clark v. Skinner*, 937 F.2d 123 (4th Cir. 1991), and the en banc First Circuit in *Cousins v. Secretary of the U.S. Department of Transportation*, 880 F.2d 603 (1st Cir. 1989), were wrong when they concluded that the Act does not imply a private right of action to enforce Section 504 against federal programs. 138 Cong. Rec. 31,520-31,523 (1992). Why, if those Senators thought that most appellate courts had been incorrect on a statutory issue, did they not propose to overrule the errant decisions? Because, they opined, the statutory text was already "sufficient on its face" to make "obvious" that the First and Fourth Circuits were incorrect. *Id.* at 31,521, 31,523.

It is difficult to imagine legislative history that could be less helpful to plaintiffs. When Members of Congress believe that most appellate courts have been wrong on a statutory question, they can rewrite the statute accordingly—if they have the votes to do so. When they instead resort to floor

statements insisting that the statute already makes the right answer "obvious," 138 Cong. Rec. at 31,523, it is because they do not have the votes. The Supreme Court made this point in *FS Credit Opportunities* even as to committee reports, which are generally considered more probative than floor statements. *See* 146 S. Ct. at 1558 ("If the House Committee wanted to authorize private remedies and knew that the Court would be reluctant to imply them, why did it not make them express? Were members of the House Committee uncertain whether express causes of action would win approval from a majority of the House, a majority of the Senate, and the President?"). Indeed, plaintiffs' argument presents "a good example of why floor statements by individual legislators rank among the least illuminating forms of legislative history," *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017).

*Second*, plaintiffs argue (Br. 28-29) that "there was good reason for Congress not to extend" the "remedies and procedures" of Title VI and Title VII "to disability discrimination claims in federal programming." But even assuming that is true, it does not help plaintiffs. If Congress wanted to create a cause of action for Section 504 violations by federal programs, but it found those particular schemes to be a poor fit, it could simply have written a new cause of action instead of cross-referencing an existing one. Indeed, to the

extent there is something special about the context of Section 504 claims against federal programs that requires refinements to the remedies Congress provided for other types of Section 504 claims, that is all the more reason why the separation-of-powers principles emphasized in *FS Credit Opportunities* and *Cisco* demand that the refinements be accomplished by Congress, not the courts. *See Cisco*, 2026 WL 1791225, at *7 ("[E]ven a *single* sound reason to defer to Congress is enough." (quotation marks omitted)).

*Third*, plaintiffs repeat (Br. 30-31) the district court's reliance on Section 505's fee-shifting provision. But they have no response to the glaring problem that the provision—which authorizes fees "[i]n any action or proceeding to enforce or charge a violation of a provision of this subchapter," 29 U.S.C. § 794a(b)—says nothing about *what* "action[s] or proceeding[s]" may be brought "to enforce or charge a violation of a provision of" the Act. Plaintiffs' argument appears to be that by referring to "*any* action or proceeding," as opposed to "an action or proceeding under Section 505," Congress meant to imply that actions or proceedings can be brought to enforce Section 504 *other* than under Section 505. But Section 505 is not the only provision of the subchapter that expressly provides for such actions or proceedings: Section 508, which requires federal agencies to ensure their information technology

is accessible to people with disabilities, incorporates Section 505's enforcement mechanisms. *See* 29 U.S.C. § 794d(f)(3). So the phrase "any action or proceeding" can easily be read to mean "any action or proceeding authorized by Section 505 or by Section 508," as opposed to "any action or proceeding authorized by Section 505 or implied by Section 504." In any event, plaintiffs' proposed inference from the word "any" is far too thin a reed to support a cause of action.

*Fourth*, plaintiffs claim it is "extremely unnatural" (Br. 33) to read Congress's directive for agencies to issue regulations "to carry out" the expansion of Section 504 to federal programs, 29 U.S.C. § 794(a), to mean that Congress meant for Section 504 to be enforced against federal programs through agency action reviewable under the APA. But plaintiffs fail to explain what else "carry out" might plausibly mean. They suggest (Br. 33-34) that Congress meant for the regulations simply to "implement" the "new prohibition." But why would regulations have been necessary to "implement" a prohibition against discrimination, other than by providing a mechanism for complaints to be adjudicated by the agency? Plaintiffs do not say. If plaintiffs were correct that Congress created a private cause of action to enforce Section 504 against agencies, then *that* would have been the means of

implementation; agencies would have modified any discriminatory practices in response to court orders or the threat of them.

To be clear, our argument is not (as plaintiffs suggest) that the issuance of regulations "repeal[ed]" (Br. 34) any right of action that Section 504 had previously created against federal programs. If Section 504 did not contain the "carry out" language, the natural inference from Sections 504 and 505, read together, would still have been that Congress did not provide a cause of action to enforce Section 504 against federal programs. But the directive to issue regulations explains *why* Congress would not have provided a cause of action if it meant for the expansion of Section 504 to federal programs to be judicially enforceable—namely, because it "knew that review would be available under the APA." *Sai v. DHS*, 149 F. Supp. 3d 99, 113 (D.D.C. 2015). And, as discussed above, the existence of this "'alternative remedial structure'" on its own forecloses the judicial implication of a cause of action. *Cisco*, 2026 WL 1791225, at *8.

*Fifth*, plaintiffs argue (Br. 36-37) that the unavailability of an APA suit against the White House should be taken to mean that Congress did not envision the APA as the exclusive means of enforcing Section 504 against federal programs. But that argument assumes Congress meant for every

Section 504 violation to be actionable in federal court, and there is no basis for that assumption. *See* Opening Br. 26. That is particularly clear because Congress has *political* means, like appropriations, to act against statutory violations by federal programs. *See, e.g.*, *Mullin v. Doe*, 2026 WL 1825840, at *10 (U.S. June 25, 2026) ("'Sometimes Congress decides that the political process is the proper forum for remedying improper conduct.'").[1]

*Sixth*, plaintiffs criticize the weight of authority on this issue, from other circuits and district courts within this Circuit, as "wrong" and "distinguishable." Br. 38-39. This is at least an improvement on the district court's approach, which was to ignore all these cases. But plaintiffs' argument that the prior decisions were "wrong" to rely on Section 505 is incorrect for the reasons discussed above. And plaintiffs' argument that the prior cases are "distinguishable," because they "'dealt with Executive agencies' acting as a *regulator*, as opposed to in a substantive capacity'" (Br. 39), fails for the reason discussed in the opening brief (at 28-29). That distinction "lacks any

[1] The Disability Rights Education and Defense Fund amicus brief is further incorrect to the extent it suggests (at 7) that, under our view, "disabled people participat[ing] in myriad federal programs … would have no way to challenge discrimination and exclusion." The vast majority of federal programs are subject to the APA and thus can be sued if the agency fails to remedy a Section 504 violation in response to a complaint.

footing in the statutory text" and is "highly malleable: Any 'regulatory' violation could be reframed as a 'substantive' violation, and vice versa." *Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8, 21 (D.D.C. 2024); *see Sai*, 149 F. Supp. 3d at 115.

Plaintiffs' brief illustrates as much. Plaintiffs try to explain that this case—a challenge to the White House's policy of not providing ASL interpreters for press briefings—differs from challenges to, for example, "DHS's naturalization-waiver process" or the Peace Corps' "medical-clearance guidelines." Br. 39-40. But how? Plaintiffs' answer (*id.*) is that this is a challenge to "the White House's operation of its own public-facing program." But the other cases likewise presented challenges to agencies' "public-facing program[s]." Plaintiffs' putative distinction is difficult to discern.

Plaintiffs also err in asserting (Br. 41) that the First Circuit in *Cousins* "recognized that its APA-channeling theory would not necessarily apply where the plaintiff asserts disability discrimination claims against 'one of the few federal bodies exempted from the APA's coverage.'" *Cousins* squarely held that Section 504 does not imply a right of action against federal programs. 880 F.2d at 608. In the course of doing so, the court noted that, given "the existence of the APA, it rarely makes sense" even "to *ask* whether" a

statute implies a right of action against the government, because the APA provides the means of enforcement. *Id.* at 606 (emphasis added). In the language that plaintiffs quote here, the court recognized that "it might make sense to *ask*" the right-of-action question where "a plaintiff seeks to challenge the action of 'one of the few federal bodies exempted from the APA's coverage.'" *Id.* (emphasis added). But the court by no means suggested that the *answer* to the question—whether a private right of action exists—would be affirmative in cases where APA review is unavailable.

*Finally*, plaintiffs argue (Br. 42) that our reliance on *Clark* and *Cousins* "is misplaced" because "Congress revisited the Rehabilitation Act in the wake of those decisions and did not amend the statute to adopt their restrictive reading." This is a through-the-looking-glass version of statutory interpretation. If *Clark* and *Cousins* had been the only cases on point when Congress reauthorized the Rehabilitation Act in 1992, the proper inference from Congress's choice not to overrule them would be that Congress impliedly *ratified* them. *See, e.g.*, *Lorillard v. Pons*, 434 U.S. 575, 580 (1978).[2] The notion

[2] The only reason we have not made that argument affirmatively is that the law was not uniform in 1992; the Ninth Circuit had reached the opposite conclusion. *See* Opening Br. 24-25. Our en banc petition asking the Ninth

*Continued on next page.*

that Congress should instead be understood to have *rejected* the holdings of *Cousins* and *Clark*—because two Senators made floor statements saying as much—epitomizes the hazards of relying on legislative history.

**B. There Is No Implied Equitable Cause Of Action To Enforce Section 504**

Plaintiffs have no more compelling defense of the district court's view that, even if Section 504 does not imply a right of action here, it can be enforced through an implied equitable cause of action. Since the enactment of the APA, the Supreme Court has "strictly limited nonstatutory ultra vires review to the 'painstakingly delineated procedural boundaries'" set forth in *Leedom v. Kyne*, 358 U.S. 184 (1958). *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). And plaintiffs cannot satisfy that standard.

Plaintiffs' principal argument—joined by the American Civil Liberties Union of the District of Columbia (ACLU) as amicus—is that the heightened *Leedom* standard does not apply unless Congress has "displaced the ordinary equitable remedy" (Br. 44-45). But that argument is beside the point here,

Circuit to bring its precedent in line with the consensus among other circuits, *see id.* at 25, remains pending more than four months after we filed it.

because Congress *has* displaced a nonstatutory equitable remedy for Section 504 violations.

That is clearest from *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), where the Supreme Court held that the plaintiffs could not "circumvent Congress's exclusion of private enforcement" of a provision of the Medicaid Act "by invoking" the "equitable powers" of the federal courts. *Id.* at 328. The Court gave two reasons for that conclusion. Both apply here.

One was that Congress had provided for the provision to be enforced by certain means, and "the 'express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'" *Armstrong*, 575 U.S. at 328 (quoting *Sandoval*, 532 U.S. at 290). Here, as in *Armstrong*, Congress provided for certain means of enforcing Section 504—through a private right of action, against funding recipients; and through administrative action, with subsequent judicial review where available under the APA, for federal programs. As in *Armstrong*, it follows that Congress intended to preclude other means of enforcing Section 504.

Indeed, the argument for preclusion based on an alternative enforcement mechanism is *stronger* here than in *Armstrong*. There, the Supreme Court's holding was that private enforcement was precluded by Congress's

provision of a *public* enforcement mechanism—namely, "the withholding of Medicaid funds." 575 U.S. at 328. Congress had not spoken expressly to private enforcement. But here, Congress *has* addressed the availability of private enforcement: It has created a private right of action for some but only some violations of Section 504, while providing for others to be pursued administratively, with judicial review to the extent available under the APA. So allowing an equitable cause of action here would override Congress's choices much more starkly than in *Armstrong*.

The Supreme Court noted in *Armstrong* that the provision of another means of enforcement "might not, *by itself*," be enough to "preclude the availability of equitable relief." 575 U.S. at 328. The Court thus relied on a second factor—namely, that the statute "[e]xplicitly conferred enforcement of [a] judgment-laden standard" on the agency. *Id.* That showed, the Court explained, "that Congress 'wanted to make the agency remedy that it provided exclusive.'" *Id.* But again, there is much less doubt here, where Congress expressly provided for certain means of private enforcement, that Congress meant for those means to be exclusive.

And in any event, if it were necessary to look for more evidence, the second factor the Supreme Court identified in *Armstrong* is likewise present

here. Even the Ninth Circuit—which has, alone among courts of appeals, read Section 504 as implying a private right of action against federal programs—has understood Congress's directive for implementing regulations as indicating that Congress meant for "agencies themselves" to "take primary responsibility for compliance," and has accordingly required that certain Section 504 claims be administratively exhausted before being brought in federal court. *J.L. v. Social Sec. Admin.*, 971 F.2d 260, 265-272 (9th Cir. 1992), *abrogated on other grounds by Lane v. Peña*, 518 U.S. 187 (1996).

And that choice by Congress makes good sense. Determining the need for an accommodation under the Rehabilitation Act "'requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to [enjoy meaningful access to the program.]'" *Mark H. v. Hamamoto*, 620 F.3d 1090, 1098 (9th Cir. 2010) (alteration in original); *see also, e.g.*, *Lyons v. Legal Aid Soc.*, 68 F.3d 1512, 1516 (2d Cir. 1995) (similar); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001) (similar, as to Americans With Disabilities Act (ADA)). As our opening brief explains (at 36-37), the pending case brought by Peace Corps applicants seeking accommodations to serve overseas with mental disabilities, *Doe A v. Spahn*,

2025 WL 1305360 (D.D.C. May 6, 2025), exemplifies why such claims are properly channeled through agencies in the first instance.

Plaintiffs suggest that the second *Armstrong* rationale can apply only where "the underlying statutory command is too 'judicially unadministrable' to support equitable enforcement" (Br. 47). But that is an overly narrow reading of *Armstrong*. The Supreme Court described the provision there as "judicially unadministrable," 575 U.S. at 328, but only in service of the point that Congress meant for the agency to enforce the provision. The same point holds here.

Plaintiffs and the ACLU also suggest that the statute should not be read to preclude equitable review because it does not prescribe "'a detailed and exclusive remedial scheme.'" Plaintiffs' Br. 46 (quoting *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 647 (2002)); *see* ACLU Br. 25 ("reticulated judicial review scheme"). That was the district court's rationale as well. JA168-169. But as the *Mathis* district court recognized, "statutes implicitly displace equity jurisdiction" *either* "where Congress has provided a 'detailed and exclusive remedial scheme'" *or* under the circumstances discussed in *Armstrong*. 749 F. Supp. 3d at 23. The latter scenario applies here, so it is irrelevant whether the former does.

And even if "'a detailed and exclusive remedial scheme'" were required for preclusion, Congress has provided such a scheme here: Section 504 can be enforced against funding recipients through a cause of action in district court, and against federal programs through administrative complaints, with judicial review to the extent available under the APA. Plaintiffs argue (Br. 46) that "[t]he Rehabilitation Act … looks nothing like the 'detailed and exclusive remedial scheme' that displaces traditional equitable relief" because it "does not establish any administrative complaint process, require exhaustion, specify a reviewing court, [or] impose time limits." But the Act effectively *does* "establish an[] administrative complaint process"; that is the clear import of its directive for agencies to promulgate implementing regulations. And all the other components that plaintiffs suggest are required for a remedial scheme—exhaustion, venue, and time limits—come from the APA framework for judicial review of agency actions under those implementing regulations.

Plaintiffs suggest (Br. 47) that "Congress cannot be understood to have displaced equitable review in favor of an APA remedy" because that remedy "does not exist for these defendants." But that gets things backwards: Where Congress has provided an exclusive framework for review, and the

framework provides for no review in particular cases, that does not mean courts can fill the gap by supplying a separate mechanism of review. It means there is no review in such cases. *See, e.g.*, *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) ("[W]hat you get under the [Civil Service Reform Act] is what you get."); Opening Br. 27 (discussing similar cases).

Plaintiffs' amici also suggest that the APA framework "is ill-suited to disability discrimination claims that often require injunctive relief, ongoing compliance measures, and systemic reform." Disability Rights Education and Defense Fund Br. 27. But a court hearing an APA challenge to the improper rejection of a Section 504 complaint can grant equitable relief to the extent necessary to protect the plaintiff's Section 504 rights. And any preference for "systemic" remedies, *id.*, cannot justify overriding Congress's choice to provide the more limited relief available through the APA. *Cf. Women's Equity Action League v. Cavazos*, 906 F.2d 742, 751 (D.C. Cir. 1990) (recognizing that Congress had provided only for "situation-specific litigation," notwithstanding plaintiffs' desire to "redress … systemic" issues).

At bottom, the reason not to imply an equitable cause of action here is the same as the reason not to imply a cause of action under Section 504. When Congress has expressly provided a cause of action for only some

violations of Section 504, it would "circumvent" Congress's remedial choices to provide, through a judicially created cause of action, the same remedy that Congress declined to provide through a statutorily express cause of action. *Armstrong*, 575 U.S. at 328. It is no accident that *Armstrong*'s analysis of whether the Medicaid Act impliedly foreclosed nonstatutory equitable relief, *id.*, quoted from *Sandoval*'s private-right-of-action analysis. The two analyses are closely related and should produce the same result.

For all these reasons, the Court need not and should not address plaintiffs' and the ACLU's argument that, absent an implied preclusion of equitable review, such review proceeds not under the *Leedom* standard but under a lesser standard. That argument is in tension with decisions of this Court and the Supreme Court. *See Nuclear Regul. Comm'n*, 605 U.S. at 681 (*Leedom* standard applies unless ultra vires review is "unavailable" altogether); *Federal Express Corp. v. Department of Commerce*, 39 F.4th 756, 764-773 (D.C. Cir. 2022) (rejecting the plaintiffs' argument for a less stringent standard of ultra vires review, even where the Court recognized that equitable review was not precluded). But this case presents no need to consider it.

Because *Leedom* clearly applies, plaintiffs cannot prevail on an implied claim for equitable relief. Plaintiffs argue in a single paragraph (Br. 50-51)

that their claim satisfies the *Leedom* standard, on the theory that Section 504's bar against discrimination is "'clear and mandatory.'" But as our opening brief explains (at 39-41), the standard requires more than a *general* command or prohibition that is "'clear and mandatory'"; rather, a court can grant non-statutory equitable relief only where the government has acted "'contrary to a *specific prohibition*' … that is 'clear and mandatory,'" *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (emphasis added). The reason plaintiffs omit the "specific prohibition" language is that they cannot possibly argue that Section 504 "specific[ally] prohibit[s]" the White House's policy, which has been followed during the decades-long era of televised press briefings by every President but one.

## II. Plaintiffs Are Unlikely To Succeed On The Merits Of Their Section 504 Claim

Because plaintiffs lack a cause of action, this Court need not and should not reach the merits, but if it does, it should reverse. Plaintiffs' brief only underscores the flaws in the district court's reasoning.

1. Plaintiffs' brief refutes the notion that the access barrier they assert—their difficulty in reading written English—arises "solely by reason of … disability," 29 U.S.C. § 794(a). Plaintiffs acknowledge (Br. 59) that "some

deaf people can read English." They go on to explain that "many deaf children are born into hearing homes where ASL is not used, while spoken English is inaccessible because they cannot hear it," and that "[*a*]*s a result*," such children "'do not typically have a strong language foundation' when learning to read English." *Id.* (emphasis added). But that statement recognizes that such reading difficulties result from the *combination* of disability and environmental circumstances. It makes clear that if deaf children receive early education that gives them a solid "'language foundation,'" they may not have comparable degrees of reading difficulty. And as our opening brief explains (at 52), the word "'solely'" in antidiscrimination statutes "indicate[s] that actions taken 'because of' the confluence of multiple factors do not violate the law." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). That makes Section 504 unlike, for example, Title VII, which can subject an employer to liability if "the plaintiff's sex was one but-for cause of" an adverse employment decision, even if "some *other* factor" also contributed to it. *Id.*

Plaintiffs' misunderstanding of the law is confirmed by their description of the obstacles they describe as "disability-*related* barriers." Br. 59 (emphasis added). Reading difficulties of the sort that plaintiffs identify are of course "related" to deafness. *See, e.g.*, *Dan's City Used Cars, Inc. v. Pelkey*, 569

U.S. 251, 260 (2013) (discussing "the breadth of the words 'related to,'" which have been understood to mean "'having a connection with or reference to'"). But plaintiffs have not shown that they are "solely by reason of" deafness, as the statute requires, 29 U.S.C. § 794(a).

2. Plaintiffs also double down on the broad implications of the district court's reasoning. They argue (Br. 54) that the record was sufficient to show they lack meaningful access to briefings—even when transcribed after the fact—because the briefings "'involve dense language and complex concepts.'" But so do the vast majority of other government communications. If Section 504 were construed to require ASL translation of any writing that "'involve[s] dense language and complex concepts,'" then the government (unless it could establish an undue-burden or fundamental-alteration defense) would have to provide ASL translations of every tax form, every page of every agency website, and every volume of the Federal Register, to name only a few examples.

The decisions that plaintiffs invoke do not support that extraordinary proposition. In this case's prior iteration, Judge Boasberg noted that "[c]losed captioning and transcripts may constitute a reasonable accommodation" for access to communications "under some circumstances," *National*

*Ass'n of the Deaf v. Trump*, 486 F. Supp. 3d 45, 58 (D.D.C. 2020)—and correctly so, given this Court's explanation that the analysis of "meaningful" access is "necessarily fact-specific," *American Council of the Blind v. Paulson*, 525 F.3d 1256, 1267 (D.C. Cir. 2008). And in explaining why closed captioning and transcripts were insufficient in the particular circumstances at issue, he relied—as our opening brief explained (at 53)—on the emergent and quickly evolving nature of communications regarding the COVID-19 pandemic. *See* 486 F. Supp. 3d at 58. The circumstances at issue in *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 253 (D.D.C. 2015), which involved a single inmate's request for an ASL interpreter in jail, are yet further afield.

Plaintiffs misallocate the burden of proof when they accuse the government (Br. 61) of having failed to provide "evidence showing that deaf ASL users who cannot understand written English can somehow obtain meaningful access by reading transcripts later." It is plaintiffs' burden to prove a deprivation of meaningful access, not the government's burden to disprove it. *See American Council of the Blind*, 525 F.3d at 1266.

Plaintiffs also misunderstand the law of "meaningful access." As our opening brief explains (at 48-49), the cases distinguish between *perfect* access and *effective* access, and the latter is what Section 504 requires. But plaintiffs'

argument fails to recognize that distinction. For example, plaintiffs are correct that transcripts of a White House press briefing would not convey "the speaker's tone, emphasis, and context" to the same degree as spoken English does (Br. 62)—but the same is true of transcripts of judicial proceedings, yet appellate courts rely on transcripts to understand what happened in the trial court. Plaintiffs also fail to explain why the video of a press briefing—which plaintiffs can access even if they cannot hear the audio—would fail to convey at least a partial sense of "tone, emphasis, and context," when reviewed (for facial expressions, body language, and the like) alongside a transcript.

Finally, plaintiffs fail to address the breathtaking implications of their position. They say that "[o]ther cases would turn on their own records" (Br. 63), but if the record here is sufficient, then it will be equally easy for other plaintiffs to establish that they lack access to other government communications. And although the government could raise an "undue-burden or fundamental-alteration defense[]" in any such case (*id.*), it would be extraordinary to put the government to that burden—the burden of justifying its decision not to provide, for virtually every government communication, an accommodation that has historically been provided only for a select few—on the basis of a record as thin as this one.

## CONCLUSION

The district court's preliminary injunction should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

CHARLES W. SCARBOROUGH

*/s/ Daniel Winik*
DANIEL WINIK
*Attorneys, Appellate Staff*
*Civil Division, Room 7245*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-8849*
*Daniel.L.Winik@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,484 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik